UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 03-40266 NMG

---

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

    Plaintiff

v.

TOWN OF NORTH BROOKFIELD,

    Defendant

---

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION TO REQUIRE PLAINTIFF TO DEPOSIT FUNDS WITH COURT

The defendant, Town of North Brookfield (the "Town"), moves this Honorable Court to enter an order compelling the plaintiff, American Manufacturers Mutual Insurance Company ("AMMIC"), to deposit the sum of $1,600,000.00 with the Court pursuant to Fed.R.Civ.P. 64, which provides for an attachment under the circumstances and in the manner provided by the law of the state in which the district court is held.

I.    FACTS[1]

This is an action for declaratory judgment brought by AMMIC against the Town seeking a declaration of its rights and responsibilities under the performance bond that AMMIC issued on the North Brookfield Junior/Senior High School Project ("Project"). The Town has asserted a counterclaim seeking damages from AMMIC based upon breach of contract, G.L. c.93A and c.176D violations, and tort liability.

---

[1] The factual allegations set forth in this Memorandum are verified in the Affidavit of James N. Caldwell, which is submitted herewith in support of the Town's Motion.

On or about April 19, 2002, the Town entered into a contract with E.J. Sciaba Contracting Company, Inc. ("Sciaba") for the construction of the Project ("Contract"). On or about April 19, 2002, AMMIC, as surety, and Sciaba, as principal, made, executed and delivered to the Town a performance bond in the penal sum of $13,222,000.00 ("Performance Bond"). A copy of the Performance Bond is attached hereto as Exhibit A. Pursuant to the Contract, Sciaba was required to complete construction of the building by June 30, 2003 and the Phase 4 parking lot and related work by October 31, 2003[2]. Change Order No.3 to the Contract extended the project deadlines so that Sciaba was required to substantially complete the building by August 15, 2003 and the Phase 4 work by December 15, 2003. A copy of Change Order No. 3 is attached hereto as Exhibit B.

On or about April 23, 2003 the Town notified Sciaba and AMMIC that Sciaba was behind schedule and it did not appear to the Town that Sciaba was likely to complete the project in a timely manner. A copy of the April 23, 2003 letter from School Superintendent Robert O'Neill to AMMIC and Sciaba is attached hereto as Exhibit C.

On or about May 21, 2003, representatives of the Town met with representatives of Sciaba and AMMIC to discuss the Town's concerns with Sciaba's progress. AMMIC's representatives at said meeting indicated that they had requested financial information from Sciaba in response to the Town's claim and that it appeared that Sciaba was having a cash flow problem. When specifically asked at said meeting if AMMIC would take over the Project if Sciaba was unable to perform, AMMIC's representatives informed the Town that AMMIC did not foresee that Sciaba would be unable to perform the Project and, as a result, a takeover would

---

[2] The original completion dates were extended prior to execution of the Contract to July 15, 2003 for the building and November 17, 2003 for the Phase 4 work.

2

not be necessary. AMMIC's representatives did not request that the Town make any checks for future payments payable to AMMIC or to AMMIC and Sciaba jointly.

On or about June 5, 2003, counsel for AMMIC forwarded to counsel for the Town a copy of a letter dated May 30, 2003 from Sciaba indicating that Sciaba was declaring its voluntary default under the Contract. A copy of the June 5, 2003 letter from AMMIC's counsel is attached hereto as Exhibit D. Counsel for AMMIC's letter also included a letter from Sciaba requesting that all payments that were due or to become due on the Project be made to AMMIC as Performance Bond surety. See Exhibit D. Since receipt of Sciaba's May 30, 2003 letter on June 5, 2003, the Town has not made any payments to Sciaba.

On or about July 2, 2003, the Town notified AMMIC and Sciaba that it was considering declaring a contractor default and requested a meeting with Sciaba and AMMIC in accordance with the requirements of paragraph 3.1 of the Performance Bond. A copy of the Town's July 2, 2003 letter is attached hereto as Exhibit E. On or about July 5, 2003 AMMIC responded to the Town's July 2, 2003 letter, indicating that it waived the pre-declaration requirements of a meeting and the passage of twenty days prior to contract termination provided for under paragraphs 3.1 and 3.2 of the Performance Bond. On or about July 23, 2003 the Town provided formal notice to AMMIC and Sciaba that it had declared a contractor default on the part of Sciaba and formally terminated Sciaba's right to complete the Contract in accordance with paragraph 3.2 of the Performance Bond and in accordance with the terms of the Contract. A copy of the Town's July 23, 2003 letter is attached hereto as Exhibit F.

Following the declaration of contractor default, the Town and AMMIC negotiated the terms of a completion contract ("Completion Contract") that was acceptable to both parties, and under which a completion contractor would complete the building by April 1, 2004 and the

Phase 4 work by August 1, 2004. A copy of the negotiated Completion Agreement is attached hereto as Exhibit G. AMMIC set several deadlines for its selection of a final completion contractor, including a deadline of October 14, 2003, all of which it failed to meet.

