UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,
                           Plaintiff,

vs.                                                    Civil Action No. 03-40266 NMG

TOWN OF NORTH BROOKFIELD,
                           Defendant.

## OPPOSITION OF AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY TO MOTION TO REQUIRE PLAINTIFF TO DEPOSIT FUNDS WITH COURT

Defendant-in-Counterclaim, American Manufacturers Mutual Insurance Company ("AMMIC"), hereby opposes the motion (the "Motion") filed by plaintiff-in-counterclaim, the Town of North Brookfield ("North Brookfield"), seeking to require AMMIC to deposit $1,600,000 with the Court. As grounds for this Opposition, AMMIC states the following:

1.    North Brookfield improperly invokes and relies upon Fed. R. Civ. P. 64 as opposed to Fed. R. Civ. P. 65. Requiring AMMIC to deposit money would be mandatory injunctive relief, not an attachment. Therefore, the more stringent showing required by Fed. R. Civ. P. 65 is applicable and must be met by the party seeking such relief. As North Brookfield invokes and argues the wrong standard, its motion necessarily fails.

2.    North Brookfield neither meets the required showing for a preliminary injunction under Fed. R. Civ. P. 65 nor could it possibly do so in any subsequent pleading. Specifically, North Brookfield has failed to (and cannot) show:

   a.    reasonable likelihood of success on the merits;

   b.    that it will suffer irreparable harm;

       c.     that such harm outweighs any harm that would befall AMMIC if this Court were to grant relief; and

       d.     that the relief sought is not against public policy.

    3.     Even if Fed. R. Civ. P. 64 was properly invoked by North Brookfield, it has failed to show that it is reasonably likely to succeed on the merits. To the contrary, it is AMMIC, not North Brookfield, that is reasonably likely to succeed.

It would be improper, under either Fed. R. Civ. P. 65 or Fed. R. Civ. P. 64, for this Court to award interlocutory relief at this time. First, as supported by the affidavits of Richard P. Anastasio ("Anastasio Aff."), Stephen J. Beatty ("Beatty Aff."), John Conway ("Conway Aff."), and Deborah S. Griffin ("Griffin Aff.") filed herewith, it is AMMIC, not North Brookfield, that is likely to obtain a judgment in its favor – if for no other reason than AMMIC has already paid more to North Brookfield than it owes under the performance bond. Second, North Brookfield is not irreparably harmed because, in addition to its receipt from AMMIC of significant good faith payments (albeit with a reservation of rights), only money damages are at issue in this action, and it is well-settled that economic loss alone does not constitute irreparable harm. In addition, allowing North Brookfield to obtain interlocutory relief would likely catalyze an effort by other obligees and claimants to obtain similar pre-judgment security in their payment bond, performance bond or insurance coverage claims. This result would necessarily cause substantial injury to AMMIC that would not only outweigh the lack of harm to North Brookfield, but could push AMMIC into liquidation, to the detriment of all its creditors. Finally, even if the Court grants some or all of the preliminary relief as requested, the order should be conditioned upon North Brookfield posting a bond under Fed. R. Civ. P. 65(c), as security for AMMIC's damages, in an amount not less than any amount AMMIC is required to deposit.

I.    **FACTS**

This factual summary presumes familiarity with the undisputed allegations of the

Complaint and Counterclaim, and uses terms defined therein.

AMMIC attended a meeting on May 21, 2003, at North Brookfield's request.  At that

meeting, North Brookfield's representatives complained that various subcontractors were not

being paid by Sciaba, that the job was substantially behind schedule, that Sciaba had failed to

provide updated monthly construction schedules, and that satisfactory progress was not being

made.  They stated that, in addition to lien waivers, Sciaba would have to submit an updated

construction schedule in order to get paid.  Sciaba representatives stated it would be three weeks

before they could submit an updated schedule.  Beatty Aff. ¶ 3.  Within hours after the May 21

meeting, and without Sciaba delivering an updated schedule, North Brookfield delivered to

Sciaba a check in the amount of $252,844.47, and on or about May 27, 2003, delivered to Sciaba

another check in the amount of $443,733.76, all unbeknownst to AMMIC.  Beatty Aff. ¶¶ 4, 5.

Shortly thereafter, Sciaba left the job.  Effective July 23, 2003, North Brookfield

terminated Sciaba's right to perform the contract.  Counterclaim Exh. F, admitted.  On August

20, 2003, AMMIC, through counsel, wrote to North Brookfield that it considered North

Brookfield's May payments to Sciaba to be prejudicial, resulting in a partial discharge of

AMMIC's liability.  Griffin Aff. Exh. A.

