UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY,<br><br>                Plaintiff,<br><br>vs.<br><br>TOWN OF NORTH BROOKFIELD,<br>                Defendant. | Civil Action No. 03-40266 NMG |

AFFIDAVIT OF RICHARD P. ANASTASIO IN SUPPORT OF THE
OPPOSITION OF AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY
TO MOTION TO REQUIRE PLAINTIFF
TO DEPOSIT FUNDS WITH COURT

I, Richard P. Anastasio, have personal knowledge of the following, except where stated to be upon information and belief. I make this affidavit in support of the Opposition of American Manufacturers Mutual Insurance Company ("AMMIC") to the motion (the "Motion") filed by plaintiff-in-counterclaim, the Town of North Brookfield ("North Brookfield") seeking to require AMMIC to deposit $1,600,000 with the Court.

1.      I am a registered professional engineer and a principal in the firm of GREYHAWK North America, LLC. A copy of my current biography, in summary form, is attached hereto as Exhibit A.

2.      I was engaged by AMMIC in the winter of 2003 in connection with various bonds it had issued as surety for E.J. Sciaba Contracting Company, Inc. ("Sciaba"), including performance and payment bonds issued to North Brookfield in connection with a contract between Sciaba and North Brookfield for the construction of the North Brookfield Jr./Sr. High School (the "Project").

3.      In the course of my engagement, I became familiar with the Project, the progress of the work at various points in the Project, and the steps AMMIC took to obtain and tender a completion contract to North Brookfield.  I made several visits to the Project site and spoke extensively with individuals who had been involved with the Project prior to Sciaba's default, including subcontractors and the Project architect and on-site construction manager.  I was in charge of the solicitation of bids from contractors interested in obtaining the completion contract for the work that remained to be performed on the Project following Sciaba's default.  I was also involved in the negotiations with contractors who bid on the completion work, including Fontaine Bros., Inc. ("Fontaine"), the successful bidder, after receipt of their initial bids.

**Overpayments Prior to May, 2003**

4.      I am familiar with, and provided the information contained in, the letter from Deborah Griffin to Thomas McEnaney dated November 5, 2003, and its enclosure, which I understand are attached as Exhibit I to the Memorandum ("North Brookfield's Memo") filed by North Brookfield in support of the Motion.

5.      I am also familiar with and provided information for AMMIC's analysis of the amounts it determined it owed to North Brookfield under its performance bond, as set forth in Mrs. Griffin's letter to Mr. McEnaney dated November 21, 2003, a copy of which is attached to Mrs. Griffin's Affidavit as Exhibit D.  For reference, a copy of the spreadsheet enclosed with the November 21 letter is also attached hereto as Exhibit B.

6.      The bids we received in September, 2003, in response to our Request for Proposals were significantly higher than my preliminary estimates had been.  In an effort to understand why that was, and whether there was any misunderstanding among the bidders concerning the scope of work, I asked the bidders to submit additional detail concerning the break-down of their pricing.  After receiving that information, I spent a good deal of time

2

analyzing the bids, the break-downs and the Project records, including prior requisitions processed by North Brookfield.

7.      As a result of that study, I came to the conclusion that, on three line items in the requisitions, North Brookfield had approved and paid for a higher percentage of the price allocated to those items than was warranted by the progress actually made in the field.  The aspects of the work that were overpaid by North Brookfield were Division 9 – Finishes; Division 2 – Site Work; and Division 1 – General Requirements.  I will explain these conclusions, and the basis for them, in greater detail below.

8.      Attached hereto as Exhibits C, D, E and F are copies of relevant pages from Requisitions 11, 12, 13B and 14 respectively, covering the periods ending February 28, 2003, March 28, 2003, May 1, 2003 and June 1, 2003, respectively.  Upon information and belief, North Brookfield paid Requisitions 12 and 13B during the last 10 days of May, 2003, and did not pay Requisition 14.  Requisition 11 had been paid prior to May.

9.      I began my analysis with Requisition 14 (Exhibit F) because, even though North Brookfield never paid the amounts shown as having been earned during the month of May, its architect stated to me orally that in his view they had been earned as of the time of Sciaba's default.  Thus, it reflected North Brookfield's view of the progress of the work in the condition it was when the bidders viewed the Project for purposes of bidding.

**Division 9 Overpayment**

10.     The work covered by Division 9 consisted of interior wall, ceiling and flooring work.  The requisitions show amounts earned on two portions of that Division: the metal stud system (Item 09110.98) and gypsum wallboard (Item 09250.98).  Requisition 14 showed work under those Items as 11.652% and 10.588% complete, respectively, and the entire Division as

4.83% complete in the aggregate. However, I know from my visits to the site that <u>no</u> interior wallboard and only minimal exterior sheathing had been installed and there was less than 5% of the stud work installed. At most, 2% of the work under Division 9 was complete as of May 31, 2003, not 4.83%. The aggregate amount carried in the contract by Sciaba for Division 9 was $902,050. Of that amount, no more than $18,041 (2% of $902,050) was earned, of which only $17,139 should have been paid after deduction of 5% retainage. Prior to May, North Brookfield had paid Sciaba $41,430. Therefore, it had overpaid Sciaba to the extent of $24,291 on Division 9.[1]

### Division 2 Overpayment

11.     The work covered by Division 2 consisted of exterior site work. It encompassed all the work from Item 02060.00 through 02950.98. Sciaba carried a total scheduled value of $1,308,000 for that Division. Requisition 14 showed work under Division 2 as 38.98% complete. However, I know from my visits to the site, and from the pricing and observations of the bidders for the completion work, that only about 20% of the work of that Division had been performed as of May 31, 2003. Thus, 18.98% of the scheduled value for that Division, $248,258, had been recognized by North Brookfield as earned but was not in fact earned. After deducting 5% retainage, the unearned amount paid or payable on Division 2 work, on Requisition 14, was $235,845.

