# EXHIBIT  A



RECEIVED
4-10-03

# MILLIS PLUMBING CO., INC.    Mechanical Contractors

April 9, 2003

Phone ( 508) 668-1040 • FAX (508) 668-1998
220 Norfolk Street, Walpole, MA 02081

### DEMAND FOR DIRECT PERIODIC PAYMENT

Town Of North Brookfield
Office of the Superintendent of Schools
10 New School Drive
North Brookfield, MA 01535

Project: North Brookfield Jr/Sr High
Subtrade: Plumbing
General Contractor: EJ Sciaba Contracting

Dore 75
EXHIBIT
4-13-05
CASE #

Gentlemen:

The undersigned submitted requests for periodic payments to the General Contractor totaling $87,118.23, representing the amount due for labor and materials to date. The General Contractor paid $55,612.38, leaving a balance due of $31,505.85. which the General Contractor failed to pay. This is written notice to you of our failure to receive such payment, a breakdown of which is as follows:

| Date of Requisition | Amount of Requisition | Date of Payment From Gen. Contr. | Amount of Payment From Gen. Contractor |
|---|---|---|---|
| Sept. 17, 2002 | $ 7,543.00 | Nov. 12, 2002 | $ 7,543.00 |
| Oct. 18, 2002 | $ 31,231.25 | Dec. 19, 2002 | $ 31,231.25 |
| Nov. 21, 2002 | $ 15,461.25 | Feb. 10, 2003 | $ 15,461.25 |
| Jan. 22, 2003 | $ 3,052.30 | Feb. 28, 2003 | $ 1,376.88 |
| Feb. 24, 2003 | $ 10,670.40 | | |
| Mar. 20, 2003 | $ 19,160.03 | | |

Periodic Payment Due                                    $ 31,505.85

Please make direct payment to us of $31,505.85, the periodic payment due, in accordance with Chapter 30, Section 39F of the General Laws.

MILLIS PLUMBING CO., INC.

By
President

Michael D. Rogers personally appeared before me at 220 Norfolk Street on April 9, 2003 and made oath that the above statements are true and that he mailed a signed copy of this letter by certified mail to the General Contractor named above on the date he mailed to original to the Awarding Authority.

Christine Kofton

Christine C. Kofton
My Commision Expires: 3/21/08

cc: General Contractor Certified Mail # 7001 2510 0002 8984 9165

CHRISTINE C. KOFTON
Notary Public
Commonwealth of Massachusetts
My Commission Expires
March 21, 2008

# EXHIBIT  B

Lee P. Dore                                                                04/13/2005

```
 1              UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS:   CENTRAL DIVISION
 2

 3

    AMERICAN MANUFACTURERS      *
 4  MUTUAL INSURANCE COMPANY    *
                                *
 5        vs.                   *  CASE NO. 03-40266 CBS
                                *
 6  TOWN OF NORTH BROOKFIELD    *

 7
                    D E P O S I T I O N
 8
                           OF
 9
                    LEE P. DORE
10
         Taken on behalf of the Plaintiff on Wednesday
11            April 13, 2005 at the offices of
          Dore and Whittier, So. Burlington, Vermont.
12

13  APPEARANCES:
14  DEBORAH S. GRIFFIN, ESQ., of the firm Holland &
    Knight, 10 St. James Avenue, 11th Floor, Boston,
15  MA 02116, appeared and represented the Plaintiff.
16  THOMAS W. MCENANEY, ESQ., of the firm Kopelman and
    Paige, P.C., 31 St. James Avenue, Boston, MA
17  02116, appeared and represented the Defendant.
18  MATTHEW M. O'LEARY, ESQ., of the firm Donovan
    Hatem LLP, World Trade Center East, Two Seaport
19  Lane, Boston, MA 02210, appeared and represented
    the Deponent.
20
21  COURT REPORTER:  Virginia L. Simmer, RPR
22
23
24
25
```

Lee P. Dore                                                      04/13/2005

Page 6

1    (Commencing at approximately 9:07 a.m.)
2    LEE P. DORE:  Being first duly sworn by a Notary
          Public to tell the truth, deposes
3          and says as follows:
4    MS. GRIFFIN:  The only stipulation is
5    that we would waive notarization of the
6    signature so the witness can read and sign
7    but it need not be before a notary.
8    MR. O'LEARY:  Okay.  We appreciate
9    that.
10   EXAMINATION BY MS. GRIFFIN
11   Q.  Would you state your name, please?
12   A.  Lee P. Dore.
13   Q.  Where do you live?
14   A.  Charlotte, Vermont.
15   Q.  And you're employed by Dore and Whittier?
16   A.  Yes.
17   Q.  What's your position currently with Dore and
18   Whittier?
19   A.  Project manager.
20   Q.  How long have you been with Dore and Whittier?
21   A.  Ten years.
22   Q.  And have you held other positions besides
23   project manager?
24   A.  I did.  I worked in the marketing department
25   for about four years and then I worked as an

Page 7

1    assistant project manager for a year.
2    Q.  So you've been a project manager for about
3    five years?
4    A.  Yeah.
5    Q.  Would you give your educational background,
6    please?
7    A.  Sure.  After high school graduation I attended
8    University of Vermont from 1989 to 1994 civil
9    engineering.
10   Q.  Did you earn a degree?
11   A.  No.
12   Q.  Have you earned any degrees since completing
13   your work at University of Vermont?
14   A.  No.
15   Q.  Do you hold any professional licenses or
16   certifications?
17   A.  I'm an associate member of American Institute
18   of Architects and member of Construction
19   Specifications Institute.
20   Q.  Have you held any jobs in the construction or
21   architecture or engineering fields prior to
22   beginning at Dore and Whittier?
23   A.  No.
24   Q.  With regard to the North Brookfield project
25   which is the subject of this suit what was your

Page 8

1    role?
2    A.  I was the project manager for Dore and
3    Whittier.
4    Q.  Were you the project manager from the very
5    beginning of Dore and Whittier's involvement in the
6    project?
7    A.  Yes.
8    Q.  And could you just describe generally what the
9    responsibilities were that you had as project
10   manager?
11   A.  Generally speaking I'm the liaison between the
12   design team consultants and the owner through the
13   design phases of the project, and during bidding and
14   construction I continue that same role and also
15   coordinate with our on-site construction manager.
16   Q.  And in this instance the on-site construction
17   manager was whom?
18   A.  Chris Conway.
19   Q.  I've put before you two exhibits that have
20   been marked Exhibits 1 and 2.  Exhibit 1 was a
21   document subpoena that was served on Dore and
22   Whittier last summer, have you seen it before?
23   A.  Yes.
24   Q.  Did you participate in gathering documents
25   that were responsive to the subpoena?

