**EXHIBIT  F**

Law Offices

# HOLLAND & KNIGHT LLP

10 St. James Avenue
Boston, Massachusetts 02116

617-523-2700
FAX 617-523-6850
http://www.hklaw.com

| | |
|---|---|
| Annapolis | Oakbrook |
| Atlanta | Orlando |
| Bethesda | Portland |
| Boston | Providence |
| Bradenton | San Antonio |
| Chicago | San Francisco |
| Fort Lauderdale | Seattle |
| Jacksonville | St. Petersburg |
| Lakeland | Tallahassee |
| Los Angeles | Tampa |
| Miami | Washington, D.C. |
| New York | West Palm Beach |
| Northern Virginia | |

International Offices:          São Paulo
Caracas*                        Tel Aviv*
Helsinki                        Tokyo
Mexico City
Rio de Janeiro                  *Representative Offices

November 21, 2003

**DEBORAH S. GRIFFIN**
617-305-2044

Internet Address:
deborah.griffin@hklaw.com

*VIA E-MAIL and*
*First Class Mail*



Thomas W. McEnaney, Esq.
Kopelman & Paige, P.C.
31 St. James Avenue, 7th Floor
Boston, MA  02116

      *Re:*    *North Brookfield Intermediate & Senior High School Project*
            *Surety:*      *American Manufacturers Mutual Insurance Co.*
            *Bond No.:*    *3SE 057 856*
            *Claim No.:*   *167-SE-002-989*

Dear Tom:

      Since sending you, on November 12, 2003, the two originals of the
Completion Contract executed by Fontaine Bros., Inc., and its Performance and
Payment Bonds and Certificate of Liability Insurance, it has come to my
attention that those documents contained the two different contract amounts.
The figure on which Fontaine and the surety had agreed was, as stated in my
cover letter to you of November 12, $11,381,362. That amount is correctly
reflected in Fontaine's Labor and Material Payment Bond. However, an
incorrect figure of $11,527,000, was stated in the Completion Contract itself and
in the Performance Bond. I have brought this scrivener's error to Fontaine's
attention and Fontaine has acknowledged it.

      In addition, we have since learned that the $11,381,362 figure was based
on a mistake on the part of both Fontaine and the Surety as to the amount of
one of the subcontractor ratification agreements. That mistake was in the
amount of $15,934.35, which should bring the correct contract amount to
$11,397,296.35. It is my understanding that Fontaine is prepared to execute a



Thomas W. McEnaney, Esq.
November 21, 2003
Page 2

credit change order to the Completion Contract that would make an adjustment on account of both of these errors. However, if the Town's acceptance of the Completion Contract and its issuance of a Notice to Proceed is delayed any further, the amount of the adjustment may be reduced if that delay increases Fontaine's completion costs.

AMMIC has continued its analysis of its obligations under its performance bond, notwithstanding the Town's refusal to provide us with copies of the Town's contract with Dore & Whittier, and the invoices the Town has received to date for design and construction management fees. I am enclosing with this letter a two-page analysis that sets forth the surety's calculation of amounts owed on its performance bond. On the basis of information available to it at this time, the surety believes it owes the Town of North Brookfield $2,538,838.37. It is in the process of issuing a check in that amount payable to the Town of North Brookfield. As soon as I receive it, I will hand-deliver it to you unconditionally.

AMMIC has taken note of the Town's failure to appropriate the additional funds necessary above that amount to pay the difference between Fontaine's price to complete and the contract balance, which difference is $3,197,996.17. AMMIC is also aware that the Town is likely to disagree with certain aspects of the surety's calculation of the amount owed, although we are not certain of the extent of that disagreement. In addition to delivering unconditionally the above-referenced check in the amount of $2,538,838.37, AMMIC is preparing to deliver to you an additional check in the amount of $659,157.80 under a reservation of rights, negotiation of which will be conditioned upon the Town executing the Completion Contract with Fontaine and issuing it a Notice to Proceed. We will continue our efforts to resolve the differences between the surety and the Town concerning disputed aspects of the Town's claims and the surety's defenses, with the $659,157.80 to be credited against any additional amount the parties may agree, or a court may determine, that AMMIC owes. If such additional amounts are lower, the difference is to be refunded to AMMIC.

To respond to the point in your November 14, 2003 letter concerning latent defects, AMMIC is prepared to pay for the reasonable and necessary costs incurred by the Town under the Fontaine contract, for latent defects caused by Sciaba's work. It believes that Fontaine's contract price covers any other defective, deficient, deteriorated or otherwise unacceptable work.

Contrary to the statements on the second page of your November 14 letter, AMMIC is not obligated to complete the project. It believes it has complied fully with its obligations under the bond by delivering the Fontaine

Thomas W. McEnaney, Esq.
November 21, 2003
Page 3

contract to the Town, as well as committing to make the unconditional payment referenced above.

     Once again, we urge the Town to take the necessary steps to mitigate its damages and to execute the agreement with Fontaine without delay (and thus minimize or eliminate any decrease in the necessary credit change order).

Very truly yours,

HOLLAND & KNIGHT LLP

Deborah S. Griffin

DSG/bsw: # 1381969_v1
431261.00002
Enclosure
cc:    Robert P. Garrity, Esq. (w/encl., via e-mail)
       Stephen J. Beatty, Esq. (w/encl., via e-mail)
       Richard P. Anastasio, P.E. (w/encl., via e-mail)

| North Brookfield Claims Analysis | | |
|---|---|---|
| Item | Amount | Notes on Surety's Position |
| Fontaine's Price to Complete | $11,397,296.35 | |
| Contract Balance | -$8,199,300.18 | |
| Completion Deficiency | $3,197,996.17 | |
| | | |
| | | C.O. 3 extended completion to 12/15/03 for both phases |
| Liquidated Damages | $228,000.00 | plus 60 days weather delays -- see Completion Date Sheet |
| Roof Repair | $0.00 | Work performed within extended time for completion |
| Legal Fees | $10,000.00 | |
| Design and Construction Management Services | $164,371.43 | See Completion Date sheet |
| | | |
| Total of Town's Claims | $3,600,367.60 | |
| | | |
| Overpayment defense | | |
| May payments | $696,578.23 | |
| | $2,903,789.37 | |
| Earlier overpayments - Div. 1 | $120,697.00 | |
| Earlier overpayments - Div. 2 | $226,213.00 | |
| Earlier overpayments - Div. 9 | $18,041.00 | |
| Total earlier overpayments | $364,951.00 | |
| | | |
| Total due from surety | $2,538,838.37 | |
| | | |
| Shortfall against completion cost | $659,157.80 | |

| Time Related Claims | | | |
|---|---|---|---|
| | | | |
| Original Dates | Date | days/amounts | comment |
| Contract Inception | 4/19/2002 | | |
| Substantially Complete New Building | 7/17/03 | 453 | |
| | | | |
| Substantially Complete Demolition of Old Building and Parking Lot | 11/15/03 | 118 | |
| Total | | 571 | |
| | | | |
| Extended Substantially Complete New Building | 2/13/2004 | 659 | December 15 per C.O. 3 plus 60 days weather delay |
| Extended Substantially Complete Demolition of Old Building and Parking Lot | 2/13/2004 | 0 | December 15 per C.O. 3 plus 60 days weather delay |
| | | 659 | |
| | | | |
| Fontaine's dates | | | |
| New Building | 8/15/04 | 182 | |
| Old Building and Parking Lot | 10/1/04 | 46 | |
| Total days late on which liquidated damages assessed | | 228 | |
| | | | |
| Liquidated Damages | | $228,000.00 | at $1000 per day |
| | | | |
| | | | |
| Design and Construction Management Dates | | | |
| | | | |
| Delay in days from above | | 228 | |
| Delay in weeks | | 33 | |
| | | | |
| Work suspended from | 5/31/2003 | | |
| to | 11/17/2003 | 167 | |
| Duration of suspension in weeks | | 24 | |
| Net additional weeks of design and c.m. services | | 9 | |
| | | | |
| Weekly rate for design and c.m. services | | $10,600.00 | weekly rate includes 40 hours a week for CM, not 50 as claimed by Town |
| | | | |
| Total cost for net additional weeks | | $92,371.43 | |
| | | | |
| Actual billings during suspension through 9/20/03 | | $48,000.00 | In the absence of copies of actual bills, running rate reduced from $4,800 claimed by Town to $3,000: 20 hours a week for CM; 2 hours a week for principal = $2,550, rounded up. |
| Estimated billings during suspension 9/20-11/17/03 8 wk x 4800/ wk | | $24,000.00 | Same as above |
| | | $164,371.43 | |



**EXHIBIT  G**



## COMPLETION CONTRACT

THIS COMPLETION CONTRACT (the "Completion Contract") is entered into this 15 day of Dec , 2003, by and between the Town of North Brookfield (the "Town") and Fontaine Bros., Inc. (the "Completion Contractor").

### RECITALS:

WHEREAS, on or about April 19, 2002, E.J. Sciaba Contracting Co., Inc. (the "Former Contractor"), and the Town entered into a contract (the "Original Contract") for construction of the Junior/Senior High School, North Brookfield, Massachusetts (the "Project"), in accordance with the terms and provisions of the Original Contract, including all contract documents forming a part of the Original Contract, as amended;

WHEREAS, the Former Contractor voluntarily defaulted or otherwise indicated its inability to perform the Project, and the Owner has called upon the Surety to fulfill its obligations as surety under the terms of the Performance Bond;

WHEREAS, the Town has terminated the right of the Former Contractor to perform the Original Contract; and

WHEREAS, the Town and the Completion Contractor desire to enter into this Completion Contract under the terms and conditions hereinafter set forth;

NOW, THEREFORE, the Town and the Completion Contractor, for and in consideration of the mutual obligations and promises hereinafter set forth, do contract and agree as follows:

### AGREEMENTS:

1. **Completion Contract Documents.** This Completion Contract consists of the terms and provisions contained herein and the Original Contract, including the Project Schedule, all General, Supplementary and Special Conditions, drawings, specifications, forms, addenda and documents forming a part of the Original Contract, and any approved change orders, construction change directives, amendments and modifications thereto, the scope of work set forth in the Request for Proposals pursuant to which the Completion Contractor bid was and was selected, and the items of deficient work listed in the Deficiency Log dated August 29, 2003 and the Steel Field Repair Log dated August 29, 2003, and all subsequently approved amendments and modifications thereto, all of which are incorporated herein by reference and which are hereinafter referred to collectively as the "Contract Documents."

