**EXHIBIT  K**

    b.    Bid deposits of the three (3) lowest responsible and eligible sub-bidders for each sub-trade shall be retained until the execution and delivery of a General Contract.

    c.    If all sub-bids are rejected in a sub-trade, all bid securities received in that sub-trade will be returned forthwith.

    d.    If a selected Sub-Bidder fails to perform his agreement to execute a Subcontract with the General Bidder selected as the General Contractor, contingent upon the execution of the General Contract; and if requested so to do in the General Bid by such General Bidder, to furnish a Performance and Payment Bond as stated in his Sub-Bid, the bid deposit of such Sub-Bidder shall become and be the property of the **Town of North Brookfield** as liquidated damages.

4.    No sub-bids may be withdrawn prior to the expiration of the statutory period after the opening of the General Bids for the making of awards and completion of the process of entering into contracts.

5.    The Awarding Authority may reject as informal, bids which are incomplete, conditional, or obscure, or which contain additions not called for, erasures not properly initialed, alterations, or irregularities of any kind; or the Awarding Authority may waive such informalities within the general laws of the Commonwealth of Massachusetts.

6.    If a General Bidder customarily performs with his own employees any sub-trade or trades listed in Item 2 of the proposal form, he may submit his name and an amount for such work as a Sub-Bid on the form herein required of the regular Subcontractors, and he shall also submit his name and amount for such work in his own bid for general work under Item 2. Such submission by selected Contractor shall be considered on a par with Sub-Bids filed with the Owner by Sub-Bidders who customarily perform such work. No such Sub-Bids by a Contractor shall be considered, however, unless he can show to satisfaction of the Owner that he does customarily perform such work and is qualified to do the character of work required by the specifications.

## I.    CONTRACT AWARDS

1.    The Awarding Authority reserves the right to waive any informalities in or to reject any or all General Bids if it be in the public interest to do so.

2.    The Awarding Authority also reserves the right to reject any sub-bid if it determines that such sub-bid does not represent the bid of a person competent to perform the work as specified or if less than three sub-bids are received for a sub-trade and bid prices are not acceptable without further competition.

3.    If the Contract is to be awarded, it will be to the lowest responsible and eligible Bidder for the Base Bid and Alternates selected, except in the event of substitution as provided under M.G.L. Chapter 149, Sections 44E and 44F, in which cases the procedure as required by said Sections shall govern the award of the Contract.

4.    The term "lowest responsible and eligible bidder" as used herein shall mean the General Bidder whose bid is the lowest of those Bidders demonstrably possessing the skill, ability, and integrity necessary for the faithful performance of the work, and who meets the requirements for Bidders set forth in M.G.L. Chapter 149, Sections 44A-H and not debarred from bidding under M.G.L. Chapter 149, Section 44C; and who shall certify that they are able to furnish labor that can work in harmony with all other elements of labor employed or to be employed on the work.

5.    If the Contract is to be awarded, Owner will give the Successful Bidder a Notice of Award within thirty (30) days (Saturdays, Sundays, and holidays excluded) after the date of the bid opening.

## J.    PERFORMANCE AND OTHER BONDS

1.    A Performance Bond and a Labor and Material Payment Bond, each in the sum of the full amount of the bid, on the forms set forth herein from a surety company licensed to do business in the

Commonwealth of Massachusetts and satisfactory to the Awarding Authority as surety shall be required for the faithful performance of the contract. Certain bond information may be requested of all Bidders by inclusion of a Bond Information Form in the Bid Forms.

2.  The party to whom the contract is awarded will be required to present forthwith the name of the surety company to be offered and to execute the contract and furnish the bond duly executed by a satisfactory surety company, within the time limit stated in the bid form after notification that the contract is ready for signature.

3.  In case the party to whom the contract is awarded shall fail or neglect to execute the contract and furnish a satisfactory bond within the time specified, the Awarding Authority may determine that the Bidder has abandoned the contract and thereupon the proposal and acceptance shall be null and void, and the bid deposit accompanying the bid shall be forfeited to and retained by the Awarding Authority as liquidated damages for such failure and neglect, and to indemnify the Awarding Authority for any loss which may be sustained by failure of the Bidder to execute the contract and furnish bond as aforesaid. After the execution of the contract and the acceptance of the bond by the Awarding Authority, the bid deposit of the Successful Bidder shall be returned.

K.  OTHER FORMS REQUIRED AT CONTRACT EXECUTION

1.  Insurance certificates for the General Contractor and Filed Sub-Contractors.

2.  Estimated Progress Payment Schedule.

3.  Form of Sub-Contract executed and submitted for:

    a.  Filed Sub-Contractors

4.  Statement of Management on Internal Accounting Controls and a Statement prepared by a CPA expressing an opinion to the state of Management Controls, as required by M.G.L. Chapter 30, Section 39R.

    a.  For General Contractor
    b.  For Subcontracts and purchase orders with a value of $100,000 or more.

L.  ALTERNATES

1.  All Bidders shall include a price for each Alternate. The prices given shall be total prices and shall include all costs for bonding, insurance, overhead and profit, or any other costs. If no change in the Base Bid is required, enter "No Change". Refer to drawings and Section 01030 - Alternates - for description of scope.

M.  DAMAGES

1.  The work shall commence at the time stated in the notice to the Contractor to proceed. Notice to proceed may be given to the successful General Bidder on any date after the Bidder has executed the General Contract and furnished the General Performance and Payment Bonds with all insurance herein requested and otherwise specified and/or required. The Contractor acknowledges that delay in completion of the Work by the substantial completion date resulting in delay of delivery of the facilities and site by such date in the condition specified for the Work will cause delay in use by the Owner of the school facilities and site and will cause various losses to the Owner, which may include without limitation increased administrative, engineering, construction management and construction costs. Therefore, the Contractor further acknowledges that its obligation to complete the work by the specified date and deliver completed the work by such date is of the essence. In the event the contractor fails to achieve substantial completion of the work by the substantial completion date, the contractor shall pay to the Owner as liquidated damages the sum of one thousand dollars ($1,000.00) per day for each and every day thereafter that it fails to deliver such Work completed according to the requirements of the Contract Documents. Such liquidated damages shall be paid not as a penalty, but to partially cover losses and expenses to the Owner, including intangible costs and losses that are or may be impracticable to ascertain. Allowing the Contractor to continue to finish the work (or any portion of the work) after the time

11.3    Project Management Protective Liability Insurance.

11.3.1    Replace first (8) words with "Contractor shall." Delete second sentence.

11.3.3    Delete

11.4    Property Insurance.

11.4.1    In the first line, change the word "Owner" to "Contractor."

11.4.1.2 Delete
11.4.1.3 Delete

11.4.2    In the first line, change the word "Owner" to "Contractor."

11.4.4    Delete

11.4.5    Delete

11.4.6    Delete

11.4.7    Delete

11.4.8    Delete the first sentence of subparagraph 11.4.8.

11.4.9    Delete, and substitute the following: The Owner shall have the power to adjust and settle with its insurers any loss for which it has obtained insurance.

11.4.10  Delete, and substitute the following: Upon the occurrence of an insured loss, the Owner and the Contractor shall cooperate with each other and with each other's insurer in the submission of claims and related information and the distribution of any insurance proceeds. If after such a loss no other special agreement is made, replacement of damaged work shall be covered by an appropriate change order.

