UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY,<br><br>                      Plaintiff,<br><br>vs.<br><br>TOWN OF NORTH BROOKFIELD,<br><br>                      Defendant. | Civil Action No. 03-40266-CBS |

MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON
COUNT II OF DEFENDANT'S COUNTERCLAIM

Plaintiff, American Manufacturers Mutual Insurance Company ("AMMIC") has moved for summary judgment on Count II of the Town of North Brookfield's Counterclaim (the "Motion"), which Count alleges that AMMIC violated G.L. c. 93A. The Town of North Brookfield (the "Town") cannot prove facts sufficient to support its claim. This failure, and certain material facts not in dispute, warrant summary judgment as a matter of law in favor of AMMIC on Count II.[1]

**I.     SUMMARY OF UNDISPUTED FACTS**

    **A.     The North Brookfield Junior/Senior High School Project**

The Town entered into a contract (the "Contract") with E.J. Sciaba Contracting Company ("Sciaba") dated April 19, 2002, for construction of the Junior/Senior High School in North Brookfield, Massachusetts (the "Project"). Facts ¶ 1. AMMIC, as surety, issued a performance bond (the "Bond") to the Town on behalf of Sciaba, as principal. Facts ¶ 2. The Project architect was Dore & Whittier, Inc. ("Dore & Whittier"). Facts ¶ 3. Sciaba ultimately failed to perform its

---

[1]     Reference is made herein to the Plaintiff's Statement of Undisputed Facts ("Facts") filed in support of the Motion.

obligations under the Contract and on July 23, 2003 the Town declared Sciaba's default and terminated its right to perform. Facts ¶ 18.

### B. The Performance Bond And AMMIC's Obligations

AMMIC's obligations under the Bond arise as follows:

**3**[**.**]   If there is no Owner Default, the Surety's obligation under this Bond **shall arise after:**

**3.1**   **The Owner has notified the Contractor and the Surety** at its address described in Paragraph 10 below **that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety** …; **and**

**3.2**   **The Owner has declared a contractor Default and formally terminated the Contractor's right to complete the contract.**  Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; **and**

3.3   The Owner has agreed to pay the Balance of the Contract Price to the Surety … or to a contractor selected to perform the Construction Contract ….

Facts ¶ 2 (emphasis added). On July 2, 2003, the Town requested a meeting with the surety and stated it considered declaring Sciaba in default pursuant to Bond ¶ 3.1. Facts ¶ 16.

AMMIC responded immediately. On the very next day, Deborah S. Griffin (attorney for AMMIC) wrote to Thomas W. McEnaney (attorney for the Town) waiving the meeting and time requirements under Bond paragraphs 3.1 and 3.2, conditions precedent to the Town's ability to formally declare Sciaba in default and terminate its right to perform. Facts ¶¶ 2, 17. The Town did not declare a default or terminate Sciaba's right to perform, or demand action by AMMIC under its Bond, until July 23, 2003. Facts ¶ 18.

### C. AMMIC's Actions *Prior To* The Town's Bond Claim Of July 23, 2003.

As early as March 2003, AMMIC had already assigned then Senior Surety Counsel Stephen Beatty to investigate Sciaba's performance at various projects (including the North Brookfield Project) and manage payment bond claims. Facts ¶ 4. By that time AMMIC had also

2

retained Richard P. Anastasio, P.E., and his firm, GREYHAWK North America L.L.P., to provide engineering, construction and claim expertise in this investigation. Facts ¶ 5. In March, 2003, Mr. Beatty requested a meeting with Sciaba to assess the overall situation at the Project and other AMMIC-bonded jobs. Facts ¶ 7. In late March, Messrs. Beatty and Anastasio traveled from out of state to North Brookfield and other project sites to conduct these investigative meetings. *Id.* Subsequently, the Town wrote to AMMIC on April 23, 2003, and requested an on-site meeting. Facts ¶ 10. On May 21, 2003, Messrs. Beatty, Anastasio, and Mrs. Griffin[2] participated in a multi-party meeting in North Brookfield to discuss the Town's concerns and further assess Sciaba's situation at the Project. *Id.* Mr. Anastasio visited the site the first week of June and began requesting documents and other information he would need in order to advise AMMIC on the potential completion of the Project if a default was declared. Facts. ¶ 15.

Shortly before the May 21 meeting with the Town, Mr. Beatty and Mrs. Griffin met with Sciaba and its counsel. Facts ¶ 11. Mr. Beatty requested that Sciaba provide him with current financial information for the Sciaba corporation generally and for each of the AMMIC-bonded construction contracts. *Id*. Shortly thereafter, AMMIC hired Frank Zito, C.P.A., and his firm, Tofias, P.C., to provide forensic accounting services. Facts ¶ 12.

