# EXHIBIT  1

DEPOSITION
EXHIBIT

Dore  22
4-13-05   vs.

FILE

SIGNED
CONTRACT  LPD
GDT
LDD/FILE
DHW

1997 Edition -Electronic Format

AIA Document A101-1997

# Standard Form of Agreement Between Owner and Contractor *where the basis of payment is a* STIPULATED SUM

**AGREEMENT** made as of the ___19 th___ day of April in the year of 2002
*(In words, indicate day, month and year)*
___(nineteenth day of April two thousand two)___
**BETWEEN** the Owner:
*(Name, address and other information)*

**North Brookfield Public Schools**
10 New School Drive
North Brookfield, MA 01535

and the Contractor:
*(Name, address and other information)*

**E.J.Sciaba Company, Inc.**
18 Wolcott Street
P.O.Box 191
Readville, MA 02137

The Project is:
*(Name and location)*

**North Brookfield Jr./Sr. High School**
North Brookfield, MA

The Architect is:
*(Name, address and other information)*

**Dore and Whittier, Inc.**
1795 Williston Road
Suite 5
South Burlington, VT 05403

The Owner and Contractor agree as follows.

## ARTICLE 1 THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 8.

RECEIVED
JUN 0 5 2002
DORE & WHITTIER, INC.
ARCHITECTS & PROJECT MANAGERS
SOUTH BURLINGTON, VERMONT

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

©1997 AIA®
**AIA DOCUMENT A101-1997
OWNER-CONTRACTOR
AGREEMENT**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. **WARNING: Unlicensed photocopying violates US copyright laws and will subject the violator to legal prosecution.** This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. expiration as noted below. expiration as noted below. expiration as noted below. User Document: north brookfield owner-gc.aia – 4/25/2002. AIA License Number 1018383, which expires on 12/31/2002.

NBDW24094

⌐...................................Cover and Table of Contents

**8.1.6**   The Addenda, if any, are as follows:

Number                          Date                          Pages

<u>See **Exhibit "C"**</u>        <u>North Brookfield JR./SR. High School</u>
                    <u>Addenda(Covers and Lists of Attachments)      9</u>

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 8.

**8.1.7**   Other documents, if any, forming part of the Contract Documents are as follows:
*(List here any additional documents that are intended to form part of the Contract Documents. AIA Document A201-1997 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*

This Agreement is entered into as of the day and year first written above and is executed in at least three original copies, of which one is to be delivered to the Contractor, one to the Architect for use in the administration of the Contract, and the remainder to the Owner.

**OWNER** *(Signature)*                  **CONTRACTOR** *(Signature)*

Richard P. Chabot                    Edward Sciaba Jr.
Chairman, Board of                   President
*(Printed name and title)*           *(Printed name and title)*
Selectman

EDWARD J. SCIABA, JR.
PRESIDENT

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
**AIA DOCUMENT A101-1997**
OWNER-CONTRACTOR
AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. **WARNING: Unlicensed photocopying violates US copyright laws and will subject the violator to legal prosecution.** This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. expiration as noted below. expiration as noted below. expiration as noted below. User Document: north brookfield owner-gc.aia -- 4/25/2002. AIA License Number 1018383, which expires on 12/31/2002.

# EXHIBIT  2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 03-40266 NMG

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

      Plaintiff

v.

TOWN OF NORTH BROOKFIELD,

      Defendant

## ANSWER TO AMENDED COMPLAINT AND COUNTERCLAIM

1.     The defendant, Town of North Brookfield ("Town"), is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 1 of the Complaint.

2.     The Town admits the allegations set forth in paragraph 2 of the Complaint.

3.     Paragraph 3 of the Complaint contains conclusions of law for which no answer is required by the Town. The Town further states that it does not contest this Court's jurisdiction over this matter.

4.     Paragraph 4 of the Complaint contains conclusions of law for which no answer is required by the Town. The Town further states that it does not contest whether venue is proper in this Court.

5.     Paragraph 5 of the Complaint contains conclusions of law for which no answer is required by the Town.

Massachusetts with a usual place of business located at 185 North Main Street, North Brookfield, Massachusetts.

2.      The plaintiff/defendant in counterclaim is American Manufacturers Mutual Insurance Company ("AMMIC"), which upon information and belief, is an Illinois corporation authorized to issue surety bonds in the Commonwealth of Massachusetts with a principal place of business in Long Grove, Illinois.

