**EXHIBIT  4**

# Holland+Knight

Tel  617 523 2700
Fax  617 523 6850

Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
www.hklaw.com
deborah.griffin@hklaw.com



Ms. Griffin's experience includes the representation of contractors, sureties, banks and bank regulators in loan and contract default situations, both before and during litigation or bankruptcy proceedings. She is an active member of the National Association of Women in Construction and the American Bar Association. Since 1984, Ms. Griffin has served on the Governing Committee of the ABA's Forum on the Construction Industry and has been a vice chair of the Fidelity and Surety Law Committee of the ABA's Torts and Insurance Practice Section. She is a fellow of the American College of Construction Lawyers.  She lectures and writes nationally on bankruptcy, construction law and complex litigation topics. Ms. Griffin is a professionally trained mediator and is on the National Construction Panel of Arbitrators for the American Arbitration Association.

Ms. Griffin is admitted to practice in the state of New York and the Commonwealth of Massachusetts, as well as the U.S. Tax Court, the United States Court of Appeals for the First Circuit and the United States District Courts for the District of Massachusetts and the Southern District of New York.

Ms. Griffin attended Bryn Mawr College, where she received her Bachelor of Arts degree *cum laude* in 1971. She earned her J.D. in 1974 from Boston University, where she was Member of Law Review.

## TEACHING AND SPEAKING ENGAGEMENTS

American Bar Association, Baltimore, November 2005:  Managing the Contract Bond Default, sponsored by Fidelity and Surety Law Committee of Tort and Insurance Practice Section.

Lorman Education Services, various locations in Boston Area, October-November 2005: seminar on Massachusetts Building Code.

American Bar Association, San Antonio, May 2005:  Managing the Contract Bond Default, sponsored by Fidelity and Surety Law Committee of Tort and Insurance Practice Section.

American Bar Association, New York, planned January, 2003:  program co-chair: Twenty-Five Years Under the Bankruptcy Code: Sureties' Lessons in Coping Survival and Success, sponsored by Fidelity and Surety Law Committee of Tort and Insurance Practice Section.

Page 2

Lorman Education Services, various locations in Boston Area, March 1999-2002: seminar on Massachusetts Mechanics Lien and Bond Law.

American Bar Association, Hilton Head, May 1999:  program co-chair for Surety Claim Workshop sponsored by Fidelity and Surety Law Committee of Tort and Insurance Practice Section.

American Bar Association, San Diego, April 1998, and Philadelphia, October 2000: Managing and Litigating the Complex Surety Case Program:  Organizing and Controlling the Massive Document/Deposition Case sponsored by Fidelity and Surety Law Committee of Tort and Insurance Practice Section.

American Bar Association, Chicago, October 1997; Atlanta, April 1996; Los Angeles, March, 1996; and New York, May, 1995:  Bond Default Program:  Completion by the Owner, sponsored by Fidelity and Surety Law Committee of Tort and Insurance Practice Section.

American Bar Association, New York, October 1996: Termination Program: Post-Termination Bankruptcy Considerations for the Defaulted Contractor, sponsored by Fidelity and Surety Law Committee of Tort and Insurance Practice.

National Association of Women in Construction, Boston, June, 1993:  Dispute Resolution Alternatives in Construction.

American Bar Association, New York,  January, 1993:  Co-Chairman for program on construction financing, sponsored jointly by Fidelity & Surety Law Committee of Torts and Insurance Practice Section and Forum on the Construction Industry.

New England Bond Claims Association, October, 1992:  Subdivision Bonds

New England Bond Claims Association, June, 1991:  Construction Surety's Exposure to Bankruptcy Preference Liability

National Association of Women in Construction, Minneapolis, September 1990: Documenting and Presenting Construction Claims

American Bar Association, New York, January, 1989:  Chairman for program on problems relating to bankruptcy problems in the construction field, sponsored jointly by Fidelity & Surety Law Committee of Tort and Insurance Practice Section and Forum on the Construction Industry.

Flaschner Institute, November 1988 and February 1989:  selected to participate in mock trial demonstration, teaching Massachusetts State Court judges rules of damages in construction litigation.

American Bar Association, New York, January, 1983:  Speaker in program on Bankruptcy Code and the Construction Industry, sponsored jointly by Fidelity & Surety Law Committee of Torts and Insurance Practice Section and Forum Committee on the Construction Industry.