AMMIC received bids for the Completion Contract on or about October 8, 2003. AMMIC did not select a completion contractor based upon the initial bids, but instead asked each bidder to make its best and final bid by October 17, 2003. Despite several requests from the Town to tender a completion contractor, AMMIC did not tender a completion contractor to the Town until on or about November 12, 2003, 6 months after Sciaba notified AMMIC of its voluntary default on the Project and more than one month after the initial bids were received. The completion contractor tendered to the Town on November 12, 2003 was Fontaine Bros., Inc. ("Fontaine"). Fontaine's initial bid was in the amount of $11,381,362.00 based upon a start date of November 14, 2003. As a result of AMMIC's delays in soliciting bids for a completion contractor and concluding the selection process, Fontaine's price for the completion of the Project increased by $290,934.00 to $11,672,296.00.

As set forth in the Completion Contract, Fontaine is required to complete the building by August 26, 2004 and the Phase 4 work by October 11, 2004 and will be paid $11,672,296.00 for its services. The original Contract between the Town and Sciaba was in the amount of $13,222,000.00 and change orders in the amount of $132,829.28 were approved prior to Sciaba's voluntary default. Prior to its default, Sciaba had been paid $5,155,969.10, leaving an unpaid balance of $8,198,860.18. The difference between Fontaine's price and the Town's remaining balance on the original Contract is $3,473,435.82.

Prior to November 12, 2003, the Town had informed AMMIC that it could not enter into a contract with a completion contractor until it had received sufficient funds from AMMIC to

4

satisfy the total completion contract price, as the Town is prohibited from entering into a contract in excess of an appropriation therefor. See G.L. c.41, §31; G.L. c.44, §31C. On or about December 3, 2003, AMMIC made payment to the Town under the Performance Bond of $2,538,838.37 unconditionally and $659,157.80 under a reservation of rights. This amount was sufficient to cover the deficiency between Fontaine's original contract price and the balance remaining on the Town's contract with Sciaba.

As set forth above, because of AMMIC's delays in soliciting bids for a completion contractor and concluding the selection process, Fontaine's bid price increased by $290,934.00 to $11,672,296.00. AMMIC refused to fund the entire increase in the Completion Contract price, and a result the Town was required to commit funds earmarked for construction contingencies in order to address the shortfall. On or about December 15, 2003, AMMIC paid the Town an additional $125,000.00 under an reservation of rights, and the Town entered into the Completion Contract with Fontaine for the completion of the Project. A copy of the contract is attached hereto as Exhibit H. Therefore, to date, AMMIC has paid the Town unconditionally the sum of $2,538,838.37 and a total of $784,157.80 under a reservation of rights towards the completion contract deficiency, for a total of $3,322,996.10. This leaves a net funding deficiency of $150,439.72 on the Completion Contract.

The Performance Bond provides that the surety is liable up to the penal sum of the bond for: (1) the responsibilities of the contractor for correction of defective work and completion of the construction; (2) additional legal, design professional and delay costs resulting from the contractor's default and the actions or failure to act by the surety; and (3) liquidated damages. See Exhibit A. AMMIC has failed to pay the Town any amounts for additional design, project

management, legal and delay costs and liquidated damages attributable to Sciaba's breach of the Contract.

As a result of Sciaba's failure to complete the Project, the Town has incurred and will incur additional design and project management fees in the amount of $674,607.24. The Town has also incurred legal fees to date in the amount of approximately $35,000.00.

Article 3.3 of the Contract provides for the Town's recovery of liquidated damages in the amount of $1,000.00 for each day beyond the required completion dates that the Contract work remains incomplete and also provides that liquidated damages shall apply to each separate substantial completion date: the date for the building and the date for Phase 4 work. As a result of Sciaba's failure to complete the Project and based on the anticipated completion date under the Completion Contract, the Town will be entitled to liquidated damages in the amount of at least $655,000.00. Despite the clear language of the Performance Bond, AMMIC has failed to make any payment to the Town for its liquidated damages.

In addition to the above damages, the Town also incurred costs to repair the roof of the existing building in the amount of $6,336.50. These costs would not have been necessary had Sciaba finished construction of the new school building by August 15, 2003 as required by the Contract. Moreover, Sciaba utilized natural gas at the Project site and incurred charges for said gas in the amount of $16,719.40 from Keyspan. These charges remain unpaid by AMMIC. Therefore, the Town's total damages as a result of Sciaba's breach and AMMIC's delays are $1,538,102.86 to date.