AMMIC proceeded to obtain competing bids from contractors to complete Sciaba's work

and, on November 12, 2003, formally tendered North Brookfield a Completion Contract

executed by Fontaine Bros ("Fontaine").  Griffin Aff. Exh. B.  During the preceding week,

AMMIC let North Brookfield know that the tender was imminent.  *Id.* Exh. C.

On November 21, 2003, AMMIC informed North Brookfield of the results of its investigation concerning its liability under the performance bond and of the need to correct a scrivener's error in the Completion Contract. Griffin Aff. Exh. D. AMMIC calculated that the difference between the unpaid balance of Sciaba's contract price and Fontaine's corrected completion contract price was $3,197,996.17. AMMIC acknowledged liability for $10,000 in legal fees (the full amount then claimed), for liquidated damages in the amount of $228,000 and for $164,371.60 in additional design and construction management services. The facts and reasoning underlying the latter two damage items are set forth in substantial detail in the Affidavit of Richard P. Anastasio, at ¶¶ 19 *et seq.*, and are too extensive to summarize here. **The Court is strongly urged to read the Anastasio Affidavit in full to understand the merit and method of these figures.** Thus, the total amount of damages AMMIC acknowledged as of November 21 was $3,600,367.60.

From that amount, however, AMMIC deducted the amount of the May overpayments – $696,578.23 – and an additional $364,951.37 that it believed North Brookfield had overpaid for work not performed.[1] These deductions brought the total amount AMMIC acknowledged as owing to $2,538,838.37. AMMIC committed in the November 21 letter to paying that amount unconditionally, and did so on December 3, 2003. Griffin Aff. ¶ 5.

AMMIC went further, however. In an effort to encourage North Brookfield to accept promptly the Completion Contract tendered on November 12, AMMIC also committed on November 21 to delivering, and so delivered to North Brookfield on December 3, under a reservation of rights, a second check in the amount of $639,157.80, so as to put into North Brookfield's hands sufficient funds to pay the full amount of Fontaine's price at that time.

---

[1] Again the detail supporting the amount deducted on account of overpayments for work not performed is set forth in the Anastasio Affidavit, albeit with adjustments that bring the total to $343,925. *See* Anastasio Aff. ¶¶ 4-14.

4

North Brookfield dallied in executing the Completion Contract, past the date through which Fontaine said it would hold its price. *See* Griffin Aff. ¶ 6. This delay, together with North Brookfield's insistence that Fontaine accelerate its work to achieve completion earlier than stated in the tendered Completion Contract, prompted Fontaine to increase its price by $275,000. Anastasio Aff. ¶¶ 15-18; Griffin Aff. Exh. E. Notwithstanding that the price increase was due entirely to unwarranted delay and changes in the schedule on the part of North Brookfield, AMMIC advanced an additional $125,000 under a reservation of rights to encourage North Brookfield to proceed. Griffin Aff. ¶ 6-7.

## II.    ARGUMENT

### A.  North Brookfield Invokes The Wrong Rule And Thus The Wrong Standard.

North Brookfield improperly classifies its request as an attachment. Decisions from this Court and the First Circuit, however, compel the conclusion that North Brookfield's request is one for *injunctive relief.* The difference is significant – and fatal – to North Brookfield's motion because the required showing for injunctive relief under Fed. R. Civ. P. 65 is markedly more rigorous than is the showing required for an attachment under Mass. R. Civ. P. 4.1, as enabled by Fed. R. Civ. P. 64 and relied upon by North Brookfield. Unlike an attachment, which only requires that "there is a reasonable likelihood that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the attachment over and above any liability insurance shown by the defendant," Mass. R. Civ. P. 4.1, a party requesting injunctive relief must show: (1) a reasonable likelihood of success on the merits; (2) that it will suffer irreparable harm; (3) that such harm outweighs any harm that would befall the defendant if the Court were to grant the injunction; and (4) that the injunction sought is not against public policy. *Teradyne, Inc. v. Mosteck Corp.*, 797 F.2d 43, 51-52 (1st Cir. 1986).

5

Although North Brookfield labels its request as one for an attachment, the nature of the order requested is clearly one of *injunctive relief.* It is well-settled that the nomenclature chosen by the plaintiff is not determinative of an order's true nature.[2] The law in this Circuit is clear that an order requiring AMMIC to deposit money is injunctive relief. The First Circuit, in *Teradyne,* held that an order is an injunction if it is more than "minimally coercive" on the defendant – if it constrains the defendant in some way beyond restricting its use of money. *Teradyne, Inc.,* 797 F.2d at 46. In *Teradyne,* the Court found that "as with a traditional injunction," an order enjoining the defendant from certain conduct (disposing of or encumbering its assets in the judgment amount of $4 million) and requiring an affirmative action (depositing the $4 million into an escrow account) was more than "minimally coercive" and therefore was properly classified as injunctive relief. *Id.*