12.     Of the $235,845 unearned as of May 31, 2003, but shown as earned and paid or payable on Requisition 14, $9,927 had been paid in May on Requisition 12; $5,890 had been paid in May on Requisition 13B, and $6,270 was not paid, because it was included in Requisition 14. Thus a total of $22,087 of the unearned component of Division 2 amounts on Requisition 14

---

[1]     The figures for this item in the prior spreadsheets were misstated, due to an incorrect formula in the Excel spreadsheet. That has been corrected in the analysis above.

had not been paid prior to May, meaning that the difference of $213,758 ($235,845 - $22,087) had been paid prior to May and should not have been.[2]

**Division 1 Overpayment**

13.      Division 1 consisted of mobilization costs (Item 00050) and general conditions, or general requirements (Item 00299).  I have focused only on the latter.  The category of "general requirements" consisted of the general contractor's field overhead, and included such items as the job superintendent, field offices, temporary utilities, and documentation requirements.  Typically, the costs under this Division are incurred fairly evenly over the life of the project, generally in proportion to the progress of the work.  For that reason, one would ordinarily expect approval of this item for payment to be roughly proportional to the overall job progress, measured in terms of price.

14.      In order to assess the actual progress of the job as of May 31, I performed the following calculation:

|  | Earned | Scheduled |
|---|---|---|
| Total job, per Requisition 14 through 5/31 | $5,644,481 | $13,354,829 |
| Less amounts overpaid on Divs. 2 and 9 (see above in affidavit) | ($238,049) |  |
| Less amounts for Div. 1 | ($433,379) | ($609,353) |
| Adjusted amount earned other than for Div. 1 | $4,973,053 | $12,745,476 |
| Percentage of scheduled value actually earned through 5/31 on items other than Div. 1 | 39.02% |  |
| That percentage applied to Scheduled value for Div. 1 (39.02% of $609,353): adjusted amount earned on Div. 1 | $237,758 |  |
| Excess amount shown as earned for Div. 1 on on Req. 14 | $195,621 |  |
| Less 5% retainage held on excess | ($9,781) |  |
| Excess amount paid or payable on Div. 1 per Req. 14 | $185,840 |  |

---

[2]      The spreadsheets enclosed with the November 5 and November 21 letters used the figure of $226,213 for this item, a difference I have been unable to reconstruct precisely.  Most of the difference is due to a deduction for retainage I had not previously made, and the balance of the difference is probably due to differences in rounding.

| | | |
|---|---|---|
| Paid on Req. 12 in May on Div. 1 | ($32,717) | |
| Paid on Req. 13B in May on Div. 1 | ($28,875) | |
| Not paid in May, Req. 14 on Div. 1 | ($18,372) | |
| Total of excess not paid prior to May on Div. 1 | ($79,964) | |
| | | |
| Excess amount paid prior to May on Div. 1 | $105,876 [3] | |

15.    On the basis of the above analysis, North Brookfield overpaid Sciaba a total of $343,925 prior to the payments in made in May.

**Cost of Completion**

16.    In the course of soliciting bids for completion of the Project, we did not set "deadlines for selection of a final completion contractor" as asserted in North Brookfield's Memo (p. 4).  Rather, we had projected dates by which we hoped to accomplish the various steps in the process.  As previously stated, the bids that came in were a good deal higher than anticipated and it took some time following their receipt to understand why.

17.    In addition, in order to offer North Brookfield the greatest amount of continuity of subcontractors on the project, we spent considerable time and effort negotiating Ratification Agreements with Sciaba's original subcontractors.  In the end, we were able to obtain Ratification Agreements from 18 of the original subcontractors.  The last of these agreements were not received until October 21, 2003.  Until we knew which subcontractors would sign Ratification Agreements and at what prices, we could not finalize the price of the Completion Contract with the completing contractor.

18.    Between October 21 and October 31, 2003, I negotiated the final price terms with Fontaine for the Completion Contract.

---

[3]    The spreadsheets enclosed with the November 5 and November 21 letters carried the figure of $120,697 instead, for reasons I have not been able to reconstruct at the present time.

19.    Between November 12, 2003, when AMMIC tendered Fontaine's Completion Contract, and December 15, 2003, when North Brookfield finally signed a completion contract with Fontaine, Fontaine's contract price had increased by $275,000.  This price increase was due to two factors:  (a) North Brookfield's not issuing a notice to proceed to Fontaine by Fontaine's stated deadline of November 14, which pushed certain work into colder weather thereby increasing its cost; and (b) North Brookfield's requirement that Fontaine accelerate its work to achieve substantial completion earlier than the dates contained in the signed Completion Contract tendered on November 12, which increased its costs further.  Thus, the increase was due to actions and positions taken by North Brookfield, not to any delays by AMMIC in "soliciting bids ... and concluding the selection process," as asserted in North Brookfield's Memo (page 4).