Page 9

1    A.  In a very minor role.  It was mostly handled
2    by our administrative staff.
3    Q.  And what was your role?
4    A.  I just helped collate all of the contractual
5    files that they weren't able to get to.
6    Q.  Other than administrative staff were any of
7    the professional staff of Dore and Whittier involved
8    besides yourself?
9    A.  No.
10   Q.  Exhibit 2 is the subpoena for this deposition
11   which was served on Dore and Whittier and required
12   Dore and Whittier to designate a witness to testify
13   to the subjects that are on the attached Schedule
14   A.  Have you seen Exhibit 2 before?
15   A.  Yes, I have.
16   Q.  And have you been designated by Dore and
17   Whittier to testify on all the subjects on Exhibit
18   A?
19   A.  Yes, I have.
20   Q.  Could you tell me what you did to prepare for
21   today's testimony?
22   A.  Nothing in great detail.  You know, I reviewed
23   this exhibit just to make sure that I was aware of
24   all of the scope of items that you may be asking.
25   Q.  Did you confer with any other Dore and

3 (Pages 6 to 9)

Lee P. Dore                                                                                    04/13/2005

Page 182

1   myself or Harald depending who was down there
2   reviewed with them at the site and it would be
3   marked up on stuff that we disagreed with and then
4   Sciaba would send to Vermont, this office, a formal
5   copy which we would then when we would get it,
6   either myself or Harald would review it with Chris
7   Conway and compare it to the pencil requisition to
8   make sure that the changes were made, and if they
9   weren't made then we would make them. And then we
10  would pass it to Al Russell or in some instances
11  Richard Ziemba would then sign which they would then
12  question us as to and review the pencil requisition
13  and the final requisition before certifying it.
14  Q. The pencil requisition was literally in
15  pencil?
16  A. No, it's a term just as a draft copy and it
17  would be basically this not formalized, notarized or
18  signed.
19  Q. But it would still be typed, right?
20  A. Yes.
21  Q. And was the -- the handwritten changes on the
22  first page of Exhibit 68, do you know were those
23  changes made because changes that were supposed to
24  have been made from the pencil requisition to the
25  formal submission had not been made or were there

Page 183

1   other reasons for those changes?
2   A. I'm not specifically sure why these were made
3   for this specific application. In some instances as
4   you described and in other instances it's because of
5   the lag time between when we review the pencil copy
6   versus the formal. Some submittals were supposed to
7   be included, updated project schedules, project
8   photographs and if those didn't come with the final
9   requisition and they were billing for them, then we
10  would also have to mark these down.
11  Q. The through date for the period covered by
12  requisition 11 was February 28, 2003, right?
13  A. Correct.
14  Q. And typically when in relation to that through
15  date did you have the meeting to go over the pencil
16  requisition?
17  A. Usually it would be by the 25th of the month.
18  Q. So February 25th for the requisition that was
19  about to cover -- that was going to cover the period
20  about to end?
21  A. Right.
22  Q. In conducting your review of the requisition
23  after it was submitted formally and signed by Sciaba
24  did you make use of any additional information about
25  events that happened between the time you reviewed

Page 184

1   the pencil requisition and the time the formal
2   requisition came in?
3   A. Yes, if at the pencil requisition we would
4   question material deliveries, for instance, if they
5   weren't there yet and Sciaba would inform us that
6   they would be coming prior to the submission of the
7   formal, we would check to verify that, indeed, they
8   did come or if they were stored off-site did we have
9   the paperwork, insurance certificates, et cetera
10  that they had actually come in.
11  Q. And you would check with Chris Conway about
12  that?
13  A. Yes.
14          MS. GRIFFIN: Mark this next bundle as
15      69.
16  BY MR. GRIFFIN:
17  Q. Can you identify Exhibit 69, please?
18  A. This is a memo from Harald Aksdal to Robert
19  O'Neill regarding application for payment No. 11.
20  Q. Are the pages behind it additional materials
21  that Sciaba submitted in support of requisition 11?
22  A. I don't recall specifically if they were in
23  support of application No. 11.
24  Q. At the bottom of some of the pages there's a
25  fax header March 7, '03 Sciaba, can you tell whether

Page 185

1   that records a fax transmission to either you or
2   Chris Conway?
3   A. It could be to one of us.
4   Q. Could you see if you can identify Exhibit 70,
5   please?
6   A. Yes, I can. It's application for payment No.
7   12.
8   Q. And it's got the same signatures on the
9   right-hand side that we referred to before, Scott
10  Finneran and Mr. Russell?
11  A. Yes, it does.
12  Q. At the bottom right-hand corner it says,
13  Recommend providing separate checks to Millis and
14  Greenwood, see attached memo. Is the memo that's
15  referred to there the one that is the third page on
16  Exhibit 70?
17  A. Bates No. 25494, yes.
18  Q. Did you have a role in formulating that
19  recommendation and particularly the dollar amounts
20  stated for payments to Millis Plumbing and Greenwood
21  Industries on page 25494?
22  A. I don't recall specifically. I do recall
23  conversations regarding direct payment requests.
24  Q. Who did you have the conversations with?
25  A. Harald and Chris Conway.

47 (Pages 182 to 185)

Lee P. Dore                                                                04/13/2005

Page 186

1    Q. Anyone else?
2    A. Maybe, I don't recall specifically.
3    Q. Did you have any communication with the
4    attorney for the town regarding the request for
5    direct payment?
6        MR. MCENANEY: Objection.
7    A. I may have.
8    Q. Do you recall if you did or not?
9    A. I don't recall.
10   Q. Did you -- at the time you were reviewing
11   Millis Plumbing's request for direct payment did you
12   identify any items of unsatisfactory work by Millis
13   Plumbing that called for a holdback from them in
14   excess of their retainage?
15   A. I do believe that some of the amounts that
16   Millis and Greenwood had requisitioned for were not
17   certified by us as being complete. In other words,
18   they were not incorporated into the application for
19   payment.
20   Q. Are you saying they weren't certified as of
21   the time of the application for payment that they
22   followed or that they weren't certified as of the
23   time you were making a recommendation about what to
24   pay?
25   A. They weren't certified within that last period

Page 187

1    of application for payment.
2    Q. Last period before what?
3    A. The next application for payment.
4    Q. I'm going to show you what's been marked as
5    Exhibit 71. Can you identify Exhibit 71 as another
6    copy of the face page of application 12?
7    A. Yes, I can.
8    Q. This one has a handwritten note about 2 inches
9    down from the top of the page. Whose handwriting is
10   that?
11   A. I don't know specifically whose it is. It's
12   either Chris Conway maybe or Harald Aksdal. I'm not
13   sure.
14   Q. Do you have any information about who it was
15   that handed a check for this requisition to Mike
16   Sheehan on May 21, 2003?
17   A. It usually would be Chris Conway that would
18   deliver that if it was handed out directly on site.
19   Q. Did Dore and Whittier have a check payable to
20   Sciaba for the amounts reflected in Exhibit 70 or
21   71, that is application 12, did it have that check
22   at the time of the meeting with Sciaba and the
23   Kemper Surety people on May 21?
24   A. I believe so.
25   Q. Was it stated to the Kemper Surety people that

Page 188

1    Dore and Whittier had the check and was ready to
2    deliver it?
3    A. I don't recall that being stated specifically.
4    Q. Do you know whether the check was delivered
5    after the meeting broke up?
6    A. I believe it was.
7    Q. And nobody from Kemper Surety was there when
8    the check was delivered, were they?
9    A. I wasn't there either when that happened so I
10   couldn't tell you who was there.
11   Q. Take a look at Exhibit 72. Can you identify
12   Exhibit 72, please?
13   A. This is application for payment 13B.
14   Q. And it was signed by someone on behalf of
15   Sciaba, right?
16   A. Yes.
17   Q. And Mr. Russell signed on behalf of the
18   architect, correct?
19   A. Yes.
20   Q. Let me show you what's been marked as Exhibit
21   73. Can you identify Exhibit 73 as another copy of
22   the face page of application 13B?
23   A. Yes.
24   Q. And on this copy there's a note at the top of
25   the page, EJS REC. payment check for this month on