EXHIBIT
Murray
96
4-29-05   KQ

2.    **Strict Compliance.** The Completion Contractor shall be bound to the Town by all of the terms and provisions of the Contract Documents, including administrative as well as technical provisions, and shall strictly comply therewith in all respects.

3.    **Work to be Performed.** The Completion Contractor shall furnish and pay for all labor, materials, services and equipment and shall do everything else necessary to perform and satisfactorily complete the Original Contract as required by the Contract Documents as defined above.

4.    **Time for the Performance of the Work.** The Completion Contractor shall commence work within five (5) days after receipt of a written Notice to Proceed issued by the Town, and shall substantially complete all work in accordance with the terms and conditions of the Contract Documents on or before August 26, 2004, except that the completion of Phase 4 parking lot and related work that, under Section 3.3 of the Original Contract (prior to any time extensions), was required to be performed by "17 November 2003" shall be complete on or before October 11, 2004. Subject to allowable time extensions as provided under the terms of the Original Contract, if the Completion Contractor fails to complete the work under the Completion Contract in the times allowed by this paragraph, the Completion Contractor is liable to the Town for all liquidated damages as provided for under the Original Contract on account of the Completion Contractor's failure to complete such work by the date of completion set forth herein. Nothing herein shall be construed as limiting in any way the right of the Town to determine, not later than June 15, 2004 that reasonable grounds exist to conclude that the new buildings will not be completed by August 26, 2004, in which event the Town has the absolute right to refuse turnover of the existing building to Completion Contractor for demolition. In the event that the Town exercises its right to suspend the start date for the demolition of the existing building, the Town shall provide Fontaine with a reasonable time extension to the Phase 4 completion date. If the Town suspends the start date of the demolition of the existing building, Fontaine shall not be entitled to additional compensation for any additional costs it may incur as a result of such suspension.

5.    **Price.** The Town shall pay to the Completion Contractor and the Completion Contractor agrees to receive and accept $11,672,296 (the "Fixed Price") as full compensation for the performance and completion of the work as described in the Contract Documents, except as otherwise provided herein. Future applications for payment shall be made based upon the Completion Contractor's schedule of values to be submitted within 10 days after receipt of a Notice to Proceed.

6.    **Additional Defects.** The Completion Contractor shall be entitled to additional compensation on a time and materials basis, in accordance with the terms hereof, for correcting defects in the work performed by the Former Contractor that are not shown in the Contract Documents as defined above or which are the result of deterioration occurring after the date of the Deficiency Log, or which were not or could not have been observed by the Completion Contractor in the course of its visits to the Project prior to the submission of its bid to the Surety (the amounts for which the Completion Contractor is entitled to payment on a time and materials basis being the "T&M Price"). The T&M Price shall consist of the actual costs paid by the Completion Contractor

for such work, less all discounts, rebates, and salvages that shall be taken by the Completion Contractor, plus a fifteen percent (15%) markup which shall be inclusive of the Completion Contractor's overhead and profit. The actual costs shall include only the following: the cost of all materials used or consumed in performance, including sales tax and cost of delivery; cost of labor, including social security, old age and unemployment insurance, fringe benefits, and workers' compensation insurance for persons working at the Project site (but not for project management personnel, corporate management personnel or any persons whose regular office is located other than at the Project site); bond premiums; and rental cost of equipment and machinery. The Completion Contractor shall not include in the T&M Price the cost of any work for which a subcontractor, whose subcontract is assigned to the Completion Contractor by the Former Contractor's Surety, is liable under such assigned contract.

7.    **Performance and Payment Bonds.** The Completion Contractor shall provide the Town with Performance and Payment Bonds each in a penal sum equal to the Fixed Price in a form acceptable to the Town prior to the Completion Contractor commencing work. The Completion Contractor's surety must be a commercial surety company currently listed with the U.S. Department of the Treasury and licensed to conduct business in the Commonwealth of Massachusetts.

8.    **Whole Agreement.** This Completion Contract contains the entire understandings and agreements of the parties hereto. All oral or written agreements prior to the effective date of this Completion Contract and which relate to this Completion Contract and the matters set forth herein are declared null and void. Any modification of this Completion Contract must be made in writing and executed by the parties hereto.

9.    **Interpretation.** In the event that there is any provision of this Completion Contract which is inconsistent or conflicting with any other documents forming a part of this Completion Contract, including but not limited to the Original Contract referred to herein, the terms and conditions of this Completion Contract shall govern and control.

10.    **Governing Law.** This Completion Contract is executed pursuant to and governed by the laws of the Commonwealth of Massachusetts.

11.    **Notice.** Any notice required to be made under the terms of this Completion Contract shall be deemed made if either party transmits such notice via facsimile and first class mail, postage pre-paid, as follows:

As to the Completion Contractor:

Fontaine Bros., Inc.
510 Cottage Street
Springfield, MA 01104
Fax: 413-734-1881
Telephone:    413-781-2020
Attn: Christopher J. Fontaine

As to the Town:

> Robert O'Neill
> Superintendent of Schools
> Town of North Brookfield
> 10 New School Street
> North Brookfield, MA 01535
> Fax: (508) _____

> With a copy to:
> Thomas W. McEnaney, Esq.
> Kopelman and Paige, P.C.
> 31 St. James Avenue
> Boston, MA 02116-4102
> Fax No.: (617) 654-1735
> Telephone:    (617) 556-0007

12.    **Construction of Contract.** It is understood and agreed by the Town and the Completion Contractor that this Completion Contract shall be construed without any regard to any presumption or other rule requiring construction against the party causing this Completion Contract, or any Exhibits attached to this Completion Contract, to be drafted.

13.    **Execution in Counterparts.** This Completion Contract may be executed in one or more counterparts, each of which shall be deemed to be an original.

IN WITNESS WHEREOF, the parties hereto have affixed their hands and seals to this Completion Contract the day and year first set forth above, and the individuals who execute this Completion Contract personally represent and warrant that they have full authority to execute this Completion Contract on behalf of the respective parties.

WITNESS:

_____

**Fontaine Bros., Inc.**

By: _____ (SEAL)

Title: _____

WITNESS:

_____

**Town of North Brookfield**

By: _____ (SEAL)

Title: CHAIRMAN, BOARD of SELECTMEN

**EXHIBIT  H**



EXHIBIT
Murray
98
4-29-05        KR



# TOWN OF NORTH BROOKFIELD
## MASSACHUSETTS 01535

OFFICE OF THE BOARD OF SELECTMEN
Town House, 185 Main Street
Telephone 508-867-0200
FAX 508-867-0249

15 December 2003

Mr. Chris Fontaine
Fontaine Brothers, Inc.
510 Cottage Street
Springfield, MA 01004

RE: NOTICE TO PROCEED

Dear Mr. Fontaine,

Please consider this correspondence official notification to proceed
with the North Brookfield Jr./Sr. High School Project.

The work of the Contract will be as defined in the Dore and Whittier,
Inc. Drawings and Specifications titled North Brookfield Jr./Sr. High
School dated 15 January 2002 and including Addenda numbered 1
through 4.

Also, please understand that no work may commence without the
Architect and the Owner receiving valid Insurance Certificates for
Fontaine Brothers, Inc. as well as Filed Sub-Contractors. The Town
also requests submittal of the following in accordance with the
Instructions to Bidders prior to executing the formal contract:

     a. Performance Bond and Labor and Materials Payment
Bond, each of a surety company qualified to do business under the
laws of the Commonwealth of Massachusetts and satisfactory to the
Awarding Authority and each in the sum of One Hundred Percent
(100%) of the Contract Price.
     b. Insurance certificates for the General Contractor and Filed
Sub-Contractors.
     c. Form of Sub-Contract executed and submitted for Filed
Sub-Contractors.
     d. Statement of Management on Internal Accounting Controls
and a Statement prepared by a CPA expressing an opinion to the
state of Management Controls for the General Contractor,

Subcontractors and purchase orders with a value of $100,000.00 or more.

     e. Certificate of Compliance with MGL requirements for foreign corporation according to Chapters 30-39L. (if applicable)

     f. Certificate of Vote of Corporation (if applicable )

     g. Schedule of Values

     h. Statement of Tax Compliance

     i. Estimated Progress Payment Schedule

Mr. Chris Fontaine
Notice to Proceed
December 15,2003
Page 2

Please signify your receipt and acceptance of this Notice to Proceed by countersigning the copies provided and returning them to this office and Dore and Whittier, Inc.

Sincerely yours,                                             Accepted:


James N. Caldwell, Chairman                    Chris Fontaine
Board of Selectmen                                      President
                                                                    Fontaine
                                                                    Brothers, Inc.
                                                                    Date:


Cc: Jim Murray, Co-Chair, North Brookfield School Building Committee
    R. John Dore, AIA, CSI President, Dore and Whittier, Inc.