11.5    Performance Bond and Labor and Material Payment Bond

        Change 11.5.1 to read:

11.5.1  The Contractor shall furnish a performance bond for the full amount of the Contract, and also a labor and materials payment bond for the full amount of the Contract, the form of which bonds are set forth in the Contract Documents, each of a surety company qualified to do business under State laws and satisfactory to the Owner, the premiums for which are to be included in the Contract Price and paid by the Contractor. These bonds shall remain in effect for the entire guarantee period for each phase of the work, which shall commence on the date of Substantial Completion, as defined in Paragraph 8.1.3.

12.     UNCOVERING AND CORRECTION OF WORK

12.2    Correction of Work

12.2.1.1 Add at the end of subparagraph 12.2.1.1: The Contractor shall bear the cost of any cost, loss, or damages to the Owner resulting from such failure or defect."

12.2.2.1 Delete words "unless the owner has previously given the Contractor a written acceptance of such condition." from the end of the first sentence.

        Delete the third sentence in its entirety.

        Add the following new subparagraphs:

12.2.2.1.1 The Contractor shall deliver to the Owner, before final payment is made on the Contract, a written Maintenance Guarantee, properly sworn to and signed by a responsible officer of the Contractor's firm,

**EXHIBIT  L**

# THE AMERICAN INSTITUTE OF ARCHITECTS



Bond No. 3SE057856

*AIA Document A312*

# Performance Bond

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

---

**CONTRACTOR (Name and Address):**
E.J. SCIABA CONTRACTING COMPANY, INC.
18 Wolcott Street

Readville, MA 02137

**SURETY (Name and Principal Place of Business):**
AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY
One Kemper Drive
Long Grove, IL 60049

**OWNER (Name and Address):**
THE TOWN OF NORTH BROOKFIELD, OFFICE OF THE SUPERINTENDENT OF SCHOOLS,
10 New School Drive
North Brookfield, MA 01535

**CONSTRUCTION CONTRACT**
Date:
Amount: Thirteen Million Two Hundred Twenty-Two Thousand and 00/100 Dollars ($13,222,000.00)
Description (Name and Location): North Brookfield Jr./Sr. High School, North Brookfield, MA

**BOND**
Date (Not earlier than Construction Contract Date):
Amount: Thirteen Million Two Hundred Twenty Two Thousand and 00/100 Dollars ($13,222,000.00)
Modifications to this Bond:              ☒ None                    ☐ See Page 3

| CONTRACTOR AS PRINCIPAL | SURETY |
|---|---|
| Company:          (Corporate Seal) | Company:          (Corporate Seal) |
| E.J. SCIABA CONTRACTING COMPANY, INC. | AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY |
| Signature: | Signature: |
| Name and Title: | Name and Title: Jean Brooker, Attorney-in-Fact |
| EDWARD J. SCIABA, JR. PRESIDENT | |

(Any additional signatures appear on page 3)

---

(FOR INFORMATION ONLY—Name, Address and Telephone)
**AGENT or BROKER:**
Aon Risk Services, Inc. of Massachusetts
99 High Street
Boston, MA 02110
(617) 482-3100

**OWNER'S REPRESENTATIVE (Architect, Engineer or other party):**

---

AIA DOCUMENT A312 · PERFORMANCE BOND AND PAYMENT BOND · DECEMBER 1984 ED. · AIA ®
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, D.C. 20006
THIRD PRINTING • MARCH 1987

A312-1984  1

**1** The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

**2** If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except to participate in conferences as provided in Subparagraph 3.1.

**3** If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

**3.1** The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

**3.2** The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

**3.3** The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

**4** When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

**4.1** Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

**4.2** Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

**4.3** Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

**4.4** Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

**.1** After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

**.2** Deny liability in whole or in part and notify the Owner citing reasons therefor.

**5** If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Subparagraph 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

**6** After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

**6.1** The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

**6.2** Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and

**6.3** Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

**7** The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators or successors.

**8** The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

**9** Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation avail-

AIA DOCUMENT A312 • PERFORMANCE BOND AND PAYMENT BOND • DECEMBER 1984 ED. • AIA ®
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, D.C. 20006
THIRD PRINTING • MARCH 1987

A312-1984   2

able to sureties as a defense in the jurisdiction of the suit shall be applicable.

**10** Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page.

**11** When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

**12    DEFINITIONS**

**12.1** Balance of the Contract Price: The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Con-

tractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

**12.2** Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

**12.3** Contractor Default: Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract.

**12.4** Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

**MODIFICATIONS TO THIS BOND ARE AS FOLLOWS:**

**NONE**

(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | (Corporate Seal) | Company: | (Corporate Seal) |

Signature: _____       Signature: _____
Name and Title:                          Name and Title:
Address:                                 Address:

AIA DOCUMENT A312 · PERFORMANCE BOND AND PAYMENT BOND · DECEMBER 1984 ED. · AIA ®
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, D.C. 20006
THIRD PRINTING · MARCH 1987

A312-1984    3

**EXHIBIT  M**

```
 1                                    Volume:   I

 2                                    Pages:    1-153

 3                                    Exhibits: 76-99

 4                   UNITED STATES DISTRICT COURT

 5                   DISTRICT OF MASSACHUSETTS

 6

 7       ----------------------------------------x

 8   AMERICAN MANUFACTURERS MUTUAL

 9   INSURANCE COMPANY,

10                    Plaintiff,

11   vs.                       C.A. NO. 03-40266 CBS

12   TOWN OF NORTH BROOKFIELD,

13                    Defendant.

14       ----------------------------------------x

15

16      30(b)(6) DEPOSITION OF THE TOWN OF NORTH BROOKFIELD

17              By its designee JAMES MURRAY

18               Friday, April 29, 2005

19                    9:00 a.m.

20               HOLLAND & KNIGHT LLP

21               10 St. James Avenue

22           Boston, Massachusetts 02116

23

24       Reporter:  Karen D. Quigley, RPR/RMR
```

James Murray                                                                04/29/2005

Page 2

1   A P P E A R A N C E S :
2
3           HOLLAND & KNIGHT LLP
4           (By Deborah S. Griffin, Esquire)
5           10 St. James Avenue
6           Boston, Massachusetts 02116
7           617-523-2700
8               For the Plaintiff
9
10          KOPELMAN AND PAIGE, P.C.
11          (By Thomas M. McEnaney, Esquire)
12  `       31 St. James Avenue, 7th Floor
13          Boston, Massachusetts 02116
14          617-556-0007
15              For the Defendant
16
17
18
19
20
21
22
23
24

Page 4

1   NO.                              PAGE
2   88   Letter dated 7-23-03 to Deborah
3        Griffin from Thomas McEnaney        117
4   89   Meeting Notes dated 9-10-03         119
5   90   Check dated 5-20-03 for $252,844.47
6        to E.J. Sciaba                      128
7   91   Check dated 5-20-03 for 443,733.76
8        to E.J. Sciaba                      128
9   92   Letter dated 11-12-03 to Thomas
10       McEnaney from Deborah Griffin       139
11  93   Letter dated 11-12-03 to Deborah
12       Griffin from Thomas McEnaney        141
13  94   Letter dated 11-12-03 to Thomas
14       McEnaney from Deborah Griffin       144
15  95   Letter dated 11-21-03 to Thomas
16       McEnaney from Deborah Griffin       144
17  96   Completion Contract                 145
18  97   Performance Bond                    145
19  98   Letter dated 12-15-03 to Chris Fontaine
20       from James Caldwell                 145
21  99   Meeting Notes dated 12-17-03        146
22
23  Afternoon Session                        88
24  ***Original exhibits retained by Ms. Griffin.