### D. AMMIC's Response To The Town's Bond Claim Of July 23, 2003

AMMIC's preemptive activity gave it a head start when the Town asserted its Bond claim on July 23, 2003. By July 23, Mr. Anastasio had *already* visited the Project at least five times, Facts ¶ 15, *already* met with Dore & Whittier and/or the Town on three occasions, Facts ¶ 21, *already* provided AMMIC with a preliminary analysis and assessment of the Project, Facts ¶ 19, and *already* begun the process of obtaining agreements from subcontractors to ratify their

---

[2] By this time, AMMIC had hired attorney Deborah S. Griffin of Holland & Knight LLP, a nationally recognized surety attorney, to provide legal advice and representation of the surety. Facts ¶ 8.

subcontracts and commit to returning to work under a replacement contractor. Facts ¶ 19. On August 6, Mr. Anastasio met again with the Town's School Building Committee and explained, among other things, the Project status and method by which AMMIC intended to obtain a completion contractor. Facts ¶ 22.

Indeed, AMMIC's early action enabled a timely solicitation of potential completion contractors. By August 13, 2003, only three weeks after the Town's July 23, 2003 demand, AMMIC began distributing a Request for Expression of Interest ("REI") to twelve potential completion contractors. Facts ¶ 23. On August 20, 2003, less than one month from the Town's July 23 notice, Anastasio distributed a formal Request for Proposal ("RFP") that included inputs from both the Town and Dore & Whittier. Facts ¶¶ 24-26.

Bids were received on September 8, 2003, and were much higher than expected. Facts ¶ 28. Mr. Anastasio therefore conducted follow-up analyses and interviews with bidders. Facts ¶ 29. On October 8, 2003, Mr. Anastasio requested each contractor's best and final bid by October 17, 2003. *Id.* All bids were again higher than the estimated cost to complete. *Id.*

On November 12, 2003, AMMIC formally tendered to the Town a completion contract executed by Fontaine Bros., Inc. ("Fontaine"),[3] despite ongoing negotiations as to the amount of

---

3   The tendered version of the completion contract arose from certain negotiations *after* Fontaine was awarded the work. Facts ¶ 46. Fontaine objected to the as-bid completion contract's latent defect provisions and completion dates – refusing to execute the completion contract until changes to the same were made. *Id*. Fontaine communicated this position to both AMMIC and North Brookfield. *See id.* Mrs. Griffin negotiated with Fontaine, requested Mr. McEnaney's input, and otherwise kept him advised. *Id*. As a result of the negotiations, changes to completion dates and latent defect provisions were incorporated into a *revised* completion agreement. Facts ¶ 47. Mrs. Griffin circulated the revised agreement to Mr. McEnaney by e-mail on November 7, 2003, and requested "comments ASAP." Facts ¶ 48. Mr. McEnaney offered none, nor even hinted that he might have any before November 12. *Id*. On the afternoon of November 11, Mrs. Griffin alerted Mr. McEnaney that Fontaine would be signing the Agreement that day, that the executed documents would be delivered to him the following day, and that Fontaine required a Notice to Proceed by November 14. Facts ¶ 49. Fontaine signed the Agreement on November 11 and AMMIC tendered it on November 12, 2003, *in precisely the form circulated a full week earlier* to Mr. McEnaney. Facts ¶ 50. In the cover letter that accompanied the tendered completion agreement, AMMIC stated clearly: "As I stated in an email to you on November 6, 2003, the Surety understands it will have responsibility for the additional liquidated damages after the dates that were given in the RFP. It also intends to accept responsibility

AMMIC's *total* liability under the Bond.[4]  Facts ¶ 40.  The Town executed a different and final version of the completion contract with Fontaine on December 15, 2003.  Facts ¶ 45.

### E.    AMMIC's Assertion Of Partial Defenses

On August 20, 2003, less than one month after the Town made its claim, AMMIC submitted a draft tender agreement to North Brookfield.  Facts ¶ 27.  The draft tender agreement, and Mrs. Griffin's email enclosing the same, articulated partial defenses to AMMIC's bond liability and explanations in support thereof.  *Id.*  AMMIC asserted that the Town made two improper, prejudicial payments at the end of May ("May Payments") and that its liability for liquidated damages should be reduced because Sciaba was entitled to time extensions.  *Id.*

Mrs. Griffin and Messrs. Beatty, McEnaney and Kieran Meagher (also counsel for the Town) discussed these defenses at a meeting on October 15, 2003.  Facts ¶ 30.  During that meeting AMMIC requested documentary support for all damages claimed by the Town.  *Id.*  Mr. McEnaney followed up with a November 3 letter challenging AMMIC's time-extension and other defenses.  Facts ¶ 34.  Mr. McEnaney's November 3 letter also provided additional information purporting to support the Town's claim for additional architect fees ("Architect Fees").  *Id.*  However, the Town had not yet provided any Dore & Whittier contract(s) or invoices.  Facts ¶ 35.  Mr. McEnaney's November 4 email acknowledges as much.  *Id.*

Two days later, by letter of November 5, 2003, Mrs. Griffin once again explained to Mr. McEnaney AMMIC's overpayment defense with respect to the May Payments.  Facts ¶ 36.  In this same letter, Griffin also explained *additional* overpayments that prejudiced the surety on a line-item level.  *Id.*  Griffin's explanation included a detailed spreadsheet and breakdown.  *Id.*

---

for the reasonable cost of addressing latent defects that were Sciaba's responsibility.  Again, these issues should not be an obstacle to the Town's executing the completion contract with Fontaine."  Facts ¶ 51.