3.      On or about April 19, 2002, the Town entered into a contract with E.J. Sciaba Contracting Company, Inc. ("Sciaba") for the construction of the North Brookfield Jr./Sr. High School ("Contract").

4.      On or about April 19, 2002, AMMIC, as surety, and Sciaba, as principal, made, executed and delivered to the Town a performance bond in the penal sum of $13,222,000.00. A copy of the performance bond is attached hereto as Exhibit A.

5.      Pursuant to the Contract, Sciaba was required to complete construction of the building by June 30, 2003 and the Phase 4 parking lot and related work by October 31, 2003. These deadlines were extended to July 17, 2003 and November 17, 2003, respectively.

6.      Change Order No.3 to the Contract extended the project deadlines by 28 days so that Sciaba was required to substantially complete the building by August 15, 2003 and the Phase 4 work by December 15, 2003. A copy of Change Order No. 3 is attached hereto as Exhibit B.

7.      On or about April 23, 2003 the Town notified Sciaba and AMMIC that Sciaba was behind schedule and it did not appear to the Town that Sciaba was likely to complete the project in a timely manner. A copy of the April 23, 2003 letter from School Superintendent Robert O'Neill to AMMIC and Sciaba is attached hereto as Exhibit C.

4

# THE AMERICAN INSTITUTE OF ARCHITECTS



Bond No. 3SE057856

*AIA Document A312*

# Performance Bond

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

**CONTRACTOR (Name and Address):**
E.J. SCIABA CONTRACTING COMPANY, INC.
18 Wolcott Street

Readville, MA 02137

**SURETY (Name and Principal Place of Business):**
AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY
One Kemper Drive
Long Grove, IL 60049

**OWNER (Name and Address):**
THE TOWN OF NORTH BROOKFIELD, OFFICE OF THE SUPERINTENDENT OF SCHOOLS,
10 New School Drive
North Brookfield, MA 01535

**CONSTRUCTION CONTRACT**
Date:
Amount: Thirteen Million Two Hundred Twenty-Two Thousand and 00/100 Dollars ($13,222,000.00)
Description (Name and Location): North Brookfield Jr./Sr. High School, North Brookfield, MA

**BOND**
Date (Not earlier than Construction Contract Date):
Amount: Thirteen Million Two Hundred Twenty Two Thousand and 00/100 Dollars ($13,222,000.00)
Modifications to this Bond:                    ☒ None                    ☐ See Page 3

**CONTRACTOR AS PRINCIPAL**
Company:                    (Corporate Seal)
E.J. SCIABA CONTRACTING COMPANY, INC.

Signature:
Name and Title:
EDWARD J. SCIABA, JR.
PRESIDENT
(Any additional signatures appear on page 3)

**SURETY**
Company:                    (Corporate Seal)
AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY

Signature: _____
Name and Title: Jean Brooker, Attorney-in-Fact

**(FOR INFORMATION ONLY—Name, Address and Telephone)**
**AGENT or BROKER:**
Aon Risk Services, Inc. of Massachusetts
99 High Street
Boston, MA 02110
(617) 482-3100

**OWNER'S REPRESENTATIVE (Architect, Engineer or other party):**

**1** The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

**2** If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except to participate in conferences as provided in Subparagraph 3.1.

**3** If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

**3.1** The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

**3.2** The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

**3.3** The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

**4** When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

**4.1** Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

**4.2** Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

**4.3** Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

**4.4** Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

**.1** After investigation, determine the amount for

which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

**.2** Deny liability in whole or in part and notify the Owner citing reasons therefor.

**5** If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Subparagraph 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

**6** After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

**6.1** The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

**6.2** Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and

**6.3** Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

**7** The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators or successors.

**8** The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

**9** Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation avail-

AIA DOCUMENT A312 • PERFORMANCE BOND AND PAYMENT BOND • DECEMBER 1984 ED. • AIA ®
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, D.C. 20006
THIRD PRINTING • MARCH 1987

A312-1984  **2**

able to sureties as a defense in the jurisdiction of the suit shall be applicable.