## PUBLICATIONS

Chapter Author, *Bond Default Manual:  Completion by the Owner*, American Bar Association, (2nd Ed. 1995) (3rd Ed. 2005).

Editor and contributing author, *The Most Important Questions a Surety Can Ask About Bankruptcy, Second Edition*, (American Bar Association, January, 2003).

Chapter Co-Author, *Managing and Litigating the Complex Surety Case Program: Organizing and Controlling the Massive Document/Deposition Case*, sponsored by Fidelity and Surety Law Committee of Tort and Insurance Practice Section, American Bar Association, 1998.

Author, *Post-Termination Bankruptcy Considerations for the Defaulted Contractor*, 17 Construction Lawyer, 1 (January 1997).

National Association of Women in Construction, Boston Chapter 15, January 1994-present:  Column entitled "Legal Angles" in quarterly magazine.

Chapter on "Payment Bonds," Construction Defaults published in 1989 by John Wiley & Sons.

Author, *Unfair Inducement of Surety to Issue Bonds:  An Expansion of the Surety's Salvage Option,* 5 Construction Lawyer 1 (Spring, 1984).

Author, *General Contractor in Wonderland:  Selected Problems in Reorganization Under the Bankruptcy Code,* 4 Construction Lawyer, 1 (Summer and Fall, 1983).

# EXHIBIT  5

Lee P. Dore                                          04/13/2005

1

1      UNITED STATES DISTRICT COURT
   DISTRICT OF MASSACHUSETTS:  CENTRAL DIVISION
2

3

AMERICAN MANUFACTURERS      *
4   MUTUAL INSURANCE COMPANY  *
                            *
5          vs.               *  CASE NO. 03-40266 CBS
                            *
6   TOWN OF NORTH BROOKFIELD *

7

          D E P O S I T I O N
8
                   OF
9
              LEE P. DORE
10
      Taken on behalf of the Plaintiff on Wednesday
11           April 13, 2005 at the offices of
       Dore and Whittier, So. Burlington, Vermont.
12

13   APPEARANCES:

14   DEBORAH S. GRIFFIN, ESQ., of the firm Holland &
   Knight, 10 St. James Avenue, 11th Floor, Boston,
15   MA 02116, appeared and represented the Plaintiff.

16   THOMAS W. MCENANEY, ESQ., of the firm Kopelman and
   Paige, P.C., 31 St. James Avenue, Boston, MA
17   02116, appeared and represented the Defendant.

18   MATTHEW M. O'LEARY, ESQ., of the firm Donovan
   Hatem LLP, World Trade Center East, Two Seaport
19   Lane, Boston, MA 02210, appeared and represented
   the Deponent.

20

21   COURT REPORTER:  Virginia L. Simmer, RPR

22

23                            CERTIFIED ORIGINAL
                           LEGALINK BOSTON
24

25

Lee P. Dore                                           04/13/2005

62

1   sentence?

2      A.   Yes, I do.

3      Q.   When the contract was ultimately signed with

4   E.J. Sciaba there was a later substantial completion

5   date than the September 2003 date you referred to in

6   the preceding paragraph, wasn't there?

7      A.   Yes.

8      Q.   It was later by two months?

9      A.   I don't know the exact duration but I know

10  there was an extension.

11     Q.   Okay.  Did Dore and Whittier amend its

12  agreement with the town for architectural and

13  construction management services because of the

14  extension from the September 2003 date you

15  referenced in Exhibit 19 to the date that was in the

16  Sciaba contract?

17     A.   No, we did not.

18               MS. GRIFFIN:   Let's mark this as the

19          next one.

20  BY MS. GRIFFIN

21     Q.   Have you looked at Exhibit 22?

22     A.   Yes, I have.

23     Q.   On the first page of Exhibit 22 there's a

24  received stamp by Dore and Whittier, right?

25     A.   Yes.

Lee P. Dore                                                04/13/2005

63

1     Q.   And was Exhibit 22 a document that Dore and

2     Whittier received from the town as the executed

3     contract between the town and Sciaba?

4     A.   I don't know if we received this from the town

5     or directly from Sciaba.