II.   ARGUMENT

**AMMIC SHOULD BE REQUIRED TO DEPOSIT FUNDS WITH THE COURT BECAUSE THE TOWN HAS A REASONABLE LIKELIHOOD OF SUCCESS ON ITS COUNTERCLAIM AND IT APPEARS THAT AMMIC WILL NOT HAVE THE FINANCIAL ABILITY TO SATISFY A JUDGMENT IN FAVOR OF THE TOWN.**

Fed.R.Civ. P.64 provides:

At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought....

Mass.R.Civ.P. 4.1 , which governs prejudgment attachments, provides:

....[T]he order of approval [of attachment] may be entered only after notice to the defendant and hearing and upon a finding by the court that there is a reasonable likelihood that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the attachment over and above any liability insurance shown by the defendant to be available to satisfy the judgment.

Here, for the reasons set forth below, there is a reasonable likelihood that the Town will recover judgment in an amount equal to or greater than $1,600,000.00. Moreover, AMMIC does not have liability insurance to cover the claim and because of its financial situation, there is a reasonable likelihood that AMMIC will not have sufficient funds on hand to satisfy the Town's claim. Therefore, the Town's Motion should be granted.

A.   There is a reasonable likelihood that the Town will recover judgment in an amount equal to or greater than $1,600,000.00.

The Town has provided documentation to AMMIC to support its claims for all of the additional costs that the Town incurred as a result of Sciaba's voluntary default. As set forth above, these costs total are to date approximately $1,600,000.00. Despite the clear obligation of AMMIC under the Performance Bond, AMMIC has failed to pay the Town any amounts for additional design, project management, legal and delay costs and liquidated damages attributable to Sciaba's breach of the Contract.

7

Rather than honor its obligations under the plain language of the Performance Bond, AMMIC has asserted a number of defenses that it alleges partially discharge it from liability under the Performance Bond. However, these alleged defenses are without merit and without legal or factual support. Each of these alleged defenses is addressed separately below.

1.   <u>Wrongful Payment to Sciaba</u>

First, AMMIC asserts that the Town wrongfully paid Sciaba in May, 2003 for work performed on the Project in March and April of 2003, thereby entitling AMMIC to a <u>pro tanto</u> discharge in the amount of $630,589.55. AMMIC's position, however, is unsupported by the facts of this matter and any legal authority.

A surety may be entitled to a discharge of a portion of its liability when the bonded contract is materially altered or changed without the surety's knowledge or consent and the surety is prejudiced or sustains damage. <u>U.S.</u> v. <u>Reliance Ins. Co.</u>, 799 F2.d 1382, 1385 (9th Cir. 1986). In order to avail itself of this defense, a surety has "'an unusually heavy burden in showing that the determination made [to issue payment to a contractor]... was arbitrary and capricious....'" <u>Balboa Ins. Co.</u> v. <u>U.S.</u>, 775 F.2d 1158, 1164 (Fed. Cir. 1985). As set forth in <u>Fireman's Fund Ins. Co.</u> v. <u>U.S.</u>, 909 F.2d 495, 498 (Fed Cir. 1990), it is clear that notice by the surety to the government is a prerequisite to trigger government responsibility to the surety: "the government as obligee owes no equitable duty to a surety . . . unless the surety notifies the government that the principal has defaulted under the bond." Stated another way, "before any obligation arises to withhold or divert funds, the Government must be notified that the sureties believe the contractor is in default and cannot complete the contract." <u>Ransom</u> v. <u>U.S.</u>, 17 Cl.Ct. 263, 272 (1989); see <u>Reliance Insurance Company</u> v. <u>U.S.</u>, 27 Fed. Cl. 815 (1993).

8

When AMMIC notified counsel for the Town in June, 2003 that Sciaba was declaring its voluntary default under the Contract, it also provided the Town with a letter from Sciaba requesting that all payments that were due or to become due on the Project be made to AMMIC as Performance Bond surety. See Exhibit D. Prior to June 5, 2003, neither Sciaba nor AMMIC requested of the Town that any payments due on the Project should be made payable to AMMIC or to AMMIC and Sciaba jointly. In any event, the Town had not made any payments to Sciaba on Sciaba's periodic requisitions until the labor and materials claimed as furnished were certified by the Town's project architect, Dore & Whittier, and until Sciaba furnished the Town with lien waivers from Sciaba's subcontractors in accordance with the requirements of the Contract. Since receipt of notice of Sciaba's default, the Town has not made any payments to Sciaba.

Since AMMIC never requested that the Town take any specific action concerning payments to Sciaba, the Town was bound to make payments to Sciaba in accordance with the requirements of the Contract and G.L. c.30, §39K. Section 39K requires that the awarding authority pay a periodic pay request within fifteen days after receipt from the general contractor. If the awarding authority fails to make timely payment, G.L. c.30, §39K subjects the awarding authority to the assessment of interest. Thus, AMMIC cannot meet the "unusually heavy burden" required to assert its defense of improper payment, and the Town is reasonably likely to prevail on the merits. See Balboa, supra.