More importantly, the order in *Teradyne* would still have been considered an injunction even if it had only required the defendant to deposit the funds into escrow. This is evident from the *Teradyne* Court's reliance on the Second Circuit's decisions in *Inter-Regional Fin. Group, Inc. v. Hashemi,* 562 F.2d 152 (2d Cir. 1978), and *In re Feit & Drexler, Inc.,* 760 F.2d 406 (2d Cir. 1985). In *Hashemi,* the Second Circuit held that "an order directing the defendant to deliver certain stock certificates to the custody of the clerk" was an injunction because the "defendant was required to bring the certificates to the clerk from outside the venue state of New York, as 'a necessary step preceding the actual attachment.'" *Teradyne, Inc.,* 797 F.2d at 46 (citing *Hashemi,* 562 F.2d at 154). Moreover, the Second Circuit later held in *In re Feit & Drexler* that there was no basis for distinguishing the *Hashemi* order from one that required the defendant not

---

[2]      *Teradyne, Inc.,* 797 F.2d at 46; *cf. Hasbro, Inc. v. Serafino,* 958 F. Supp. 19, 23, 26-27 (D. Mass. 1997) (Neiman, M.J.) (plaintiff's motion for "injunction" was "in the nature of" an equitable attachment and treated as such by the court); *Anderson Foreign Motors, Inc. v. New England Toyota Distrib.,* 475 F. Supp. 973, 978 (D. Mass. 1979) (Garrity, J.) (same).

to transfer her property and to deliver that property to her attorney to hold for safekeeping pending further order of the court. *Id.* (citing *In re Feit & Drexler, Inc.*, 760 F.2d at 412).

North Brookfield's request that AMMIC be ordered to deposit $1.6 million with this Court is remarkably similar to the plaintiffs' requests in *Teradyne*[3], *Hashemi* and *In re Feit & Drexler*. Like the defendant in *Teradyne* who was required to "affirmatively take certain action" by depositing $4 million into escrow for pre-judgment security, so too would AMMIC be required to "affirmatively take certain action" to deposit money into another account (*i.e.*, with this Court). Just as the defendant in *Hashemi* was required to bring stock certificates to the court from outside the jurisdiction, so too is North Brookfield seeking an order requiring AMMIC to transport its property ($1.6 million) from outside the Commonwealth and deposit it into this Court.[4] This is enough to classify the order as an injunction.

Moreover, this Court has held that a plaintiff who seeks an "equitable attachment" pursuant to Fed. R. Civ. P. 64 is required to make the same showing as for a preliminary injunction. *Hunter v. Youthstream Media Networks, Inc.*, 241 F. Supp. 2d 52 (D. Mass. 2002) (Collings, M.J.). In *Youthstream*, the plaintiff moved under Fed. R. Civ. P. 64 for an "equitable attachment" order requiring a holding corporation to hold $300,000 in cash and assets as security for an anticipated judgment against the defendant. *Id.* at 53. This Court found that "to be entitled to such an injunction in this Circuit, the plaintiff must satisfy the very familiar four-prong test . . . .." *Id.* at 54.

---

[3]     *Teradyne* is binding authority for the procedural (matter of law) determination of whether an order is an attachment or an injunction. The injunction issued by this Court in *Teradyne*, however, is limited to the facts of that case – facts that AMMIC contends are fully distinguishable from the facts at bar.

[4]     Property subject to attachment must be located in the Commonwealth. *Hasbro Inc. v. Serafino*, 958 F. Supp. 19, 22-23 (D. Mass. 1997) (Neiman, M.J.) ("Hasbro also seeks injunctive relief, pursuant to Fed. R. Civ. P. 65, with respect to both personal and real property . . . outside Massachusetts, as to which attachment proceedings would be ineffective.").

In *Youthstream*, the defendant would not have been required to perform any affirmative action (*i.e.*, pay money into any account for safekeeping), yet this Court required a showing for an equitable attachment that was identical to that required for an injunction. It follows that if this Court applied the injunction standard to an equitable attachment where *no* affirmative action was required, as it did in *Youthstream*, then surely where AMMIC *would* be required to take affirmative action (*i.e.*, depositing money into this Court), North Brookfield should be required to make the same showing for the order it seeks.

Accordingly, in light of the conclusive law decided by the First Circuit and this Court, the relief sought by North Brookfield is in the nature of an injunction, not an attachment. As North Brookfield has not addressed three of the required prongs for injunctive relief, this Court must deny its Motion.

## B. North Brookfield Cannot Establish The Required Grounds For Injunctive Relief Under Fed. R. Civ. P. 65.

### 1. North Brookfield has not shown, and cannot show, that it has a reasonable likelihood of success on the merits.

This Court cannot find that North Brookfield has a reasonable likelihood of succeeding on the merits, because there are pervasive disputes of fact and law at this stage in the proceeding – on many of which, the record indicates, it is AMMIC who is more likely to succeed. Additionally, North Brookfield makes no showing in its Memorandum ("Memo") that it is likely to prevail, but only tries to cast doubt upon the defenses available to AMMIC.