**Liquidated Damages**

20.    I have personal knowledge of the facts contained in the second paragraph of the November 21 letter (Exhibit B) and the statements therein are true.

21.    The spreadsheets enclosed with the November 21 letter reflect some information I provided.  In particular, I supplied the information supporting AMMIC's assertion that Sciaba was entitled to a time extension of 60 days on account of abnormal inclement weather that occurred between November 1, 2002, and March 31, 2003.

22.    Attached hereto as Exhibit G is a true copy of those provisions of the contract between North Brookfield and Sciaba that deal with time extensions, including time extensions for abnormal weather.[4]  These provisions are from a standard form of General Conditions to construction contracts published by the American Institute of Architects, Form A201, with minor modifications.  AIA Form A201 is widely used in this country and, over my 35 years in the

---

[4]    Also included are additional provisions relating to payment.

construction industry, I have presented and/or refuted numerous claims for time extensions under these and similar provisions, with and without modifications such as those used here.

23.     The original contract was dated April 19, 2002, and called for the new building to be substantially complete on July 17, 2003, and the so-called Phase 4 work (which consisted primarily of demolition of the old school building and completion of a parking lot) to be substantially complete November 17, 2003. This was a period of a total of 577 days from April 19, 2002 to November 17, 2003. (The enclosure to the November 21 letter was an Excel spreadsheet that used Excel's day-counting function, which is based upon a 360-day year. It used an end date of November 15 rather than November 17. These differences resulted in a count of only 571 days on that spreadsheet.)

24.     By Change Order 3, North Brookfield extended the substantial completion dates to December 15, 2003, an addition of 28 days, bringing the total construction period to 605 days.[5]

25.     The Northeastern United States, including Massachusetts, encountered unusually severe weather during the period November 1, 2002 through March 31, 2003. Information compiled by the Northeast Climate Center of the National Oceanographic and Atmospheric Association ("NOAA"), copies of which are attached hereto as Exhibit H, demonstrates the severity and abnormality of the weather during the referenced period. The pages in Exhibit H are true copies of extracts from NOAA data downloaded electronically, redacted for brevity and highlighted to show dates with abnormally low temperatures and abnormally high precipitation.

26.     The recorded precipitation on 14 days in November and December 2002 was at least 25% higher than the daily averages for those months, and temperatures were lower

---

[5] This understanding is also reflected in the letter from North Brookfield to AMMIC dated April 23, 2003, in which it stated that the date for substantial completion of the new school building was December 15, 2003, as a result of the change order. I understand this letter is Exhibit C to North Brookfield's Memo.

throughout the entire period. In addition, a number of the dates where there was abnormal precipitation were followed by periods of abnormally low temperatures, which exacerbated the adverse conditions created by the precipitation. For example, November 16 and 17, 2002 saw 1.4 inches of precipitation (compared to a normal .3), and were followed by two days at or below freezing. Similarly, .64 inches of precipitation fell on November 6, followed by freezing temperatures the next day. From November 27 through December 11 there was only one day in which the daily average temperature was above normal. In one stretch there were eleven consecutive below-normal days. That period of abnormally cold weather was immediately followed on December 11 through 14 by abnormally high precipitation. Between November 1, 2002 and December 5, 2002, the date on which the normal average temperature drops to the freezing level, 11 of the 35 days – almost a third – were below freezing.

27.    Temperatures in January, 2003 were also abnormally cold: only 5 days had temperatures above normal, and the monthly average temperature was 5.9 degrees below normal. This frigid weather followed four days of precipitation during the first week of January.

28.    Temperatures in February, 2003 continued the deep freeze, with the monthly average 4.5 degrees below normal, coupled with a major snowfall on February 17 and another on February 22-23.

29.    This abnormal weather had an adverse impact on the progress that could be made on the Project during the period from November 1, 2002, through March 31, 2003. Specifically, North Brookfield's Construction Manager, Chris Conway, noted in his daily reports work being interrupted by precipitation on 10 days between November 6 and December 16, 2002. Copies of a selection of those reports, with portions highlighted, are attached hereto as Exhibit I.[6]

---

[6]    I do not currently have a full set of Mr. Conway's reports. The ones I have end in mid-January, 2003.

9

30.    Going into November, Sciaba needed to complete the removal of the unsuitable soil that had been discovered on the site, and then to perform significant excavation, backfilling and compaction with suitable replacement soil, before the foundations could be completed and the structural steel erected.  So much precipitation fell in such a short period of time that the ground became saturated and unstable, incapable of being excavated or compacted.  Once saturated it stayed saturated, and then it froze.  Mr. Conway noted the early freeze in his December 9 report, "due to the unusual early cold weather we have been receiving the current ground frost depth averages 16" to 18"," and acknowledged the impediment that the deep frost posed: "no structural fill work was undertaken today due to the depth of the ground frost."  That depth of frost is extraordinary in early December.

31.    During January, when structural steel erection should have been in full swing, the cold temperatures and precipitation hampered work.  At the stage of work that had been reached, the detail work of torquing bolts, welding connections and adding of cross-bracing and trusses could be not done efficiently because that work requires the ironworkers to walk on the steel, which they could not do efficiently when the steel was covered with ice or snow.  Mr. Conway noted this in some of his reports.  For example on January 2 he stated: "Weather has again hurt the progress of structural steel erection and detailing.  As of this morning most of the erected steel frame has a layer of ice covering preventing any possibility of the ironworkers working on it."  His January 3 report stated:  "The project is again affected by weather today.  Light snow flurries and blowing winds made it to [sic] dangerous to work on detailing area B steel.  CWS's crew left after coffee break this morning."