Page 189

1    5/27/03 (hand delivered to Matt Daley), did I read
2    that correctly?
3    A. Yes, you did.
4    Q. Whose handwriting is that?
5    A. I don't recall specifically. Similar to the
6    one on the previous exhibit you showed to me.
7    Q. Do you know who delivered a payment for
8    application 13B to Sciaba?
9    A. I believe it was Chris Conway.
10   Q. Have you had any conversation with Chris
11   Conway about the delivery of checks to Sciaba for
12   applications 12 and 13B?
13   A. Nothing I can remember specifically.
14   Q. Have you discussed with anybody else the
15   delivery of checks to Sciaba for applications 12 and
16   13B?
17   A. Not that I can recall any specifics.
18   Q. Prior to delivering the check in payment of
19   application 13B Dore and Whittier did not notify
20   anybody from Kemper Surety that it was about to
21   deliver the check, did it?
22   A. No.
23   Q. And after the check was delivered Dore and
24   Whittier didn't tell Kemper Surety that it had
25   delivered the check, did it?

48 (Pages 186 to 189)

Lee P. Dore                                                              04/13/2005

Page 190

1   A. No.
2   Q. Did Dore and Whittier tell the town, anybody
3   from the town that the check had been delivered?
4   A. The town I believe was aware that the checks
5   were being delivered when they wrote the checks.
6   Q. Well, the town delivered the checks to Mr.
7   Conway, right?
8   A. Correct.
9   Q. And what reason do you have to think that they
10  knew when the checks were going to be delivered to
11  Sciaba?
12  A. I don't recall specifically why they would
13  know when that would happen.
14  Q. Can you identify Exhibit 74, please?
15  A. Yes, this is an uncertified copy of
16  application No. 14.
17  Q. Did somebody from Dore and Whittier go over
18  the figures in application 14 with somebody from
19  Sciaba before it was received with a signature on
20  it?
21  A. I don't recall specifically that we did, if we
22  had reviewed the pencil requisition at that point or
23  not.
24  Q. Your usual practice would have been to review
25  the pencil requisition approximately May 25th for a

Page 191

1   requisition covering the period --
2   A. Usually, yes.
3   Q. -- for the period ending June 1; is that
4   right?
5   A. Yes.
6   Q. You just don't remember if that happened?
7   A. Right. I would have to see if there was a
8   pencil document.
9   Q. Even though there's no signature by the
10  architect certifying these numbers did you,
11  nevertheless, go over them carefully and determine
12  whether Exhibit 74 accurately represented work that
13  had been accomplished since the last requisition
14  that was certified?
15  A. I don't believe that we did spend a great deal
16  of time on this. I think this was actually
17  forwarded to Mr. Anastasio.
18  Q. Did you have some conversations with Mr.
19  Anastasio about whether Dore and Whittier went along
20  with the figures in Exhibit 74?
21  A. I may have.
22  Q. Do you recall telling them that even though
23  you weren't officially going to certify the
24  requisition that you believed the figures shown
25  accurately represented what Sciaba had accomplished

Page 192

1   during the month of May?
2   A. No, I don't specifically remember that
3   conversation.
4   Q. Are you saying you didn't say that or you just
5   don't recall?
6   A. I don't recall.
7   Q. Can you tell me as of June 1, 2003 -- let's
8   take a look in Exhibit 74 on page 10 of 24. It's
9   Bates numbered 25458, there's a section for gypsum
10  wallboard, do you see that?
11  A. Bates number again.
12  Q. It's Bates page 25458.
13  A. Yes.
14  Q. And there's a line item number 09250.05
15  exterior gypsum and sheathing?
16  A. Yes.
17  Q. From your own observation can you tell me what
18  portion of the exterior gypsum and sheathing had
19  been installed as of June 1, '03?
20  A. Not off the top of my head, no.
21  Q. Did you personally make any kind of inspection
22  with regard to the amount of exterior gypsum and
23  sheathing that had been installed?
24  A. I personally wouldn't have made any
25  observations on that.

Page 193

1   Q. You would rely on Chris Conway for that?
2   A. Correct.
3       MS. GRIFFIN: I'd like to mark as a
4       bundle -- let's mark this as the next
5       exhibit.
6   BY MS. GRIFFIN:
7   Q. Can you identify Exhibit 75, please?
8   A. This is a direct payment claim from Millis
9   Plumbing.
10  Q. And Millis Plumbing was looking for direct
11  payment by the town of $31,558.05?
12  A. Yes.
13  Q. And they were saying that they had not been
14  paid for amounts that they requisitioned through the
15  period ending March 20, 2003, right?
16  A. Correct.
17  Q. And was this the request for direct payment
18  that was being referenced in the memo that we talked
19  about earlier that was part of Exhibit 70?
20  A. Yes.
21  Q. You're not aware of Sciaba responding in
22  writing to the April 9 request for direct payment
23  from Millis Plumbing, are you?
24  A. No, I am not.
25  Q. The memo that was included in Exhibit 70

49 (Pages 190 to 193)

Lee P. Dore                                                                                04/13/2005

Page 194

1  regarding Millis' claim, it was prepared on May 6th,
2  2003, right?
3      A.  That is the date on it.
4      Q.  And that was -- the recommendation of Dore and
5  Whittier was to pay Millis Plumbing $3,361.81,
6  right?
7      A.  That was our recommendation.
8      Q.  Now, as of May 6, 2003 did Dore and Whittier
9  make a determination that there were unsatisfactory
10 items of work that Millis Plumbing had performed?
11     A.  I don't recall specifically.
12     Q.  Did Dore and Whittier make a determination as
13 to whether the amount of Millis Plumbing's
14 subcontract that the town had not made payment for
15 as of May 6, 2003 was or was not sufficient to cover
16 the work that Millis Plumbing remained to perform?
17     A.  Sorry, can you restate that?
18     Q.  As of May 6, 2003 Millis had performed more
19 work than was being certified for Sciaba application
20 12, hadn't it?
21     A.  This direct payment claim was for work through
22 March 20th, 2003.  Our memo of May 6 was addressing
23 an application of payment for the period through
24 3/28/2003.  I guess I don't follow.
25             MR. O'LEARY:  Deb, before we go any

Page 195

1             further, I have 5:35.  I think we're
2             actually six minutes past the limit and I
3             know Tom needs to get home.
4             MS. GRIFFIN:  I kind of figured maybe
5             another four minutes.
6             MR. O'LEARY:  Okay, we can go with your
7             calculation.
8             MS. GRIFFIN:  We can finish on this and
9             then we're done.
10 BY MS. GRIFFIN
11     Q.  Did Millis Plumbing perform additional work
12 during the month of April 2003?
13     A.  I believe so.  We can look at the requisition.
14     Q.  We can tell that by looking at Exhibit 72,
15 right?
16     A.  There's listing for the period of Exhibit 72
17 that were showing a requisition amount of $29,484.
18     Q.  Of additional work that Millis Plumbing
19 performed during the month of April, right?
20     A.  Through 5/1/2003.
21     Q.  And you're getting that from Exhibit 72 page
22 NBDW 27035 line 15400.900, right?
23     A.  Yes.
24     Q.  So my question to you is looking at that
25 figure at the time that Dore and Whittier was making