# EXHIBIT  I

NORTH BROOKFIELD JR./SR. HIGH SCHOOL DAILY REPORT
Tuesday, December 16, 2003
Report No. 405
Page 1 of 2
Weather: 7:00 AM 15 degrees --- clear and cold
        Noon 40 degrees ------- clear and sunny
        3:00 PM 32 degrees --- ditto
Digital Photos: Digital Photos 608 thru 614 (file dated 12-16-03). All photos are of the underground primary electric and tele/data duct bank conduit installation, concrete encasement and pull boxes. Run location start at the set of pull boxes north of the site trailers (SMH #1) down to the pull boxes opposite building corner 19'/P' line.
Visitors: Fontaine Bros. safety engineer on site for the review on going work a review recommendation of any other safety issues.
Meetings: None.
Inspections: Donald Doe town electrical inspector on site for inspection of the tele/data underground duct bank. Irving Cornire from Mass Electric on site for inspection of the primary electrical duct bank from about 9'/P' line down to the pull box opposite 19'/P' line. All was accepted.
Phone Calls: None.
E-Mail or Faxes: e-mail sent to Lee Dore containing an updated certificate of insurance log.
Significant Material Deliveries: T & M received deliveries of coarse sand for bedding of the underground duct bank.
Time and Material Slip Work: None.
**Special Notes: Per Jim Murray Leslie Scott Burton will forward to Fontaine Brothers an executed copy of the formal Notice To Proceed today and the selectmen signed the completion contract last night.**

## CONTRACTOR ACTIVITY

Fontaine Brothers – 1 General Superintendent (Mike Allen – Site Office), 1- Superintendent (George Davian – Site and Building Superintendent)
Laborers continued general conditions clean up and consolidation of materials around the back part of the site. The O. S. super and carpenters ran a benchmark at the column steel at area "A". Carpenters continued on erecting winter closures for area "C".
Section 02200 Excav. Fill & Grade – T & M Excavating, off loaded excess excavated material from the underground duct bank, placed sand bedding for the tele/data conduits at the underground duct bank from opposite 9'/P' line up towards the north pull boxes. Backfilled and compacted material to rough grade for the duct bank from 9'/P' line north towards the pull boxes.
Section 02300 Storm Drainage – T & M Excavating
Section 03300 Concrete – FBI, carpenters erected forms for the primary electrical conduit concrete encasement from about 9'/P' line down to the pull box opposite 19'/P' line. Laborers placed 2000# concrete at this same location.
Section 04200 Masonry – FBI, foreman on site for general clean up masonry materials and evaluation of work in place.
Section 05100 Structural Steel – Mandate/Builders Resource, no activity
Section 05400 Lt. Gage Metal Framing – Prof Drywall Construction, started layout and installation of exterior stud walls at area "A" along 1 and A line.
Section 06100 Rough Carpentry – FBI, no activity
Section 07100 Waterproofing and Dampproofing – no activity
Section 07200 Building Insulation – FBI, no activity
Section 07500 Roofing, & Sheet Metal – Greenwood, no activity.
Section 08400 Alum. Ent. Doors & Wind. Systems – Cheviot Corp., no activity
Section 15400 Plumbing – Millis Plumbing, no activity
Section 15500 HVAC – KMD/Bonner, no activity
Section 16000 Electrical – Griffin Electric, (see inspections above) continued tele/data underground conduit at the pull box north of the site trailers and completed installation of power conduits at the pull box opposite 19'/P' line.. Monitored placement of primary power conduit concrete encasement (see concrete above for location). Drove ground rods and place ground wire at the two open pull boxes.

MDW014601

NORTH BROOKFIELD JR./SR. HIGH SCHOOL DAILY REPORT
Tuesday, December 16, 2003
Report No. 405
Page 2 of 2


TOTAL PERSONNEL COUNT
Fontaine Brothers – 1-General Superintendent, 1-Outside Superintendent
1-Carp. Foreman, 1-Carpenter
1-Mason Foreman
1-Laborer foreman, 3-Laborers
T & M Equipment – 1-Foreman, 2 Operating Engineers, 2-Laborers
Professional Drywall Const. – 1-Carp. Foreman, 1-Carpenter
Griffin Electric – 1-Foreman, 1-apprentice

EQUIPMENT ON SITE
Fontaine Brothers – 1-Telescoping Lull ATV Materials Handler.
T & M Equipment – 1-Samsung SE-210 excavator, 1 – Bob Cat loader.
Professional Drywall – 1-Platform Scissor Lift


Chris Conway


Resident Construction Manager

File:dr12-16-03

# EXHIBIT  J

```
 1              UNITED STATES DISTRICT COURT
        DISTRICT OF MASSACHUSETTS:  CENTRAL DIVISION
 2

 3

   AMERICAN MANUFACTURERS    *
 4 MUTUAL INSURANCE COMPANY  *
                            *
 5        vs.                * CASE NO. 03-40266 CBS
                            *
 6 TOWN OF NORTH BROOKFIELD *

 7

                D E P O S I T I O N
 8
                        OF
 9
                  LEE P. DORE
10

        Taken on behalf of the Plaintiff on Wednesday
11        April 13, 2005 at the offices of
         Dore and Whittier, So. Burlington, Vermont.
12

13 APPEARANCES:
14 DEBORAH S. GRIFFIN, ESQ., of the firm Holland &
   Knight, 10 St. James Avenue, 11th Floor, Boston,
15 MA 02116, appeared and represented the Plaintiff.
16 THOMAS W. MCENANEY, ESQ., of the firm Kopelman and
   Paige, P.C., 31 St. James Avenue, Boston, MA
17 02116, appeared and represented the Defendant.
18 MATTHEW M. O'LEARY, ESQ., of the firm Donovan
   Hatem LLP, World Trade Center East, Two Seaport
19 Lane, Boston, MA 02210, appeared and represented
   the Deponent.
20
21 COURT REPORTER:  Virginia L. Simmer, RPR
22
23
24
25
```

Lee P. Dore                                                                    04/13/2005

Page 6

1    (Commencing at approximately 9:07 a.m.)
2  LEE P. DORE:  Being first duly sworn by a Notary
       Public to tell the truth, deposes
3       and says as follows:
4     MS. GRIFFIN:  The only stipulation is
5    that we would waive notarization of the
6    signature so the witness can read and sign
7    but it need not be before a notary.
8     MR. O'LEARY:  Okay.  We appreciate
9    that.
10  EXAMINATION BY MS. GRIFFIN
11   Q.  Would you state your name, please?
12   A.  Lee P. Dore.
13   Q.  Where do you live?
14   A.  Charlotte, Vermont.
15   Q.  And you're employed by Dore and Whittier?
16   A.  Yes.
17   Q.  What's your position currently with Dore and
18  Whittier?
19   A.  Project manager.
20   Q.  How long have you been with Dore and Whittier?
21   A.  Ten years.
22   Q.  And have you held other positions besides
23  project manager?
24   A.  I did.  I worked in the marketing department
25  for about four years and then I worked as an

Page 7

1  assistant project manager for a year.
2   Q.  So you've been a project manager for about
3  five years?
4   A.  Yeah.
5   Q.  Would you give your educational background,
6  please?
7   A.  Sure.  After high school graduation I attended
8  University of Vermont from 1989 to 1994 civil
9  engineering.
10   Q.  Did you earn a degree?
11   A.  No.
12   Q.  Have you earned any degrees since completing
13  your work at University of Vermont?
14   A.  No.
15   Q.  Do you hold any professional licenses or
16  certifications?
17   A.  I'm an associate member of American Institute
18  of Architects and member of Construction
19  Specifications Institute.
20   Q.  Have you held any jobs in the construction or
21  architecture or engineering fields prior to
22  beginning at Dore and Whittier?
23   A.  No.
24   Q.  With regard to the North Brookfield project
25  which is the subject of this suit what was your

Page 8

1  role?
2   A.  I was the project manager for Dore and
3  Whittier.
4   Q.  Were you the project manager from the very
5  beginning of Dore and Whittier's involvement in the
6  project?
7   A.  Yes.
8   Q.  And could you just describe generally what the
9  responsibilities were that you had as project
10  manager?
11   A.  Generally speaking I'm the liaison between the
12  design team consultants and the owner through the
13  design phases of the project, and during bidding and
14  construction I continue that same role and also
15  coordinate with our on-site construction manager.
16   Q.  And in this instance the on-site construction
17  manager was whom?
18   A.  Chris Conway.
19   Q.  I've put before you two exhibits that have
20  been marked Exhibits 1 and 2.  Exhibit 1 was a
21  document subpoena that was served on Dore and
22  Whittier last summer, have you seen it before?
23   A.  Yes.
24   Q.  Did you participate in gathering documents
25  that were responsive to the subpoena?

Page 9

1   A.  In a very minor role.  It was mostly handled
2  by our administrative staff.
3   Q.  And what was your role?
4   A.  I just helped collate all of the contractual
5  files that they weren't able to get to.
6   Q.  Other than administrative staff were any of
7  the professional staff of Dore and Whittier involved
8  besides yourself?
9   A.  No.
10   Q.  Exhibit 2 is the subpoena for this deposition
11  which was served on Dore and Whittier and required
12  Dore and Whittier to designate a witness to testify
13  to the subjects that are on the attached Schedule
14  A.  Have you seen Exhibit 2 before?
15   A.  Yes, I have.
16   Q.  And have you been designated by Dore and
17  Whittier to testify on all the subjects on Exhibit
18  A?
19   A.  Yes, I have.
20   Q.  Could you tell me what you did to prepare for
21  today's testimony?
22   A.  Nothing in great detail.  You know, I reviewed
23  this exhibit just to make sure that I was aware of
24  all of the scope of items that you may be asking.
25   Q.  Did you confer with any other Dore and

3 (Pages 6 to 9)

Lee P. Dore                                                                04/13/2005

---

Page 26

1  at this time we didn't know exactly when
2  construction was proposed to start. This budget was
3  developed approximately two months after that
4  drawdown schedule was and at that time we were
5  contemplating quite a few years out for the start of
6  construction.
7    Q. So the $124,000 number was just a plug number
8  that would be available for whatever reason, right?
9    A. If the project wasn't bid during this year
10  period that we had developed this estimate.
11    Q. And if it was bid during the year that you
12  developed the estimate would that money still be
13  available for something else?
14    A. It would be up to the building committee where
15  that money went.
16    Q. And who received Exhibit 6?
17    A. I'm aware that the school building committee
18  definitely received it.
19    Q. Anyone else that you know of?
20    A. Not that I recall.
21        MS. GRIFFIN:  Off record.
22        (Recess at 9:50 a.m.)
23        (On the record at 9:53 a.m.)
24        MS. GRIFFIN:  Let's mark these next two
25        documents as 7 and 8.