Page 3

1              I N D E X
2
3   DEPOSITION OF:              PAGE
4   JAMES MURRAY
5   BY MS. GRIFFIN              5
6
7   ---------------------------------------------
8            E X H I B I T S
9   NO.                        PAGE
10  76   Notice of Deposition           11
11  77   General Conditions of the contract    53
12  78   Project Manual Volume 1 of 2          53
13  79   Addendum No. 2                 53
14  80   Minutes dated 11-6-02          66
15  81   Minutes dated 11-20            67
16  82   Minutes dated 11-20-02         70
17  83   Minutes dated 2-5-03           79
18  84   Minutes dated 2-26-03          82
19  85   Letter dated 4-23-03 from Robert
20       O'Neill to Edward Sciaba       111
21  86   Memo dated 5-15-03 to Robert
22       O'Neill from Ed O'Malley       111
23  87   Letter dated 7-2-03 to Deborah
24       Griffin from Thomas McEnaney   117

Page 5

1              P R O C E E D I N G S
2
3               JAMES MURRAY,
4   a witness called for examination by counsel for the
5   Plaintiff, having been satisfactorily identified by the
6   production of his driver's license and duly sworn, was
7   examined and testified as follows:
8
9               MS. GRIFFIN:  The parties have
10  stipulated that the witness may read and sign the
11  deposition but it need not be before a notary, and that's
12  the only stipulation.
13
14               DIRECT EXAMINATION
15  BY MS. GRIFFIN:
16      Q.  Would you state your full name please.
17      A.  James William Murray.
18      Q.  Where do you live?
19      A.  46 Lakeview Road, North Brookfield, Mass.
20      Q.  What do you do for work?
21      A.  Civil engineer.
22      Q.  By whom are you employed?
23      A.  ET&L Corp.
24      Q.  Where are they located?

James Murray                                                                04/29/2005

Page 6

1       A.   Stow, Mass.
2       Q.   And what type of work do they do?
3       A.   Highway and bridge construction and site
4   development.
5       Q.   What's your position with ET&L?
6       A.   Professional engineer and project manager.
7       Q.   Do you hold any registrations or licenses?
8       A.   Yes, registered professional engineer.
9       Q.   And would you -- how long have you been
10  with ET&L?
11      A.   About four years.
12      Q.   Could you give your employment history
13  before that time?
14      A.   Prior to ET&L I was with McManus
15  Excavating about five years.  Prior to that I was with
16  the Mass. Highway Department for about six years.  How
17  far back do we want to go?
18      Q.   All the way back to college.
19      A.   All the way back to college.  Can I go the
20  other way?
21      Q.   Sure.
22      A.   Well, I graduated from college in 1980.  I
23  went to work for -- let me see -- Daniel O'Connell and
24  Sons out of Holyoke.  I would say that was roughly four

Page 7

1   years.  Then I went to work for Gutirezz Construction
2   Company out of Burlington, Mass. was probably five years
3   and then Mass. Highway and so on.
4       Q.   Where did you go to college?
5       A.   Worcester Polytechnic Institute.
6       Q.   And what degree did you earn there?
7       A.   Civil engineer, bachelor of science.
8       Q.   Did you have any formal post-graduate
9   education?
10      A.   No.
11      Q.   When did you become a registered
12  professional engineer?
13      A.   1995.
14      Q.   When you were working for Daniel O'Connell
15  and Sons, what was your job?
16      A.   Assistant superintendent of construction.
17      Q.   What type of construction projects did you
18  work on with Daniel O'Connell and Sons?
19      A.   Building construction.
20      Q.   When you were with Gutirezz, what was your
21  position?
22      A.   Superintendent of construction.
23      Q.   What type of construction projects did you
24  work on there?

Page 8

1       A.   Building construction.
2       Q.   And with Mass. Highway what was your
3   position?
4       A.   Resident engineer.
5       Q.   Did you work on roads and bridges, a whole
6   array of jobs that Mass. Highway does?
7       A.   Yes.
8       Q.   What was your position with McManus
9   Excavating?
10      A.   Project manager and estimator.
11      Q.   What type of projects did you work on
12  there?
13      A.   Mainly site development for commercial
14  projects and subdivisions, residential subdivisions.
15      Q.   Have you done any teaching, speaking or
16  writing in your capacity as a registered professional
17  engineer?
18      A.   No.  Well, as far as writing I mean I've
19  written numerous letters.
20      Q.   For publication?
21      A.   No.
22      Q.   Do you currently hold a position with the
23  town of North Brookfield?
24      A.   Employed?

Page 9

1       Q.   Any kind of position, volunteer or
2   otherwise?
3       A.   I'm a volunteer, co-chairman of the school
4   building committee.
5       Q.   Do you hold any other positions with the
6   town?
7       A.   No.
8       Q.   How long have you served as co-chair of
9   the school building committee?
10      A.   Best of my knowledge I would it's probably
11  four years.
12      Q.   Going back to 2001?
13      A.   Best of my knowledge.  I don't know the
14  exact date.
15      Q.   Can you recall what stage of planning the
16  junior/senior high school was in when you became co-chair
17  of the school building committee?
18      A.   There was no stage of planning.  The
19  building committee was formed to pursue the design and
20  construction of the school.
21      Q.   So your tenure as co-chair coincided with
22  the entire life of the committee?
23      A.   No, it didn't.
24      Q.   Did the committee exist before you came on

3 (Pages 6 to 9)

James Murray                                                                04/29/2005

Page 10

1    the committee?
2        A.   No, but I wasn't co-chair.
3        Q.   Okay.  So you've been on the committee as
4    long as the committee's been in existence?
5        A.   Correct.
6        Q.   When did you become co-chair?
7        A.   Exact date I couldn't tell you but
8    approximately six months after the committee was formed.
9        Q.   And when was the committee formed?
10       A.   I don't know the exact date.
11       Q.   Do you remember the year?
12       A.   I would say it's 2000 but I'm not
13   positive.
14       Q.   What have been your responsibilities as a
15   member of the school building committee?
16       A.   I'm not sure I understand the question.
17       Q.   What have you had to do in your role as a
18   committee member?
19       A.   As a co-chair I run the committee
20   meetings.  I mean if you're asking what the committee is
21   in charge of as a whole, I could better explain that.
22       Q.   Okay.  What is the purpose of the school
23   building committee?
24       A.   The purpose of the committee was to