[4]    AMMIC chose to perform under Bond ¶ 4.3 and was thereby required to (1) arrange for a new, executed contract between the Town and an acceptable completion contractor; and (2) pay to the Town damages (as described in Bond ¶ 6) incurred as a result of Sciaba's default, in excess of the unpaid balance of Sciaba's contract price.  Facts ¶ 2.

5

On November 12, 2003, the Town accused AMMIC of refusing to pay its claim for Architect Fees without an adequate explanation. Facts ¶ 37. The Town, however, had *still* not provided AMMIC with its Dore & Whittier contract(s) or invoices. Facts ¶¶ 37-38. Mrs. Griffin responded to Mr. McEnaney on the same day, made another specific request for Dore & Whittier contract(s), and advised that, despite the Town's not having furnished them, the surety would analyze what information it had and assess coverage as to Architect Fees. Facts ¶ 39.

On November 21, 2003, Mrs. Griffin provided a comprehensive recap and accounting of AMMIC's entire Bond liability. Facts ¶ 42. The accounting only included an estimate of the Architect Fees AMMIC was willing to pay because the Town still had not yet produced the Dore & Whittier contract(s) or past invoices. Facts ¶ 42-43. Indeed, Ms. Griffin never received this information until December 4, 2003. Facts ¶ 43.

On December 3, 2003, AMMIC paid the Town $2,538,828.37 unconditionally and $659,157.80 under a reservation of rights. Facts ¶ 53. Fontaine ultimately raised its price by $275,000 because a Notice to Proceed did not issue on November 14, 2003. Facts ¶ 54. AMMIC paid $125,000 of this increase on December 15, 2003, under a reservation of rights. *Id*. Thus, by December 15, AMMIC paid a total of $3,322,996.17, part unconditionally and part under a reservation of rights. *Id*. Including all disputed items, the Town's total Bond claim was $4,854,379.66[5] before crediting AMMIC's total $3,322,996.17 payments. Facts ¶ 56.

## II.    PROCEDURAL BACKGROUND

AMMIC filed this suit seeking declaratory judgment on the extent of its Bond liability and a refund of amounts already paid to the Town under a reservation of rights. The Town counterclaimed, asserting claims for breach of contract, G.L. c. 93A and unspecified "Tort." In

---

[5] By summarizing the information above, AMMIC is not admitting that the amounts sought by the Town were either actually or reasonably incurred and expressly reserves the right to dispute them in the event this motion is denied. Rather, AMMIC submits this information to show what the Town's claim consists of.

6

Count II of its Counterclaim, the Town alleges that AMMIC knowingly and willfully violated G.L. c. 93A by way of G.L. c. 176D, § 3(9)(a)-(h), (n).[6] Based upon the applicable law and undisputed facts, AMMIC's is entitled to summary judgment as a matter of law.

### III. ARGUMENT

#### A. Summary Judgment Standard

Summary judgment is proper when the Court, viewing the evidence in the light most favorable to the non-moving party, determines that no genuine dispute of material fact exists and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The moving party can either (1) submit affirmative, undisputed evidence to negate an element of a claim; or (2) demonstrate that, due to insufficient evidence, the burden-bearing party[7] has no reasonable expectation of proving an element of its claim at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Fireman's Fund Ins. Co. v. Harley Realty Co.,* 24 F. Supp. 2d 117, 118 (D. Mass 1998). Here, AMMIC does both.

#### B. Summary Judgment Should Enter For AMMIC Because It Did Not Violate Chapter 93A By Way Of G.L. c. 176D § 3(9).

*1. Applicable Law.*

The Town alleges that AMMIC automatically violated chapter 93A by way of chapter 176D § 3(9) (a), (b), (c), (d), (e), (f), (g), (h), and (n). *See* G.L. c. 93A § 9 ("any person whose rights are affected by [violations of chapter 176D § 3(9)] may bring an action in the superior court …"). The relevant provisions of chapter 176D § 3(9) provide the following:

---

[6] As drafted, Count II of the Counterclaim does not specify what section of chapter 93A AMMIC allegedly violated. It is presumed for this Motion, however, that the Town's action comes under section 9 because: (1) the Town is not a section 11 claimant as it is not engaged in "the conduct of any trade or commerce;" *See Peabody N.E., Inc. v. Town of Marshfield*, 426 Mass. 436, 439-41 and (2) a violation of chapter 176D § 3(9) automatically violates section 9. *See* G.L. c. 93A § 9.

[7] The Town bears the burden of proving its chapter 176D/93A claim and any bad faith on AMMIC's part. *See Taveras v. Rodriquez*, 2000 Mass. App. Ct. 39, 40 (2000); *Pandey v. Paul Revere Ins. Co.*, 34 Mass. App. Ct. 919, 920 (1993); *Femino v. Manufacturers & Merch. Mut. Ins. Co.*, 1994 WL 878939, *3 (Mass. Super. 1994).