**10** Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page.

**11** When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

**12  DEFINITIONS**

**12.1**  Balance of the Contract Price: The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Con-

tractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

**12.2**  Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

**12.3**  Contractor Default: Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract.

**12.4**  Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

**MODIFICATIONS TO THIS BOND ARE AS FOLLOWS:**

NONE

(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)

CONTRACTOR AS PRINCIPAL
Company:                                (Corporate Seal)

SURETY
Company:                                (Corporate Seal)

Signature: _____
Name and Title:
Address:

Signature: _____
Name and Title:
Address:

AIA DOCUMENT A312 • PERFORMANCE BOND AND PAYMENT BOND • DECEMBER 1984 ED. • AIA ®
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, D.C. 20006
THIRD PRINTING • MARCH 1987

A312-1984    3

# EXHIBIT  3

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


DOCKET NO.: 03-40266-CBS


AMERICAN MANUFACTURER'S MUTUAL INSURANCE COMPANY

v.

TOWN OF NORTH BROOKFIELD



30(b)(6) DEPOSITION OF AMERICAN MANUFACTURERS

MUTUAL INSURANCE COMPANY, taken pursuant to Notice under the

applicable provisions of the General Rules of Civil

Procedure before Ilona Connor, a Notary Public in and for

the Commonwealth of Massachusetts, at KOPELMAN & PAIGE,

P.C., 31 St. James Avenue, Boston, Massachusetts 02115 on

Tuesday, May 10, 2005, commencing at 8:59 a.m.




CDA CONNOR & DESMARAIS AGENCY

517 Walnut Street

Saugus, MA 01906

(781) 231-0900

17

1    Q    Did you prepare that?

2    A    No.

3    Q    Who prepared that?

4    A    I believe that this was prepared by Rick Anastasio.

5    Q    Who is Rick Anastasio?

6    A    Rick Anastasio is a surety consultant that we've

7         engaged.

8    Q    And, when was he engaged?

9    A    I think sometime in March of 2003, roughly.

10   Q    Why was he engaged?

11   A    Because we had some claims activity on E-J Sciaba.

12   Q    On specifically -- what was the claims activity?

13   A    We had some claims activity on projects for the Town of

14        North Brookfield, your client, or the Town of

15        Brookline, and the Town of Winthrop, I believe.

16   Q    When did you first get any claims activity on any of

17        the Sciaba projects?

18   A    The first I knew of it was, I believe, in January of

19        2003.

20   Q    Had there been claims prior to that, do you know?

21   A    I believe there had been several.

22   Q    And, who was handling those, if you were not?

23   A    Ana Velasquez had been handling the E-J Sciaba files.

24   Q    And, who is Ana Velasquez?

24

1          of?

2     A    Mandate Directors is still in litigation.

3     Q    Any others?

4     A    I'm not sure of the others.

5     Q    Do you know -- do you have any documents that indicate

6          whether or not these claims have been paid?

7     A    They would be in the claim files.

8     Q    Did you ever visit E-J Sciaba's site?

9     A    What do you mean by E-J Sciaba's site?

10    Q    Their place of business?

11    A    No, I never did.

12    Q    Do you know whether Mr. Anastasio did?

13    A    I believe he did.

14    Q    Do you know what occurred during that site visit at

15         all?

16    A    I have no idea.

17    Q    Did you ever visit the project site in May of 2003?

18    A    Which project site?

19    Q    North Brookfield.

20    A    Yes.

21    Q    When was that?

22    A    The 20th, the 21st.  There was a meeting out there.

23    Q    Prior to that, did you visit the site at all?

24    A    Yes, I did.

25

| | | |
|---|---|---|
| 1 | Q | And, when was that? |
| 2 | A | That was the latter part of March. |
| 3 | Q | And, what occurred during that site visit? |
| 4 | A | Basically, I just had a conversation with Sciaba's |
| 5 | | project manager, who -- I believe that was Scott |
| 6 | | Finneran. |
| 7 | Q | What was the purpose of your meeting? |
| 8 | A | We just wanted to go out and see the site. |
| 9 | Q | Why? |
| 10 | | MS. GRIFFEN: Objection. |
| 11 | A | Well, I had been -- I had been in town on another |
| 12 | | matter, and there was some claim activity on Sciaba, |
| 13 | | and so I thought I would go out and take a look at the |
| 14 | | -- at the work, the job site, talk with the project |
| 15 | | manager, and Rick was along. |
| 16 | Q | Who else was at the meeting, besides you and Rick? |
| 17 | A | I believe that was it. |
| 18 | Q | What was your discussions with Mr. Finneran, the |
| 19 | | substance? |
| 20 | A | Just what's happening with the job, how's it |
| 21 | | progressing, things of that nature. |
| 22 | Q | And, what did he say? |
| 23 | A | I don't recall specifically what he said. |
| 24 | Q | Were you concerned? |

99

1    any discussion on cash flow, other than that was an

2    issue that was raised as being something that was a

3    concern.