6     Q.   On the second page of Exhibit 22 does looking

7     at section 3.3 on page 2 of Exhibit 22 refresh your

8     recollection as to what the substantial completion

9     date was under the contract?

10    A.   No, I do know that this was extended from the

11    contract but precisely without looking at the bid

12    documents I can't tell you what the dates were for

13    substantial completion that Sciaba initially bid on.

14    Q.   Okay.  In your -- what I was trying to ask you

15    was does Exhibit 22 refresh your recollection as to

16    the date of substantial completion under the

17    contract?

18    A.   Yes, this was the date of substantial

19    completion under the contract.

20    Q.   This being November 17, 2003?

21    A.   Well, there's two phases of it but the last

22    phase of the project by 17 November 2003.

23    Q.   In Exhibit 19 where you referred in the second

24    paragraph to a September 2003 substantial completion

25    date were you referring there to the substantial

140

1    A.  Run date of November 20, 2002.

2    Q.  Right.  That was Exhibit 26; is that right?

3    A.  Yes.

4    Q.  Did you provide your draft letter of April 21

5    that we marked as Exhibit 47 to someone at the town

6    in electronic format?

7    A.  I believe it was given to the superintendent

8    of schools.

9    Q.  In electronic format?

10   A.  It may have been e-mailed to him.  I don't

11   recall specifically.

12   Q.  Can you identify the document that's been

13   marked Exhibit 48, please?

14          Can you identify Exhibit 48?

15   A.  Yes, this is -- looks to be the formal copy to

16   Ed Sciaba regarding ongoing issues at the high

17   school project and looking to set up a meeting with

18   him and his surety.

19   Q.  Did you have any conversation with Mr. O'Neill

20   between the time you sent him your April 21 draft

21   and the time you got your copy of Exhibit 48?

22   A.  May have.  I don't recall specifically.

23   Q.  Did you talk with anyone else besides Mr.

24   O'Neill about your draft?

25   A.  About our draft?

148

1    preparation of meeting minutes?

2        A.   I believe he did.

3        Q.   Let me show you now what's been marked as

4    Exhibit 54.  Can you identify Exhibit 54?

5        A.   These are school building committee meeting

6    minutes of 18 June 2003.

7        Q.   Did you prepare Exhibit 54?

8        A.   Yes.

9        Q.   Did you prepare Exhibit 54 in accordance with

10   the procedures you've described previously?

11       A.   Yes.

12       Q.   Do you recall anything being said at the

13   meeting that is not reflected in the minutes?

14       A.   Not that I recall, no.

15       Q.   Let me show you a document that's been marked

16   as Exhibit 55.  Can you identify Exhibit 55?

17       A.   These would be school building committee

18   meeting minutes of 6 August 2003.

19       Q.   Did you prepare Exhibit 55?

20       A.   Yes, I did.

21       Q.   Did you prepare Exhibit 55 in accordance with

22   the procedures you described previously regarding

23   preparation of meeting minutes?

24       A.   Yes, I did.

25       Q.   Were the school building committee meetings of

Lee P. Dore                                          04/13/2005

149

1    August 6, 2003 and June 18, 2003 the only two school

2    building committee meetings that Rick Anastasio

3    attended?

4       A.   I don't recall specifically.  I know he was at

5    a few.  I don't know if it was more than these two

6    or not.

7       Q.   Do you recall any discussion at the August 6th

8    meeting beyond what is reflected in Exhibit 55?

9       A.   I don't recall anything in addition.

10      Q.   During the meeting of August 6 there was

11   discussion about the procedures that were under way

12   to prepare a request for proposals from new

13   contractors to come in and complete the work after

14   Sciaba's default, right?

15      A.   Yes.

16      Q.   And Mr. Anastasio explained the steps that

17   were being followed in that process?

18      A.   Yes.

19      Q.   And at some point along the way did Mr.

20   Anastasio forward to you drafts of the requests for

21   proposals?

22      A.   I don't recall if he sent them to me directly

23   or to town counsel or the owner.

24      Q.   But you got a set of the drafts and commented

25   on them, correct?

150

1    A.   I do recall getting a draft.  I don't remember

2    if I commented on them or not.

3    Q.   Do you recall having input on the proposed

4    list of bidders who would receive the RFP?

5    A.   Yes.

6    Q.   Let me show you what's been marked as Exhibit

7    56.  Can you identify Exhibit 56?