2.   Time Extension

Second, AMMIC asserts that Sciaba was entitled to an additional 60 day time extension on the Project for winter conditions. AMMIC has failed to offer any facts whatsoever to support its claim that Sciaba was entitled to this 60 day extension. Curiously, Sciaba itself never

9

requested an extension for winter conditions at any time prior to its voluntary default on May 30, 2003.

Any delays on the Project were not caused by the weather, but rather were attributable to Sciaba's own action and inaction. As set forth in the Town's Counterclaim, Sciaba failed to enclose the building prior to January 7, 2003 in violation of its own construction schedule. If Sciaba had enclosed the building, it would have been able to work without delay throughout the Winter. Therefore, non-performance or delays in the performance of work during the Winter, are attributable solely to Sciaba. In short, there is no factual basis to support AMMIC's claim that it is entitled to a 60 day extension for winter conditions.

3.  Overpayment to Sciaba

Finally, AMMIC asserts that the Town overpaid Sciaba in the amount of $364,951.00. In a letter from AMMIC's counsel dated November 5, 2003, AMMIC asserted that the Town had approved payment in excess of the actual amount of work performed by Sciaba on the Project. A copy of counsel for AMMIC's November 5, 2003 letter is attached hereto as Exhibit I. Remarkably, AMMIC makes these bald assertions without any facts or analysis to support its claim or any explanation as to how it made such determination.

As set forth above, the Town made payments to Sciaba based upon the amounts certified by the Town's project architect, and not until Sciaba furnished the Town with lien waivers from Sciaba's subcontractors in accordance with the requirements of the Contract. Again, AMMIC's claim is completely baseless, and the Town is reasonably likely to prevail on the merits.

In summary, the Performance Bond clearly states that AMMIC is liable for: (1) the responsibilities of Sciaba for correction of defective work and completion of the construction; (2) additional legal, design professional and delay costs resulting from Sciaba's voluntary default

and the actions or failure to act by AMMIC; and (3) liquidated damages. See Exhibit A. Despite this clear language, AMMIC has failed to pay the Town sufficient sums to fund the Completion Contract with Fontaine, and has not paid any amounts for additional design, project management, legal and delay costs and liquidated damages attributable to Sciaba's breach of the Contract. The defenses asserted by AMMIC are without support in fact or at law. As a result, AMMIC's liability is clear and the Town is likely to prevail on the merits.

    B.    AMMIC does not have liability insurance to cover the Town's claims under the Performance Bond and given its financial situation, there is a reasonable likelihood that AMMIC will not have sufficient funds on hand to satisfy the Town's claims.

To the best of the Town's knowledge and information, AMMIC does not have liability insurance to cover the Town's claims. Moreover, AMMIC may not have sufficient funds on hand to satisfy its obligations to the Town. As set forth in the Affidavit of James N. Caldwell in Support of this Motion, insurance rating service, A.M. Best, has reduced AMMIC's bond rating to "D," which is defined as "poor" and applies to companies that in A.M. Best's opinion, "may not have an ability to meet their current obligations to policyholders and are financially extremely vulnerable to adverse changes in underwriting and economic conditions." See Affidavit of James N. Caldwell, ¶5. In its present financial situation, there is a reasonable likelihood that AMMIC will not have sufficient funds on hand to satisfy the Town's claims.

If the Town is unable to recover judgment in this matter, it will result in a significant hardship to the Town. Moreover, absence of a viable means of recovery will frustrate the plain public policy behind the statutory obligation of contractors, such as Sciaba, to provide public awarding authorities with 100% performance bonds. Performance and completion of publicly bid construction projects, at the contract price agreed to by the awarding authority, should be ensured and secured. As a matter of public policy, the government and its taxpayers should not

be exposed to additional financial obligations and expenditures on bonded public construction projects where, as here, the general contractor voluntarily defaults on its obligations.

III. CONCLUSION

For all of the reasons set forth in its Motion, this Memorandum and the Affidavit submitted herewith, the Town respectfully requests that this Honorable Court grant its Motion to Require Plaintiff to Deposit Funds with Court.

TOWN OF NORTH BROOKFIELD,

By its attorneys,

_____
David J. Doneski (BBO# 546991)
Thomas W. McEnaney (BBO# 629130)
Kopelman and Paige, P.C.
 Town Counsel
31 St. James Avenue
Boston, MA 02116
(617) 556-0007


CO-COUNSEL

_____
Kieran B. Meagher (BBO# 340920)
92 Montvale Avenue
Stoneham, MA 02180
(781) 246-1101

211206/NBRO/0019

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by (hand)(mail) on 2/24/04
_____