North Brookfield's counterclaim is founded upon a written construction contract. There is no dispute that Sciaba breached its contract and that AMMIC had liability under its performance bond. However, AMMIC has paid North Brookfield a total of $3,322,996.10, an amount that exceeds the damages North Brookfield can prove. *See* Memo at 5. North Brookfield has the burden of proving that the damages it seeks were caused by the default and

are recoverable under the contract. Its contract claim is also subject to numerous affirmative defenses, including partial discharge, failure to mitigate, and its own breach. The affidavits submitted by AMMIC herewith demonstrate that, at the very least, there are *substantial* disputes of fact. Moreover, these affidavits also demonstrate that, far from owing money to North Brookfield, AMMIC has paid North Brookfield more than it owes, and that North Brookfield owes AMMIC a refund. In addition, the parties disagree on the law applicable to payments North Brookfield made that AMMIC contends it should not have made. Accordingly, this Court cannot find a reasonable likelihood of North Brookfield succeeding on the merits, where there are such pervasive disputes of fact and law.

> **a. North Brookfield breached its statutory and equitable obligations to AMMIC and failed to mitigate its damages when it made payments of $696,578.23 to Sciaba in May 2003.**

AMMIC has several legal defenses to North Brookfield's claims – all of which reflect well-settled law. AMMIC is entitled to a *pro tanto* discharge pursuant to North Brookfield's breach of its statutory and equitable obligations, including its duty to mitigate damages for the benefit of the surety. As such, it is AMMIC, not North Brookfield, that is likely to succeed on the merits.

First, North Brookfield clearly had a statutory obligation to mitigate its damages under Mass. Gen. Laws c. 30 § 39K. This statutory provision requires that:

> [w]ithin fifteen days ... after receipt from the contractor ... of a periodic estimate requesting payment ... the awarding authority will make a periodic payment ... *but less (1) a retention based on its estimate of the fair value of its claims against the contractor.*

Mass. Gen. Laws c. 30 § 39K (emphasis added). North Brookfield conveniently omits the "but less ..." portion of the statute from its memorandum, yet attempts to hide behind this section when claiming that it was required under c. 30, § 39K to make the May 2003 payments absent

any notification from AMMIC not to do so or that Sciaba had defaulted under the bond. *See* Memo at 9.

The facts indicate, however, that North Brookfield had claims against Sciaba and had enough information to estimate their fair value at the time it made the May 2003 payments. First, North Brookfield had identified numerous breaches by Sciaba in its April 23, 2003 letter to AMMIC. *See* Memo Exh. C. Its primary concern was that "the project will not be completed until January, 2005." Memo Exh. C at 1. Second, the very fact that the purpose of the May 21, 2003 meeting was "to discuss the Town's concern's with Sciaba's progress," indicates North Brookfield's awareness of its claims against Sciaba. *See* Memo at 2. Indeed, representatives from North Brookfield at that meeting indicated that Sciaba would not be paid unless it provided updated monthly construction schedules. Beatty Aff. ¶ 3. Third, and contrary to the assertion on page 2 of the Memo, neither AMMIC nor its representatives made any representation at the May 21, 2003 meeting that Sciaba would likely be able to perform. Beatty Aff. ¶ 2. Thus, North Brookfield was clearly aware of, and therefore able to estimate and withhold, the fair value of its claims against Sciaba – as it was obligated to do under c. 30, § 39K. North Brookfield therefore breached its statutory and common law duties to AMMIC to mitigate damages when it failed to estimate and withhold the fair value of its claims against Sciaba.

AMMIC had a right to expect that North Brookfield would comply with its statutory obligations. Moreover, AMMIC was led to believe at the May 21, 2003 meeting that no payment would be made without Sciaba's submission of a current schedule. That is what North Brookfield stated at the May 21, 2003 meeting. Beatty Aff. ¶ 3. Yet, within hours after that meeting, without receiving such a schedule, North Brookfield delivered a check for $252,844.47 to Sciaba (the first of the two May 2003 payments in dispute). *See* Beatty Aff. ¶ 4. It did not tell

AMMIC that it was dropping the requirement of a schedule and did not ask AMMIC's consent. If AMMIC had known the intention of North Brookfield, it would have directed it not to make the payments. *See id.* ¶ 5. Accordingly, North Brookfield's breach of its obligation to mitigate its damages provides a valid defense, making AMMIC, not North Brookfield, reasonably likely to succeed as to the two May payments totaling $696,578.23.