32.    Without having the structural steel substantially completed in building areas B and C, Sciaba could not proceed with the exterior masonry work, and therefore could not

10

complete the building envelope.  Sciaba's schedule submitted to North Brookfield as of September 30, 2002, contemplated that Building Area C would not be weather tight until December 20, 2002; Building Area B would not be weather tight until February 24, 2003, and Building Area A would not be weather tight until February 27, 2003.  See Exhibit J attached hereto, pages 2-3.  On the basis of this schedule, North Brookfield's assertion that Sciaba's failure "to enclose the building prior to January 7, 2003 [was] in violation of its own construction schedule" is inaccurate.  *See* North Brookfield's Memo page 10.

33.    Attached hereto as Exhibit K is a copy of the construction schedule Sciaba submitted to North Brookfield as of March 31, 2003.  It shows that the structural steel in building area C was completed and ready for masonry work on January 6, 2003.  Exh. K p. 3.  However, because of the extremely severe cold, masonry work could not start.  Placement of masonry in an extended period of below-freezing is inadvisable because there needs to be a proper level of moisture in the mortar, which crystalizes in extreme, extended cold.  Crystalizing of the mortar prevents the mortar from curing at the proper rate.  This makes the mortar brittle and ineffective as a material to hold the masonry units together reliably.  Sciaba's March 31 schedule also shows a 60-day impact due to "inclimate" weather in the sections of the schedule for building areas A and B on page 3 of Exhibit K, items SUPOB350 and SUPO350.

34.    The masonry work did not start until February 8, following installation of a gas meter on February 6 that permitted temporary heating to take place.  In order to install and connect a gas meter, a gas line needed to be run by the gas company.  Installation of the line was completed January 25, 2003.  *See* Exh. K p. 1.  Installation of the gas line and gas meter were not part of Sciaba's contract, and were dependent upon the gas company.

35.    Although some progress was made during the period of abnormal weather, in my opinion, the abnormal weather set back progress to the extent of approximately sixty days. This delay is over and above the typical allowance that contractors in the Northeast make for normal winter weather.

36.    My opinion is reinforced by the fact that municipalities throughout the Northeastern U.S. weather region routinely granted sixty-day extensions with respect to the same period of time.

37.    Accordingly, in my view, liquidated damages should not be assessed for the 60-day delay resulting from abnormal weather in the winter of 2002-03.

38.    Adding sixty days on account of the abnormal weather would bring the substantial completion dates to February 13, 2004, and would bring the total construction period to 665 days.

39.    The Completion Contract that I negotiated with Fontaine, and which Fontaine signed prior to November 12, 2003 (a copy of which was enclosed with the letter to McEnaney dated November 12, 2003, *see* Griffin Affidavit Exhibit B), contains the following provision regarding the time for performance of the work:

> 4.    The Completion Contractor shall commence work within five (5) days after receipt of a written Notice to Proceed issued by the Town, and shall substantially complete all work in accordance with the terms and conditions of the Contract Documents on or before August 15, 2004, except that the completion of Phase 4 parking lot and related work that, under Section 3.3 of the Original Contract (prior to any time extensions), was required to be performed by "17 November 2003" shall be complete on or before October 1, 2004.

August 15, 2004 is 184 days after February 13, 2004. (The Excel date-counting function only counts 182 days, as shown on the spreadsheet.) October 1, 2004 is an additional 47 days beyond that date. (Excel only counts 46.) Thus, the total number of days that Fontaine's proposed

completion date, as set forth in the Completion Contract tendered on November 12, 2003, went beyond the date when liquidated damages should have begun to run (February 13, 2003) was 231 days. Because of our use of the Excel date-counting function, we used the figure of 228 days as the proper number of days for which liquidated damages were owed.

40.    The contract assessed liquidated damages at the rate of $1,000 a day. Thus, by our calculation, AMMIC owed $228,000 for liquidated damages. This amount was carried forward to the first page of the spreadsheet that accompanied the November 21 letter.

**North Brookfield's Claim for Additional Architects' Fees and Expenses**

41.    I am familiar with various submissions North Brookfield has made to AMMIC in an effort to document its claim for additional architects' fees and expenses supposedly incurred as a result of Sciaba's default, including the document attached as Exhibit A to the Affidavit of James Caldwell in Support of the Motion (the "Architects' Fee Estimate").

42.    The approach taken by North Brookfield's architect, Dore and Whittier, to quantifying its fees and expenses is known in the construction industry as a Total Cost approach. It is my understanding that the Total Cost approach to measuring damages is generally disfavored by the courts, and that a party trying to use that approach must establish four factors:

> (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses.

*WRB Corp. v. United States,* 183 Ct. Cl. 409, 426 (1968).

43.    I have considered the information available to me concerning these factors as they relate to North Brookfield's claim for increased architects' fees and expenses in this case and concluded that (a) some of the amounts used as the actual costs are estimates, not actual costs; (b) some of the actual or estimated costs incurred are unreasonable or not credible; and (c) there

were some reasons other than Sciaba's default for the increase in architects' fees and expenses. I will expand upon these points below.