Page 196

1  a recommendation to the town on how much to pay
2  Millis Plumbing --
3      A.  For the requisition in Exhibit 70, correct?
4      Q.  -- Millis for the direct payment amount that
5  was requested in Exhibit 75, the request for direct
6  payment?
7      A.  Yes, this direct payment is through work
8  provided through March 20th which would be
9  representative of this requisition Exhibit No. 70
10 for work through 3/28.
11     Q.  I understand that's how you approached your
12 comments on Exhibit 75 but what I'm trying to find
13 out is by the time you were making your
14 recommendation Millis Plumbing had, in fact,
15 performed at least another $29,000 worth of work
16 beyond what you had certified in application 12,
17 right?
18     A.  Yes.
19     Q.  So as of the time you were making your
20 recommendation did Dore and Whittier make a
21 determination as to whether the then earned -- the
22 then balance of Millis Plumbing's subcontract that
23 hadn't been paid to it or to Sciaba was or was not
24 sufficient to cover the work that it remained to do
25 as of May 6?

Page 197

1      A.  I'm sorry, can you go through that question
2  again?
3      Q.  As of May 6 what was the dollar value of the
4  work that remained for Millis to perform?
5      A.  I guess I'm not -- I mean the memo is dated
6  May 6.  That was the date on the memo but it is in
7  reference --
8      Q.  I'm not asking you that.  I'm asking you as of
9  May 6 what was the dollar value of the work that
10 then remained to be performed by Millis Plumbing and
11 can you figure that out by taking the scheduled
12 value and subtracting the figures for work completed
13 and both in previous applications and the this
14 period column in Exhibit 72, the May 1 application?
15     A.  For May 6 you could take the balance in
16 15400.9 column H balance to finish in addition to
17 column E, the 29,484 that hadn't been certified yet
18 at that point as the balance of work to finish.
19     Q.  The 29,484 had been performed, right?
20     A.  Yes.
21     Q.  So you wouldn't need to add it because it had
22 already been performed?
23     A.  Correct.
24     Q.  Now, did you make a determination that the
25 $519,000 was enough to cover the cost of the work

50 (Pages 194 to 197)

Lee P. Dore                                                                04/13/2005

<div style="display: flex;">
<div>

Page 198

1  that Millis Plumbing had not yet performed as of May
2  6, 2003?
3     A. One more time, sorry.
4     Q. Did you make a determination whether on May 6,
5  2003 $519,000 and change was enough to cover the
6  work that Millis Plumbing had yet to perform?
7     A. I don't recall specifically we made a
8  determination at that point.
9     Q. Not one way or the other?
10    A. One way or another.
11          MR. O'LEARY: I think I'm going to pull
12      the plug, Deb.
13          MS. GRIFFIN: That's fine. I think
14      that's it. Thank you.
15          MR. O'LEARY: Thank you.
16          (Whereupon, the deposition was
17      adjourned at 5:43 p.m.)
18
19
20
21
22
23
24
25

</div>
<div>

Page 200

1              CERTIFICATE
2
3  I, Virginia L. Simmer, Registered Professional
4  Reporter, certify:
5          That the foregoing proceedings were
6      reported stenographically by me at the time
7      and place herein set forth;
8          That the foregoing is a true and
9      correct transcript of my shorthand notes so
10     taken;
11         That the witness was sworn by me as
12     a Notary Public for the State of Vermont;
13         That I am not a relative or employee
14     of any attorney of the parties nor
15     financially interested in the action.
16  The certification of this transcript does not apply
17  to any reproduction of the same by any means unless
18  under the direct control and/or direction of the
19  certifying reporter.
20
21
22         _____
22             Virginia L. Simmer
23
24     My Commission expires February 10, 2007.
25

</div>
</div>

Page 199

1        I have carefully read the foregoing
2    deposition and the answers made by me are
3    true.
4
5        _____
          LEE P. DORE
6
7
8
9
10
11   STATE OF _____
12   COUNTY OF _____
13
14      At _____ in said
15   County, this _____ day of _____ ,
16   200_ , personally appeared the above-named
17   LEE P. DORE, and made oath that
18   the foregoing answers, subscribed by
19   LEE P. DORE, are true.
20      Before me,
21
22
23        _____
          Notary Public
24   My commission expires:
25

51 (Pages 198 to 200)

# EXHIBIT  C

**KOPELMAN AND PAIGE, P. C.**

ATTORNEYS AT LAW

31 ST. JAMES AVENUE

BOSTON, MASSACHUSETTS 02116-4102

(617) 356-0007
FAX (617) 654-1735

PITTSFIELD OFFICE
(413) 443-6100

NORTHAMPTON OFFICE
(413) 586-8632

WORCESTER OFFICE
(508) 752-0203

LEONARD KOPELMAN
DONALD G. PAIGE
ELIZABETH A. LANE
JOYCE FRANK
JOHN W. GIORGIO
BARBARA J. SAINT ANDRE
JOEL B. BARD
JOSEPH L. TEHAN, JR.
THERESA M. DOWDY
DEBORAH A. ELIASON
RICHARD BOWEN
DAVID J. DONESKI
JUDITH C. CUTLER
ILANA M. QUIRK
KATHLEEN E. CONNOLLY
DAVID C. JENKINS
MARK R. REICH

EDWARD M. REILLY
DIRECTOR WESTERN OFFICE

WILLIAM HEWIG III
JEANNE S. McKNIGHT
KATHLEEN M. O'DONNELL

SANDRA M. CHARTON
PATRICIA A. CANTOR
THOMAS P. LANE, JR.
BRIAN W. RILEY
MARY L. GIORGIO
DARREN R. KLEIN
THOMAS W. McENANEY
JONATHAN M. SILVERSTEIN
KATHARINE GOREE DOYLE
GEORGE X. PUCCI
LAUREN F. GOLDBERG
JASON R. TALERMAN
MICHELE E. RANDAZZO
GREGG J. CORBO
RICHARD T. HOLLAND
LISA C. ADAMS
ELIZABETH R. CORBO
MARCELINO LA BELLA
VICKI S. MARSH
JOHN J. GOLDROSEN
SHIRIN EVERETT
BRIAN E. GLENNON, II
JONATHAN D. EICHMAN
TODD A. FRAMPTON
CAROLYN M. MURRAY
JACKIE A. COWIN

May 7, 2003

Mr. Michael D. Rogers
President
Millis Plumbing Co., Inc.
220 Norfolk Street
Walpole, MA 02081

Re:    North Brookfield Jr./Sr. High School Project, North Brookfield, MA;
       Demand for Direct Payment: Plumbing Subtrade Work

Dear Mr. Rogers:

Please be advised that this firm serves as Town Counsel to the Town of North Brookfield, Massachusetts. I am in receipt of your April 9, 2003 demand for direct payment. A copy of the demand letter is attached hereto for your review and convenience. No reply was received from the general contractor, E.J. Sciaba Contracting, Inc. Based upon the information available to the Town, the amount eligible for direct payment is computed as follows:

| | |
|---|---:|
| Plumbing subtrade work certified for payment prior to date of demand ............................................................... | $62,078.10 |
| Change Order work certified for payment prior to date of demand ....... | $ -0- |
| | $62,078.10 |
| Less payments made to you by the general contractor, Sciaba ............................................................................ | $ 55,612.38 |
| | $ 6,465.72 |
| Less Retainage ....................................................................... | $ 3,103.91 |
| Direct Payment Amount ............................................................ | $ 3,361.81 |