---

Page 27

1  BY MS. GRIFFIN
2    Q. Have you had a chance to look at Exhibits 7
3  and 8?
4    A. 7. I haven't gone through 8 yet.
5    Q. All right, go ahead. All set?
6    A. Yes.
7    Q. Let's start with Exhibit 8 if we could before
8  we do Exhibit 7. Can you identify Exhibit 8,
9  please?
10    A. This is the contract or agreement between
11  owner and architect.
12    Q. For the North Brookfield project?
13    A. For the North Brookfield project.
14    Q. And would you turn to the page that's numbered
15  up at the top NBDW 33868. It's page 11 of the
16  printed form.
17    A. Okay.
18    Q. And is the signature on the right-hand side on
19  that page that of John Dore?
20    A. Yes.
21    Q. And was he the president of Dore and Whittier
22  in June of 2001?
23    A. Yes.
24    Q. What relation is he to you?
25    A. He is my father.

---

Page 28

1    Q. The entire document, Exhibit 8, looks like
2  there's actually two parts to it, the first part
3  running from Bates page number NBDW 33858 through
4  880 and then the pages after that are a second part,
5  can you tell me if that's right?
6    A. Yes, it looks like the standard two-part AIDBI
7  contract with an amendment attached to it.    AIA  B141
8    Q. What page does --
9    A. With an addendum, sorry.
10    Q. What page does the addendum start on?
11    A. 33869.
12    Q. In general in your experience how do these two
13  parts of the agreement work together?
14        MR. O'LEARY:  Objection.
15    A. They make up a complete document. The second
16  piece deals more with services, what type of
17  services are offered, and the first part is more
18  standard contractual language of responsibilities of
19  the owner and architect and fees along with other
20  items.
21    Q. And this -- is Exhibit 8 the formal document
22  that replaced the letter that we looked at earlier
23  that was marked as Exhibit 4?
24    A. It appears to be, yes. Just want to note that
25  it appears that the second part of this copy of the

---

Page 29

1  contract in Exhibit 8 doesn't appear to be signed by
2  either the owner or the architect and I can't recall
3  if the original document did have signatures on that
4  page or not.
5    Q. Was Exhibit 8 one of the documents that you
6  assembled for production by Dore and Whittier
7  because your staff couldn't get to it?
8    A. I don't understand the question.
9    Q. When I was asking you about the document
10  subpoena you said that there were some documents you
11  pulled together and the rest the staff did, the
12  administrative staff?
13    A. Yes, I don't think so. I handled this one
14  personally. It was just a group of files that are
15  located in administrative office that administration
16  personnel up front reception doesn't have access to.
17    Q. But you don't recall if Exhibit 8 was in that
18  group that you --
19    A. I don't. I didn't go through every piece of
20  document in the file.
21    Q. On page 10 of Exhibit 8, the page that's Bates
22  numbered 33867, toward the bottom in article 1.5
23  there's a reference to a schedule of hourly rates
24  set forth in Exhibit C to the agreement, do you see
25  that reference?

---

8 (Pages 26 to 29)

Lee P. Dore                                                                          04/13/2005

Page 30

1    A. What article are you looking at?
2    Q. Well, it's actually in several places on that
3  page. In 1.5 at the bottom there's a reference to
4  Exhibit C.
5    A. Yes, I do see it.
6    Q. There's also a reference in 1.4.1.3?
7    A. Yes.
8    Q. I'm going to mark the next document and ask
9  you if this is the document that was referred to as
10  Exhibit C there. This will be Exhibit 9.
11    A. Can you repeat your question?
12    Q. Yes. Is the document that we've just marked
13  as Exhibit 9 the schedule C that is referenced in
14  Exhibit 8 on page 10 as the schedule of hourly
15  rates, Exhibit C?
16    A. No, it would appear to me that this attachment
17  C is strictly dealing with construction management
18  which would be more related to Exhibit 7 than it
19  would be to Exhibit 8. Normally with the final
20  signed executed contract all of the exhibits and
21  attachments would be included with this contract so
22  it's hard for me to tell what this is actually for
23  or whether it's actually attached as a contract
24  item.
25    Q. Can you look down at the lower left-hand

Page 31

1  corner of Exhibit 9 and translate the letters and
2  numbers in that corner?
3    A. North Brookfield Junior/Senior High School
4  construction management Exhibit A No. 2 dated
5  7/25/2001.
6    Q. Does that help you figure out what Exhibit 9
7  was attachment C to?
8    A. It could have been a draft attachment C that
9  got changed during negotiations with the contract
10  but I can't tell exactly whether it belongs with
11  Exhibit 8 or Exhibit 7 directly.
12    Q. Let's turn to exhibit -- sorry, while we're on
13  Exhibit 8 -- let's mark the next Exhibit 10.
14        Have you looked at Exhibit 10?
15    A. Yes, I have.
16    Q. And is Exhibit 10 the actual exhibits that
17  were part of Exhibit 8?
18    A. I can't be certain but they appear to be
19  similar to what I remember the attachments being to
20  that contract.
21    Q. Would you turn to Bates pages 33897 through 98
22  in Exhibit 10 and explain what that part of Exhibit
23  10 is, please?
24    A. This is the preliminary estimated work plan
25  developed as kind of a scope of work breakdown

Page 32

1  between the owner services directly from Dore and
2  Whittier as well as the work of our consultants and
3  it's breakdown through each phase of what work we're
4  looking to accomplish and when.
5    Q. On page 33898 toward the bottom it shows some
6  calendar dates and it's kind of hard to read in this
7  copy but it looks like there's a date of June 1,
8  2001 and then to the right of that October 1, 2001,
9  do you see that?
10    A. Yes, I do.
11    Q. What activity on this chart or on this
12  schedule was anticipated to take place during that
13  time interval?
14    A. Between 1 June 2001 and 1 October 2001?
15    Q. Right.
16    A. That would be the development of construction
17  documents.
18    Q. And then to the right of that is October 31,
19  2001. What activity was anticipated to take place
20  between October 1, 2001 and October 31, 2001
21  according to the schedule?
22    A. According to this schedule that would be the
23  bidding phase.
24    Q. Between October 31 -- strike that. Between
25  October 31, 2001 and August 2003 what activity was

Page 33

1  anticipated to take place?
2    A. The construction administration phase.
3    Q. And was the construction administration phase
4  supposed to take the same length of time as the
5  construction itself?
6    A. No, our contract was actually worded that our
7  construction administration services would keep
8  going 90 days after the substantial completion date.
9    Q. So according to the schedule that we're
10  looking at in Exhibit 10 what were anticipated to be
11  the starting and ending dates of construction
12  itself?
13    A. With this exhibit it appears that 1 November
14  2001 through August 2003 would be project completion
15  and it can't be deciphered whether that means
16  construction administration services or actual
17  construction work would be finished by August 2003.
18  This is more related to the architect services than
19  it is to a construction schedule.
20    Q. Okay. And then if you could turn back to
21  Exhibit 7 and identify that document for us, please?
22    A. Exhibit 7 is an amendment to Exhibit 8 for
23  additional services provided through the architect
24  for construction, on-site construction management
25  services.

9 (Pages 30 to 33)

Lee P. Dore                                                                04/13/2005

Page 34

1    Q. And again on -- there's some signatures on
2  Bates number page 34663. Can you identify John
3  Dore's signature on that page?
4    A. Yes, I can.
5    Q. And this amendment was entered into in May of
6  2002?
7    A. That's when it was signed and it was signed on
8  5/1/02 by John Dore.
9    Q. Can you explain why this amendment was not
10 entered into until over a year after the original
11 contract was entered into?
12   A. There was a period when this project initially
13 went out to bid. It came in over budget and had to
14 be redesigned and then put back out to bid again so
15 I'm not completely certain on the timeframes of that
16 but that is a reason on the project why construction
17 was delayed. Because when we put it out the bid the
18 first time it came in over the maximum estimated
19 cost so we had to redesign it to bring the cost back
20 down.
21   Q. Why did that lead to an amendment to the
22 architect's contract with the owner?
23   A. In our original contract, Exhibit 8, we were
24 not providing as a service the on-site construction
25 management representation.

Page 35

1    Q. So Exhibit 7 is the amendment to the contract
2  under which Chris Conway's services as the on-site
3  project manager were provided?
4    A. Yes.
5    Q. Were any other services besides Chris Conway's
6  services added by Exhibit 7?
7    A. I would have to refer back to the scope of
8  work but to my knowledge it would be the services of
9  Chris Conway and the scope of work described within
10 the contract.
11   Q. Did you participate in any discussions with
12 the owner concerning the addition of construction
13 management services?
14   A. Yes, at building committee meetings we
15 discussed the process and what the services would
16 provide and the process that they could go about to
17 select an individual.
18   Q. Would you turn to page numbered 34664 in
19 Exhibit 7, please. Are you on that page?
20   A. Yes, I am.
21   Q. In the lower right-hand corner there are some
22 dates from January 1, 2002 to January 1, 2003 -- let
23 me strike that. Can you explain to what services
24 the hourly rates schedule on page 34664 pertained?
25   A. Can you be more specific with the question?