Page 11

1    oversee the selection process of an architect and to
2    oversee the construction of the new school.
3            MS. GRIFFIN:  Let's mark this as the
4    next exhibit.  We're going to continue numbering from
5    where we left off the last time so this will be No. 76.
6            (Document marked for identification
7            as Exhibit No. 76.)
8    BY MS. GRIFFIN:
9        Q.   Would you take a look at the document
10   that's been marked as Exhibit 76, please.  Have you seen
11   Exhibit 76 before?
12       A.   You have to give me a minute to review it.
13           (Pause.)
14       A.   Yes.
15       Q.   And have you been designated by the town
16   of North Brookfield to be a witness for the town at
17   today's deposition with respect to some of the topics
18   listed on beginning on page five in Exhibit 76?
19       A.   I have been deemed the most knowledgeable
20   on the majority of these items.
21       Q.   And has the town designated you to come
22   testify about those items?
23           MR. McENANEY:  If you understand, you
24   can answer the question.  Do you understand what she

Page 12

1    says?
2        A.   I really don't understand when you say the
3    town.  The town's Selectmen or...
4        Q.   Well, if you look at the first page of the
5    exhibit, it says the deponent which is the town shall
6    designate one or more persons most knowledgeable to
7    testify, and what I'm trying to find out is if you're the
8    person that's been designated?
9        A.   I would say yes.
10       Q.   And are there some topics on the list in
11   Exhibit 76 that you have not been designated for?
12       A.   Yes.
13       Q.   Which topics have you not been designated
14   for?
15           (Pause.)
16       A.   Item 14, item 12, item 13, partially on
17   item three.  That's it.
18       Q.   Okay.  What part of item three have you
19   not been designated on?
20       A.   I don't make the payments to Sciaba.
21       Q.   Who does make the payments?
22       A.   I don't know.
23       Q.   All right.  Did you finish your list of
24   the topics that you have not been designated for?

Page 13

1        A.   Yes.
2        Q.   I'm going to show you a document that was
3    marked previously as Exhibit 5.  Would you take a look at
4    that please.
5            (Pause.)
6        Q.   Have you seen Exhibit 5 before?
7        A.   No, I haven't.
8        Q.   Along the top of each page of Exhibit 5
9    but inside the chart there's some years above the listing
10   of the months.  Do you see that?
11       A.   Yes.
12       Q.   And on the first page there's a reference
13   to 2000 and 2001.
14       A.   Yes.
15       Q.   And then on the second page of the
16   document the years jump to 2006, 2007 and under the
17   columns where it says 2006, 2007 there's a row that says
18   bidding; do you see that?
19       A.   Yes.
20       Q.   Was there a time in the planning of the
21   junior/senior high school project when it was anticipated
22   that the design work would be done and then the project
23   would pause and bidding would not take place until 2006?
24       A.   No.

4 (Pages 10 to 13)

James Murray                                                                           04/29/2005

Page 50

1    A.  Correct.
2    Q.  All right.  And what did you discuss with
3    Mr. Hasenfus?
4    A.  I discussed his recollection of the I
5    believe it was the May meeting with the surety.
6    Q.  Anything else you discussed with
7    Mr. Hasenfus?
8    A.  No.
9    Q.  What did you discuss with Mr. O'Neill?
10    A.  I asked Mr. O'Neill if he could send me
11    the copies of the minutes of the May meeting with
12    surety.
13    Q.  All right.  Did you discuss anything else
14    with Mr. O'Neill to prepare for today's deposition?
15    A.  No.
16    Q.  Did you talk to any members of the school
17    building committee to prepare for today's meeting?
18    A.  No.
19    Q.  In Exhibit 67 which is the invoice, would
20    you turn to invoice No. 36 please.  This is an invoice
21    that covers the period June 26 to July 25, '03; right?
22    A.  Yes.
23    Q.  And on this invoice No. 36 the town was
24    billed for 14 hours of the project manager's time and 151

Page 51

1    hours of the construction manager's time; right?
2    A.  Yes.
3    Q.  And did you see that the total charge for
4    the construction manager's time was $16,610?
5    A.  Yes.
6    Q.  Did the town request any information from
7    Dore and Whittier about what the construction manager did
8    for 151 hours?
9    A.  Not that I'm aware of.
10    Q.  Did the town request any information about
11    what the project manager did for 14 hours during the
12    period covered by invoice 36?
13    A.  Not that I recall.
14    Q.  Did the town ever receive copies of time
15    cards or time records showing what activities Dore and
16    Whittier was billing the town for on a time-card basis?
17    A.  I don't know if the town did.  The
18    building committee did not receive actual time cards, but
19    it was discussed at building committee meetings the hours
20    charged.
21    Q.  Was there a discussion of invoice 36 --
22    strike that.  Was there a discussion at a school building
23    committee meeting of the time spent by Chris Conway
24    during the period June 26 to July 25, '03?

Page 52

1    A.  I don't recall.
2    Q.  Did the town ever question why the charges
3    for the construction manager's time while the project was
4    shut down for the period June 26 to July 25, '03 were
5    higher than when construction was going on?
6    A.  Could you ask that again?
7    Q.  We talked earlier about the fact that the
8    monthly charge while construction was ongoing for
9    construction management services by Chris Conway was
10    $11,325; right?
11    A.  Yes.
12    Q.  And in invoice 36 the town was billed
13    $16,610 for Mr. Conway's time; right?
14    A.  Yes.
15    Q.  And that's higher than the monthly charge
16    the town received when construction was underway;
17    correct?
18    A.  Correct.
19    Q.  Did the town ever question why it should
20    be being billed more when the job was shut down than it
21    was paying for construction, the construction manager's
22    time when construction was ongoing?
23    A.  No.
24    Q.  And for months after the one that we were

Page 53

1    just looking at in invoice 36 is your answer the same,
2    the town did not question why charges during any of those
3    months were higher than the charges when construction
4    were ongoing?
5    A.  That would be the same answer, yes.
6    MS. GRIFFIN:  Let's go off the record
7    for a minute.
8    (Off the record from 10:43 until
9    10:50 a.m.)
10    (Documents marked for identification
11    as Exhibit Nos. 77 through 79.)
12    BY MS. GRIFFIN:
13    Q.  I've put before you, Mr. Murray, documents
14    that have been marked Exhibits 77, 78 and 79.  Could you
15    look at Exhibit 77 and confirm that Exhibit 77 is a copy
16    of the general conditions of the contract that were part
17    of the contract between the town and Sciaba?
18    A.  I believe they are.
19    Q.  Can you go to Exhibit 78 and confirm that
20    Exhibit 78 is a copy of the first volume of the project
21    manual that was part of Sciaba's contract with the town?
22    A.  Yes, it is.
23    Q.  Can you take a look at Exhibit 79 and
24    confirm that Exhibit 79 is a copy of Addendum No. 2 that

14 (Pages 50 to 53)

James Murray                                                                04/29/2005

Page 94

1  concern that you had even though you weren't at the
2  meeting on April 2nd?
3      A.  Yes.
4      Q.  Did you express that concern to somebody?
5      A.  Just among the building committee members.
6      Q.  Did you express that concern both before
7  and after the April 2nd meeting?
8      A.  I don't recall exactly but I'm sure it
9  was.
10     Q.  Had you done any calculations or estimates
11 yourself to try to estimate whether the retainage was
12 sufficient to cover what you thought liquidated damages
13 might be?
14     A.  I didn't do any calculations, write them
15 down.  I was just thinking numbers in my head at the
16 time.
17     Q.  Okay.  What do you remember thinking in
18 the way of numbers in your head about that subject?
19     A.  Just that the liquidated damages was going
20 to be excessive based on a late winter completion.
21     Q.  When you say excessive, do you mean they
22 were going to exceed the retainage?
23     A.  No, just that they were going to be very
24 high.