> (9) Unfair claim settlement practices: An unfair claim settlement practice shall consist of …: (a) Misrepresenting pertinent facts or insurance policy provisions …; (b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims …; (c) Failing to adopt and implement reasonable standards for the prompt investigation of claims …; (d) Refusing to pay claims without conducting a reasonable investigation …; (e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; (f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; (g) Compelling insured to institute litigation to recover amounts due … by offering substantially less than the amounts ultimately recovered …; (h) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application; ... (n) Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

G.L. c. 176D §§ 3(9)(a)-(h), (n).

Very few reported Massachusetts decisions exist that analyze a *surety's* violation of chapter 176D/93A during performance of bond obligations. Of these, only *one* finds chapter 176D/93A liability – and there the surety's passivity was extreme. *See R.W. Granger & Sons, Inc. v. J & S Insulation, Inc.*, 435 Mass. 66 (2001). In *R.W. Granger*, the surety refused to settle a payment bond claim until one year after a jury verdict entered against it. *See R.W. Granger*, 435 Mass. at 68-70. During this post-verdict timeframe, the surety only made one settlement offer equaling half the verdict amount. *See id*. at 69. These actions, and the lack of *any* investigation before or after the verdict, violated chapter 93A by way of chapter 176D § 3(9) (d), (e), (f), and (g). *See id*. at 71-72.[8] As demonstrated below, AMMIC's actions are not remotely comparable to those of the surety in *Granger*.

Cases analyzing chapter 93A liability based on a chapter 176D violation arise almost exclusively from settlement activity on *insurance policies*, not surety bonds. The most instructive claims-handling case on point is *Spencer Press, Inc. v. Utica Mut. Ins. Co.*, 1994 WL

---

[8] The surety only preserved for appeal the trial court findings on 176D § 3(9) (f) and (g), and the SJC affirmed.

8

879732 (Mass. Super. 1994), *aff'd*, 42 Mass. App. Ct. 631, 636 (1997).  In *Spencer Press*, the plaintiff ("Spencer Press") engaged in the business of commercial printing. *Spencer Press*, 1994 WL 879732 at *1-2.  While manufacturing its client's catalogue, a defect arose causing the mail-order forms in four million catalogs to stick between certain pages and be hidden from view.  *See id*.  Spencer Press admitted its negligence and the client filed a claim with Spencer Press' insurance carrier, Utica Mutual Insurance Company ("Utica").  *See id*. at *3.

Utica's Senior Claims Manager began the claim investigation within weeks of the claim.  *See id.*  Within a month, Utica established a claim reserve and the Senior Claims Manager visited the Spencer Press facilities, met with personnel, and provided the home office with an initial analysis.  *See id*.  Within the same month, Utica also retained a separate investigation service and approved the engagement of an outside accounting firm.  *See id.* at *4.  Four months later, Utica retained another specialized claim-service firm to obtain and analyze certain statistical industry information.  *See id*.  Based upon these analyses, a comprehensive seven-month investigation, and input from Utica's *Regional* Claims Manager,[9] the claim was denied.  *See id*. at *5, 11.  Spencer Press allegedly lost the client's business as a result.  *See id.* at *3.

Spencer Press then filed suit against Utica, alleging that its bad faith and mishandling of the claim violated chapter 93A – both independently and by way of G.L. c. 176D § 3(9)(a), (c), (d), (e), and (f).  *See id*.  The Court found, however, that Utica's investigation and denial of the claim in no way violated chapter 176D § 3(9) or Chapter 93A.

---

[9] Spencer Press' follow-on claim against Utica, *see infra*, revolved primarily around certain flaws in the actions and judgment of the *Regional* Claims Manager.  The Court found, however, that despite the numerous errors made by the *Regional* Claims Manager that the ultimate decision to deny the claim was based upon the independent and expert opinion of investigators, accountants, and counsel.  *Spencer Press*, 1994 WL 879732, at *8.

    2.  *As a matter of law, AMMIC did not violate c. 176D § 3(9)(a).*

Chapter 176D § 3(9)(a) prohibits misrepresentation of "pertinent facts or [Bond] provisions relating to the coverages at issue." A misrepresentation requires a *false* statement of *material fact* made to induce a person to act – together with *reliance* on the false statement to that person's detriment. *See Zimmerman v. Kent*, 31 Mass. App. Ct. 72, 77 (1991). While the record is replete with *disagreements* over Bond coverage, there is no evidence to suggest that AMMIC intentionally made false statements to induce the Town to act in any way. When asked by interrogatory to state the basis for the allegation of misrepresentation, the Town simply stated:

> despite the clear language of the performance bond, AMMIC has refused to pay for the cost of correcting defective work and completing the contract work and has not compensated the Town for its additional legal, design professional, project management, and delay costs, and liquidated damages.