4    Q    Were you concerned by any statements made by Sciaba

5         and/or its representatives at the meeting concerning

6         their cash flow situation?

7    A    Was I concerned, no.  I mean, I think that anything

8         they probably discussed with us previously.

9    Q    And, when would those discussions have taken place?

10   A    Earlier in the day, with Bert Capone.

11   Q    On the same day?

12   A    I believe it was that morning.

13   Q    And, what were those discussions that you had with Mr.

14        Capone?

15   A    Well, we went around and around that before, sir.  We

16        had a discussion with Burt Capone, and with Ed Sciaba

17        inquiring into the particulars of the finances of E-J

18        Sciaba Construction, and asked for detailed information

19        from which we can make some sort of assessment.

20   Q    And, Mr. Sciaba was present at that meeting as well?

21             MS. GRIFFEN: Objection.

22   Q    The meeting that you had with Attorney Capone?

23   A    Yes.

24   Q    He was not at the May 21, 2003 meeting with the group

130

1    A    I don't see any specific reference in that.

2    Q    Is there anyone from -- who attended the May 21, 2003

3         meeting that you are aware of, that will corroborate

4         your allegation that you had made such a request to the

5         town concerning advising it before it made payments to

6         the surety?

7              MS. GRIFFEN: Objection.

8    A    I haven't -- I didn't specifically inquire it.

9    Q    Now, let's move on to the Sciaba's default, which is

10        something that we spoke briefly about before.  I want

11        to get in a little more detail about that.  I'm going

12        to ask you to take a look at two different documents,

13        which will be marked as Exhibits 144 and 145.

14   (Exhibit 144 marked; Letter to Attorney O'Neill from Ed

15              Sciaba dated May 30, 2003)

16        (Exhibit 145 marked; Default Letter dated

17        May 30, 2003 to Attorney O'Neill from Ed Sciaba)

18   Q    (By Mr. McEnaney) Could you take a look at the document

19        that's been marked as Exhibit 144, and after you do so,

20        identify that document, please?

21   A    144 is a letter to Robert O'Neill, Superintendent of

22        Schools from Ed Sciaba, dated May 30.

23   Q    And, was that letter ever sent to Mr. O'Neill, do you

24        know?

136

```
 1           jobs might be affected, if they were specified, but I
 2           don't recall right now.
 3      Q    How many weeks did you provide funding to Sciaba to
 4           meet its payroll?
 5      A    I don't recall.  It was quite a few weeks.  It was six
 6           weeks, maybe, something in that neighborhood.
 7      Q    Was that -- and, when -- do you recall when the first
 8           week was when you provided them with some funding?
 9      A    No.  It probably would have been somewhere within a
10           week or so of this letter of May 30th.
11      Q    Was it prior to May 21st meeting?
12      A    No, it was not.
13      Q    Obviously, not on the North Brookfield project, but
14           with regard to any of the other projects?
15      A    No, it was not.
16      Q    So, did -- what type of investigation did you do in
17           response to Sciaba indicating that it could not meet
18           its payroll?
19      A    Well, we had engaged the accounting firm of Tofias to
20           review the financial documents of Sciaba and sent them
21           out to its offices and its job sites to get what they
22           could, and get us a report back.
23      Q    Did they make such a report?
24      A    They attempted to make such a report, but they kept
```