8    A.   This appears to be a final list of potential

9    bidders developed by Mr. Anastasio for the North

10   Brookfield project.

11   Q.   Did you discuss with the town any of the

12   contractors named on Exhibit 56 as potential

13   bidders?

14   A.   I believe, yes, we did.

15   Q.   And following your discussions with them did

16   the town approve the list of bidders to bid on the

17   job?

18   A.   I believe they did.  I think it would have

19   been included as an approval in meeting minutes

20   following their review of it.

21   Q.   Let me show you Exhibit 57 and ask if you can

22   identify that.  Can you identify Exhibit 57?

23   A.   Yes, this is a memo from myself to Rick

24   Anastasio discussing items for the RFP and the

25   potential bidders' list.

Lee P. Dore                                        04/13/2005

151
1    Q.   The date that's on the printed copy of Exhibit
2    57 says March 9, 2004.  Is that a date that you
3    printed it out for response to a subpoena as opposed
4    to the date that it was actually prepared?
5    A.   I don't know.
6    Q.   Well, you know when the RFP went out, right,
7    and that was in August of '03?
8    A.   Yes.
9    Q.   Did you prepare and send Exhibit 57 to Mr.
10   Anastasio before the RFP went out?
11   A.   Yes, I believe this was sent to him before the
12   RFP went out.  Just trying to see if there's a date
13   down here.  Draft response 8/14/03.
14   Q.   Where do you see that?
15   A.   The very bottom.  It's right here, draft
16   response.  You have to have your magnifying glass.
17   Q.   Okay, the 8 and the 14 are on different lines?
18   A.   Correct.
19   Q.   Got it.  Did Mr. Anastasio address the points
20   that were outlined in Exhibit 57 before actually
21   sending the RFP out to bidders?
22   A.   I believe he did.  I don't recall
23   specifically.
24   Q.   You don't recall thinking that the RFP went
25   out with any of these still being loose ends, do

Lee P. Dore                                    04/13/2005

152

1    you?

2      A.   I don't recall that was the case.

3      Q.   On item No. 1 on Exhibit 57 you've said the

4    owner has approved the list of nine contractors that

5    you've labeled final list, were you referring to

6    Exhibit 56?

7      A.   Final list, 8/13/03, correct, Exhibit 56.

8      Q.   Would you take a look at the document that's

9    been marked Exhibit 59, please.

10              MR. MCENANEY:  Excuse me, aren't we at

11          58?

12              MS. GRIFFIN:  Yes, let's do 58 before

13          we do 59.

14   BY MS. GRIFFIN

15     Q.   Here's 58.  Have you seen Exhibit 58 before

16   today?

17     A.   I don't recall seeing this before.

18     Q.   Do you recall being informed at any time in

19   2003 that the surety was taking the position that

20   certain checks that were delivered to Sciaba

21   provided the surety with a partial defense to the

22   town's claim on the bond?

23              MR. MCENANEY:  Objection.

24     A.   I think I recall hearing something about this,

25   yes.

                                                              155
1              MR. MCENANEY:  Objection.

2       A.  Not anything specific.

3       Q.  Now take a look at Exhibit 59 which I put in

4    front of you before.  Have you seen Exhibit 59

5    before today?

6       A.  Yes, I have.

7       Q.  Including the chart which was an enclosure

8    with it?

9       A.  Yes, I have.

10      Q.  From whom did you receive Exhibit 59?

11      A.  I don't recall specifically but I do recall

12   having read this before.

13      Q.  As a result of reading Exhibit 59 did you do

14   any analysis?

15      A.  I do believe I kind of reviewed some of these

16   issues that were mentioned in this letter.

17      Q.  Okay.  Can you explain what you did?

18      A.  Sure.  First looking at your chart on page 3,

19   the scheduled value for general requirements of

20   $609,000, percent approved 72 percent, amount

21   over-approved $200,000.  When we looked back at that

22   we looked at -- general requirements are a little

23   bit different than other trades and line items in

24   the schedule of values of the contractors in that

25   they're more time, contractual time dependent than

Lee P. Dore                                    04/13/2005

158

1   in question had been held up due to the fact that we

2   hadn't received lien waivers on one and then on the

3   other one we did not receive lien waivers as well as

4   other issues with it so it was returned to the

5   contractor.