AMMIC is also reasonably likely to succeed on the merits because North Brookfield breached equitable obligations it owed to AMMIC. Whether an obligee owes an equitable duty to the surety is, in a diversity case such as this, an issue of Massachusetts law and highly dependent upon the facts. Even though the Supreme Judicial Court of Massachusetts ("SJC") has not squarely addressed this issue, case law in the Commonwealth and elsewhere supports that such a duty exists. North Brookfield points to decisions under federal law that have required the surety to give notice of the principal's default to the owner in order for any equitable duty to the surety to arise. *See* Memo at 8; citing, *e.g., Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 498 (Fed. Cir. 1990). A subsequent case from the Federal Circuit, however, suggests that the notice requirement articulated in *Fireman's Fund* is not absolute and would not apply on different facts. *National Sur. Corp. v. United States*, 118 F.3d 1542, 1547 (Fed. Cir. 1997). The *National Surety* court clarified that in *Fireman's Fund* the surety was required to notify the obligee of the principal's default because of the obligee's *discretion* to authorize payments in full without holding back retainage from periodic payments. *See id.* Therefore, when the obligee has *discretion* with regard to payments, the surety must notify the obligee of the principal's default (or object to payments) in order to precipitate its equitable subrogation rights to any retainage. *See id.* Unlike in *Fireman's Fund*, the court in *National Surety* found that the obligee was

*required* by contract to withhold a percentage of each periodic payment, and therefore an

equitable duty arose in the surety's subrogation rights to the retainage. *See id.*[5]

AMMIC submits that the SJC should and would hold that, just as the obligee in *National*

*Surety* was *required* to retain funds from each periodic payment, North Brookfield was also

*required* to retain the estimated fair value of its claims from any progress payments under c. 30,

§ 39K. Additionally, in *First Nat'l Ins. Co. v. Commonwealth*, 391 Mass. 321 (1984), the SJC

left undisturbed the trial court's reasoning that "*so long as* the progress of the contractor on the

job is satisfactory to the Commonwealth and it has *good reason to believe that the Contract will*

*be completed*," then there is no equitable duty to withhold progress payments "[e]ven where the

Commonwealth knows, or should know, that a contractor has serious financial difficulties ... ."

*Id.* (emphasis added). In this case, however, the equitable duty alluded to by the SJC in *First*

*National* arises because the condition that prevented its arising in that case is *not* substantiated by

the facts here: North Brookfield was *clearly aware* that the contractor had serious difficulties,

that progress on the job was *not* satisfactory, that subcontractors were *not* being paid, and that the

job would be more than a year late. Indeed, this is what North Brookfield complained about in

its April 23 letter and May 21 meeting with AMMIC! Moreover, AMMIC was led to refrain

from giving notice by North Brookfield's statement that it would not release payments until a

new schedule was submitted. Accordingly, it is likely that under *First National*, as buoyed by

*National Surety*, the SJC would find that the facts in this case triggered an equitable duty

---

[5] The Court stated:

> When the contractor abandoned performance before completion, . . . and the government had knowledge of the default, as here, and so informed the surety, as here, *Fireman's Fund* does not impose a further requirement that the surety notify the government that "the principal has defaulted." The holding in *Fireman's Fund* did not change the rules of subrogation, but simply dealt with the rights and obligations of the parties *on the conditions of that case.*

*National Sur. Corp.*, 118 F.3d at 1547 (emphasis added).

requiring North Brookfield to mitigate damages for the benefit of AMMIC, both in the traditional sense and under c. 30, § 39K.

In summary, AMMIC's defenses are firmly grounded in law and fact. AMMIC is therefore more likely to succeed on the merits or, alternatively, sufficient questions of law and fact exist precluding North Brookfield from, at this time, a reasonable likelihood of success.

### b. North Brookfield breached its obligations to AMMIC by overpaying Sciaba for work not performed prior to May 2003.

The Affidavit of Richard Anastasio demonstrates that North Brookfield processed and paid three line items from Sciaba payment requisitions for work not actually performed. Anastasio Aff. ¶¶ 4-14. The items overpaid were for interior walls, site work and general conditions. *Id.* As a result of this over-recognition of earnings, North Brookfield overpaid Sciaba by $343,925 prior to May, 2003.[6]

Both the contract and c. 30, § 39K require that North Brookfield only pay for work performed.[7] As shown in the Anastasio Affidavit, North Brookfield either paid for work not yet performed or paid so much of the contract funds as to leave insufficient funds to complete the work. The very fact that Fontaine's completion price – $11,672,296 – was 87% of the then-current price under Sciaba's contract[8] shows that North Brookfield should not have paid out 38% of Sciaba's contract price,[9] leaving only 62% to finish the work. Accordingly, AMMIC has a viable overpayment defense in the amount of $343,925.