44.    Sciaba's work on the Project ceased on or about May 30, 2003. If North Brookfield had accepted the contract tendered by AMMIC on November 12, 2003, and given Fontaine a Notice to Proceed on November 14, 2003, the work on the Project would have been suspended for a total of 168 days or 24 weeks. As demonstrated above, the total elapsed time that the Project duration was extended by Sciaba's default was 228 days or just under 33 weeks. However, during 24 of those nearly 33 weeks, no work was taking place on the Project site. Thus, Sciaba's default and/or slow performance added just under nine (9) weeks of additional construction time.

45.    Based upon the information furnished by Dore and Whittier, the architectural staff expected to bill at the average rate of approximately $6,000 a week, once construction resumed. I base this upon the figures contained in the Architects' Fee Estimate. The second section of that Estimate, entitled Basic A/E Services, shows estimated billings of $298,719 for a 49-week construction period. This translates to $6,096 a week, which I have rounded to $6,000.

46.    In addition to the architectural services, Dore and Whittier was to provide a construction manager. Their Estimate shows that his hourly rate will be $115. (Dore and Whittier's actual billings show that during most of 2003, the actual hourly billing rate for the construction manager was $110.) At 40 hours a week (probably more than would actually be required), the average weekly cost for the construction manager during construction would be $4,600. When added to the estimated $6,000 in weekly charges for basic architectural and engineering services, I arrive at a weekly rate of $10,600. This represents the maximum

reasonable weekly charge for the nearly nine weeks of added construction duration caused by Sciaba's default.

47.     Applying that weekly rate to the slightly less than nine weeks of extended construction duration gave the amount of $92,371.43. This, in my view, is a reasonable measure of North Brookfield's damages stemming from the extended construction duration attributable to Sciaba's default.

48.     In addition, it was necessary to determine a reasonable charge for architectural and construction managers' services rendered during the period of suspension of the work because of Sciaba's default. The Architects' Fee Estimate includes an amount totaling $193,159.67, apparently covering this time period. This amount appears to consist of actual bills rendered by Dore and Whittier to North Brookfield for the period from May 30 to September 19, 2003, sixteen weeks at an average of $4,800 per week, plus an additional fifteen weeks at an estimated $4,800 per week through the end of 2003. *See* Architects' Fee Estimate, second to last section.

49.     Because of my investigation of the Project prior to Sciaba's default and my involvement with the process of preparing the Request for Proposals sent out by AMMIC to prospective bidders and the entire bid process, I am familiar with the extent to which the services of a construction manager were needed on the Project during the period work was suspended. I am also aware of the extent of my communications with the personnel of Dore and Whittier and the scope of the requests I made of them for assistance in compiling information and documents in the bidding process. I have also reviewed copies of the invoices submitted by Dore and Whittier to North Brookfield through October 30, 2003.

50.    On the basis of this information, I have concluded that charges amounting to $4,600 a week for the period during which work on the Project was suspended are unreasonably high. This amount represents a weekly average of more than forty percent (40%) of the average weekly billings during active construction, which, in my view, is excessive. For example, during the five-week period from September 20 through October 24, 2003, Dore and Whittier billed North Brookfield for 212.5 hours of the construction manager's time. This represents more than a full-time commitment. During those five weeks, it is inconceivable that it was necessary for the construction manager to be providing services full time, when no construction activity whatsoever was going on. The construction manager attended a meeting with the bidders at the job site trailer on Thursday, October 9, 2003, which I ran. The meetings that day lasted approximately 8 hours. They required no preparation on the part of the construction manager. In addition, upon information and belief, during that billing period the construction manager met at the site together with the roofing subcontractor, whose subcontract we were trying to get ratified, to reach an understanding concerning the extent to which materials previously furnished and/or installed were still suitable for use on the Project. That meeting required little, if any, preparation and should have been accomplished in half a day. I am aware that the construction manager prepared a two-page memorandum on October 21, 2003, outlining issues relating to exposure of the incomplete building to the elements during the period of suspension. Even if it was necessary to prepare such a memorandum, which I am not sure that it was, it would have been unreasonable for the construction manager to have spent more than a day's time preparing it. No other issues arose during that billing period, that I am aware of, that might have required the attention of the construction manager. North Brookfield has not shown what other activities justified 212.5 hours of the construction manager's time during that billing period.

51.    I have similar difficulty believing that the number of hours charged by Dore and Whittier for the construction manager in the other months when work was suspended for which I have seen their invoices were necessary or justifiable.

52.    In recognition of the fact that Sciaba's default undoubtedly required some time and attention from Dore and Whittier and the construction manager, even while work was suspended, I have estimated, subject to verification, that a reasonable – even generous -- amount of billings during the 24-week suspension would be $3,000 a week.  This is a sum sufficient to cover twenty hours a week for the construction manager and two to four hours a week for architectural staff.  Thus, the total reasonable billings for that period would be $72,000, reflected in the enclosure to the November 21 letter in two parts, $48,000 and $24,000.

53.    These amounts, together with the amount reasonably attributable to the extended construction duration result in total additional reasonable architects' and construction management fees of $164,371.43.  This amount was carried forward from the second page of the spreadsheet enclosed with the November 21 letter to the first page and included in the calculation of amounts owed by AMMIC to North Brookfield.