PRINTED ON RECYCLED PAPER

KOPELMAN AND PAIGE, P.C.
Mr. Michael D. Rogers
President
May 7, 2003
Page 2

As set forth above, the amount eligible for direct payment is $3,361.81. This payment shall be charged against the next requisition submitted by E.J. Sciaba Contracting, Inc., and paid by the Town from any amounts which may become payable to E.J. Sciaba Contracting, Inc. in accordance with the priority rules established by G.L. c. 30, §39F.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

Thomas W. McEnaney

TWM/rlf
Enc.
cc:    Board of Selectmen
       School Building Committee
       Mr. Lee Dore
       E.J. Sciaba Contracting, Inc.
188904/NBRO/0001

NB41964

**EXHIBIT  D**

```
 1                                    Volume:   I

 2                                    Pages:    1-153

 3                                    Exhibits: 76-99

 4               UNITED STATES DISTRICT COURT

 5               DISTRICT OF MASSACHUSETTS

 6

 7    ------------------------------------------x

 8   AMERICAN MANUFACTURERS MUTUAL

 9   INSURANCE COMPANY,

10                 Plaintiff,

11   vs.                         C.A. NO. 03-40266 CBS

12   TOWN OF NORTH BROOKFIELD,

13                 Defendant.

14    ------------------------------------------x

15

16      30(b)(6) DEPOSITION OF THE TOWN OF NORTH BROOKFIELD

17            By its designee JAMES MURRAY

18             Friday, April 29, 2005

19                  9:00 a.m.

20             HOLLAND & KNIGHT LLP

21              10 St. James Avenue

22            Boston, Massachusetts 02116

23

24         Reporter:  Karen D. Quigley, RPR/RMR
```

James Murray                                                                                    04/29/2005

Page 2

1  A P P E A R A N C E S :
2
3       HOLLAND & KNIGHT LLP
4       (By Deborah S. Griffin, Esquire)
5       10 St. James Avenue
6       Boston, Massachusetts 02116
7       617-523-2700
8           For the Plaintiff
9
10      KOPELMAN AND PAIGE, P.C.
11      (By Thomas M. McEnaney, Esquire)
12      31 St. James Avenue, 7th Floor
13      Boston, Massachusetts 02116
14      617-556-0007
15          For the Defendant
16
17
18
19
20
21
22
23
24

Page 4

| | NO. | PAGE |
|---|---|---|
| 2 | 88  Letter dated 7-23-03 to Deborah | |
| 3 | Griffin from Thomas McEnaney | 117 |
| 4 | 89  Meeting Notes dated 9-10-03 | 119 |
| 5 | 90  Check dated 5-20-03 for $252,844.47 | |
| 6 | to E.J. Sciaba | 128 |
| 7 | 91  Check dated 5-20-03 for 443,733.76 | |
| 8 | to E.J. Sciaba | 128 |
| 9 | 92  Letter dated 11-12-03 to Thomas | |
| 10 | McEnaney from Deborah Griffin | 139 |
| 11 | 93  Letter dated 11-12-03 to Deborah | |
| 12 | Griffin from Thomas McEnaney | 141 |
| 13 | 94  Letter dated 11-12-03 to Thomas | |
| 14 | McEnaney from Deborah Griffin | 144 |
| 15 | 95  Letter dated 11-21-03 to Thomas | |
| 16 | McEnaney from Deborah Griffin | 144 |
| 17 | 96  Completion Contract | 145 |
| 18 | 97  Performance Bond | 145 |
| 19 | 98  Letter dated 12-15-03 to Chris Fontaine | |
| 20 | from James Caldwell | 145 |
| 21 | 99  Meeting Notes dated 12-17-03 | 146 |
| 22 | | |
| 23 | Afternoon Session | 88 |
| 24 | ***Original exhibits retained by Ms. Griffin. | |

Page 3

1                    I N D E X
2
3  DEPOSITION OF:                          PAGE
4  JAMES MURRAY
5  BY MS. GRIFFIN                            5
6
7  --------------------------------------------
8              E X H I B I T S
9  NO.                                       PAGE
10  76  Notice of Deposition              11
11  77  General Conditions of the contract    53
12  78  Project Manual Volume 1 of 2        53
13  79  Addendum No. 2                     53
14  80  Minutes dated 11-6-02              66
15  81  Minutes dated 11-20               67
16  82  Minutes dated 11-20-02             70
17  83  Minutes dated 2-5-03               79
18  84  Minutes dated 2-26-03              82
19  85  Letter dated 4-23-03 from Robert
20      O'Neill to Edward Sciaba          111
21  86  Memo dated 5-15-03 to Robert
22      O'Neill from Ed O'Malley          111
23  87  Letter dated 7-2-03 to Deborah
24      Griffin from Thomas McEnaney      117

Page 5

1                 P R O C E E D I N G S
2
3              JAMES MURRAY,
4  a witness called for examination by counsel for the
5  Plaintiff, having been satisfactorily identified by the
6  production of his driver's license and duly sworn, was
7  examined and testified as follows:
8
9          MS. GRIFFIN:  The parties have
10  stipulated that the witness may read and sign the
11  deposition but it need not be before a notary, and that's
12  the only stipulation.
13
14              DIRECT EXAMINATION
15  BY MS. GRIFFIN:
16      Q.  Would you state your full name please.
17      A.  James William Murray.
18      Q.  Where do you live?
19      A.  46 Lakeview Road, North Brookfield, Mass.
20      Q.  What do you do for work?
21      A.  Civil engineer.
22      Q.  By whom are you employed?
23      A.  ET&L Corp.
24      Q.  Where are they located?

2 (Pages 2 to 5)

James Murray                                                                                    04/29/2005

Page 6

1      A.  Stow, Mass.
2      Q.  And what type of work do they do?
3      A.  Highway and bridge construction and site
4  development.
5      Q.  What's your position with ET&L?
6      A.  Professional engineer and project manager.
7      Q.  Do you hold any registrations or licenses?
8      A.  Yes, registered professional engineer.
9      Q.  And would you -- how long have you been
10  with ET&L?
11      A.  About four years.
12      Q.  Could you give your employment history
13  before that time?
14      A.  Prior to ET&L I was with McManus
15  Excavating about five years.  Prior to that I was with
16  the Mass. Highway Department for about six years.  How
17  far back do we want to go?
18      Q.  All the way back to college.
19      A.  All the way back to college.  Can I go the
20  other way?
21      Q.  Sure.
22      A.  Well, I graduated from college in 1980.  I
23  went to work for -- let me see -- Daniel O'Connell and
24  Sons out of Holyoke.  I would say that was roughly four

Page 7

1  years.  Then I went to work for Gutirezz Construction
2  Company out of Burlington, Mass. was probably five years
3  and then Mass. Highway and so on.
4      Q.  Where did you go to college?
5      A.  Worcester Polytechnic Institute.
6      Q.  And what degree did you earn there?
7      A.  Civil engineer, bachelor of science.
8      Q.  Did you have any formal post-graduate
9  education?
10      A.  No.
11      Q.  When did you become a registered
12  professional engineer?
13      A.  1995.
14      Q.  When you were working for Daniel O'Connell
15  and Sons, what was your job?
16      A.  Assistant superintendent of construction.
17      Q.  What type of construction projects did you
18  work on with Daniel O'Connell and Sons?
19      A.  Building construction.
20      Q.  When you were with Gutirezz, what was your
21  position?
22      A.  Superintendent of construction.
23      Q.  What type of construction projects did you
24  work on there?