Page 36

1  I'm not sure I understand.
2    Q. Well, we were just talking about the fact that
3  the services that were added by Exhibit 7 were just
4  Chris Conway's services but attached to that
5  document is a schedule of hourly rates for
6  categories of professionals other than construction
7  manager, although construction manager is there too
8  and I can't understand why that would be?
9        MR. O'LEARY: Objection.
10   A. This is our standard hourly of rate schedule
11 which would include all the services, construction
12 management being one of them.
13       MS. GRIFFIN: Let's mark this as the
14       next exhibit.
15 BY MS. GRIFFIN
16   Q. Have you looked at Exhibit 11?
17   A. Yes.
18   Q. Can you identify it, please?
19   A. This appears to be a draft of the addendum to
20 construction management contract which is Exhibit 7.
21   Q. Why do you say it's a draft?
22   A. Just because of the notation on the bottom
23 left.
24   Q. Whose handwriting is that in the bottom left?
25   A. I don't recall, no.

Page 37

1    Q. Is Exhibit 11 -- Exhibit 11 was dated May 24,
2  2002 while Exhibit 7 was signed by John Dore on May
3  1, 2002. Can you explain your last answer having
4  taken a look at the sequence of the documents now?
5  Let me rephrase the question. Do you still say that
6  Exhibit 11 was a draft of Exhibit 7 if it postdated
7  Exhibit 7?
8    A. It could be a draft. Exhibit 7 also has an
9  addendum to construction management contract
10 attached to it that doesn't have that notation so
11 this could have been, you know, faxed down to them
12 after the signature process was done even though it
13 was already included as part of Exhibit 7.
14   Q. I see, okay. Thank you. Other than the
15 contracts that have been marked as exhibits so far
16 did Dore and Whittier enter into any other contracts
17 with the Town of North Brookfield for this project?
18   A. There was an amendment made to our contract
19 once we went into additional services after the
20 default of E.J. Sciaba.
21   Q. And was that in the form of a letter or
22 something that looks more like just a contract, not
23 letter?
24   A. I can't recall specifically but I think it was
25 just an addendum sheet that would be added to

10 (Pages 34 to 37)

Lee P. Dore                                                                    04/13/2005

1  sentence?
2    A.  Yes, I do.
3    Q.  When the contract was ultimately signed with
4  E.J. Sciaba there was a later substantial completion
5  date than the September 2003 date you referred to in
6  the preceding paragraph, wasn't there?
7    A.  Yes.
8    Q.  It was later by two months?
9    A.  I don't know the exact duration but I know
10  there was an extension.
11    Q.  Okay.  Did Dore and Whittier amend its
12  agreement with the town for architectural and
13  construction management services because of the
14  extension from the September 2003 date you
15  referenced in Exhibit 19 to the date that was in the
16  Sciaba contract?
17    A.  No, we did not.
18        MS. GRIFFIN:  Let's mark this as the
19        next one.
20  BY MS. GRIFFIN
21    Q.  Have you looked at Exhibit 22?
22    A.  Yes, I have.
23    Q.  On the first page of Exhibit 22 there's a
24  received stamp by Dore and Whittier, right?
25    A.  Yes.

1    Q.  And was Exhibit 22 a document that Dore and
2  Whittier received from the town as the executed
3  contract between the town and Sciaba?
4    A.  I don't know if we received this from the town
5  or directly from Sciaba.
6    Q.  On the second page of Exhibit 22 does looking
7  at section 3.3 on page 2 of Exhibit 22 refresh your
8  recollection as to what the substantial completion
9  date was under the contract?
10    A.  No, I do know that this was extended from the
11  contract but precisely without looking at the bid
12  documents I can't tell you what the dates were for
13  substantial completion that Sciaba initially bid on.
14    Q.  Okay.  In your -- what I was trying to ask you
15  was does Exhibit 22 refresh your recollection as to
16  the date of substantial completion under the
17  contract?
18    A.  Yes, this was the date of substantial
19  completion under the contract.
20    Q.  This being November 17, 2003?
21    A.  Well, there's two phases of it but the last
22  phase of the project by 17 November 2003.
23    Q.  In Exhibit 19 where you referred in the second
24  paragraph to a September 2003 substantial completion
25  date were you referring there to the substantial

1  completion for phase two?
2    A.  I don't recall exactly.
3    Q.  Does looking at Exhibit 22 in conjunction with
4  Exhibit 19 refresh your recollection that the
5  construction schedule was extended by two or two and
6  a half months compared to the bid document dates?
7    A.  I would agree with you based on what is listed
8  in Exhibit 19 as the substantial completion date but
9  can't answer you completely unless I knew exactly
10  what was in the bid documents what substantial
11  completion date would be.
12    Q.  Shortly after Sciaba began excavation for the
13  project did they encounter soil that was unsuitable
14  for supporting the building?
15    A.  Yes, they did.
16    Q.  Could you explain generally what happened with
17  the unsuitable soil?
18    A.  What appeared to happen was the spoils from
19  the construction of the existing high school ended
20  up being moved and located where we were building
21  the new high school footprint and Sciaba ran into
22  some unsuitable soil conditions in several areas
23  which was outside of what they thought they had
24  purchased under the contract.
25    Q.  So what you were talking about as the spoils

1  from the existing building was material that had
2  been excavated way back when the old high school was
3  built?
4    A.  Correct.
5    Q.  And you happened to site the new school in the
6  dumping spot for that old school?
7    A.  Perfectly located it there.
8    Q.  Okay.  And as a result of encountering the
9  unsuitable soil was a changeorder issued to
10  compensate Sciaba for the cost of dealing with the
11  unsuitable soil and replacing it with suitable soil?
12    A.  Yes.
13        MS. GRIFFIN:  Let's mark this as the
14        next exhibit.
15  BY MS. GRIFFIN
16    Q.  Have you looked at Exhibit 23?
17    A.  Yes, I have.
18    Q.  Can you identify it, please?
19    A.  This is changeorder No. 3 in the contract with
20  E.J. Sciaba and the Town of North Brookfield.
21    Q.  Who signed Exhibit 23 on behalf of Dore and
22  Whittier?
23    A.  Albert Russell.
24    Q.  Who's he?
25    A.  He's our chief architect.

17 (Pages 62 to 65)

Lee P. Dore                                                                04/13/2005

Page 70

1    Q. What is it?
2    A. Those are minutes from the partnering session,
3  the second partnering session held on the project.
4    Q. Who prepared the minutes?
5    A. John Thompson from our office.
6    Q. And he was -- his title at the time was job
7  captain?
8    A. Yes.
9    Q. What does a job captain do?
10   A. A job captain kind of heads up the actual
11 production of documents within the office.
12   Q. Could you explain -- strike that. Was it the
13 usual practice of Dore and Whittier to prepare
14 minutes of meetings that occurred with respect to
15 the project?
16   A. Yes.
17   Q. And was there a particular person who was
18 generally assigned the task of preparing those
19 meeting minutes?
20   A. Usually it was me and it would depend on the
21 type of meeting we were at. So John happened to be
22 designated at this meeting to take notes.
23   Q. Did John prepare the -- strike that. The date
24 of the partnering session was October 10, 2002?
25   A. Yes.

Page 71

1    Q. And did John Thompson prepare the minutes that
2  we've marked as Exhibit 24 shortly after -- on or
3  shortly after October 10, 2002?
4    A. I would believe so.
5    Q. And did he prepare the minutes in accordance
6  with Dore and Whittier's usual practice regarding
7  the preparation of meeting minutes?
8    A. Yes.
9    Q. As best you can recall do the minutes
10 accurately reflect things that took place at the
11 meeting?
12   A. As best as I can recall, yes.
13   Q. Do you recall anything that took place at the
14 meeting that's not reflected in Exhibit 24?
15   A. Not that I can recall, no.
16   Q. As best you can recall were all the people
17 listed on page 1 of Exhibit 24 actually in
18 attendance?
19   A. I believe this came from a sign-in sheet.
20   Q. I'd like to go back to some topics that we
21 touched on earlier. When we were talking about
22 Exhibit 17 this was the analysis of the Sciaba base
23 bid that showed a over budget figure of 1.4 million
24 and change and I had asked you was the
25 construction -- the figure in that document Exhibit

Page 72

1  17, I had asked you if the figure for construction
2  management, about a third of the way down the page,
3  was a reflection of the lump sum for construction
4  management services under Exhibit 7, remember that?
5    A. Yes.
6    Q. The actual date that John Dore signed Exhibit
7  7 was later than February 20, 2002 so my question to
8  you is had the dollar amount for the construction
9  management contract been agreed to by February 20,
10 2002 even though the contract itself was not signed
11 until later?
12   A. I don't know if it would have been agreed to
13 but that would have been a place holder in the
14 budget that we carried forward.
15   Q. And further down that page in the narrowest
16 column you see where it says 24 mo, months?
17   A. Yes.
18   Q. That's on a line that refers to clerk,
19 correct?
20   A. Correct.
21   Q. There was no separate clerk on this job, was
22 there?
23   A. Correct.
24   Q. Chris Conway performed functions that might
25 otherwise have been performed by a clerk of the

Page 73

1  works?
2    A. In addition to others, yes.
3    Q. Can you explain what was referred to as 24
4  months in that line?
5    A. That was the estimated time that services of a
6  clerk would be needed on the project.
7    Q. In Exhibit 7 on the page that's Bates numbered
8  34663, top of the page refers to the compensation,
9  right?
10   A. Yes.
11   Q. And it says -- it specifies the fixed lump sum
12 fees of $226,500 and says, Said fee is to be paid in
13 monthly installments as billed starting April 2002
14 and ending December 2003. It is agreed that this
15 fee is based on a project construction schedule of
16 20 months, right?
17   A. That's what it says, yes.
18   Q. Now, was that 20-month period supposed to end
19 at the time of substantial completion of phase two
20 or three months after that?
21   A. I can't tell you specifically from this but it
22 would be our usual practice that it would be after
23 substantial completion, the second substantial and
24 final substantial completion date.
25   Q. Three months after?