Page 95

1      Q.  Did Dore and Whittier make an
2  investigation of a projected completion date as
3  requested?
4      A.  Yes.
5      Q.  Let me show you the document that was
6  marked Exhibit 43.  This is a job meeting minutes which
7  job meeting that you did not attend.  My question to you
8  about this is can you identify the handwriting on Exhibit
9  43?
10     A.  No, I cannot.
11     Q.  On the second page of Exhibit 43 there's a
12 note in a box that says complete on January 2005.  Did
13 anybody tell you or in the early April 2003 time frame
14 that somebody held the view that the project would not be
15 complete until January 2005?
16     A.  I don't recall.
17     Q.  Let me show you the document that was
18 marked Exhibit 45, and I'll give you 46 at the same time.
19         (Pause.)
20     Q.  Okay?
21     A.  Yes.
22     Q.  Did you attend the school building
23 committee meeting of April 16, 2003 which is the subject
24 of Exhibit 45?

Page 96

1      A.  It states that I did.
2      Q.  Do you remember the meeting?
3      A.  Yes, I do.
4      Q.  And paragraph two of Exhibit 45 says
5  progress has been slow over the past two weeks.  Do you
6  remember any discussion about that item beyond what's
7  written in that paragraph?
8      A.  No, I don't.
9      Q.  Paragraph five of Exhibit 45 refers to a
10 projected completion graph that was based on average
11 monthly requisitions on the project to date.  Was the
12 project completion graph that was distributed at that
13 meeting the document that was marked Exhibit 46?
14     A.  Yes.
15     Q.  Do you recall anything of the presentation
16 made by Dore and Whittier about Exhibit 46 beyond what is
17 written in Exhibit 45?
18     A.  No.
19     Q.  At the top of the page on Exhibit 46 just
20 under the heading it says estimated completion is 14
21 months behind substantial completion.  Do you see that?
22     A.  Yes.
23     Q.  Did anybody make any comment on that
24 finding?

Page 97

1      A.  Not that I'm aware of.
2      Q.  Did the committee ask any questions about
3  it?
4      A.  I'm sure there were questions, but I don't
5  recall the actual questions.
6      Q.  Do you recall any of the responses by Dore
7  and Whittier to the questions?
8      A.  Just that progress was very slow and
9  that's what they projected as a completion.
10     Q.  Did Dore and Whittier present the results
11 of any analysis other than the one that's shown on
12 Exhibit 46 at the April 16 meeting?
13     A.  Not that I recall.
14     Q.  So after hearing Dore and Whittier's
15 presentation at the April 16 meeting, did you believe
16 that substantial completion was going to be 14 months
17 late?
18     A.  Yes.
19     Q.  Did anybody who attended that meeting
20 disagree with that conclusion or voice disagreement with
21 that conclusion?
22     A.  No.
23     Q.  Did anybody at that meeting speak about an
24 estimate of what the damages would be that the town could

LegaLink Boston
(617) 542-0039

James Murray                                                                                          04/29/2005

Page 98

1    claim against Sciaba if substantial completion was 14
2    months late?
3            MR. McENANEY:  Objection.
4        A.   All's that I recall is the discussion of
5    the liquidated damages and the contract relating to, you
6    know, covering costs of the architect and construction
7    manager.
8        Q.   Could you explain what you meant by what
9    you just said?
10       A.   The committee had concerns on how we were
11   going to pay for the extended services of the architect
12   and construction manager, and the discussion centered
13   around a thousand dollars a day liquidated damages for
14   not completing the contract.
15       Q.   You're talking about what's reported in
16   paragraph five where at the top of the second page?
17       A.   Yes.
18       Q.   Okay.  "Additional costs will be incurred
19   to pay the architect and construction manager beyond the
20   scheduled substantial completion dates.  These funds will
21   need to be made up by liquidated damages of $1,000 a
22   day," right?
23       A.   Correct.
24       Q.   Who said that?

Page 99

1        A.   I don't recall the person who said it.
2        Q.   Did anybody disagree with it?
3        A.   Not that I'm aware of.
4        Q.   Did anybody ask how much was being held at
5    that point in time in retainage?
6        A.   Not that I recall.
7        Q.   If you look at Exhibit 46, it was showing
8    total actual billings as of April 16, 2003 total actual
9    billings of four million seven hundred and some odd
10   dollars; right?
11       A.   Correct.
12       Q.   And is it your recollection that retainage
13   was being held at the rate of 5 percent?
14       A.   That's correct.
15       Q.   So 5 percent of $4.7 million was
16   approximately what $235,000 or thereabouts?
17       A.   Approximately.
18       Q.   And that's obviously less than the
19   $400,000 estimate of liquidated damages; correct?
20       A.   Correct.
21       Q.   Did the school building committee -- other
22   than expressing concern did the school building committee
23   take any steps with regard to withholding additional
24   funds from Sciaba to cover the shortfall between the

Page 100

1    estimated liquidated damages and the retainage?
2        A.   What I recall was the committee suggested
3    talking to town counsel to look into the matter in
4    regards to the progress of the project and any options
5    that we may have.
6        Q.   Is that the only action the committee
7    suggested taking?
8        A.   That's what I recall.
9        Q.   I may have asked you this but let me just
10   be sure.  The sentence that says, "These funds will need
11   to be made up by liquidated damages of $1,000 per day,"
12   et cetera, did anybody disagree with that statement at
13   the meeting?
14       A.   No.
15       Q.   And was that statement consistent with
16   your understanding of the terms of the contract with
17   Sciaba?
18           MR. McENANEY:  Objection.
19       A.   Yes.
20       Q.   Item six in Exhibit 45 talks about some
21   subcontractors who were saying they hadn't been paid.  Do
22   you see that?
23       A.   Yes.
24       Q.   Did any of those subcontractors contact

Page 101

1    the members of the school building committee about their
2    non-payment situation?
3        A.   Yes.
4        Q.   Who made contact with the school building
5    committee?
6        A.   Company-wise?
7        Q.   Yes.
8        A.   I believe Millis Plumbing and Greenwood
9    Roofing.
10       Q.   All right.  And who at the school
11   committee did Millis Plumbing contact?
12       A.   I recall a letter being written to the
13   superintendent of schools I believe.
14       Q.   Making a claim for direct payment?
15       A.   Correct.
16       Q.   And Greenwood also submitted a claim for
17   direct payment?
18       A.   Yes.
19       Q.   Did Millis communicate at all with any
20   town officials by telephone or in person?
21       A.   I don't know.
22       Q.   Did Greenwood contact town officials by
23   telephone or in person?
24       A.   I don't know.