Facts ¶ 52. The Town's answer, even if true (which undisputed facts show it is not) does not identify any misrepresentation of fact or detrimental reliance. Moreover, the undisputed facts demonstrate that AMMIC acknowledged its liability for latent defective work of Sciaba's, Facts ¶ 51, and *did* make payment in 2003 for what it estimated to be covered legal, design professional, project management and delay costs and liquidated damages. Griffin Aff. Exh. 27. These undisputed facts negate the Town's purported basis for a claim under § 3(9)(a).

Moreover, in *Spencer Press*, the court found that Utica's reliance on express policy terms did not amount to misrepresentation. Utica relied on a policy provision that excluded from coverage any damage to Spencer Press' work product itself. *See id*. at *12. As in *Spencer Press*, AMMIC also relied on express Bond provisions in handling the Town's claim. For example, the plain terms of the Bond provide that AMMIC is liable "**without duplication**" for:

> 6.1 The **responsibilities** of the Contractor for correction of defective work ... 6.2 Additional legal, design professional and delay costs **resulting from** the Contractor's Default ... and 6.3 Liquidated damages ....

10

Facts ¶ 2 (emphasis added). The terms "without duplication," "responsibility," and "resulting from" entitled AMMIC to determine exactly what corrective work was Sciaba's "responsibility," to what extent the Town's damages "resulted from" Sciaba's default, and whether the Town's claims included any "duplication." AMMIC's overpayment defenses reflect Bond provisions (¶¶ 3.3 and 12.1) that require the Owner to dedicate the Balance of Contract Funds to the cost of completion – after adjustment for "valid and proper payments" by way of Paragraph 6. Additionally, AMMIC's calculation of liquidated damages in its November 21, 2003 letter clearly reflected its position that a sixty (60) day extension is appropriate under the Contract. The Town's mere disagreement with these determinations does not make them a misrepresentation. Right or wrong, the disagreements on Bond coverage turn on numerous facts, applicable law and contract interpretation – not misrepresentation under c. 176D § 3(9)(a). Nor is any detrimental reliance shown or even asserted by the Town.

        3.    *As a matter of law, AMMIC did not violate c. 176D § 3(9)(c) or (d).*

            a.    <u>AMMIC adopted reasonable standards for a prompt investigation</u>.

Failing to implement "reasonable standards for the prompt investigation of claims" is a violation of chapter 176D § 3(9)(c). In *Spencer Press*, Utica established reasonable standards for a prompt investigation when it assigned its Senior Claims Manager to the task, began the investigation within a month after the claim, hired various outside professionals to conduct the investigation, visited the site, interviewed personnel, and communicated the extent of coverage to Spencer Press in a timely manner. *See Spencer Press*, 1994 WL 879732 at *12.

Here, as in *Spencer Press*, AMMIC instituted reasonable standards for a prompt investigation. First, the Town's "claim" on the performance bond did not actually arise until July 23, 2003, at the earliest, when it had fulfilled the conditions precedent set forth in Bond

11

paragraphs 3.1, and 3.2.[10]  *See Enterprise Capital, Inc. v. San-Gra Corp.*, 284 F. Supp. 2d 166, 179 (D. Mass. 2003) (AIA A312 Bond ¶¶ 3.1-.3 are conditions precedent to surety obligations); *see also 120 Greenwich Dev. Assocs., LLC v. Reliance Ins. Co.*, 2004 U.S. Dist. LEXIS 10514, *9 (S.D.N.Y. 2004) (same); *Ag-Grow Oils, LLC v. National Union Fire Ins. Co.*, 276 F. Supp. 2d 999, 1017 (D.N.D. 2003) (same).  Similar to the timely retention of industry experts in *Spencer Press*, several months before these conditions were met, AMMIC had *already* hired Mr. Anastasio as its construction claims specialist, Mr. Zito as its a forensic accountant, and Mrs. Griffin as its outside counsel.  Moreover, AMMIC conducted its investigation under the direction of Stephen Beatty, who was *more senior* than the Senior Claims Manager in *Spencer Press* (by virtue of the fact that Mr. Beatty held the authority to resolve the Town's claim).

In addition to AMMIC's pre-July 23 activity, AMMIC's professionals worked with the Town and its architects to identify technical Project requirements and distribute a Request for Proposal to potential bidders within a month after July 23.  Like the insurer in *Spencer Press,* which established reasonable standards for a prompt investigation by hiring seasoned professionals and conducting a timely and comprehensive investigation, AMMIC's early engagement of surety professionals and its pre-claim activity established standards that enabled the Town to sign a completion contract with Fontaine *within five months* of its Bond claim.  In light of the complexities involved in this construction project, AMMIC's disposition of the claim within five months is reasonable and operates as a proof of reasonable claim standards.  *See Seaboard Sur. Co. v. Town of Greenfield*, 266 F. Supp. 2d 189, 194 (D. Mass.2003) (sureties are

---

[10]   The Town arguably has not fulfilled the condition precedent in Bond ¶ 3.3, as it has not acknowledged proper adjustments to the Balance of the Contract Price due to overpayment.  It did not fulfill condition 3.3 as to other parts of the Balance of the Contract Price until it executed the completion contract with Fontaine on December 15, 2003.