137

```
 1            having problems getting all of the necessary

 2            documentation that they needed, so that there could be

 3            anything presented to us with some certainty or

 4            reliability.

 5     Q      Why was that?  Why were they having trouble getting the

 6            documents?

 7                   MS. GRIFFEN: Objection.

 8     A      They were having trouble getting the documents.  Sciaba

 9            was having trouble getting them assembled.  There was

10            some documentation that was retained on computer, and

11            that was misplaced, or sold or erased or something like

12            that, and that was, you know, part and parcel of it.

13     Q      Did they ever provide you with any type of report?

14     A      Nothing of a conclusory nature, because they could

15            never get the documentation that would be sufficient

16            for that form of report.  Everything was rather

17            tentative.

18     Q      So, the report basically indicated that Sciaba -- they

19            weren't able to get whatever documents they needed from

20            Sciaba in order to perform their analysis?

21     A      Right.

22     Q      Do you recall when that report from Tofias came?

23     A      I had a series of tentative, kind of down and dirty

24            reports and summaries from them.  We never had like a
```

139

1       wanting money from you.  They're wanting you to finance

2       their venture on this particular bond so you can say,

3       "Okay, I want these terms and conditions, one of which

4       is you send a letter like this directing the town to

5       turn over the money to us, and now there's a default

6       letter."

7    Q  I'll ask you take a look at the document that's been

8       marked as Exhibit 145, please.

9    A  (Witness complying).

10   Q  And, can you identify that after you have a chance to

11      look at it?

12   A  That's the default letter.

13   Q  That's the default letter that you were just talking

14      about, correct?

15   A  Yes.

16   Q  And, that -- so, you asked Mr. Sciaba to execute both

17      documents marked as Exhibit 144 and 145, in exchange

18      for providing them for funding?

19   A  That's correct.

20   Q  At some point, did you send these letters out?

21   A  Did we send those letters out.  I believe that we sent

22      the voluntary default letter out.  The other letter was

23      supposed to have come from Sciaba.

24      (Exhibit 146 marked; Letter from Holland Knight to

146

1    Q    Have you had a chance to take a look at that document?

2    A    Yes.

3    Q    And, can you identify it, please?

4    A    It's a letter to my counsel to Bert Capone from this

5         firm, Notice of Default under general contract.  North

6         Brookfield Junior/Senior High School, requesting a

7         meeting to discuss defaulting Sciaba Construction.

8    Q    And, what was done in response to that from AMMIC's

9         perspective.

10   A    Oh Gosh, I don't really specifically recall what the

11        next thing was that was done on that.

12   Q    Did -- was a meeting ever held?

13   A    I don't specifically recall whether it was held, or if

14        people said, what's the -- what's the necessity of

15        that.  Do we waive the 15-day period, or not.

16   Q    I'm going to ask you to take a look at a document

17        that's been marked as Exhibit 147, please?

18                    (Exhibit 147 marked; Letter from

19                    Holland Knight dated June 5, 2003)

20   A    (Witness complying).  This looks like we waived it.

21   Q    Can you identify that document, please?

22   A    It's a letter from Holland & Knight to you saying we

23        waived the 20-day notice, and the requirement for a

24        meeting.

1        exchanging information, and then somebody puts it

2        together under their signature, and that would probably

3        then be Rick.  It would be under his signature.  But,

4        he certainly had input on various features, both from

5        his staff undoubtedly from individuals at Dore &

6        Whittier, that he would have been trying to solicit

7        information from.

8    Q   Do you know whether he had any specific conversations

9        with anyone from Dore & Whittier concerning the

10       estimate?

11   A   No, not the estimate as a whole.

12   Q   Do you know whether or not he retained a separate cost

13       estimator to perform the cost estimate?

14   A   No.

15   Q   No, he didn't, or no, you don't know?

16   A   I don't know.  I don't know who participated in that.

17       I know that the ultimate product came through Rick, but

18       who participated in that, or the information that was

19       down, and any cost estimate, where that came from, I

20       don't know the specific source or the individuals that

21       might be involved.

22   Q   I'm going to ask you to take a look at a document

23       that's been marked as Exhibit 151.

24               (Exhibit 151 marked; Projected Cost

164

1                    Completion dated 7/21/03)

2    A    (Witness complying).  Okay.

3    Q    Are you familiar with that document?

4    A    Yes, it looks like a Cost to Complete, or one of the

5         Cost to Complete estimates that were prepared by

6         Greyhawk in the Sciaba matters.

7    Q    Are there others, besides this one, that you're aware

8         of?