6     Q.  Did you communicate the results of all of the

7   review and analysis that you've testified to to

8   somebody else?

9     A.  I believe I discussed this with Jim Murray.

10    Q.  Did you talk with anybody else about it?

11    A.  Not that I can recall specifically other than

12  Jim.

13    Q.  Would you take a look at the document that's

14  been marked as Exhibit 60, please.  Can you

15  identify -- strike that.  Have you seen Exhibit 60

16  before today?

17    A.  Yes, I have.

18    Q.  And did you have some input into any of the

19  either numerical or descriptive portions of Exhibit

20  60?

21            MR. MCENANEY:  Objection.

22    A.  I believe I did.

23    Q.  Which portions did you have input on?

24            MR. MCENANEY:  Objection.  Are you

25        asking him whether he had conversations

160

1    utilized in preparation of determining how much

2    additional fees would be required for basic

3    architectural engineering services, additional

4    services, construction management costs, and

5    reimbursable expenses.

6        Q.   Did you initial Exhibit 63 at the bottom?

7        A.   Yes.

8        Q.   And did you prepare Exhibit 63 on October 28,

9    2003?

10       A.   I initialed it then.  I don't know when it was

11   actually prepared.

12       Q.   Did you send it to Mr. McEnaney?

13       A.   I don't recall specifically if I did this

14   particular work sheet.

15       Q.   Okay.  Did you send Mr. McEnaney something

16   else with information that showed additional fees

17   totaling $579,027.05?

18               MR. MCENANEY:  Objection.

19       A.   I don't think I sent Mr. McEnaney anything

20   directly.  I would have forwarded this to the school

21   building committee through their cochairs.

22       Q.   Let me show you what's been marked as Exhibit

23   61.  Is the bottom part of Exhibit 61 an e-mail that

24   you were copied on?

25       A.   It says I was copied on it, yes.

161

1    Q.   Do you remember getting it?

2    A.   Not specifically.

3    Q.   Have you ever seen the top part of Exhibit 61

4    before today?

5    A.   I don't think so.

6    Q.   Had you received any calls from Chris Fontaine

7    of Fontaine Brothers on or about or before November

8    4, 2003 concerning Fontaine Brothers selection as

9    the completing contractor?

10   A.   I believe I had heard some information from

11   Fontaine Brothers.

12   Q.   Did Chris Fontaine call you?

13   A.   I don't know if it was Chris Fontaine or

14   someone else there.  It could have been.

15   Q.   What do you remember about that conversation?

16   A.   Just that he had thought that they were the

17   apparent low bidder.

18   Q.   Was there anything more to that conversation?

19   A.   I believe he was inquiring what the next steps

20   were, didn't know exactly what the process was going

21   to be.

22   Q.   He didn't or you didn't?

23   A.   I didn't.

24   Q.   Okay.  And do you recall anything else of that

25   conversation?

Lee P. Dore                                            04/13/2005

168

1    A.   Would you have received invoices from the

2  town, I mean our invoices to the town?

3    Q.   I'm going to -- we can do that now.  I have a

4  stack of invoices that we did receive from the

5  town.  We can mark the -- let's mark this entire set

6  with the cover letter, the transmittal letter as

7  Exhibit 67?

8                MR. O'LEARY:  Just for the record I'm

9            reviewing Exhibit 1 and I don't see a

10           specific request for invoices.  I'm not

11           sure if they were asked for or if they

12           were produced at this point it was so

13           long ago.  Well, for time records or

14           anything like that.

15            MS. GRIFFIN:  We can review that

16           after.

17            MR. O'LEARY:  Yes.

18  BY MS. GRIFFIN

19    Q.   I'm showing you what's been marked as Exhibit

20  67 and apart from the transmittal letter on the

21  front of the exhibit can you identify the rest of

22  Exhibit 67?

23    A.   Can you repeat your question?

24    Q.   Can you identify Exhibit 67 apart from the

25  transmittal letter?

1    A.   They appear to be our invoices to the Town of

2    North Brookfield.

3    Q.   On the second to last page of Exhibit 67, this

4    is part of an invoice dated October 30, 2003, right?