---

[6]    The amounts paid in May, 2003 are excluded from this figure to avoid double-counting, as the entire May payments should not have been made, on account of Sciaba's delinquent performance.

[7]    Chapter 30, section 39K states that: "the awarding authority will make a periodic payment to the contractor for the work performed during the preceding month and for the materials ... ." Contract Section 5.1.6 permits progress payments to be made only for "completed "Work," and requires the deduction of amounts withheld on account of delinquent performance under General Condition Section 9.5.1. *See* Anastasio Aff. Exh. G.

[8]    The price was $13,352,973.38. See Change Order 3, Memo Exh. B.

[9]    North Brookfield admits having paid out $5,155,969. Memo at 4.

### c. North Brookfield cannot prove the damages it claims.

North Brookfield seeks to charge AMMIC with several components of damages it has not proved and cannot prove: (i) the $275,000 increase in Fontaine's price; (ii) liquidated damages in the amount of $655,000; and (iii) design and project management fees of $674,607.24.[10]

North Brookfield cannot substantiate a legal or factual basis for charging AMMIC with the $275,000 increase in the cost to complete the work. First, AMMIC was not subject to "deadlines for selection of a final completion contractor," but only target dates by which the parties hoped to complete the bidding process. Anastasio Aff. ¶ 15. Moreover, the completion price increased by $275,000 not because of any delay in selecting a contractor (this increase came *after* the completion contractor, Fontaine, was tendered), but because *North Brookfield* (1) did not issue a notice to proceed by Fontaine's stated deadline of November 14, 2003 (causing the project schedule to push into colder weather thereby increasing the cost); and (2) required that Fontaine accelerate its work to achieve substantial completion dates *earlier than those outlined in the tendered Completion Contract*. Anastasio Aff. ¶ 18.

The Court should reject North Brookfield's attempt to hide behind Mass. G.L. c. 44, § 31, the Massachusetts statute that prevents a municipality from entering into a contract beyond the monies appropriated.[11] North Brookfield's argument under this statute is disingenuous at best, because it ultimately *did* proceed with the Completion Contract without having received from

---

[10]    AMMIC reserves the right to contest the other elements of North Brookfield's claim. The elements discussed here account for the bulk of the amount in dispute.

[11]    Mass. G.L. c. 44, § 31 provides that: "No department financed by municipal revenue . . . of any city or town . . . shall incur a liability in excess of the appropriation made . . . ." Further, although North Brookfield's Memo cites Mass. Gen. Laws c. 41, § 31 for the same proposition, this section has been repealed. The SJC has held that the purpose and legislative intent of chapter 44, § 31 limits the statute's application in certain circumstances. The SJC has held that the purpose of the statute "is to provide central municipal control over irresponsible municipal spending." *Lawrence v. Falzarano*, 380 Mass. 18, 24 (1980). The Massachusetts Appeals court has similarly held that "incur[ring] a liability" under the statute does not include liabilities incurred by the "wrongful actions" of municipalities – particularly, breaches of contract. *Thomas O'Connor & Co. v. Medford*, 448 N.E.2d 1276, 1278 (Mass. App. Ct. 1983). North Brookfield's failure to mitigate, under c. 30, § 39K or otherwise, is a wrongful action, similar to a breach of contract, for which North Brookfield cannot escape the consequences.

14

AMMIC the full amount necessary to fund the price. *See* Memo at 5 (AMMIC only advanced $125,000 of the increased price). Moreover, North Brookfield had known since August 20 that AMMIC would assert an overpayment defense to the extent of more than $600,000. Griffin Aff. Exh. A. It had ample time in which to arrange for an additional appropriation in the event completion costs exceeded the amount of AMMIC's payment. Failure to mitigate its damages is a wrongful action that is outside the protection of c. 44, § 31.

Further, an obligee may only *reasonably and in good faith* refuse a surety's tender.[12] An obligee's dissatisfaction with completion dates is not, alone, reasonable grounds for refusing a surety's completion contract tender. *See St. Paul Fire & Marine Ins. Co. v. City of Green River*, 93 F. Supp. 2d 1170, 1174-75 (D. Wyo. 2000); *Hamlen v. Rednalloh, Co.*, 291 Mass. 119 (1935) (explaining good faith duty of lessor to accept tender by lessor's surety). North Brookfield, by objecting to and changing Fontaine's completion dates, delayed the notice to proceed and therefore cannot substantiate its claim for completion cost increases after AMMIC's tender.