54.    As noted above, some of the figures used by North Brookfield in its Architects' Fee Estimate are estimated, not actual, fees.

55.    In addition, as is evident from the portion of my affidavit above dealing with liquidated damages, there were reasons other than Sciaba's default that caused the duration of the project to be extended.  Specifically, there were unanticipated unsuitable soils encountered at the Project for which North Brookfield granted an extension in Change Order No. 3 (attached to North Brookfield's Memo as Exhibit B) and abnormal winter weather, which extended the construction duration by about 60 days.

17

56.    Under the contract documents previously mentioned, as well as the custom and practice in the construction industry, if delays that are not the contractor's responsibility cause an increase in the fees the architect charges the owner, the contractor is not liable for those charges. Under a total cost approach to damages, the failure of the claimant to take account of the causes of delay that are not the contractor's responsibility invalidates the damage figure.

57.    On the basis of the information above, I do not believe use of a Total Cost approach to determining the amount of additional architects' and construction managers' fees and expenses caused by Sciaba's default is warranted or in accord with the custom and practice in the construction industry.

Signed under the penalties of perjury this 22nd day of March, 2004.

_____
Richard P. Anastasio

# 1731441_v1
431261.00002

18

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,
                              Plaintiff,

vs.                                                      Civil Action No. 03-40266 NMG

TOWN OF NORTH BROOKFIELD,
                              Defendant.

**EXHIBIT A TO AFFIDAVIT OF RICHARD P. ANASTASIO IN SUPPORT OF
THE OPPOSITION OF AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY TO MOTION TO REQUIRE
PLAINTIFF TO DEPOSIT FUNDS WITH COURT**

# RICHARD P. ANASTASIO

**GREYHAWK**
North America

**OFFICE ADDRESS**
260 Crossways Park Drive
Woodbury, NY 11797-2015

**WEB ADDRESS**
http://www.greyhawk.com

**TELEPHONE**
516-802-5705

**FACSIMILE**
516-801-6205

**EMAIL ADDRESS**
ranastasio@greyhawk.com

**EDUCATION**
City College of New York
B.C.E., Civil Engineering

**LICENSES & REGISTRATIONS**
Professional Engineer

**INDUSTRY AFFILIATIONS**
Member, *National Society of Professional Engineers*
   ♦   Member, *Professional Engineers in Construction*
Member, *National Bond Claims Association*
Member, *Defense Research Institute*
Associate, *American Bar Association*
   ♦   Member, *Tort & Insurance Practice Section*

Rick Anastasio is a Senior Principal of GREYHAWK, North America.  He has more than 35 years of experience in construction, construction management, contract administration, cost control and estimating, design, claims preparation and rebuttal and expert testimony.

At GREYHAWK, Rick's extensive experience combined with his acute knowledge of construction matters enables him to concentrate on GREYHAWK's surety work, construction management, cost control and design issues.  He leads the surety practice with a keen understanding of how the complexities of construction impact critical project decisions needed to be made by the Surety.  He is responsible for preparing and negotiating claims on behalf of clients and the review and refutation of claims on behalf of defendants.

Rick has completed a series of complex projects for sureties following a default by its principal.  The projects include pharmaceutical plants, bus facilities, tunnels and bridges on the Interstate Highway System, transportation facilities, public housing projects and water and wastewater treatment plants.  As a result of his work on these projects he has obtained significant experience as an expert witness providing testimony at Mediation and Arbitration sessions and in Trial.

He has been associated with the design and construction of a significant variety of projects, including chemical and food processing plants, power plant expansions and rehabilitation's, co-generation facilities, pollution control facilities, refinery projects, material handling facilities, transportation systems, schools, hospitals, housing projects, marine construction, hotels and research facilities.

**REPRESENTATIVE PROJECT EXPERIENCE**
U.S. Federal Building and U.S. District Courthouse in Trenton, NJ
Bus Maintenance and Storage Facility, NJ
Veterans Administration and Federal Building in Newark, NJ
Bergen County School for Special Education Services, NJ
Central Artery Tunnel and Highway Program, MA
Various New York City Housing Projects, NY
Essex County Resource Recovery Facility, NJ
Hoffman-LaRoche Pharmaceutical Plant, NC
Glaxo-Wellcome Pharmaceutical Plant, NC
New York City Transit Authority Facilities and Stations, NY

# RICHARD P. ANASTASIO



## EMPLOYMENT HISTORY

**1997 - Present**
**GREYHAWK North America L.L.C.**
    Senior Principal
*Construction Management and Consulting*

**1993- 1997**
**The Barrington Consulting Group, Inc.**
    Senior Project Manager
*Construction Consulting*

**1984- 1993**
**RPA Technical Associates, Inc.**
    *President*
*Industrial Erection and Rigging Company*

**1981 – 1984**
**Centrig Industries, Inc.**
    Manager, Petrochemical Construction
    Division
*National Construction and Rigging
Company*

**1976 – 1981**
**Chemico Air Pollution Control Company**
    Manager of Construction
    Manager of Construction Purchasing &
    Contract Administrator
*Design and Construction of Major Air
Pollution Control Projects*

**1971 – 1976**
**Arnold M. Diamond, Inc.**
    Project Manager
*National Construction Firm Specializing in
Government & Military Projects*

**1969 – 1971**
**Grumman Aerospace Corporation**
    Structural Design Engineer
    (Top Secret Clearance)
*International Aerospace Company*