Page 8

1      A.  Building construction.
2      Q.  And with Mass. Highway what was your
3  position?
4      A.  Resident engineer.
5      Q.  Did you work on roads and bridges, a whole
6  array of jobs that Mass. Highway does?
7      A.  Yes.
8      Q.  What was your position with McManus
9  Excavating?
10      A.  Project manager and estimator.
11      Q.  What type of projects did you work on
12  there?
13      A.  Mainly site development for commercial
14  projects and subdivisions, residential subdivisions.
15      Q.  Have you done any teaching, speaking or
16  writing in your capacity as a registered professional
17  engineer?
18      A.  No.  Well, as far as writing I mean I've
19  written numerous letters.
20      Q.  For publication?
21      A.  No.
22      Q.  Do you currently hold a position with the
23  town of North Brookfield?
24      A.  Employed?

Page 9

1      Q.  Any kind of position, volunteer or
2  otherwise?
3      A.  I'm a volunteer, co-chairman of the school
4  building committee.
5      Q.  Do you hold any other positions with the
6  town?
7      A.  No.
8      Q.  How long have you served as co-chair of
9  the school building committee?
10      A.  Best of my knowledge I would it's probably
11  four years.
12      Q.  Going back to 2001?
13      A.  Best of my knowledge.  I don't know the
14  exact date.
15      Q.  Can you recall what stage of planning the
16  junior/senior high school was in when you became co-chair
17  of the school building committee?
18      A.  There was no stage of planning.  The
19  building committee was formed to pursue the design and
20  construction of the school.
21      Q.  So your tenure as co-chair coincided with
22  the entire life of the committee?
23      A.  No, it didn't.
24      Q.  Did the committee exist before you came on

3 (Pages 6 to 9)

James Murray                                                                                           04/29/2005

Page 10

1  the committee?
2      A.  No, but I wasn't co-chair.
3      Q.  Okay.  So you've been on the committee as
4  long as the committee's been in existence?
5      A.  Correct.
6      Q.  When did you become co-chair?
7      A.  Exact date I couldn't tell you but
8  approximately six months after the committee was formed.
9      Q.  And when was the committee formed?
10     A.  I don't know the exact date.
11     Q.  Do you remember the year?
12     A.  I would say it's 2000 but I'm not
13 positive.
14     Q.  What have been your responsibilities as a
15 member of the school building committee?
16     A.  I'm not sure I understand the question.
17     Q.  What have you had to do in your role as a
18 committee member?
19     A.  As a co-chair I run the committee
20 meetings.  I mean if you're asking what the committee is
21 in charge of as a whole, I could better explain that.
22     Q.  Okay.  What is the purpose of the school
23 building committee?
24     A.  The purpose of the committee was to

Page 11

1  oversee the selection process of an architect and to
2  oversee the construction of the new school.
3          MS. GRIFFIN:  Let's mark this as the
4  next exhibit.  We're going to continue numbering from
5  where we left off the last time so this will be No. 76.
6          (Document marked for identification
7          as Exhibit No. 76.)
8  BY MS. GRIFFIN:
9      Q.  Would you take a look at the document
10 that's been marked as Exhibit 76, please.  Have you seen
11 Exhibit 76 before?
12     A.  You have to give me a minute to review it.
13         (Pause.)
14     A.  Yes.
15     Q.  And have you been designated by the town
16 of North Brookfield to be a witness for the town at
17 today's deposition with respect to some of the topics
18 listed on beginning on page five in Exhibit 76?
19     A.  I have been deemed the most knowledgeable
20 on the majority of these items.
21     Q.  And has the town designated you to come
22 testify about those items?
23         MR. McENANEY:  If you understand, you
24 can answer the question.  Do you understand what she

Page 12

1  says?
2      A.  I really don't understand when you say the
3  town.  The town's Selectmen or...
4      Q.  Well, if you look at the first page of the
5  exhibit, it says the deponent which is the town shall
6  designate one or more persons most knowledgeable to
7  testify, and what I'm trying to find out is if you're the
8  person that's been designated?
9      A.  I would say yes.
10     Q.  And are there some topics on the list in
11 Exhibit 76 that you have not been designated for?
12     A.  Yes.
13     Q.  Which topics have you not been designated
14 for?
15         (Pause.)
16     A.  Item 14, item 12, item 13, partially on
17 item three.  That's it.
18     Q.  Okay.  What part of item three have you
19 not been designated on?
20     A.  I don't make the payments to Sciaba.
21     Q.  Who does make the payments?
22     A.  I don't know.
23     Q.  All right.  Did you finish your list of
24 the topics that you have not been designated for?

Page 13

1      A.  Yes.
2      Q.  I'm going to show you a document that was
3  marked previously as Exhibit 5.  Would you take a look at
4  that please.
5          (Pause.)
6      Q.  Have you seen Exhibit 5 before?
7      A.  No, I haven't.
8      Q.  Along the top of each page of Exhibit 5
9  but inside the chart there's some years above the listing
10 of the months.  Do you see that?
11     A.  Yes.
12     Q.  And on the first page there's a reference
13 to 2000 and 2001.
14     A.  Yes.
15     Q.  And then on the second page of the
16 document the years jump to 2006, 2007 and under the
17 columns where it says 2006, 2007 there's a row that says
18 bidding; do you see that?
19     A.  Yes.
20     Q.  Was there a time in the planning of the
21 junior/senior high school project when it was anticipated
22 that the design work would be done and then the project
23 would pause and bidding would not take place until 2006?
24     A.  No.

LegaLink Boston
(617) 542-0039

James Murray                                                                04/29/2005

Page 30

1  contract between Dore and Whittier and the town covering
2  construction management services; correct?
3      A.  Yes, it is.
4      Q.  Who negotiated the construction management
5  services agreement that's been marked Exhibit 7?
6      A.  The building committee.
7      Q.  And who particularly on the building
8  committee conducted those negotiations?
9      A.  The entire committee.
10      Q.  The negotiations took place in formal
11  school building committee meetings?
12      A.  Yes.
13      Q.  There were no discussions outside of
14  meetings with Dore and Whittier about the terms of this
15  agreement?
16      A.  Not with the building committee.
17      Q.  Were there discussions outside of building
18  committee meetings with Dore and Whittier in which the
19  terms of Exhibit 7 were negotiated by less than the full
20  committee?
21          MR. McENANEY:  Objection.  You can
22  answer the question.
23      A.  Not that I'm aware of.
24      Q.  Did the school building committee have

Page 31

1  counsel involved in the negotiation of the construction
2  management services agreement with Dore and Whittier?
3          MR. McENANEY:  Objection.  You can
4  answer yes or no to that question.
5      A.  Yes.
6      Q.  Who was that counsel?
7          MR. McENANEY:  Objection.  You can give
8  the name but that's it.
9          THE WITNESS:  I have a question.
10          MR. McENANEY:  She asked you the name
11  of whoever the attorney was or the law firm that
12  represented you, and you can give that but nothing
13  further regarding any discussions that you may have had.
14      A.  I recall two counsels reviewed the
15  contract.
16      Q.  And who were they?
17      A.  Kopelman and Paige and I don't recall the
18  name of the school committee's counsel.
19      Q.  Was there a particular attorney at
20  Kopelman and Paige that reviewed the architect's
21  contract, the construction management services part of
22  it?
23      A.  I can't answer that question.  I don't
24  know.