19 (Pages 70 to 73)

Lee P. Dore                                                                                    04/13/2005

Page 74

1    A. Yes, and that depends on each individual
2  contract.
3    Q. And for North Brookfield?
4    A. Is 90 days.
5    Q. It was 90 days after, okay. Now, I want to go
6  to the contract between Sciaba and the town that we
7  marked as Exhibit 22. Apart from the handwritten
8  sections of Exhibit 22 did Dore and Whittier prepare
9  the language that we see in Exhibit 22?
10    A. I believe we prepared this contract for the
11  owner's counsel review prior to it being sent out.
12    Q. Are you aware if there was any negotiation of
13  project language between Sciaba and either the town
14  or Dore and Whittier?
15        MR. MCENANEY: Objection.
16    A. No.
17    Q. Let me rephrase the question. Was there any
18  negotiation of the contract language between Sciaba
19  and anybody else that you're aware of?
20        MR. MCENANEY: Objection.
21    A. Not that I recall.
22    Q. Was the form of contract that we see as
23  Exhibit 22 -- again disregarding the handwritten
24  parts -- was that part of the bid package that the
25  bidders bid on?

Page 75

1    A. With the exception of the substantial
2  completion dates which we discussed previously had
3  been extended from what was in the original bid
4  documents, to the best of my knowledge that's all
5  that would be different.
6        MS. GRIFFIN: Okay. Let's mark this as
7        the next exhibit.
8  BY MS. GRIFFIN
9    Q. Have you looked at Exhibit 25?
10    A. Yes, I have.
11    Q. Can you identify it, please?
12    A. This appears to be an E.J. Sciaba project
13  schedule update.
14    Q. Is Exhibit 25 a document that Sciaba submitted
15  to Dore and Whittier some time in the fall of 2002?
16    A. Some time in the fall of 2002?
17    Q. Right.
18    A. I don't know. There's a run date listed on
19  this of March 2nd, 2004.
20    Q. Do you recall sending some project schedules
21  to Rick Anastasio in electronic format that he could
22  then print?
23    A. No, because we never received these in
24  electronic format.
25    Q. Are you familiar with the Primavera scheduling

Page 76

1  program?
2    A. Yes.
3    Q. Does Primavera have a feature where it will --
4  on the run date line it will put in the print date?
5    A. I'm not positive of that. The only thing I
6  was trying to answer is I can't tell specifically
7  when we received this other than I just noticed that
8  the run date was a couple years after the date that
9  you had suggested.
10    Q. Do you recall receiving from Sciaba project
11  schedule with a data date of September 30, 2002?
12    A. Not specifically. Sciaba as part of their
13  contract had to submit project schedule updates
14  monthly so they were never very up to speed with
15  getting those every month but that was what they
16  were supposed to do so we would receive these things
17  at different points and I can't tell you exactly
18  when this would be coming in.
19    Q. Do you recognize Exhibit 25 as a schedule that
20  you received from Sciaba except for the run date?
21    A. It could be. And again I couldn't tell you
22  unless I looked back at the actual submittal we
23  received to compare it to this.
24    Q. On Exhibit 25 do you understand the
25  significance of the vertical blue line that looks

Page 77

1  like it's at the dividing line between September and
2  October 2002?
3    A. Yes, that would be at the point in time of
4  where they were when they were producing this
5  schedule.
6    Q. Would you refer to that as the data date?
7    A. Yes.
8    Q. Okay. And anything to the left of that line
9  was supposed to indicate actual progress?
10    A. Yes.
11    Q. And the information to the right of that line
12  was supposed to be projected progress?
13    A. Yes.
14        MS. GRIFFIN: Mark this as the next
15        one.
16  BY MS. GRIFFIN
17    Q. Have you looked at Exhibit 26?
18    A. Yes, I have.
19    Q. Can you identify it?
20    A. This appears to be another E.J. Sciaba project
21  schedule update.
22    Q. And I will represent to you that this was a
23  document that Dore and Whittier produced in response
24  to a document subpoena as indicated by the MDW
25  prefix to the Bates number so can you -- with that

20 (Pages 74 to 77)

Lee P. Dore                                                                 04/13/2005

Page 78

1  in mind can you confirm that Exhibit 26 is a
2  schedule that Dore and Whittier received from
3  Sciaba?
4     A. Following what you said that if you received
5  it from us, yes.
6     Q. Can you tell me who circled various dates in
7  Exhibit 26?
8     A. I can't tell you specifically.
9     Q. Can you explain what the person who made those
10 circles were signifying by circling particular
11 dates?
12    A. No, I cannot.
13    Q. And this one's not in color so we can't refer
14 to a vertical blue line but if you look at the
15 vertical line on the first page -- I guess it's on
16 all pages of Exhibit 26 -- it looks like the
17 vertical line is approximately November 15, 2002; is
18 that right?
19    A. Yes.
20    Q. And is that again the dividing line between
21 what had been accomplished and what was projected to
22 be accomplished as of the date of the schedule?
23    A. Yes, that's what it's intended for.
24    Q. When Dore and Whittier received schedules from
25 Sciaba did it review the activities to the left of

Page 79

1  that data date line to see if they were accurate?
2     A. We would review both sides of the data date
3  line.
4     Q. And could you explain the procedures that Dore
5  and Whittier followed in reviewing the information
6  displayed to the left of the data line?
7     A. This would mostly be handled by Mr. Conway in
8  the field because he would have more of the
9  day-to-day operational understanding that he could
10 verify back against daily reports on what got
11 completed when.
12    Q. Do you recall Mr. Conway ever bringing to your
13 attention inaccuracies in the depiction of
14 activities preceding the data date line on Sciaba
15 schedules?
16    A. I don't remember any specific instances but I
17 do recall conversations with him on certain items
18 that he didn't feel had been accomplished against
19 this and I don't know specifically which project
20 schedule update it would have been at.
21    Q. Was that -- were those statements in the
22 context of schedule review or requisition review?
23    A. More in the context -- when he would ask
24 questions would be about the schedule review. We
25 would have similar conversations during a

Page 80

1  requisition review.
2     Q. Do you recall what particular activities Mr.
3  Conway questioned whether they had been done as
4  reflected in a schedule?
5     A. Not specifically, no.
6     Q. And can you estimate how many different
7  occasions he brought such questions to your
8  attention?
9     A. Not specifically a number but there were a few
10 instances.
11       MS. GRIFFIN: Let's mark this as the
12       next one.
13 BY MS. GRIFFIN
14    Q. Have you looked at Exhibit 27?
15    A. Yes, I have.
16    Q. Can you identify it?
17    A. This again appears to be another updated
18 schedule from Sciaba.
19    Q. Can you confirm that apart from the run date
20 Dore and Whittier received a schedule with a March
21 31, '03 data date with the same run date in it?
22    A. Your question is can we confirm that we did?
23    Q. Right.
24    A. No, not without looking at the actual
25 submittal that it came in. The only reason I bring

Page 81

1  up the run date is because we had lots of issues
2  with Sciaba during the project where they would be
3  providing us with a schedule that would have a run
4  date that wasn't consistent in what they were
5  telling us when they produced the schedule. So when
6  I just see those it comes back. So I can't tell you
7  specifically if this is what was submitted to us at
8  a certain time or not.
9     Q. You referred to part of Chris Conway's review
10 of schedules as making reference to daily reports,
11 right?
12    A. Yes.
13       MS. GRIFFIN: I'm going to ask that
14       this folder in its entirety be marked as
15       the next exhibit and, Tom, you can look at
16       it after and --
17 BY MS. GRIFFIN
18    Q. Could you take a look briefly through Exhibit
19 28 --
20    A. Briefly?
21    Q. Briefly and tell me whether you recognize the
22 contents of Exhibit 28 as daily reports prepared by
23 Mr. Conway for the project?
24    A. A quick sampling would lead me to believe that
25 these all look like Chris Conway's daily reports.

21 (Pages 78 to 81)

Lee P. Dore                                                                          04/13/2005

Page 122

1    A.  I believe so, yes.
2    Q.  Did he prepare them in accordance with the
3  procedures you described earlier?
4    A.  Yes.
5    Q.  Was part of the procedures with regard to
6  meeting minutes that Dore and Whittier would send a
7  copy of them to the school building committee if
8  they were school building committee meeting minutes?
9    A.  If they were school building committee meeting
10  minutes?
11    Q.  Let me rephrase the question.  Did Dore and
12  Whittier regularly send copies of meeting minutes to
13  representatives of the town?
14    A.  Yes, the superintendent got copied on it.
15    Q.  The superintendent got job meeting minutes?
16    A.  Yes.
17    Q.  Did he also get school building committee
18  meeting minutes?
19    A.  Yes.  He was our point of contact for
20  distribution of such.
21    Q.  Do you recognize the handwritten portions of
22  Exhibit 43 other than Mr. Aksdal's signature?
23    A.  No.
24    Q.  On the second page of Exhibit 43 there's a
25  handwritten note starting about halfway down the

Page 123

1  page that looks to me like it says formal LD request
2  Ed come to next meeting, building committee meeting
3  April 30th.  Can you help us understand that note at
4  all?
5    A.  Not sure what it means.
6    Q.  After the job meeting on April 2nd did anyone
7  ask you to ask Ed Sciaba to attend the next building
8  committee meeting?
9    A.  I don't recall.  I know there were a few
10  instances over the course of the project where the
11  building committee did ask to invite Ed Sciaba but I
12  don't remember specifically the timeframes of
13  those.  The Ed they're referring to here could also
14  be Ed O'Malley who was the principal.  He was
15  usually in attendance at job meetings.
16    Q.  Could you take a look at the document that's
17  been marked Exhibit 44, please.  Can you identify
18  Exhibit 44, please?
19    A.  It's a memo from myself to E.J. Sciaba's
20  project manager Scott Finneran.
21    Q.  Are the four bullet points at the bottom of
22  Exhibit 44 the list of critical path items that it
23  was indicated in Exhibit 42 that Dore and Whittier
24  would issue in paragraph 3 of Exhibit 42?
25    A.  And the items you're referring are items 1, 2,