James Murray                                                04/29/2005

Page 138

1              (A short break was taken from 2:27 to
2          2:32 p.m.)
3    BY MS. GRIFFIN:
4         Q.   Prior to releasing the $443,000 check to
5    Sciaba, did anybody on behalf of the town ask the
6    architect to nullify its prior certification of
7    application 13B?
8         A.   No.
9         Q.   Prior to releasing the $443,000 check from
10   the town to Sciaba, did the town ask the architect to
11   consider nullifying either in whole or in part its prior
12   certification of application 13B?
13        A.   No.
14        Q.   Now, in some of the correspondence there
15   has been a reference made to bills that the town received
16   from Keyspan Energy. Do you know anything about those
17   bills or what their status is?
18        A.   I know of those bills.
19        Q.   And was the town at one time trying to get
20   the surety to pay those bills because they were sent to
21   the town but they had to do with construction?
22        A.   Yes.
23        Q.   Did the town ever make any payments on
24   those bills?

Page 139

1         A.   I'm not sure.
2         Q.   Who would know that?
3         A.   The town accountant I would say.
4         Q.   Would the town administrator know that?
5         A.   Possibly.
6              MS. GRIFFIN: Let's mark this as the
7    next exhibit.
8              (Document marked for identification
9              as Exhibit No. 92.)
10   BY MS. GRIFFIN:
11        Q.   Have you seen Exhibit 92 before?
12        A.   Yes, I have.
13        Q.   How soon after November 12 did you see
14   Exhibit 92?
15        A.   I don't recall.
16        Q.   Was it just a matter of days?
17        A.   I would say it was within a week or two
18   time period.
19        Q.   Now the town never signed the completion
20   contract that accompanied the November 12 letter in
21   Exhibit 92, did it?
22        A.   That's correct.
23        Q.   In fact the school building committee
24   didn't convene a meeting to discuss the completion

Page 140

1    contract that came with the November 12 letter, did it?
2              MR. McENANEY: Objection.
3         A.   I wouldn't say that.
4         Q.   Was there a meeting after November 12 at
5    which the subject of whether to sign the completion
6    contract that came with the November 12 letter was
7    discussed?
8         A.   To the best of my knowledge there was.
9         Q.   When was that?
10        A.   I don't recall the date.
11        Q.   It wasn't in November, was it?
12        A.   I don't recall.
13        Q.   Do you know of any building committee
14   meeting in November after November 12, 2003?
15        A.   I can't recall.
16        Q.   Do you recall any discussion among members
17   of the building committee putting aside discussion with
18   counsel, which I'm not asking about, but do you recall
19   any discussion among the members of the building
20   committee concerning the completion contract that
21   accompanied the November 12 letter in Exhibit 92?
22        A.   I'm sure at a meeting I discussed with the
23   building committee the recommendation of counsel in
24   regards to the completion contract.

Page 141

1         Q.   Did you have any discussions with members
2    of the school building committee outside of a meeting
3    concerning the completion contract that came with the
4    November 12 letter?
5         A.   Not that I'm aware of.
6         Q.   Why did the town not sign the completion
7    contract that came with Exhibit 92?
8              MR. McENANEY: Objection. You can
9    answer.
10        A.   To the best of my knowledge the town
11   cannot sign a contract which it does not have funds to
12   pay.
13        Q.   How much funds did the town have on hand
14   as of November 12, 2003?
15        A.   I can't answer that.
16        Q.   Is that because you don't know?
17        A.   That's correct.
18             MS. GRIFFIN: Let's mark this as the
19   next exhibit.
20             (Document marked for identification
21             as Exhibit No. 93.)
22             (Pause.)
23   BY MS. GRIFFIN:
24        Q.   Have you seen Exhibit 93 before?

36 (Pages 138 to 141)

James Murray                                                                04/29/2005

---

Page 142

1    A.  Yes, I have.
2    Q.  Did the town authorize Mr. McEnaney to
3  send Exhibit 93?
4         MR. McENANEY:  Objection.  Again I
5  think it's getting into discussions that occurred between
6  the town and me regarding a particular letter which are
7  off limits.
8         MS. GRIFFIN:  Well, I disagree with
9  that.  I'm not asking about legal advice that was
10  requested.  I'm not asking about legal advice that was
11  given.  I'm asking whether this letter was authorized.
12         MR. McENANEY:  You're asking whether or
13  not there was communications between the town and me
14  which in my opinion are protected.
15         MS. GRIFFIN:  I'm entitled to know
16  whether you were speaking on behalf of the town when this
17  letter was sent.  That's not a privileged issue.  It's
18  not a privileged communication.
19         MR. McENANEY:  I disagree with that.
20  You're asking him whether or not there was essentially a
21  privileged communication between me and my client
22  regarding this particular letter.
23         MS. GRIFFIN:  Well, I'm not going to
24  waste time during this deposition debating it with you.

---

Page 143

1  I disagree and I'll reserve my rights.
2  BY MS. GRIFFIN:
3    Q.  Did you see the text of Exhibit 93 before
4  it went out?
5         MR. McENANEY:  Objection.  You can
6  answer yes or no.
7    A.  I don't believe so.
8    Q.  You saw it after it went out; correct?
9    A.  Yes.
10    Q.  Did the town voice any objection to
11  Mr. McEnaney having sent Exhibit 93 out?
12         MR. McENANEY:  Objection.  Don't answer
13  that question.
14    Q.  Would you take a look at the spreadsheet
15  that was an enclosure with Exhibit 93.
16         (Pause.)
17    Q.  And do you see the section of the
18  spreadsheet about three-quarters of the way down the page
19  that says construction manager 115 hourly rate, hours per
20  week 50, estimated number of weeks to complete 43 and
21  estimated cost $247,250?
22    A.  Yes.
23    Q.  Did the town actually incur fees to Dore
24  and Whittier at that rate for Mr. Conway's time during

---

Page 144

1  the completion of the work?
2    A.  I don't know.
3    Q.  Did the town enter into a new contract
4  with Dore and Whittier after Fontaine was hired as the
5  completion contractor?
6    A.  I believe there was an amendment to Dore
7  and Whittier's contract not a new contract.
8    Q.  Was it in the form of a letter or did it
9  look more like the printed contracts that we saw earlier?
10    A.  I believe it was more of a letter form.
11    Q.  Let me show you a document that was marked
12  previous to this as Exhibit 66.  Is that the letter that
13  you're referring to as an amendment?
14         MR. McENANEY:  Can we go off the record
15  for one second?
16         MS. GRIFFIN:  All right.
17         (Discussion off the record.)
18         MS. GRIFFIN:  While we were off the
19  record counsel has indicated there is an actual amendment
20  which the town will produce; correct?
21         MR. McENANEY:  That's fine.
22    Q.  I'll withdraw that last question.
23         (Documents marked for identification
24         as Exhibit Nos. 94 and 95.)

---

Page 145

1         (Pause.)
2  BY MS. GRIFFIN:
3    Q.  I've handed you Exhibits 94 and 95 which
4  are two different copies of a letter dated November 21,
5  2003.  Have you seen either of them before?
6    A.  I believe I've seen them both.
7    Q.  Whose handwriting -- other than the
8  signature on the letter whose handwriting appears on
9  Exhibit 94?
10    A.  I don't know that.
11    Q.  But you have seen Exhibit 95 as well which
12  has a two-page enclosure; is that right?
13    A.  Yes.
14    Q.  Okay.  And how soon after November 21st
15  did you receive either Exhibit 94 or 95?
16    A.  Exact date I don't know but I would say
17  within a couple weeks.
18         (Documents marked for identification
19         as Exhibit Nos. 96, 97 and 98.)
20         (Pause.)
21  BY MS. GRIFFIN:
22    Q.  Can you identify Exhibit 96 for us please?
23    A.  It's the completion contract to Fontaine
24  Brothers.