12

allowed reasonable time to review the completed work and to analyze the tasks remaining for completion), *aff'd on other grounds*, 370 F.3d 215 (1st Cir. 2004); *see also infra* § B.4.

There is also no reasonable expectation that the Town can offer sufficient evidence to support its claim. The Town will likely point to the fact that AMMIC did not have written policies or manuals for handling bond claims. This evidence, however, is immaterial and irrelevant. The determination of whether reasonable standards were adopted turns on an insurer's *activity* on a *particular* claim investigation – not on the existence of written materials that might govern claims-handling in general. *See Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 586-87 (6th Cir. 2001) (lack of guidelines or manuals irrelevant when claims analyst with twenty-years experience conducts comprehensive investigation in good faith); *Johnson v. Essex Ins. Co.*, 2002 WL 112561, *12 (Tex. Ct. App. 2002) (written policies for claim handling immaterial amidst sufficient evidence of an otherwise prompt and reasonable investigation) (not designated for publication); *Spencer Press*, 1994 WL 879732 at *12 (analyzing reasonable standards for prompt investigations without consideration of written policies or procedures); *Andrade v. Aetna Life & Cas. Co.*, 1995 WL 808695, *5-6 (Mass. Super. 1995) (failure to follow requirements in claim-settlement manual is not determinative; *actual* activity on the claim is). Accordingly, without any evidence supporting the Town's claim, AMMIC is entitled to summary judgment as a matter of law.

        b.      <u>AMMIC conducted a reasonable investigation</u>.

Chapter 176D § 3(9)(d) forbids rejection of a claim without first conducting a "reasonable investigation based upon all available information." G.L. c. 176D § 3(9)(d). In *Spencer Press*, the same activities that established reasonable claim standards also established a "reasonable investigation." *See Spencer Press*, 1994 WL 879732, at *12. By this measure, AMMIC's engagement of outside professionals, numerous site visits beginning in March 2003,

13

communications with the architect, meetings with subcontractors, solicitation of bids, and repeated requests to the Town for documentation of damages constituted a reasonable investigation. Accordingly, AMMIC's investigation was reasonable and a far cry from the surety's egregious refusal to conduct *any* claims investigation in *R.W. Granger*. Moreover, from the record there is no reasonable expectation that the Town can offer any evidence to establish a failure to conduct a reasonable investigation that might reach the level of that in *R.W. Granger*. As a matter of law, AMMIC did not violate chapter 176D § 3(9)(d).

        4.     *As a matter of law, AMMIC did not violate c. 176D § 3(9)(e).*

AMMIC resolved the Town's Bond claim within a reasonable time and not in violation of chapter 176D § 3(9)(e). Section 3(9)(e) requires that coverage be affirmed or denied "within a reasonable time after proof of loss statements have been completed." G.L. c. 176D § 3(9)(e). The Bond, however, did not require submission of a "proof of loss statement" by the Town and AMMIC did not impose such a requirement. AMMIC did, however, request information substantiating the Town's damage claims several times between October 15 and November 15, 2003. Facts ¶¶ 30, 39. AMMIC stated its position on its liability and defenses on November 21, 2003, less than four months after the Town's claim. Facts ¶ 42.

AMMIC's statement of its position within four months of the Town's claim was timely and reasonable as a matter of law. In *Spencer Press*, Utica denied the claim in approximately seven months. *Spencer Press*, 1994 WL 879732 at *12. This timeframe was reasonable "[i]n light of the complexity of the mail order business and the fact that [because] the business relies heavily upon statistical information, an accounting was necessary…." *See id*.; *see also Town of Greenfield*, 266 F. Supp. 2d. at 194 (explaining that a surety is allowed reasonable time to review completed work and analyze tasks remaining for completion). Like the mail-order business in *Spencer Press*, construction projects are fraught with factual and technical complexities involving

14

numerous accounting, engineering, legal, and management disciplines. The volume of paper records generated by a $13 million contract is staggering. Facts ¶ 57. Despite such challenges, AMMIC issued an RFP within one month of the Town's July 23 claim, estimated its liability and tendered a completion contract within four months, and made substantial payments (both conditional and unconditional) within four and a half months after the claim was asserted. AMMIC stands in stark contrast to the surety in *R.W. Granger*, which failed to settle a bond claim within a year after a jury verdict made its liability all but certain. Accordingly, AMMIC's ability to investigate a construction project and state its coverage position within four months is reasonable as a matter of law. Without a reasonable likelihood of the Town proving any facts to the contrary, as a matter of law AMMIC did not violate chapter 176D § 3(9)(e).

    5.  *As a matter of law, AMMIC did not violate c. 176D § 3(9)(f).*

Failure to settle a claim promptly after liability has become "reasonably clear" is a violation of chapter 176D § 3(9)(f). However, "liability is not 'reasonably clear' if it is still the subject of good faith disagreement." *Clegg v. Butler*, 424 Mass. 413, 418 (1997); *see also Spencer Press, Inc. v. Utica Mut. Ins. Co.*, 1994 WL 879732 at *13 (Mass. Super. 1994) (input from objective claims-handling professionals engaged by insurer can ground good faith dispute).