9    A    I don't know if there's one, or if there's more.

10        Sometimes they're updated from time-to-time, depending

11        on new information that comes in, and you know, whether

12        you've got additional subs ratified, if there's been

13        some information that comes in that constitutes a

14        material change.  Then there will be -- it will be

15        amended.

16   Q    And, are you aware of whether or not there was any such

17        amendment between the effective date of this estimate,

18        which is dated 7/21/03, and September 8, 2003, when the

19        bids were communicated, the bid results communicated.

20   A    I don't specifically recall.  I know that it was an

21        ongoing process in terms of ratifying subs.  They were

22        not all, by any means, ratified as of 7/21.  It was a

23        date that I think wasn't until sometime in September,

24        that all of the available subs were -- those that had

1          been selected, they'd been ratified.

2    Q   What was your reaction to the bids that came in in the

3          beginning of September, 2003, compared to -- when you

4          compared them to the estimate?

5    A   Quite a difference.

6    Q   What was the difference, do you know?  The amount?

7                 MS. GRIFFEN: Objection.

8    A   I don't specifically recall.

9          (Exhibit 152 marked; Email from Rick Anastasio dated

10                  October 24, 2003)

11    Q   I'm going to ask you to take a look at a document

12          that's been marked as Exhibit 152, please?

13    A   (Witness complying).  Okay.

14    Q   Are you familiar with that document?

15    A   Yes, it looks like an email responding to my email.

16    Q   In your email, which is the lower half of that document

17          sent October 24, 2003, it appears, correct?

18    A   Pardon?

19    Q   Your email, which is the lower half of that document,

20          appears to have been sent on October 24, 2003, correct?

21    A   That's what it says.

22    Q   Subsequent to the opening of the bids in and around the

23          beginning of September, did American Manufacturer's

24          solicit a second round of bids from proposed

1    MR. MCENANEY: Yes, we can go off the record.

2    (Off the record, 1:55 to 2:00 p.m.)

3   (Exhibit 153 marked; Email plus attachment from Rick

4    Anastasio to Attorney Griffen, 12-pages)

5 Q (By Mr. McEnaney) I'm going to ask you to take a look

6   at this document.

7 A Something new?

8 Q Yes, 153.

9 A (Witness complying).  Okay.

10 Q Are you familiar with this document?

11 A Yes.

12 Q Can you identify it for the record, please?

13 A It's an email from Rick to counsel and myself that

14   forwards best and final bid breakdowns on the project.

15 Q And, with regard to -- one of those bids was submitted

16   by Fontaine Brothers, correct?

17 A Yes.

18 Q And, their bid amount appears to be in the amount of

19   $11,527,000, correct?

20    MS. GRIFFEN: Can you direct him to the page

21   you're looking at?

22 Q It would be Page 4 of the document.

23 A Right.  Eleven, five twenty-seven, yes.

24 Q And, that is lower than the bid price that was

ERRATA SHEET
Deposition of Stephen J. Beatty

I, Stephen J. Beatty, do hereby certify that I have read the foregoing transcript of my testimony taken on May 10, 2005, and further certify that, subject to the following list of corrections, said transcript is a true and accurate record of said testimony.

Signed under the pains and penalties of perjury.

Dated this 14th day of June, 2005.

Stephen J. Beatty

LIST OF CHANGES

| Page/Line | Change | Reason |
|---|---|---|
| Throughout | "Griffin," not "Griffen" | Spelling |
| Throughout | "Manufacturers," not "Manufacturer's" | Punctuation |
| 14:16-17 | "run off," not "run-off" | Punctuation |
| 23:6 | client's professionals | Stenographic and punctuation |
| 30:2 | "my own personal," not "non-personal" | Stenographic |
| 48:10 | "They were," not "We're" | Stenographic |
| 48:24 | delete the comma after claims | Punctuation |
| 53:7 | "are wont," not "want" | Stenographic |
| 56:23 | Matters | Stenographic |
| 64:17 | "Dore," not "Dora" | Stenographic |
| 69:11 | "they'd," not "I'd" | Stenographic |
| 73:20 | I got the letter at the May 21 meeting with the Town. | Memory refreshed; see p. 74:10 |
| 77:20 | "ABA," not "A-V-A" | Stenographic |
| 78:9 | "ABA," not "A-V-A" | Stenographic |
| 78:14 | "ABA," not "A-V-A" | Stenographic |
| 78:16 | "analysts," not "panelists" | Stenographic |
| 84:3 | "A" not "Q" | Stenographic |
| 86:5 | delete "other" | Stenographic |
| 88:23 | delete "and" | Stenographic |
| 89:10 | "complicit," not "complicite" | Spelling |
| 91:5 | "right," not "write" | Spelling |
| 92:59 19 | "financing," not "finance" | Stenographic |
| 95:6 | "issued," not "issues" | Stenographic |
| 95:23 | "Bert," not "Burt" | Spelling |
| 99:16 | "Bert," not "Burt" | Spelling |
| 104:23 | "juncture," not "junction" | Stenographic |
| 107:6 | was not in breach | Stenographic or I misspoke |