5    A.   Yes.

6    Q.   And on the second to last page there's a

7    section starting about halfway down the page called

8    legal issues GC default, do you see that?

9    A.   Yes, I do.

10   Q.   On this particular month you were billing the

11   town for 24 and a half hours of your time; is that

12   right?

13   A.   Yes.

14   Q.   And 212 and a half hours of Chris Conway's

15   time?

16   A.   Yes.

17   Q.   Did Chris Conway, in fact, keep time

18   records --

19   A.   Yes.

20   Q.   -- to back up these billed amounts?

21   A.   Yes, he did keep time sheets.

22   Q.   Was Mr. Conway working on any other projects

23   besides North Brookfield during the time he was

24   working on North Brookfield?

25   A.   Very limited.  He may have reviewed some plans

# E R R A T A   S H E E T

I, Lee P. Dore, do hereby certify that I have read the foregoing transcript of my deposition taken on April 13th, 2005, and further certify that it is a true and accurate record of my testimony (with the exception of the corrections listed below):

| Page | Line | Correction |
|------|------|------------|
| 28 | 6 | change A10B1 to "...A1A B141" |
| 142 | 11 | change Ziemba to "...Zybura" |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Signed under the pains and penalties of perjury this 17th day of ___MAY___, 2005.

_____
Lee P. Dore

# EXHIBIT  6



DEPOSITION EXHIBIT

Dore   48
4-13-05              v s



**North Brookfield Public Schools**
**Office of the Superintendent**
10 New School Drive, North Brookfield, MA  01535
Telephone (508) 867-9821 Fax (508) 867-8148
e-mail ~ roneill@nbschools.org

23 April 2003                                                 By FAX and Certified Mail

Mr. Edward Sciaba, President
Mr. Mike Sheehan, General Superintendent
E. J. Sciaba Contracting Co., Inc.
18 Wolcott St.
Readville, MA 02137

Jean Brooker, Attorney-in-Fact
American Manufacturers Mutual Insurance Company
One Kemper Drive
Long Grove, IL 60049
Bond No. 3SE057856

**Project:**      **North Brookfield Junior-Senior High School**
                  **DW Project No. 00-404**

Dear Mr. Sciaba:

The Owner formally requests a meeting with you and a representative from your bonding company to be held at the project site to discuss the Contractor's ongoing lack of performance on this project.  The original contract between E.J. Sciaba and the Town of North Brookfield required that the new school building be substantially complete by November 17, 2003 (this was extended by Change Order No. 3 to December 15, 2003).  It has become apparent that this date may not be achieved; therefore we are requesting this meeting to discuss the following issues:

1.  It has been one full year since the Notice to Proceed was issued and accepted by E.J. Sciaba Contracting, Inc.  The project should be 72% complete at this point according to the Architect's projected drawdown schedule for the project.  Based on an analysis of billings to date the project is only 35% complete (attached).  Please note that E.J. Sciaba has still failed to issue a projected drawdown schedule for the project as required by the contract documents (Instructions to Bidders Paragraph K, Item 2 and the Notice of Intent dated March 14, 2002).  A projection based upon the average requisition billing to date indicates that the project will not be completed until January, 2005, more than one year after the completion time required by the contract.

2.  The Contractor has failed to provide adequate staffing and labor forces for this project in order to complete the project by the dates prescribed by the contact documents (General Conditions 8.2.1 and 8.2.3).

3.  The Contractor repeatedly has failed to provide Proposal Request pricing information within a reasonable time pursuant to section 7.3.6 of the General Conditions of the contract. The Owner and Architect have issued two Construction Change Directives (CCD #5 & CCD #7) with pricing established following the protocols of the contract documents in order for this work to continue without affecting the ongoing sequencing of work. The Contractor has been notified repeatedly that another Construction Change Directive will be forthcoming for Proposal Requests that remain unanswered by the Contractor for over the past three months.

4.  The Owner remains concerned that information approved by the Owner and Architect in the form of Construction Change Directives or approved Change Orders are not being forwarded to the appropriate subcontractors for expeditious completion of this work.