North Brookfield cannot be deemed reasonably likely to succeed in proving its liquidated damage claim of $655,000, nor its additional design and project management fees of $674,607.24. Stated simply, there are too many facts in dispute at this time to render North Brookfield the likely winner on these issues. Indeed, AMMIC contends that it owed only $228,000 in liquidated damages as detailed and demonstrated in the Anastasio Aff. ¶¶ 19-37. Additionally, AMMIC contends that it owed only $92,371.43 for additional design and construction management fees for the extended *construction* period caused by Sciaba's default and $72,000 for additional design and construction management fees for the period of project *suspension* caused by Sciaba's default, for a total of $164,371.43. Anastasio Aff. ¶¶ 38-54. On

---

[12]    *See* Daniel E. Toomey & Tamara McNulty, *Surety Bonds: A Basic User's Guide For Payment Bond Claimants and Obligees*, 22 CONSTR. LAWYER 5 (Winter 2002) (citing analogous support in *St. Paul Fire & Marine Ins. Co. v. City of Green River*, 93 F. Supp. 2d 1170 (D. Wyo. 2000)).

the pleadings and affidavits to date, AMMIC has made a stronger and more robust showing as to the amount of its liability for these expenses under the bond.

In summary, the only damages North Brookfield is reasonably like to prove are:

| | |
|---|---|
| Shortfall between Fontaine's 11/12 price and remaining contract funds | $3,197,996.17 |
| Liquidated damages | $228,000.00 |
| Reasonable increased architects' and construction management fees | $164,371.43 |
| Attorneys' fees | ? |
| Total | $3,590,367.60 |

AMMIC has paid North Brookfield $3,322,996.10 and has defenses for overpayment and failure to mitigate totaling $1,040,503.23.[13] These defenses total $4,363,499.33, and therefore AMMIC owes North Brookfield no more. To the contrary, since $784,157.80 was paid under a reservation of rights, North Brookfield owes AMMIC a refund on the order of $773,000.

With so many issues of fact and law outstanding, this Court cannot now find that North Brookfield is reasonably likely to succeed on the merits. Where the "crucial facts necessary to establish [the] plaintiff's claims are in dispute[]," there is no reasonable likelihood of success on the merits. *Geas v. Dubois*, 868 F. Supp. 19, 24 (D. Mass. 1994) (Lindsay, J.) (adopting opinion of Bowler, M.J.). Moreover, where a sharp dispute over critical facts exists, the court should not grant preliminary injunction without additional oral testimony. *See SEC v. Frank*, 388 F.2d 486, 491 (2d Cir. 1968); *Sims v. Greene*, 161 F.2d 87, 88 (3d Cir. 1947). It is clear from this Opposition that an overwhelming number of critical facts are in dispute and numerous questions of law remain. This Court should follow its decision in *Geas* and find that North Brookfield is not reasonably likely to succeed on the merits.

---

[13]      $1,040,503.23 = $696,578.23 (May 2003 overpayments) **plus** $343,925 (overpayment for work not performed prior to May 2003). *See supra*, §§ B.1.a., b.

### 2. North Brookfield, as a matter of law, will not suffer irreparable harm.

This Court cannot conceivably find that North Brookfield would suffer irreparable harm should its Motion be denied. "Economic harm alone ... will not suffice as irreparable harm unless 'the loss threatens the very existence of the movant's business.'" *Hull Mun. Lighting Plant v. Massachusetts Mun. Wholesale Elec. Co.*, 399 Mass. 640, 643 (1987) (quoted in *Travelers Cas. & Sur. Co., Inc. v. Long Bay Mgmt. Co.*, 2001 WL 1809816 (Mass. Super. 2001)). This is a case predominantly about damages, and therefore, North Brookfield will not suffer irreparable harm as a matter of law.

The facts of this case also indicate that North Brookfield will not suffer irreparable harm. First, North Brookfield has an adequate remedy at law in that AMMIC, as one of the Kemper Insurance Companies, Inc. ("Kemper"), is in sufficient financial position to pay a judgment against it. *See* Affidavit of John Conway ¶¶ 3 – 8. Kemper currently possesses a *surplus* of $200 million (that is, $200 million in assets *over and above* liabilities, including liabilities for losses and loss adjustment expenses on outstanding bond and insurance obligations). *Id.* ¶ 8. It is not in liquidation or administrative rehabilitation. *Id.* ¶ 5. It has never failed to pay a final judgment against it. *Id.* ¶ 6. Therefore, this Court must deny North Brookfield's Motion as no irreparable harm would result.

Second, it is also clear – and logical – that North Brookfield will not go out of business or even fail to complete the Project if AMMIC does not deposit money into the Court. Moreover, AMMIC has *already* paid North Brookfield $784,157.80 under a reservation of rights. AMMIC has always disputed its liability for this amount, but made the payments to North Brookfield so as to avoid an impasse between the parties as to completion of the Project. In this sense, AMMIC has already provided North Brookfield with ample security against the disputed legal

rights in this litigation. Accordingly, the facts and law clearly indicate that North Brookfield cannot establish irreparable harm and its Motion must be denied.