**1967 – 1969**
**General Dynamics- Convair Division**
    Design Liaison Specialist
    Structural Design Engineer
    (Top Secret Clearance)
*Multinational Corporation Specializing in
Design & Construction of Military &
Civilian Aircraft, Boats, Submarines and
Spacecraft.*

## TESTIFYING EXPERIENCE

**Expert** – *Star Insurance vs. McDermott Industries, Inc.*, District Court, Miami, FL, 2001

**Expert** – *Perth Amoy Board of Education and Saxon Construction Corporation (and Fireman's Fund Insurance Company)*, Arbitration, Perth Amboy and Livingston, NJ, 1999 - 2001

**Expert** – *Bergen County Special Services School District and Saxon Construction Corp. (and Fireman's Fund Insurance)*, Mediation, Office of Dispute Resolution, Newark, NJ, 2000

**Expert/Fact Witness** – *Sparta Steel et al vs. Saxon Construction Corp. (and Fireman's Fund Insurance)*, Federal Court, Newark, NJ, 1999

**Expert** – *Aniero Concrete (and CGU Insurance) and The School Construction Authority (and Aetna Insurance Company)*, Mediation, New York, NY, 1996

**Expert** – *Glaxo-Wellcome vs. Becon Construction*, Hearing by Court-Appointed Special Master, Raleigh, NC, 1994

**Expert/Fact Witness** – *Brennan Company and Tenneco Industries*, Mediation, Agawam, MA, 1991

**Expert/Fact Witness** – *Centrig Industries and Petrochem Industries Ltd.*, Mediation, Houston, TX, 1984

**Expert/Fact Witness** – *Chemico Air Pollution Control Company and Rettenbach Construction*, Mediation, Knoxville, TN, 1979

**Fact Witness** - *U.S. Navy vs. Arnold M. Diamond, Inc.*, Armed Services Review Board Hearing, Hampton, VA, 1976

**Fact Witness** - *State of NY General Services Administration vs. Arnold M. Diamond, Inc.*, NY State Contract Review Board Hearing, Albany, NY, 1975

**Fact Witness** - *U.S. Corps of Engineers vs. Arnold M. Diamond , Inc.*, Armed Services Review Board Hearing, Philadelphia, PA, 1972

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,
                              Plaintiff,

vs.                                                          Civil Action No. 03-40266 NMG

TOWN OF NORTH BROOKFIELD,
                              Defendant.

**EXHIBIT B TO AFFIDAVIT OF RICHARD P. ANASTASIO IN SUPPORT OF
THE OPPOSITION OF AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY TO MOTION TO REQUIRE
PLAINTIFF TO DEPOSIT FUNDS WITH COURT**

Law Offices
# HOLLAND & KNIGHT LLP

10 St. James Avenue
Boston, Massachusetts 02116

617-523-2700
FAX 617-523-6850
http://www.hklaw.com

| | |
|---|---|
| Annapolis | Oakland |
| Atlanta | Orlando |
| Bethesda | Portland |
| Boston | Providence |
| Bradenton | San Antonio |
| Chicago | San Francisco |
| Fort Lauderdale | Seattle |
| Jacksonville | St. Petersburg |
| Lakeland | Tallahassee |
| Los Angeles | Tampa |
| Miami | Washington, D.C. |
| New York | West Palm Beach |
| Northern Virginia | |

| International Offices: | |
|---|---|
| Caracas* | São Paulo |
| Helsinki | Tel Aviv* |
| Mexico City | Tokyo |
| Rio de Janeiro | *Representative Offices |

November 21, 2003

**DEBORAH S. GRIFFIN**
617-305-2044

Internet Address:
deborah.griffin@hklaw.com

*VIA E-MAIL and*
*First Class Mail*

Thomas W. McEnaney, Esq.
Kopelman & Paige, P.C.
31 St. James Avenue, 7th Floor
Boston, MA  02116

> Re:   *North Brookfield Intermediate & Senior High School Project*
> *Surety:*          *American Manufacturers Mutual Insurance Co.*
> *Bond No.:*       *3SE 057 856*
> *Claim No.:*      *167-SE-002-989*

Dear Tom:

Since sending you, on November 12, 2003, the two originals of the Completion Contract executed by Fontaine Bros., Inc., and its Performance and Payment Bonds and Certificate of Liability Insurance, it has come to my attention that those documents contained the two different contract amounts. The figure on which Fontaine and the surety had agreed was, as stated in my cover letter to you of November 12, $11,381,362. That amount is correctly reflected in Fontaine's Labor and Material Payment Bond. However, an incorrect figure of $11,527,000, was stated in the Completion Contract itself and in the Performance Bond. I have brought this scrivener's error to Fontaine's attention and Fontaine has acknowledged it.

In addition, we have since learned that the $11,381,362 figure was based on a mistake on the part of both Fontaine and the Surety as to the amount of one of the subcontractor ratification agreements. That mistake was in the amount of $15,934.35, which should bring the correct contract amount to $11,397,296.35. It is my understanding that Fontaine is prepared to execute a

Thomas W. McEnaney, Esq.
November 21, 2003
Page 2

credit change order to the Completion Contract that would make an adjustment
on account of both of these errors. However, if the Town's acceptance of the
Completion Contract and its issuance of a Notice to Proceed is delayed any
further, the amount of the adjustment may be reduced if that delay increases
Fontaine's completion costs.