Page 32

1      Q.  The page of Exhibit 7 that is numbered
2  34664, would you take a look at that please.
3          (Pause.)
4      Q.  Do you see item Roman numeral number five
5  construction manager $105?
6      A.  Yes.
7      Q.  That was the hourly rate that was to be
8  charged if there were hourly charges for the construction
9  manager's time; correct?
10      A.  Correct.
11      Q.  Exhibit 7, the construction management
12  services contract, appears to have been signed on May 1,
13  2002.  Do you see that?
14      A.  Correct.
15      Q.  And that's the date next to John Dore's
16  signature; right?
17      A.  Correct.
18      Q.  Can you tell me when it was signed by the
19  town?
20      A.  I cannot answer that.
21      Q.  The addendum which is the last page of
22  Exhibit 7 has a May 24, 2002 date.  Can you explain why
23  that page has that date on it?
24      A.  No, I can't.

Page 33

1      Q.  The paragraph two on that page says, "If
2  the construction period extends beyond December 31, 2003
3  through no fault of the owner, it is the owner's intent
4  to have any additional construction management costs paid
5  out of liquidated damages," et cetera, I won't read the
6  whole thing.  Was that language the subject of discussion
7  in the school building committee meeting?
8      A.  I don't recall.
9      Q.  Do you have any information about how that
10  language came to be part of the contract?
11      A.  To the best of my knowledge it was under
12  the recommendation of counsel.
13      Q.  And how did the date of December 31, 2003
14  come to be selected as the date that appears in that
15  paragraph?
16      A.  I believe that's the completion date of
17  the school project as bid at the time.
18      Q.  I'm going to show you the document that's
19  been marked as Exhibit 22.  Would you take a look at that
20  please, and in particular if could you turn to the second
21  page of Exhibit 22.
22          Exhibit 22 is the contract between E.J.
23  Sciaba Contracting and the town for this project; right?
24      A.  Correct.

9 (Pages 30 to 33)

James Murray                                                                        04/29/2005

Page 50

1      A.   Correct.
2      Q.   All right.  And what did you discuss with
3  Mr. Hasenfus?
4      A.   I discussed his recollection of the I
5  believe it was the May meeting with the surety.
6      Q.   Anything else you discussed with
7  Mr. Hasenfus?
8      A.   No.
9      Q.   What did you discuss with Mr. O'Neill?
10      A.   I asked Mr. O'Neill if he could send me
11  the copies of the minutes of the May meeting with the
12  surety.
13      Q.   All right.  Did you discuss anything else
14  with Mr. O'Neill to prepare for today's deposition?
15      A.   No.
16      Q.   Did you talk to any members of the school
17  building committee to prepare for today's meeting?
18      A.   No.
19      Q.   In Exhibit 67 which is the invoice, would
20  you turn to invoice No. 36 please.  This is an invoice
21  that covers the period June 26 to July 25, '03; right?
22      A.   Yes.
23      Q.   And on this invoice No. 36 the town was
24  billed for 14 hours of the project manager's time and 151

Page 51

1  hours of the construction manager's time; right?
2      A.   Yes.
3      Q.   And did you see that the total charge for
4  the construction manager's time was $16,610?
5      A.   Yes.
6      Q.   Did the town request any information from
7  Dore and Whittier about what the construction manager did
8  for 151 hours?
9      A.   Not that I'm aware of.
10      Q.   Did the town request any information about
11  what the project manager did for 14 hours during the
12  period covered by invoice 36?
13      A.   Not that I recall.
14      Q.   Did the town ever receive copies of time
15  cards or time records showing what activities Dore and
16  Whittier was billing the town for on a time-card basis?
17      A.   I don't know if the town did.  The
18  building committee did not receive actual time cards, but
19  it was discussed at building committee meetings the hours
20  charged.
21      Q.   Was there a discussion of invoice 36 --
22  strike that.  Was there a discussion at a school building
23  committee meeting of the time spent by Chris Conway
24  during the period June 26 to July 25, '03?

Page 52

1      A.   I don't recall.
2      Q.   Did the town ever question why the charges
3  for the construction manager's time while the project was
4  shut down for the period June 26 to July 25, '03 were
5  higher than when construction was going on?
6      A.   Could you ask that again?
7      Q.   We talked earlier about the fact that the
8  monthly charge while construction was ongoing for
9  construction management services by Chris Conway was
10  $11,325; right?
11      A.   Yes.
12      Q.   And in invoice 36 the town was billed
13  $16,610 for Mr. Conway's time; right?
14      A.   Yes.
15      Q.   And that's higher than the monthly charge
16  the town received when construction was underway;
17  correct?
18      A.   Correct.
19      Q.   Did the town ever question why it should
20  be being billed more when the job was shut down than it
21  was paying for construction, the construction manager's
22  time when construction was ongoing?
23      A.   No.
24      Q.   And for months after the one that we were

Page 53

1  just looking at in invoice 36 is your answer the same,
2  the town did not question why charges during any of those
3  months were higher than the charges when construction
4  were ongoing?
5      A.   That would be the same answer, yes.
6          MS. GRIFFIN:  Let's go off the record
7  for a minute.
8          (Off the record from 10:43 until
9          10:50 a.m.)
10          (Documents marked for identification
11          as Exhibit Nos. 77 through 79.)
12  BY MS. GRIFFIN:
13      Q.   I've put before you, Mr. Murray, documents
14  that have been marked Exhibits 77, 78 and 79.  Could you
15  look at Exhibit 77 and confirm that Exhibit 77 is a copy
16  of the general conditions of the contract that were part
17  of the contract between the town and Sciaba?
18      A.   I believe they are.
19      Q.   Can you go to Exhibit 78 and confirm that
20  Exhibit 78 is a copy of the first volume of the project
21  manual that was part of Sciaba's contract with the town?
22      A.   Yes, it is.
23      Q.   Can you take a look at Exhibit 79 and
24  confirm that Exhibit 79 is a copy of Addendum No. 2 that

14 (Pages 50 to 53)

James Murray                                                                04/29/2005

Page 126

1    Q.   And therefore took no steps; correct?
2    A.   Correct.
3    Q.   Let me show you the document that was
4  marked previously as Exhibit 59.
5        (Pause.)
6    Q.   Have you seen Exhibit 59 before?
7    A.   Yes, I have.
8    Q.   Did you see it shortly after November 5,
9  2003?
10   A.   Yes.
11   Q.   When you received your copy of Exhibit 59,
12 did you understand that the surety's claim regarding
13 overpayment was now at over a million dollars?
14   A.   Yes.
15   Q.   Did the school building committee discuss
16 the November 5th letter at any of its meetings?
17   A.   I'm sure I mentioned the letter.  I don't
18 think there was much discussion on it.
19   Q.   Between the time you received your copy of
20 the November 5th letter, Exhibit 59, and the time the
21 completion contract with Fontaine was signed, did the
22 town take any steps to arrange for additional funding in
23 the event the surety's overpayment claim was successful?
24   A.   No.