Page 124

1  3 and 4?
2    Q.  The four bullet points at the bottom.
3    A.  No, they're the numerical bulleted points 1,
4  2, 3 and 4.  Those are critical path submittals that
5  we hadn't received yet.
6    Q.  Okay.  So the bolded statement in Exhibit 44
7  that refers to these issues, they're the ones above
8  the bolded language?
9    A.  Correct.
10    Q.  Did you have a conversation with Scott
11  Finneran about this memo, Exhibit 44?
12    A.  I don't recall.
13    Q.  Did you have a conversation with anybody else
14  at E.J. Sciaba Contracting about this memo?
15    A.  I don't specifically recall if they responded
16  to this or not.
17    Q.  What analysis, if any, did Dore and Whittier
18  prepare to identify the four items you listed in
19  Exhibit 44?
20    A.  Can you restate the question?
21    Q.  What analysis did Dore and Whittier perform in
22  order to identify the four numbered items in Exhibit
23  44 as being critical path items?
24    A.  We review a shop drawing log at the job
25  meetings at every job meeting.  And so what we try

Page 125

1  and do is identify items that Sciaba needs quickly
2  because all the items usually come in fairly close
3  together and there are some items that are hot, what
4  we call hot items that need to get completed first
5  in order to sequence the job correctly or there may
6  be a certain sequence of work coming up during the
7  construction progress that requires us to approve a
8  submittal.  And so these four were items that were
9  very important to the sequencing of work at that
10  point and we had not received shops or approved
11  shops for these items.
12    Q.  How did you know they were hot items?
13    A.  Mostly because they were required for the
14  sequence of work that was coming up.  So we would
15  review it at a job meeting with Sciaba and it would
16  be a discussion that we would have.
17    Q.  I'll hand you now what's been marked as
18  Exhibit 45.  Can you identify Exhibit 45, please?
19    A.  School building committee meeting minutes from
20  16 April 2003.
21    Q.  Did you prepare Exhibit 45?
22    A.  Yes, I did.
23    Q.  Did you prepare these minutes on April 21,
24  2003?
25    A.  Yes, I did.

32 (Pages 122 to 125)

Lee P. Dore                                                                                        04/13/2005

Page 126

1    Q. Did you prepare Exhibit 45 in accordance with
2    the procedures you described earlier regarding the
3    preparation of meeting minutes?
4    A. Yes, I did.
5    Q. In paragraph 2 the minutes say at the end of
6    the sentence, Progress has been slow over the past
7    two weeks, correct?
8    A. Yes, it does.
9    Q. And was that an accurate statement?
10   A. I believe so. I don't recall exactly what was
11   going on at the site at that time.
12   Q. What analysis did Dore and Whittier do, if
13   any, to come to the conclusion that progress had
14   been slow over the two weeks preceding April 16th?
15   A. That would have been based on Chris Conway's
16   observations of activity on the site over the past
17   two weeks in question.
18   Q. Was it also based on his judgment about what
19   the progress should have been?
20   A. I don't know if that entered into that
21   context. I know that he observed the site over that
22   time duration and it didn't appear to him that there
23   was a lot of activity going on.
24   Q. You don't know if he based his opinion on more
25   than just a general impression?

Page 127

1    A. I don't know.
2    Q. Paragraph 5 of Exhibit 45 refers to a
3    projected completion graph based on requisitions,
4    right?
5    A. Yes.
6    Q. I'm going to hand you the document that's been
7    marked Exhibit 46 and ask if that's the graph that
8    was referenced in paragraph 5 of Exhibit 45?
9    A. I believe so, yes.
10   Q. Who prepared Exhibit 46?
11   A. I did.
12   Q. Would you describe what you've depicted in
13   Exhibit 46 please and where you got the information?
14   A. Sure. The top line on the graph there
15   represents what we have projected the cash flow to
16   be for the job for E.J. Sciaba. The bottom line
17   illustrates what the actual billings were on a
18   monthly basis. Up to that point kind of midway
19   through there it's hard to read. It says something
20   like April 2003 with the two hash marks on each end
21   is a projection based on an averaged requisition
22   that they had been forwarding to date which I
23   believe is at the very bottom of the page, actual
24   average billing per month of 392,000.
25   Q. And what conclusion did you draw after

Page 128

1    compiling the projected drawdown part of the graph
2    and the actual part of the graph?
3    A. Based on this modeling it appeared that the
4    construction was going to be about 14 months beyond
5    substantial completion if they followed a consistent
6    path of the average billing rate.
7    Q. When we were looking at Exhibit 42 paragraph 4
8    we were talking about the building committee's
9    request that D and W investigate a projected
10   completion date based on manpower history as well as
11   payment requisitions, right?
12   A. Yes.
13   Q. Was Exhibit 46 intended to be your
14   investigation of a projected completion date based
15   on payment requisitions?
16   A. Yes.
17   Q. Did you do any other analysis based on
18   manpower history to come up with a projected
19   completion date?
20   A. No, it was based on -- this is -- the analysis
21   that I did was based on requisitions as far as I can
22   remember. I don't recall exactly if Chris Conway
23   had prepared any manpower scheduling based on his
24   daily reports or not. I think we had a conversation
25   about it but I don't know if it was actually

Page 129

1    completed.
2    Q. All right. Going back to Exhibit 45, we were
3    looking at paragraph 5, the third sentence of which
4    says the projection indicates a completion date of
5    January 2005, more than one year late. That's --
6    that was -- that corresponded to the 14 months that
7    you referenced in one of your earlier answers?
8    A. Yes.
9    Q. And then the next sentence says, Substantial
10   completion with all approved extensions of contract
11   is December 15, 2003, right?
12   A. Yes.
13   Q. And that was the date from changeorder 3?
14   A. Yes, the date of the second substantial
15   completion date for all of the building.
16   Q. The last full sentence on page 1 of Exhibit 45
17   says, DW and the committee are very concerned that
18   this schedule will not be completed anywhere near
19   the contract timeframe. Can you recall anything
20   more of the discussion beyond what's reported there?
21   A. I think it was just a general discussion from
22   the committee that they were concerned based on some
23   of this information and recent lack of progress on
24   the project that it didn't appear that they were
25   going to be hitting the schedule.

33 (Pages 126 to 129)

Lee P. Dore                                                                                                04/13/2005

Page 130

1    Q.  Who voiced the concerns referenced in that
2   sentence?
3    A.  I don't know specifically.
4    Q.  Did anyone at the meeting voice the view that
5   it was still possible for the contract to be
6   completed on time?
7    A.  I don't recall any specific conversations
8   about that, no.
9    Q.  Did you think as of April 16, 2003 that it was
10   possible for the contract to be completed on time?
11    A.  I don't think I formed an opinion on that.  If
12   I had been listening to the contractor then I would
13   agree with that statement that they would be able to
14   complete because they had consistently told us they
15   were still going to be able to complete within the
16   contract period.
17    Q.  But you didn't believe it?
18    A.  I guess my opinion at that point would be
19   skeptical.
20    Q.  The next sentence in Exhibit 45, the one that
21   starts at the bottom of the first page and carries
22   over to page 2 says, The committee noted that
23   additional costs will be incurred to pay the
24   architect and construction manager beyond the
25   scheduled completion dates.  These funds will need

Page 131

1   to be made up by liquidated damages of a thousand
2   dollars per day for each and every day the project
3   is beyond substantial completion.  Liquidated
4   damages are estimated at over 400,000 based on the
5   projected completion date.  Who said that at the
6   meeting?
7    A.  I don't recall specifically.  I think someone
8   was probably playing on their calculator at the
9   meeting and brought up that comment.
10    Q.  It was someone on the school building
11   committee rather than someone from Dore and Whittier
12   who made that statement?
13    A.  I don't specifically recall who said the
14   statement.
15    Q.  Did anyone disagree with it?  Did anyone voice
16   disagreement with it at the meeting I should say?
17    A.  Not that I recall.
18    Q.  Do you recall how much was held in retainage
19   as of April 16, 2003?
20    A.  Not off the top of my head, no.
21    Q.  If we look at the last requisition prior to
22   that time that will tell us?
23    A.  Yes.
24    Q.  We'll get there.  Was there any discussion at
25   the April 16 school building committee meeting about

Page 132

1   the possibility of withholding liquidated damages
2   from any future payments over and above retainage?
3    A.  No, not that I remember.
4    Q.  In paragraph 6 there's a discussion of issues
5   relating to various subcontractors who hadn't been
6   paid, is that -- was that your report?
7    A.  Yes, just on -- as it says there, various
8   subcontractors were having varying levels of
9   frustration with lack of payment, some had even
10   filed for direct payment claims.
11    Q.  Did any of the subcontractors referenced in
12   paragraph 6 speak to you?
13    A.  I believe I had heard from Greenwood Roofing
14   and possibly Millis Plumbing.
15    Q.  Did the others speak to Chris Conway?
16    A.  I believe so.
17    Q.  In paragraph 8 of Exhibit 45 it says the
18   committee discussed available options to them
19   regarding lack of performance by the contractor.
20   What discussion do you recall on that topic at the
21   April 16 school building committee meeting?
22    A.  I don't recall any specific options.  I think
23   it was just noted here that it was just general
24   discussions.  I don't recall any specifics of what
25   options they were throwing out there.