---

LegaLink Boston
(617) 542-0039

James Murray                                                                                            04/29/2005

Page 146

1    Q.   And that's signed by both the town and
2  Fontaine; correct?
3    A.   Correct.
4    Q.   And can you identify Exhibit 97 please?
5    A.   It's the performance bond from Fontaine
6  Brothers.
7    Q.   And Exhibit 98 can you identify that?
8    A.   It's a notice to proceed to Fontaine
9  Brothers.
10        MS. GRIFFIN:  Let's mark this as the
11  next exhibit.
12        (Document marked for identification
13        as Exhibit No. 99.)
14        (Pause.)
15  BY MS. GRIFFIN:
16    Q.   Can you identify Exhibit 99 please?
17    A.   It's meeting minutes from a school
18  building committee meeting.
19    Q.   Dated December 17, 2003?
20    A.   Correct.
21    Q.   Did you attend that meeting?
22    A.   Yes, I did.
23    Q.   Do you remember the meeting?
24    A.   Yes.

Page 147

1    Q.   Do you see in item five it states, "J.
2  Murray discussed additional cost of $275,000 for
3  accelerated cost to Fontaine's contract to meet the
4  completion dates of August 23, 2003 new building and
5  October 11, 2003 demo existing high school and site."
6  Did I read that right?
7    A.   It's August 25th.  I think you said the
8  23rd.
9    Q.   Sorry.  With that correction did I read it
10  correctly?
11    A.   Yes.
12    Q.   And was it your understanding that
13  $275,000 was added to Fontaine's bid price because the
14  town wanted earlier completion dates than Fontaine's bid
15  had assumed?
16    A.   No.
17    Q.   What was your understanding of what the
18  $275,000 was for that was referenced in item five in
19  Exhibit 99?
20    A.   I recall that $275,000 was based on
21  holding the completion date of an agreement Fontaine had
22  with the surety that did not get executed until a later
23  date.
24    Q.   Is the agreement that did not get executed

Page 148

1  until a later date that you're referring to the one that
2  accompanied the November 12 letter that was marked as
3  Exhibit 93?
4        MR. McENANEY:  I think the reference
5  should be in Exhibit 92.
6        MS. GRIFFIN:  92, right you are.  I
7  still can't find it.
8    A.   That is my belief.
9    Q.   Item seven in Exhibit 99 says you also
10  "advised the attendees of the Selectmen's approval at
11  their December 15, 2003 meeting to use $275,000 of the
12  FF&E budget to provide funding for the additional
13  acceleration cost."  FF&E refers to furniture, fixtures
14  and equipment?
15    A.   Correct.
16    Q.   And in fact did the Selectmen approve
17  using $275,000 from the FF&E budget to cover Fontaine's
18  additional charge of 275?
19    A.   Yes.
20    Q.   At the time that the Selectmen approved
21  the use of that money, did you inform them that American
22  Manufacturers had committed to advance $125,000 of that?
23    A.   I can't say that I did.  I'm not too sure
24  of the time frame.

Page 149

1    Q.   Do you recall that American Manufacturers
2  sent the town an additional check for $125,000 under a
3  reservation of rights toward a portion of the 275?
4    A.   I recall the surety sending a check in
5  that amount under reservations.  I'm not sure if it was
6  related to the 275.
7    Q.   Do you know what the town did with the
8  $125,000 check?
9    A.   I assume they deposited it but I don't
10  know exactly what they do with them.
11    Q.   Has that money been spent?
12    A.   I can't answer that.
13    Q.   All right.  Paragraph eight of Exhibit 99
14  says you "advised the attendees that the surety has
15  provided to the town an additional $125,000 as what they
16  describe as their portion of the acceleration cost."  Who
17  is it that described the $125,000 as their portion of the
18  acceleration cost?
19    A.   Town counsel.
20    Q.   Town counsel gave that description?
21        MR. McENANEY:  Objection.  I'm going to
22  instruct the witness not to answer that questions since
23  it regards a communication between attorney/client.
24    Q.   In paragraph eight of Exhibit 99 who is

38 (Pages 146 to 149)

**EXHIBIT  N**

Apr. 22. 2003  8:18AM                                                              No. 9510   P. 2/4

## DORE AND WHITTIER, INC. Architects • Project Managers

1795 Williston Road, Suite 5, South Burlington, Vermont 05403  Tel. (802)863-1428 Fax (802)863-6955
1400 Hancock Street, Quincy Massachusetts C2169 Tel. (617) 471-2897 Fax (617) 471-2516

### MEETING NOTES

**DEPOSITION EXHIBIT**

Dore  45
4-13-05        US

| | |
|---|---|
| **DATE OF MEETING:** | 16 April 2003 |
| **PROJECT:** | North Brookfield Jr./Sr. High School<br>Dore & Whittier Project No. 00-404 |
| **SUBJECT:** | School Building Committee Meeting, 7:00 PM |

| **ATTENDING:** | | |
|---|---|---|
| | Don Gillette | Co-Chair, Building Committee |
| | Jim Murray | Co-Chair, Building Committee |
| | Greg Kline | Building Committee |
| | Ed Wilkins, Jr. | Building Committee |
| | Patricia Pariseau | Building Committee |
| | Mary Ellen Tshilis | Building Committee |
| | Ed O'Malley | Principal |
| | Robert O'Neill | Superintendent |
| | Chris Conway | Construction Manager (CMC) |
| | Lee Dore | Dore and Whittier, Inc. (DW) |

1. Minutes of 2 April 2003 were distributed and reviewed. Due to the lack of a quorum these minutes were not formally voted. Minutes of 19 March 2003 were approved unanimously as presented.

2. DW deferred the construction manager's report until the next meeting as progress has been slow over the past two weeks.

3. A motion was made to accept Peter Barstow's resignation from the Building Committee. This motion was approved unanimously. It is noted that there are seven active members of the Building Committee.

4. George Hanson passed away last week. The Committee valued his dedication and commitment to the building project, he will be missed. The Committee will draft a letter of appreciation for review at the next meeting.

5. DW distributed a projected completion graph for the project as of 16 April 2003. This projection was based on average monthly requisitions on the project to date. The projection indicates a completion date of January, 2005, more than one year late. Substantial Completion with all approved extensions of contract is December 15, 2003. The required average monthly billing to hit the project schedule was approx. $881,000 per month. The actual billings have been $392,000 per month and decreasing over the last three months. The projected completion percentage as of 16 April 2003 is 72% complete while the actual is 36% complete. DW and the Committee are very concerned that this schedule will not be completed anywhere near the contract timeframe. The Committee noted that additional costs

Prepared 21 April 2003

North Brookfield School Building Committee
Meeting 16 April 2003
Page 2                                                                                          - 2 -

will be incurred to pay the Architect and Construction Manager beyond the scheduled
substantial completion dates. These funds will need to be made up by liquidated damages of
$1,000 per day for each and every day the project is beyond substantial completion.
Liquidated damages are estimated at over $400,000 based on the projected completion date.