In *Spencer Press*, the court found that while liability for the manufacturing defect was clear from the beginning, the *extent* of liability was not. *See Spencer Press*, 1994 WL 879732, at *13. Similarly, while AMMIC has never disputed the propriety of the Town's declaration of Sciaba's default, or that it had some liability under the Bond, it always questioned the *extent* of its obligation based upon the investigation and analysis of its outside professionals. Facts ¶¶ 41, 42. It is undisputed that AMMIC asserted overpayment defenses both on a line-item level and as to the May Payments. It is also undisputed that the parties disagree about the substantial completion dates in effect and whether those dates should have been extended due to abnormal

15

winter weather. The overpayment defense for a *pro tanto* discharge and requests for time extensions are well-recognized in construction and surety law, but are highly fact-specific. Unlike the surety in *R.W. Granger*, which failed to settle the bond claim after a jury verdict made the extent of its liability reasonably clear, the Town's Bond claim remains in bona fide dispute based upon the objective and professional input received by AMMIC in the course of its investigation and fulfillment of its Bond obligations. Based upon this, and the Town's inability to offer evidence supporting its claim, as a matter of law AMMIC did not violate chapter 176D § 3(9)(f).

      6.     *As a matter of law, AMMIC did not violate c. 176D § 3(9)(b) or (n).*

Chapter 176D § 3(9)(b) required AMMIC to "acknowledge and act reasonably promptly ... with respect to claims arising under [the Bond]." G.L. c. 176D § 3(9)(b). The statute also required AMMIC to "provide promptly a reasonable explanation ... for denial of a claim or for the offer of a compromise settlement." G.L. c. 176D § 3(9)(n). AMMIC did both.

Of particular import is *Andrade v. Aetna Life & Cas. Co.*, 1995 WL 808695 (Mass. Super. 1995). After accepting a policy-limit settlement from the defendant-driver's insurance carrier, the plaintiff filed various claims, as an additional insured, on Aetna policies held by others. *See id*. at *1-2. Aetna immediately assigned a claims representative who made an initial analysis and telephoned plaintiff's attorney within 24 hours. *See id*. at *3-4. On that call the representative explained coverage concerns and articulated that resolution of the plaintiff's claimant-status as a "household member" must be resolved. *See id*. at *4. The representative also advised plaintiff's attorney that she would require a statement from the plaintiff and others. *See id*. After that initial call, and during the next two months, the claims representative repeatedly tried to obtain a statement from the plaintiff to no avail. *See id.* The court held that Aetna promptly

16

acknowledged and responded to the claim, immediately began information-gathering activities, and properly articulated the "household member" issue. *See id*. at *9, 11.

Here, as in *Andrade*, AMMIC promptly (and indeed, preemptively) acknowledged the Town's claim and acted promptly. As explained above, AMMIC's activity from March through December demonstrates this. Additionally, like Aetna's explanation of the "household member" issue to plaintiff's attorney in *Andrade*, AMMIC promptly articulated its overpayment and other legal defenses on August 20, 2003 in an email to Mr. McEnaney. In that email, Mrs. Griffin cited case law supporting the overpayment position. She also cited additional facts in the draft tender agreement supporting the liquidated-damage position. Mrs. Griffin repeatedly explained and reasserted these and other defenses at the October 15 meeting and by letter of November 5. Indeed, AMMIC's subsequent November 21, 2003 letter provided a detailed and comprehensive explanation of AMMIC's liability under the Bond even though some requested information had not yet been furnished. In this manner AMMIC continuously provided prompt and reasonable explanations of any "denial" or defense. The Town's interrogatory answer on this issue presents no additional evidence that might rebut any of the undisputed facts.[11] As such, on the undisputed facts and available law AMMIC did not violate section 3(9)(b) or (n) and the Town does not have a reasonable likelihood of proving that it did.

       7.    *As a matter of law, AMMIC did not violate c. 176D § 3(9)(g).*

Chapter 176D § 3(9)(g) forbids an insurance carrier from "compelling [the] insured to institute litigation to recover amounts due under an insurance policy by offering substantially less

---

[11] The Town's answer to Interrogatory No. 15, by which AMMIC requested facts supporting the claim that it failed to "acknowledge [the Town's claim] and act reasonably promptly [thereto]," refers to missed "deadlines." Any "deadline" (if they were "deadlines" at all) were self-imposed by AMMIC. Facts ¶ 60. Even if this assertion is true *arguendo*, its import would be ancillary at best. After all, AMMIC facilitated the Town's execution of a completion contract and made substantial payments *within five months* of the Town's claim – a reasonable timeframe based upon the complexity of the Project. Thus, AMMIC's actions overall were timely, regardless of any interim steps leading to its ultimate response.

than the amounts ultimately recovered ...." G.L. c. 176D § 3(9)(g).  It should first be noted that AMMIC, not the Town, instituted this litigation.  Accordingly, section 3(9)(g) is inapposite to the procedural posture in this case.