| 108:18 | Insert "you" after "do" | Stenographic |
|---|---|---|
| 110:3 | financial condition. We . . . | Punctuation |
| 111:20 | "not," not "no" | Stenographic |
| 112:4 | "issue," not "issued" | Stenographic |
| 113:5 | Insert "say" before "impending" | Stenographic |
| 114:5 | Insert "a fire alarm" not "to fire" | Stenographic |
| 116:19-20 | "sum and substance" not "some in substance" | Stenographic |
| 116:23 | Delete "our" | Stenographic |
| 117:18 | "conclusion," not "conclusive" | Stenographic |
| 118:10-11 | "appointed an arbitrator," not "appointment an arbitrary" | Stenographic |
| 128:3 | "doctrine of," not "document" | Stenographic |
| 128:4 | "doctrine," not "document" | Stenographic |
| 128:7 | "run off," not "run-off" | Punctuation |
| 130:8 | Insert "about" after "inquire" | Stenographic |
| 134:17 | Insert periods after "recall" and "jobs" | Punctuation |
| 134:18 | Insert a period after "one" | Punctuation |
| 135:15 | "Float," not "flow" | Stenographic |
| 141:10 | Insert "do" after "should" | Stenographic |
| 150:16 | "ratifying," not "erratify the posture" | Stenographic |
| 153:15 | "go," not "do" | Stenographic |
| 158:19 | "retained," not "regained" | Stenographic |
| 161:9 | "some time," not "sometime" | Stenographic |
| 167:10 | "seek," not "see" | Stenographic |
| 167:23 | "at," not "for" | Stenographic |
| 168:20 | "Fireman's Fund," not "firemen's fund" | Stenographic |
| 172:10-11 | "Agostini/Bacon," not "Agastini slash Bacon" | Spelling |
| 173:13-14 | "Joe Iantuono," not "Joy Enfano" | Spelling |
| 178:9 | "Mandate," not "a mandate" | Stenographic |
| 178:16 | "contractor," not "contract" | Stenographic |
| 181:12 | "an e-mail," not "a fax" | I misspoke |
| 181:20 | Insert "out" after "set" | Stenographic |
| 181:24 | "scriveners," not scripture | Stenographic |
| 182:22 | "14th," not "16th" | See pg. 183:15 |
| 185:5 | "as," not "a" | Stenographic |
| 185:11 | "them," not "him" | Stenographic |
| 188:1 and 7 | Remove quotation marks | This was a paraphrase, not a quote – Punctuation |
| 192:13 | Insert "you may" before "have" | Stenographic |
| 194:1 | "milieu," not "millue" | Spelling |
| 199:4 | "you're asking," not "we ask of" | Stenographic |
| 201:6-8 | This does not sound right and makes no sense, but I do not recall what I said | Stenographic |

| 206:6 | Change to "I don't know." | Clarification.  See also pg. 225:18 |
|-------|---------------------------|-------------------------------------|
| 210:11 | Insert a period after "engaged" | Punctuation |
| 211:9 | "construction," not "inspection" | Stenographic |
| 215:8 | "additional," not "traditional" | Stenographic |
| 217:14 | "Treasury," not "treasurer" | Stenographic |
| 217:15 | "Treasury," not "treasuring" | Stenographic |
| 217:16-17 | Capitalize "treasury" | Spelling |
| 218:4 | Change the period to a comma | Punctuation |
| 219:20 | "design and," not "assignment of" | Stenographic |
| 225:6 | "foreclose," not "propose" | Stenographic |

# 2936019_v1
431261.00002