5.  There continues to be claims made by subcontractors regarding the apparent lack of payment for completed work approved and paid in Requisitions to the Owner from the General Contractor. Delay claims have been filed with the General Contractor from subcontractors due to delays in the sequencing of work because of GC non-performance. The Owner has received claims from the following subcontractors for lack of payment and/or demands for direct payment:

    a.  Greenwood Industries, Inc.
    b.  Mark Equipment
    c.  American Equipment
    d.  Dominion Rebar
    e.  Holyoke Equipment
    f.  Millis Plumbing
    g.  Griffin Electric

6.  Failure to provide updated monthly construction schedules as required by the contract documents. The latest project schedule was received by the Owner and Architect on December, 2002 (run date of November 20, 2002).

7.  Non-attendance by the Contractor's project manager at job meetings even after meetings have been re-scheduled at the request of E.J. Sciaba's project manager. The project manager has failed to attend the past two on-site project meetings, which makes it difficult or impossible to discuss issues that affect the ongoing progress of work.

8.  Almost every Application for Payment to date has had inadequate documentation or mistakes. The latest payment application was returned to the Contractor uncertified by the Architect due to mistakes (that have been consistently brought to the Contractor's attention) and improper documentation which is specifically listed in a different letter (separate cover) to the Contractor citing the reasons for non-certification of the application.

9.  Ongoing history of subcontractors and E.J. Sciaba's own forces demobilizing and leaving the job site due to the apparent lack of payment to subcontractors and/or union benefits which in turn have had serious ramifications to the project schedule.

10. The project schedule calls for the roofing system to have a <u>late finish</u> of 10 March 2003. The roofing system hasn't begun yet and it is 21 April 2003. Overhead power and lighting is scheduled to be complete (late finish) in each of the three sections of the building by 28 April 2003. It hasn't begun yet. Interior masonry walls were scheduled as a <u>late finish</u> of April 7, 2003 – they have not started (with the exception of the elevator shaft wall). These are several specific examples of the non-conformance with the Contractor's submitted project schedule. To date we

find it difficult to account for a single critical milestone date that has been achieved per the project schedule. At every job meeting we are told to expect progress and are later discouraged to realize that none or very little has been made. Lack of proper project administration by the Contractor and insufficient labor forces are the 'norm' for this project to date. The latest schedule submission (December, 2002) indicates substantial completion of the building will be achieved by September 17, 2003. We believe that based on current Contractor performance and the past history of non- performance to date, that this project will not be completed within that time frame.

We request the attendance of both Mr. Edward Sciaba and a representative of the Contractor's Bonding Company (American Manufacturers Mutual Insurance Company) on **Wednesday May 7, 2003 at 1PM** at the project site to discuss these issues and the Contractor's intentions for corrective action in carrying out the work and project schedule as defined by the Contract Documents. We also request once again that the Contractor provide an updated project schedule prior to this meeting for review. Please confirm your attendance at this meeting in writing.

Sincerely,

Mr. Robert O'Neill
Superintendent of Schools
North Brookfield School District

c:    Lee P. Dore, Dore and Whittier, Inc. (Fax 802-863-6955)
      Aon Risk Services, Inc. of Massachusetts  (Fax 617-457-7777)
      Jim Murray, Co-Chair – Building Committee (Fax 978-897-0779
      R. John Dore, Dore and Whittier, Inc.
      Chris Conway, Construction Manager
      Thomas W. McEnaney, Kopelman and Paige, P.C. April 23, 2003

**EXHIBIT 7**

Ex 145



**E.J. SCIABA
CONTRACTING
COMPANY, INC.**

May 30, 2003

Robert O'Neill
Superintendent of Schools
North Brookfield Public Schools
10 New School Drive
North Brookfield, MA 01535

> Re:   *North Brookfield Intermediate & Senior High School Project*
> *DW Project No.:*   *00-404*
> *Surety:*           *American Manufacturers Mutual Insurance Co.*
> *Bond No.:*         *3SE 057 856*
> *Claim No.:*        *167-SE-002-989*

Dear Mr. O'Neill:

Due to circumstances beyond our control, we regret to advise you that we are unable to complete the captioned contract. We, accordingly, hereby irrevocably acknowledge that we are declaring a voluntary default for convenience on said contract and waive any notice required under the contract documents.

We request that you discuss with our surety the matter of completing this contract.

Very truly yours,

E.J. SCIABA CONTRACTING COMPANY, INC.

Edward J. Sciaba, Jr.
President

BOS1 #1343331 v1
131261.00002