### 3. The harm to AMMIC if this Court were to grant injunctive relief clearly outweighs any harm that North Brookfield might suffer.

North Brookfield cannot meet this required showing because granting the Motion would catalyze an effort by other similarly situated parties to move for similar pre-judgment security. With this Court's order as precedent, AMMIC would be at significant risk of being required to pay into various courts the amount of all claims pending against it. *See* Conway Aff. ¶¶ 9-10. Indeed this Court has indicated that such a ripple effect is conceivable for an insurance company with similarly situated claimants. *See Atlantic Research Marketing Systems, Inc. v. G.G.&G., LLC*, 167 F. Supp. 2d 458, 468-69 (D. Mass. 2001) (Keeton, J.) (implying that "a large number of similarly situated plaintiffs racing to the courthouse" could precipitate the state's regulatory interest in the court's disposition); *but see Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 53 (1st Cir. 1986) (affirming District Court's refusal to apply the ripple effect because the party failed to address the issue on appeal).[14] Moreover, North Brookfield cannot possibly suffer *any* irreparable harm as a matter of law or based upon the facts. Accordingly, even the reasonable threat of harm to AMMIC outweighs the lack of any harm to North Brookfield. Accordingly, this Court must deny the Motion.

### 4. Injunctive relief in this case is against public policy.

Finally, an order from this Court granting North Brookfield's Motion would violate public policy as defined by numerous federal statutes and the very concept of Federalism. Indeed, the United States Supreme Court has held that an injunction is an extraordinary remedy only to be exercised sparingly. *See State of Connecticut v. Commonwealth of Massachusetts*,

---

[14]     The defendant in Teradyne was not an insurance or bonding company, as here, lessening the probability of any ripple effect in that case.

282 U.S. 660 (1931); *see also* 42 AM. JUR. 2D *Injunctions* § 15 (2004).  In order to issue an injunction, this Court would necessarily have to find that AMMIC is, or is likely to be, insolvent (*i.e.* causing irreparable harm).  This very declaration of AMMIC's insolvency would trigger the substantial interest Illinois has in regulating its domestic insurance companies – an interest that all the states still possess.[15]  It would therefore be outside the jurisdiction of this Court to "regulate" the cash flow of an allegedly insolvent insurance company.  Moreover, such a deposit into this Court would be tantamount to a separate receivership established solely for the benefit of North Brookfield, in direct conflict with Illinois' right to regulate or take AMMIC into receivership for the benefit of all its creditors, were its financial condition to so warrant.  Such an injunction is therefore in conflict with the public policy reflected in federal statutes and the concept of comity inherent to our federal system of government.

### C.   Even If Fed. R. Civ. P. 64 Applies, North Brookfield Is Not Reasonably Likely To Succeed On The Merits, Precluding Preliminary Relief Under Either Standard.

As described in Section B.1., *supra*, North Brookfield cannot establish at this time that it is reasonably likely to succeed on the merits.  Therefore, even if this Court finds that the Motion is properly brought pursuant to Fed. R. Civ. P. 64 and Mass. R. Civ. P. 4.1, North Brookfield still fails to demonstrate that "there is a reasonable likelihood that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the attachment over and above any liability insurance shown by the defendant."  Mass. R. Civ. P. 4.1.  As such, this Court must deny North Brookfield's motion for an "attachment" that would require AMMIC to deposit $1.6 million into the Court.

---

[15]     *See* Graham-Leach-Bliley Act, 15 U.S.C. §§ 6711 *et seq.* (West 1998 & Supp. 2003) ("The insurance activities of any person shall be functionally regulated by the States . . . ); McCarran-Ferguson Act 15 U.S.C. §§ 1101 *et seq.* (1998) ("Congress hereby declares that the continued regulation . . . by the several States of the business of insurance is in the public interest . . . ); United States Bankruptcy Code 11 U.S.C. § 109 (2004) (explicitly excluding insurance companies from those eligible to be a Chapter 7 debtor).

## CONCLUSION

For all the foregoing reasons, the Court should deny North Brookfield's Motion to

Require AMMIC to Deposit Funds With Court.

### REQUEST FOR ORAL ARGUMENT

If this Court is not prepared to deny North Brookfield's Motion based upon the pleadings,

AMMIC requests a hearing on this matter.

> **American Manufacturers Mutual**
> **Insurance Company**
>
> By its attorneys,
>
> Deborah S. Griffin, BBO #211460
> Jeff D. Bernarducci, BBO #657454
> HOLLAND & KNIGHT LLP
> 10 St. James Avenue
> Boston, MA  02116
> Tel:     (617) 523-2700
> Fax:     (617) 523-6850

Dated:          March 23, 2004

# 1731310_v1
431261.00002