AMMIC has continued its analysis of its obligations under its
performance bond, notwithstanding the Town's refusal to provide us with copies
of the Town's contract with Dore & Whittier, and the invoices the Town has
received to date for design and construction management fees. I am enclosing
with this letter a two-page analysis that sets forth the surety's calculation of
amounts owed on its performance bond. On the basis of information available to
it at this time, the surety believes it owes the Town of North Brookfield
$2,538,838.37. It is in the process of issuing a check in that amount payable to
the Town of North Brookfield. As soon as I receive it, I will hand-deliver it to
you unconditionally.

AMMIC has taken note of the Town's failure to appropriate the additional
funds necessary above that amount to pay the difference between Fontaine's
price to complete and the contract balance, which difference is $3,197,996.17.
AMMIC is also aware that the Town is likely to disagree with certain aspects of
the surety's calculation of the amount owed, although we are not certain of the
extent of that disagreement. In addition to delivering unconditionally the above-
referenced check in the amount of $2,538,838.37, AMMIC is preparing to deliver
to you an additional check in the amount of $659,157.80 under a reservation of
rights, negotiation of which will be conditioned upon the Town executing the
Completion Contract with Fontaine and issuing it a Notice to Proceed. We will
continue our efforts to resolve the differences between the surety and the Town
concerning disputed aspects of the Town's claims and the surety's defenses, with
the $659,157.80 to be credited against any additional amount the parties may
agree, or a court may determine, that AMMIC owes. If such additional amounts
are lower, the difference is to be refunded to AMMIC.

To respond to the point in your November 14, 2003 letter concerning
latent defects, AMMIC is prepared to pay for the reasonable and necessary costs
incurred by the Town under the Fontaine contract, for latent defects caused by
Sciaba's work. It believes that Fontaine's contract price covers any other
defective, deficient, deteriorated or otherwise unacceptable work.

Contrary to the statements on the second page of your November 14
letter, AMMIC is not obligated to complete the project. It believes it has
complied fully with its obligations under the bond by delivering the Fontaine

| North Brookfield Claims Analysis | | |
|---|---|---|
| | | |
| Item | Amount | Notes on Surety's Position |
| Fontaine's Price to Complete | $11,397,296.35 | |
| Contract Balance | -$8,199,300.18 | |
| Completion Deficiency | $3,197,996.17 | |
| | | |
| Liquidated Damages | $228,000.00 | C.O. 3 extended completion to 12/15/03 for both phases plus 60 days weather delays -- see Completion Date Sheet |
| Roof Repair | $0.00 | Work performed within extended time for completion |
| Legal Fees | $10,000.00 | |
| Design and Construction Management Services | $164,371.43 | See Completion Date sheet |
| | | |
| Total of Town's Claims | $3,600,367.60 | |
| | | |
| Overpayment defense | | |
| May payments | $696,578.23 | |
| | $2,903,789.37 | |
| Earlier overpayments - Div. 1 | $120,697.00 | |
| Earlier overpayments - Div. 2 | $226,213.00 | |
| Earlier overpayments - Div. 9 | $18,041.00 | |
| Total earlier overpayments | $364,951.00 | |
| | | |
| Total due from surety | $2,538,838.37 | |
| | | |
| Shortfall against completion cost | $659,157.80 | |

| Original Dates | Date | days/amounts | comment |
|---|---|---|---|
| Contract Inception | 4/19/2002 | | |
| Substantially Complete New Building | 7/17/03 | 453 | |
| Substantially Complete Demolition of Old Building and Parking Lot | 11/15/03 | 118 | |
| Total | | 571 | |
| | | | |
| Extended Substantially Complete New Building | 2/13/2004 | 659 | December 15 per C.O. 3 plus 60 days weather delay |
| Extended Substantially Complete Demolition of Old Building and Parking Lot | 2/13/2004 | 0 | December 15 per C.O. 3 plus 60 days weather delay |
| | | 659 | |
| | | | |
| Fontaine's dates | | | |
| New Building | 8/15/04 | 182 | |
| Old Building and Parking Lot | 10/1/04 | 46 | |
| Total days late on which liquidated damages assessed | | 228 | |
| | | | |
| Liquidated Damages | | $228,000.00 | at $1000 per day |
| | | | |
| | | | |
| Design and Construction Management Dates | | | |
| | | | |
| | | | |
| Delay in days from above | | 228 | |
| Delay in weeks | | 33 | |
| | | | |
| Work suspended from | 5/31/2003 | | |
| to | 11/17/2003 | 167 | |
| Duration of suspension in weeks | | 24 | |
| Net additional weeks of design and c.m. services | | 9 | |
| | | | |
| | | | |
| Weekly rate for design and c.m. services | | $10,600.00 | weekly rate includes 40 hours a week for CM, not 50 as claimed by Town |
| | | | |
| Total cost for net additional weeks | | $92,371.43 | |
| | | | |
| Actual billings during suspension through 9/20/03 | | $48,000.00 | In the absence of copies of actual bills, running rate reduced from $4,800 claimed by Town to $3,000: 20 hours a week for CM; 2 hours a week for principal = $2,550, rounded up. |
| Estimated billings during suspension 9/20-11/17/03 8 wk x 4800/ wk | | $24,000.00 | Same as above |
| | | $164,371.43 | |