Page 127

1    Q.   Do you recall that in December 2003 the
2  surety sent some checks to the town in connection with
3  the tender of Fontaine as the completion contractor?
4    A.   Yes.
5    Q.   Did you ever see those checks yourself?
6    A.   No.
7    Q.   Where did they go, do you know?
8    A.   I believe they went to the town treasurer,
9  but I'm not positive.
10   Q.   Did -- do you know whether the checks that
11 the surety sent to the town in connection with the tender
12 of Fontaine were deposited by the town and used?
13   A.   I can only assume so.
14   Q.   Who would know that?
15   A.   Town accountant.
16   Q.   Who's that?
17   A.   Nancy Nikiel, N-I-K-E-I-L.
18       MR. McENANEY:  I believe it's I-E-L.
19   Q.   Is she a town employee?
20       MR. McENANEY:  Yes.
21   Q.   I'm going to show you the document that
22 was marked previously as Exhibit 71 -- strike that.  I'm
23 going to show you the document that was marked previously
24 as Exhibit 70 and also 72.

Page 128

1        (Documents marked for identification
2          as Exhibit Nos. 90 and 91.)
3  BY MS. GRIFFIN:
4    Q.   Have you seen Exhibit 90 before or any
5  part of it?
6    A.   90, no, I have not.
7    Q.   Can you identify the check, at least the
8  front of the check at the top of Exhibit 90, as a check
9  that the town of North Brookfield cut in favor of E.J.
10 Sciaba Contracting Company?
11   A.   That's what it is, yes.
12   Q.   And is exhibit, the check shown in Exhibit
13 90 the check that was delivered in payment of application
14 No. 12 which was Exhibit 70?
15   A.   I can't answer that question.
16   Q.   Why is it you can't answer that question?
17   A.   It appears to me Exhibit 90 and Exhibit 70
18 have two different amounts on them.
19   Q.   Do you see at the bottom of Exhibit 70
20 where it says recommend providing separate checks to
21 Millis and Greenwood, see attached memo?
22   A.   Yes.
23   Q.   And on the second page of Exhibit 70 it's
24 got the -- strike that.  On the third page of Exhibit 70

Page 129

1  it's got the dollar amounts of the direct payment claims
2  that Dore and Whittier was recommending be paid; correct?
3    A.   Correct.
4    Q.   Those two direct payment claims total
5  between 34 and $35,000; right?
6    A.   Correct.
7    Q.   And does that dollar amount account for
8  the difference between the amount payable on application
9  No. 12 and the amount of the check in Exhibit 90?
10   A.   Without doing the exact math it appears
11 that way, yes.
12   Q.   So having looked at that can you now
13 confirm that the check that's shown in Exhibit 90 is the
14 check that the town delivered to Sciaba in payment of
15 application 12?
16   A.   Since I didn't write the check I can only
17 assume that is correct.
18   Q.   You don't have any reason to believe
19 otherwise; right?
20   A.   No.
21   Q.   Was my statement correct?
22   A.   Correct.
23   Q.   Exhibit 91 was the check that the town
24 prepared to Sciaba in payment of application 13B, Exhibit

33 (Pages 126 to 129)

James Murray                                                                04/29/2005

Page 130

1  70; correct?
2       A.  It appears to be.
3       Q.  Now did the town deliver these two checks
4  in Exhibits 90 and 91 to Dore and Whittier for delivery
5  to Sciaba?
6       A.  My recollection was that at least one of
7  these checks was hand delivered to Sciaba after the May
8  21st meeting.
9       Q.  And where did you get that understanding?
10      A.  Mr. O'Neill.
11      Q.  Did he say who delivered the check?
12      A.  No, he did not.
13      Q.  At the time -- strike that.  Did
14  Mr. O'Neill say who delivered -- strike that.  Was
15  whoever delivered the check to Sciaba authorized by the
16  school building committee to deliver the check?
17      A.  No.
18      Q.  I'm sorry?
19      A.  No.
20      Q.  You don't know who it was who delivered
21  the check?
22      A.  No, I don't.
23      Q.  Is it your testimony that the person who
24  delivered the check to Sciaba was not authorized to

Page 131

1  deliver the check?
2       A.  I guess I need to know what authorized
3  means.
4       Q.  When was it that Mr. O'Neill told you the
5  check was delivered after the meeting?
6       A.  I don't recall the exact date, but it was
7  sometime after that May 21st meeting.
8       Q.  Approximately how long after?
9       A.  To the best of my recollection was a few
10  days.
11      Q.  When you learned from Mr. O'Neill that a
12  check had been delivered after the meeting, did you
13  express dismay to him that that shouldn't have been done?
14      A.  No.
15      Q.  Did you think that it shouldn't have been
16  done?
17      A.  No.
18      Q.  So as far as you were concerned it was
19  okay that the check had been delivered?
20      A.  Correct.
21      Q.  At the time the check was delivered to
22  Sciaba -- the check you're talking about is Exhibit 90,
23  right, the one that was delivered right after the
24  meeting?

Page 132

1       A.  I believe it was the first one.
2       Q.  Okay.  That was the May 20th -- well, both
3  checks are dated May 20; correct?
4       A.  Yes, they are.
5       Q.  Okay.  So it was at the time that Exhibit
6  90, the $252,000 check was delivered to Sciaba, you
7  already knew and believed that the project was 14 months
8  late; right?
9       A.  Correct.
10      Q.  And you already knew that the retainage
11  that the town was holding was not enough to cover
12  liquidated damages; correct?
13          MR. McENANEY:  Objection.  You can
14  answer.
15      A.  Well, we could only make an assumption.
16      Q.  But that's what you believed; right?
17      A.  Based on a projected schedule.
18      Q.  Before the check was delivered to Sciaba,
19  the Exhibit 90, the $252,000 check was delivered to
20  Sciaba, did the town take any action to determine what
21  claims the town had against Sciaba?
22      A.  I don't understand the question.
23      Q.  Did the town or any town official or town
24  committee members ask themselves do we have any claims

Page 133

1  against Sciaba that should -- do we have any claims
2  against Sciaba?
3       A.  Claims?  I'm not sure what you mean by
4  claims.
5       Q.  Did anybody on behalf of the town ask Dore
6  and Whittier whether there was a basis to reduce the
7  amount that they had previously approved on application
8  No. 12?
9       A.  Could you repeat that please.
10      Q.  Well, Dore and Whittier had signed off on
11  application No. 12 sometime in April; correct?
12      A.  That's correct.
13      Q.  And between the time the architect signed
14  off on application 12 and the time the check was
15  delivered, at least three or four weeks had passed,
16  hadn't they?
17      A.  Yes.
18      Q.  Between the time the architect signed off
19  on application 12 and the time the check for that
20  application was delivered to Sciaba, did anyone ask Dore
21  and Whittier whether they still considered the
22  certification to be applicable?
23      A.  No.
24      Q.  Between the time the architect initially

34 (Pages 130 to 133)