Page 133

1    Q.  Which committee members spoke up on that
2   topic?
3    A.  I don't recall.
4    Q.  The next sentence of paragraph 8 says a motion
5   was made to have town counsel review the job status
6   and provide recommendations on how to proceed and
7   the motion was approved unanimously.  Did anyone
8   from Dore and Whittier talk to the town's attorney
9   to review job status and provide recommendations on
10   how to proceed?
11        MR. MCENANEY:  Objection.
12    A.  I don't recall.  We may have.
13    Q.  Did you ever learn if somebody from the school
14   building committee contacted town counsel about
15   that?
16        MR. MCENANEY:  Objection.
17    A.  I think I had heard they had been in touch
18   with town counsel.
19    Q.  Did you hear the results of that discussion?
20        MR. MCENANEY:  Objection.  I'm going to
21        instruct Lee not to answer that question.
22        It's inquiring into attorney-client
23        privilege.
24        MS. GRIFFIN:  Are you taking the
25        position that Mr. Dore was part of the

34 (Pages 130 to 133)

Lee P. Dore                                                                04/13/2005

Page 158

1  in question had been held up due to the fact that we
2  hadn't received lien waivers on one and then on the
3  other one we did not receive lien waivers as well as
4  other issues with it so it was returned to the
5  contractor.
6     Q. Did you communicate the results of all of the
7  review and analysis that you've testified to to
8  somebody else?
9     A. I believe I discussed this with Jim Murray.
10    Q. Did you talk with anybody else about it?
11    A. Not that I can recall specifically other than
12 Jim.
13    Q. Would you take a look at the document that's
14 been marked as Exhibit 60, please. Can you
15 identify -- strike that. Have you seen Exhibit 60
16 before today?
17    A. Yes, I have.
18    Q. And did you have some input into any of the
19 either numerical or descriptive portions of Exhibit
20 60?
21          MR. MCENANEY: Objection.
22    A. I believe I did.
23    Q. Which portions did you have input on?
24          MR. MCENANEY: Objection. Are you
25    asking him whether he had conversations

Page 159

1     with me regarding these numbers or whether
2     he had an opinion concerning the numbers?
3          MS. GRIFFIN: I'm asking if -- let me
4     rephrase the question.
5  BY MS. GRIFFIN
6     Q. Did you provide input to either the town or
7  its attorney on the figures and descriptive portions
8  of Exhibit 60?
9     A. Well, the first portion there at the bottom of
10 the first paragraph, the $440 I believe.
11    Q. Skip that one. Go on to some of the others.
12 That's a small item.
13          MR. MCENANEY: I think the question was
14    a yes or no question. Did you have.
15    A. Can you repeat the question?
16    Q. Did you provide information to either the town
17 or its attorney concerning in particular let's look
18 at page 2, the middle paragraph where there's a
19 discussion of Dore and Whittier's fees?
20    A. Yes.
21    Q. We're going to take one a little bit out of
22 numerical order here. This will be 63. Would you
23 take a look at Exhibit 63, please. Can you identify
24 Exhibit 63?
25    A. This looks like a draft of a work sheet we

Page 160

1  utilized in preparation of determining how much
2  additional fees would be required for basic
3  architectural engineering services, additional
4  services, construction management costs, and
5  reimbursable expenses.
6     Q. Did you initial Exhibit 63 at the bottom?
7     A. Yes.
8     Q. And did you prepare Exhibit 63 on October 28,
9  2003?
10    A. I initialed it then. I don't know when it was
11 actually prepared.
12    Q. Did you send it to Mr. McEnaney?
13    A. I don't recall specifically if I did this
14 particular work sheet.
15    Q. Okay. Did you send Mr. McEnaney something
16 else with information that showed additional fees
17 totaling $579,027.05?
18          MR. MCENANEY: Objection.
19    A. I don't think I sent Mr. McEnaney anything
20 directly. I would have forwarded this to the school
21 building committee through their cochairs.
22    Q. Let me show you what's been marked as Exhibit
23 61. Is the bottom part of Exhibit 61 an e-mail that
24 you were copied on?
25    A. It says I was copied on it, yes.

Page 161

1     Q. Do you remember getting it?
2     A. Not specifically.
3     Q. Have you ever seen the top part of Exhibit 61
4  before today?
5     A. I don't think so.
6     Q. Had you received any calls from Chris Fontaine
7  of Fontaine Brothers on or about or before November
8  4, 2003 concerning Fontaine Brothers selection as
9  the completing contractor?
10    A. I believe I had heard some information from
11 Fontaine Brothers.
12    Q. Did Chris Fontaine call you?
13    A. I don't know if it was Chris Fontaine or
14 someone else there. It could have been.
15    Q. What do you remember about that conversation?
16    A. Just that he had thought that they were the
17 apparent low bidder.
18    Q. Was there anything more to that conversation?
19    A. I believe he was inquiring what the next steps
20 were, didn't know exactly what the process was going
21 to be.
22    Q. He didn't or you didn't?
23    A. I didn't.
24    Q. Okay. And do you recall anything else of that
25 conversation?

41 (Pages 158 to 161)

Lee P. Dore                                                                    04/13/2005

Page 178

1  provided 90 days after the date of substantial
2  completion of the work, right?
3      A. Yes.
4      Q. So it's -- that's where the 90 days after
5  substantial completion comes in?
6      A. Substantial completion.
7      Q. So going back to my -- the earlier discussion,
8  if Sciaba had achieved substantial completion on
9  December 15, 2003 under that provision of the
10 contract that we just looked at Dore and Whittier
11 was obligated to provide contract administration
12 services into mid February 2004; is that right?
13         MR. O'LEARY: Objection.
14     A. 90 days after substantial completion of the
15 work.
16     Q. That would be mid February -- no, that would
17 be mid March, wouldn't it, 2004?
18     A. Not positive.
19     Q. You're not positive that mid March is 90 days
20 after December 15 or you're not positive that Dore
21 and Whittier would have had to continue?
22     A. I'm not positive that it's 90 days from your
23 December 15th date or if it's 90 days from the
24 original date of substantial completion.
25     Q. The original date of substantial completion

Page 179

1  according to what?
2      A. According to Sciaba's contract.
3      Q. All right. What would you look at to make
4  that determination?
5      A. I wouldn't know. I'd have to review this with
6  who put this contract together and what the
7  determination of 90 days of substantial completion
8  of the work, is that substantial completion of the
9  work per the contract documents or is it substantial
10 completion of the work of any extensions given by
11 changeorder.
12     Q. All right. When you said this you were
13 pointing to Exhibit 8?
14     A. Yes.
15     Q. Let's look at Exhibit 66, please. Can you
16 identify Exhibit 66?
17     A. Yes, this is an updated proposal regarding
18 additional fees to complete the project sent from me
19 to Jim Murray on 31 December 2003.
20     Q. And is that your handwriting on the upper
21 right-hand corner of Exhibit 66?
22     A. Yes, it is.
23     Q. You wrote that it supersedes a December 30th
24 letter but did it also supersede the September 10th
25 letter that we marked as Exhibit 65?

Page 180

1      A. Yes.
2      Q. Did the town ever sign a copy of your December
3  31 letter indicating acceptance of your proposal?
4      A. No, they did not.
5      Q. Did the town sign something else that covered
6  the financial terms of Dore and Whittier services
7  after this date?
8      A. Yes, there was an amendment to our contract
9  that covered both time and fees.
10     Q. All right. Either it wasn't produced or we
11 didn't find it in the documents. Perhaps, Matt, you
12 could get that to me after the deposition?
13         MR. O'LEARY: I'll see what I can do,
14     if it exists and I can find it.
15         MR. MCENANEY: I believe that I recall
16     seeing that document specifically in the
17     documents that we produced to Jeff
18     Bernarducci.
19         MS. GRIFFIN: That the town produced?
20         MR. MCENANEY: Yes, so I don't recall
21     whether he marked it for copying or not.
22     I know it was in the documents.
23         MS. GRIFFIN: If we didn't mark it for
24     copying, one of you can get it to me.
25 BY MS. GRIFFIN

Page 181

1      Q. Mr. Dore, do you recall approximately when
2  that amendment was signed?
3      A. I really can't recall the date.
4      Q. Okay. Can you identify Exhibit 68?
5      A. This is application for payment No. 11 from
6  E.J. Sciaba to the Town of North Brookfield.
7      Q. And the signatures on the right-hand side of
8  the first page of Exhibit 68 are first Scott
9  Finneran on behalf of Sciaba, right?
10     A. Yes.
11     Q. And then a notary for his signature?
12     A. Yes.
13     Q. And there's no signature on the -- oh, yeah,
14 and the signature at the bottom is Mr. Russell's
15 signature as the architect on the project?
16     A. Yes.
17     Q. And whose handwriting is on the left-hand side
18 of the page where some numbers were changed?
19     A. Harald Aksdal's initials.
20     Q. Would you describe just generally and briefly
21 what the steps were in the submission review,
22 approval and signature of requisitions on the North
23 Brookfield project?
24     A. Yes. Pencil requisition would be submitted at
25 the job site from Sciaba to Chris Conway and either

46 (Pages 178 to 181)

# E R R A T A   S H E E T

I, Lee P. Dore, do hereby certify that I have read the foregoing transcript of my deposition taken on April 13th, 2005, and further certify that it is a true and accurate record of my testimony (with the exception of the corrections listed below):

| Page | Line | Correction |
|------|------|------------|
| 28 | 6 | Change A10B1 to "...A1A B141" |
| 182 | 11 | Change Ziemba to "...Zybura" |
| —— | —— | —————————————— |
| —— | —— | —————————————— |
| —— | —— | —————————————— |
| —— | —— | —————————————— |
| —— | —— | —————————————— |
| —— | —— | —————————————— |
| —— | —— | —————————————— |
| —— | —— | —————————————— |
| —— | —— | —————————————— |

Signed under the pains and penalties of perjury this 17th day of _____MAY_____, 2005.

_____
Lee P. Dore