6. D&W reviewed ongoing issues with the General Contractor.
   • Roofer has issued a letter to EJS stating that they will not be working on any EJS jobs
     until accounts are paid in full on several projects not just North Brookfield.
   • Griffin Electric has demobilized from the site as of today due to lack of progress on the
     work of the general contractor.
   • DW is concerned that approved change orders are not being distributed to subcontractors.
     One CO dating 1/14/03 has not been forwarded to Griffin Electric regarding additional
     conduit.  Griffin stated that their price proposal is no longer valid and it will be an
     additional cost to EJS.
   • Millis Plumbing has filed for direct payment claims. DW advised the Committee to send
     the claim to Town Counsel for them to issue a letter back to EJS with a specific time
     frame for action on the claim.

7. DW advised the Committee that the March, 2003 Application for Payment will be sent back
   to EJS with an explanation of mistakes such as:
   • Non incorporation of CCD #5 (2nd month in a row this has not been added)
   • Lack of monthly progress schedule (last rec'd on 12/02)
   • Lack of coordination drawings
   • Lien release from Millis is not dated and appears to be from January, 2003 (Millis is filing
     a direct payment claim)

8. The Committee discussed available options to them regarding lack of performance by the
   Contractor.  A motion was made to have Town Counsel review the job status and provide
   recommendations on how to proceed.  This motion was approved unanimously.

9. The Committee review another proposed basketball court color scheme.  This option had an
   additional 4 ft black strip around the 4 ft purple stripe at the perimeter of the court.  This
   layout also did not include volleyball striping.  The Committee deferred a decision on this
   layout until the next meeting when the athletic director can be present.

10. The Committee approved warrants for the Dept. of Revenue and Yankee Engineering and
    Testing services.

11. CMC noted that Verizon is still working on a cost for new service connection.  The utility
    easement for Verizon has been approved by the Selectboard and returned to Verizon.

12. DW to fax copies of the payment bond and performance bond to Jim Murray at work.  Bob
    O'Neill will have a copy of the Contract between the Town and EJS sent to Kopelman and
    Paige for review.  DW noted that K&P may require a copy of the front end specifications as
    well.

13. The next Building Committee meeting will be held on 30April 2003 at 6:00pm.  A site tour



Prepared 21 April 2003

Apr.22. 2003  9:19AM                                    No.9510   P. 4/4

North Brookfield School Building Committee
Meeting 16 April 2003
Page 3                                                        - 3 -

    will start the meeting.  Meeting will start at the Construction Manager's trailer.

The above is my summation of our meeting.  If you have any additions and/or corrections, please
contact me for incorporation into these minutes.  After 10 days, we will accept these minutes as
an accurate summary of our discussion and enter them into the permanent record of this project.

Sincerely,

**DORE AND WHITTIER, INC.**
Architects • Project Managers

Lee P. Dore, Assoc. AIA, CSI
Project Manager

c Bob O'Neill, Superintendent of Schools
  Mr. John Couture, Building Inspector
  Chris Conway, Construction Manager
  Engineers Design Group
  Garcia, Galuska, Desousa
  Berkshire Design Group
  ATC
  CCR/Pyramid
  John Crisafulli Consulting Services, Inc.
  RJD/LPD/ARR/JFT/RLZ/HA/CMC/GOJ/DAW/File

Prepared 21 April 2003

**EXHIBIT  O**

LEONARD KOPELMAN
DONALD G. PAIGE
ELIZABETH A. LANE
JOYCE FRANK
JOHN W. GIORGIO
BARBARA J. SAINT ANDRE
JOEL B. BARD
JOSEPH L. TEHAN, JR.
THERESA M. DOWDY
DEBORAH A. ELIASON
RICHARD BOWEN
DAVID J. DONESKI
JUDITH C. CUTLER
KATHLEEN E. CONNOLLY
DAVID C. JENKINS
MARK R. REICH
BRIAN W. RILEY
DARREN R. KLEIN
JONATHAN M. SILVERSTEIN

EDWARD M. REILLY
DIRECTOR WESTERN OFFICE

WILLIAM HEWIG III
JEANNE S. McKNIGHT

## KOPELMAN AND PAIGE, P. C.

### ATTORNEYS AT LAW

31 ST. JAMES AVENUE

BOSTON, MASSACHUSETTS 02116-4102

(617) 556-0007
FAX (617) 654-1735

PITTSFIELD OFFICE
(413) 443-6100

NORTHAMPTON OFFICE
(413) 585-8632

WORCESTER OFFICE
(508) 752-0203

KATHLEEN M. O'DONNELL
SANDRA M. CHARTON
PATRICIA A. CANTOR
THOMAS P. LANE, JR.
MARY L. GIORGIO
THOMAS W. McENANEY
KATHARINE GOREE DOYLE
GEORGE X. PUCCI
LAUREN F. GOLDBERG
JASON R. TALERMAN
JEFFREY A. HONIG
MICHELE E. RANDAZZO
GREGG J. CORBO
RICHARD T. HOLLAND
LISA C. ADAMS
ELIZABETH R. CORBO
MARCELINO LA BELLA
VICKI S. MARSH
JOHN J. GOLDROSEN
SHIRIN EVERETT
BRIAN E. GLENNON, II
JONATHAN D. EICHMAN
LAURA H. PAWLE
TODD A. FRAMPTON
JACKIE COWIN
SARAH N. TURNER

January 15, 2004



O'Neill
EXHIBIT NO. 193
5-23-05
MICHELLE KEEGAN

<u>BY FACSIMILE - (617) 523-6850</u>

Deborah S. Griffin, Esq.
Holland & Knight, LLP
10 St. James Avenue
Boston, MA  02116

Re:    <u>North Brookfield Junior/Senior High School Project</u>

Dear Ms. Griffin:

Enclosed please find a letter dated December 31, 2003 from project architect Lee P. Dore of Dore & Whittier, Inc. ("D&W") relative to the above-referenced matter. As set forth in the letter, the additional design and construction administration fees that the Town will incur to complete the project total $738,040.95. As you may recall from previous correspondence and discussion, the Town has a balance of $256,593.38 on its original contract with D&W for design and construction administration services. The Town also incurred design and construction administration fees in the amount of $193,159.67 from May 30, 2003 through December 31, 2003. Therefore, the Town is seeking reimbursement in the amount of $674,607.24 from American Manufacturers Mutual Insurance Company for the additional design and construction administration fees that it incurred as a result of E.J. Sciaba Contracting Company, Inc.'s ("Sciaba") voluntary default. Please note that this sum does not include the Town's liquidated damages, legal fees and the costs required to complete the actual construction of the project.

The Town reserves all of its rights against AMMIC and Sciaba at law, under the contract and the performance bond.

**KOPELMAN AND PAIGE, P.C.**

Deborah S. Griffin, Esq.
January 15, 2004
Page 2

If you have any questions, please do not hesitate to contact me.

Very truly yours,

Thomas W. McEnaney

TWM/kad
Enc.
cc:     Board of Selectmen
        School Building Committee
        Mr. Lee Dore
        Kieran B. Meagher, Esq. (by fax 781-246-1102)

211025/NBRO/0017