Assuming, *arguendo*, that section 3(9)(g) applies, AMMIC still did not violate the statute when it filed this declaratory judgment action.  The legislative purpose of this section is to penalize the practice of "'low balling;' *i.e.* offering much less than the case is reasonably worth *where liability is either clear or highly likely*."  *Guity v. Commerce Ins. Co.*, 36 Mass. App. Ct. 339, 343 (Mass. App. Ct. 1994) (emphasis added).  Where liability is *not* reasonably clear, therefore, section 3(9)(g) does not apply.  *See Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co.*, 406 Mass. 7, 13-14 (1989); *Guity*, 36 Mass. App. Ct. at 343.  Thus, an insurer is entitled to file a declaratory judgment action when liability is genuinely disputed and beyond negotiation.  *See Aetna Cas. & Sur. Co. v. Ericksen*, 903 F. Supp. 836, 841 (M.D. Pa. 1995) (filing declaratory action alone is not bad faith); *International Surplus Lines Ins. Co. v. University of Wyo.*, 850 F. Supp. 1509, 1727 (D. Wyo. 1994), *aff'd on other grounds*, 52 F.3d 901 (10th Cir. 1995) (same).

As described in § B.5, *supra*, AMMIC has always, in good faith, admitted liability on the Bond.  It is the *extent* of such liability, however, that has never become "reasonably clear" due to the legal and factual defenses that AMMIC asserted in good faith.  Since there is still no reasonable clarity on the extent of AMMIC's liability, this declaratory action could not possibly be viewed as the result of any "low ball" offer of settlement to the Town – particularly when AMMIC *has actually paid* $784,157.80, under a reservation of rights, *over and above its admitted liability*.  Moreover, even if the Town ultimately succeeds, the total asserted amount of its claim is approximately $4,854,379.66 – of which AMMIC *has already paid* $3,322,996.17 (both unconditionally and under a reservation of rights).  AMMIC has therefore already paid

18

approximately 68.45% of the Town's claim without the benefit of a jury verdict to guide its decision-making process as in *R.W. Granger*. Such a payment could not evidence a bad-faith "low-ball" offer or attempt to unfairly instigate litigation under any standard of reasonableness.

In addition, AMMIC's *payment* of $3,322,996.17 could also not possibly be tantamount to a bad-faith, "low-ball" *offer of settlement*. It is "low-ball" *offers of settlement* that the statute tries to discourage. *Guity*, 36 Mass. App. Ct. at 343. In fact, not one case in the Commonwealth has found § 3(9)(g) liability for an insurer's actual payment and then affirmative effort to seek declaratory judgment of a bona fide dispute as to the remainder. Indeed, AMMIC did more than offer settlement, *it made payments* of approximately 68.45% of the total value of the Town's claim and put the Town in the position to complete the Project (which it did) – despite the disagreements between the parties. Accordingly, on these facts, the applicable law, and without any indication that the Town has a reasonable likelihood of proving its claim, AMMIC is entitled to summary judgment.

> 8. *As a matter of law, AMMIC did not violate c. 176D § 3(9)(h).*

Chapter 176D § 3(9)(h) proscribes any attempt to settle a bond claim for "less than the amount to which a reasonable man would have believed he was entitled [based on] written or printed advertising material accompanying or made part of an application." G.L. c. 176D § 3(9)(h). This requirement has no applicability in the present context. The Town did not submit an application for the Bond. Rather, the Town advertised for competitive bids from contractors and left it to the winning contractor – Sciaba – to obtain the bond required by the Town in the Contract Documents. Facts ¶ 58. Nor did the Town rely on any advertising material from AMMIC concerning Bond coverage. Rather, the Town specified in its bid documents a performance bond published not by AMMIC, but ultimately by the American Institute of Architects. Facts ¶ 59.

The Town has no evidence to suggest that AMMIC provided, and that the Town relied, on any "advertising material" relative to the Bond or its provisions. There is no reasonable likelihood, therefore, that the Town will offer evidence to satisfy the elements of section 3(9)(h). Accordingly, AMMIC is entitled to summary judgment in its favor.

## IV.    CONCLUSION

The undisputed facts demonstrate that AMMIC acted in good faith and in conformity with its Bond obligations. In the final analysis, the Town is left only with factual and/or legal disagreements as to the extent of AMMIC's Bond liability. Such disagreements on coverage do not constitute violations of chapter 176D § 3(9) and chapter 93A. Accordingly, based upon the undisputed facts, applicable law, and the Town's inability to offer sufficient evidence on each 176D/93A allegation, AMMIC is entitled to summary judgment as a matter of law on Count II of the Town's Counterclaim.

Respectfully submitted,

**AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY**

By its attorneys

**HOLLAND & KNIGHT LLP**

*/s/ Deborah S. Griffin*
Deborah S. Griffin, BBO #211460
Jeff D. Bernarducci, BBO #657454
10 St. James Avenue
Boston, MA  02116
Tel:    (617) 523-2700
Fax:    (617) 523-6850

Dated: December 16, 2005

# 3353266_v6
431261.00002