# EXHIBIT  11

James Murray                                              04/29/2005

1                                          Volume:   I

2       CERTIFIED ORIGINAL                 Pages:    1-153
        LEGALINK BOSTON

3                                          Exhibits: 76-99

4                UNITED STATES DISTRICT COURT

5                DISTRICT OF MASSACHUSETTS

6

7       ------------------------------------------x

8    AMERICAN MANUFACTURERS MUTUAL

9    INSURANCE COMPANY,

10                  Plaintiff,

11   vs.                          C.A. NO. 03-40266 CBS

12   TOWN OF NORTH BROOKFIELD,

13                  Defendant.

14      ------------------------------------------x

15

16      30(b)(6) DEPOSITION OF THE TOWN OF NORTH BROOKFIELD

17               By its designee JAMES MURRAY

18               Friday, April 29, 2005

19                    9:00 a.m.

20               HOLLAND & KNIGHT LLP

21               10 St. James Avenue

22               Boston, Massachusetts 02116

23

24         Reporter:  Karen D. Quigley, RPR/RMR

53

1    just looking at in invoice 36 is your answer the same,

2    the town did not question why charges during any of those

3    months were higher than the charges when construction

4    were ongoing?

5            A.    That would be the same answer, yes.

6                    MS. GRIFFIN:  Let's go off the record

7    for a minute.

8                    (Off the record from 10:43 until

9                    10:50 a.m.)

10                   (Documents marked for identification

11                   as Exhibit Nos. 77 through 79.)

12   BY MS. GRIFFIN:

13           Q.    I've put before you, Mr. Murray, documents

14   that have been marked Exhibits 77, 78 and 79.  Could you

15   look at Exhibit 77 and confirm that Exhibit 77 is a copy

16   of the general conditions of the contract that were part

17   of the contract between the town and Sciaba?

18           A.    I believe they are.

19           Q.    Can you go to Exhibit 78 and confirm that

20   Exhibit 78 is a copy of the first volume of the project

21   manual that was part of Sciaba's contract with the town?

22           A.    Yes, it is.

23           Q.    Can you take a look at Exhibit 79 and

24   confirm that Exhibit 79 is a copy of Addendum No. 2 that

54

1    was distributed to bidders who were bidding for the

2    contract that was ultimately awarded to Sciaba?

3              A.    I believe it is.

4              Q.    Could you take a look in the project

5    manual -- if you need to take the rubber band off, you

6    can because I'm going to ask you to open to some of the

7    pages.  Could you turn to the section that's called

8    instructions to bidders.

9              A.    Do you know what page it is on?

10             Q.    You found it, okay.  Could you turn to

11   page four of the instructions to bidders in Exhibit 78

12   and look particularly at the paragraph numbered G6.  You

13   see there there's some dates for substantial completion?

14             A.    Yes.

15             Q.    You found that?  Okay.  And in that

16   project manual was part of the package that was sent out

17   to bidders in mid-January 2002; correct?

18             A.    I'm not sure of the dates but it is the

19   package.

20             Q.    So at the time that project manual was

21   sent out to bidders, the proposed dates for substantial

22   completion were October 31, 2003 for the building and

23   June 15, 2004 for the parking lot and demolition;

24   correct?

111

1              A.    Not that I recall.

2              Q.    I'm going to show you the document that

3    was marked exhibit -- wait a minute.

4                    (Document marked for identification

5                    as Exhibit No. 85.)

6    BY MS. GRIFFIN:

7              Q.    I'm handing you another copy of the April

8    23rd letter, this one having been marked Exhibit 85, and

9    I direct your attention to the handwritten notes that are

10   on there.  Can you identify the handwriting in those

11   notes?

12             A.    No, I can't.

13             Q.    Do you have any information about when the

14   notes on Exhibit 85 were made?

15             A.    No, I don't.

16             Q.    Let me show you a document that was marked

17   Exhibit 49.  Never mind.

18                   (Document marked for identification

19                   as Exhibit No. 86.)

20                   (Pause.)

21   BY MS. GRIFFIN:

22             Q.    All set?

23             A.    Yes.

24             Q.    Have you seen Exhibit 86 before?

James Murray                                        04/29/2005

117

1    E.J. Sciaba's financial stability.

2            Q.    Do you recall Mr. Dore telling you

3    anything else?

4            A.    No.

5            Q.    Did you talk to anybody else about the May

6    21st meeting?

7            A.    Mr. O'Neill.

8            Q.    When did you talk to Mr. O'Neill about the

9    May 21st meeting?

10           A.    I believe again it was the following day.

11           Q.    By phone?

12           A.    Yes.

13           Q.    What did Mr. O'Neill tell you about the

14   May 21st meeting?

15           A.    Pretty much the same comments I already

16   made that E.J. Sciaba was not even on the radar screen

17   yet and that the bonding company was going to look into

18   their finances.

19           Q.    Did you talk to anybody else about the May

20   21st meeting?

21           A.    No.

22                 (Documents marked for identification

23                 as Exhibit No. 87 and 88.)

24                 (Pause.)

118

1   BY MS. GRIFFIN:

2          Q.    Have you looked at Exhibit 87?

3          A.    Yes.

4          Q.    Did the school building committee

5   authorize Mr. McEnaney to send Exhibit 87?

6                MR. McENANEY:  Objection.

7          A.    Yes.

8          Q.    I'm sorry, I didn't hear your answer?

9          A.    Yes.

10         Q.    How long before July 2, 2003 did the

11  school building committee authorize the sending of

12  Exhibit 87?

13               MR. McENANEY:  Objection.  Are you

14  asking him about any conversations he had with me prior

15  to sending this?

16               MS. GRIFFIN:  No, I just asked him how

17  long before July 22nd the authorization was given.

18         A.    I don't recall.

19         Q.    Did the Board of Selectmen separately

20  authorize the sending of Exhibit 87 if you know?

21               MR. McENANEY:  Objection.

22         A.    Not that I'm aware of.

23         Q.    Can you tell me why Exhibit 87, the July

24  2nd letter, was not sent until July 2nd?

1                        MR. MCENANEY:  Objection.

2               A.    I don't know.

3               Q.    Did the school building committee

4    authorize the sending of Exhibit 88?

5               A.    Yes.

6               Q.    How long before July 23rd did the school

7    building committee authorize the sending of Exhibit 88?

8               A.    I don't recall.

9               Q.    I'm going to show you now the document

10   that was marked previously as Exhibit 58.

11                    (Pause.)

12              Q.    Have you seen Exhibit 58 before today?

13              A.    I don't believe so.

14              Q.    Before today you were aware that the

15   surety was asserting that the payments that were released

16   to Sciaba during the last ten days of May should not have

17   been released; correct?

18              A.    I'm aware of that, yes.

19              Q.    When did you first learn of that?

20              A.    I don't recall.

21                    MS. GRIFFIN:  Let's mark this as the

22   next exhibit.

23                    (Document marked for identification

24                    as Exhibit No. 89.)

James Murray                                    04/29/2005

120

1                   (Pause.)

2    BY MS. GRIFFIN:

3           Q.    Have you seen Exhibit 89 before?

4           A.    Yes, I have.

5           Q.    Is Exhibit 89 a copy of the minutes of the

6    school building committee meeting held on September 10,

7    2003?

8           A.    Yes, it is.

9           Q.    And you attended that meeting; correct?

10          A.    Yes.

11          Q.    On the second page of Exhibit 89 you see

12   there are two paragraphs numbered four?

13          A.    Yes.

14          Q.    Would you take a look at the second

15   paragraph number four.

16                (Pause.)

17          Q.    Did you look at that?

18          A.    Yes, I looked at it.

19          Q.    Does that paragraph refresh your

20   recollection about when you learned that the surety was

21   claiming that the town should not have released payments

22   to Sciaba?

23          A.    As to an exact time, no, it doesn't.

24          Q.    Well, certainly you had learned about it

James Murray                                          04/29/2005

139

1           A.   I'm not sure.

2           Q.   Who would know that?

3           A.   The town accountant I would say.

4           Q.   Would the town administrator know that?

5           A.   Possibly.

6                MS. GRIFFIN:   Let's mark this as the

7      next exhibit.

8                (Document marked for identification

9                as Exhibit No. 92.)

10     BY MS. GRIFFIN:

11          Q.   Have you seen Exhibit 92 before?

12          A.   Yes, I have.

13          Q.   How soon after November 12 did you see

14     Exhibit 92?

15          A.   I don't recall.

16          Q.   Was it just a matter of days?

17          A.   I would say it was within a week or two

18     time period.

19          Q.   Now the town never signed the completion

20     contract that accompanied the November 12 letter in

21     Exhibit 92, did it?

22          A.   That's correct.

23          Q.   In fact the school building committee

24     didn't convene a meeting to discuss the completion

James Murray                                          04/29/2005

141

1           Q.   Did you have any discussions with members

2   of the school building committee outside of a meeting

3   concerning the completion contract that came with the

4   November 12 letter?

5           A.   Not that I'm aware of.

6           Q.   Why did the town not sign the completion

7   contract that came with Exhibit 92?

8                MR. MCENANEY:  Objection.  You can

9   answer.

10          A.   To the best of my knowledge the town

11  cannot sign a contract which it does not have funds to

12  pay.

13          Q.   How much funds did the town have on hand

14  as of November 12, 2003?

15          A.   I can't answer that.

16          Q.   Is that because you don't know?

17          A.   That's correct.

18                MS. GRIFFIN:  Let's mark this as the

19  next exhibit.

20                (Document marked for identification

21                as Exhibit No. 93.)

22                (Pause.)

23  BY MS. GRIFFIN:

24          Q.   Have you seen Exhibit 93 before?

142

1          A.    Yes, I have.

2          Q.    Did the town authorize Mr. McEnaney to

3   send Exhibit 93?

4               MR. McENANEY:  Objection.  Again I

5   think it's getting into discussions that occurred between

6   the town and me regarding a particular letter which are

7   off limits.

8               MS. GRIFFIN:  Well, I disagree with

9   that.  I'm not asking about legal advice that was

10  requested.  I'm not asking about legal advice that was

11  given.  I'm asking whether this letter was authorized.

12              MR. McENANEY:  You're asking whether or

13  not there was communications between the town and me

14  which in my opinion are protected.

15              MS. GRIFFIN:  I'm entitled to know

16  whether you were speaking on behalf of the town when this

17  letter was sent.  That's not a privileged issue.  It's

18  not a privileged communication.

19              MR. McENANEY:  I disagree with that.

20  You're asking him whether or not there was essentially a

21  privileged communication between me and my client

22  regarding this particular letter.

23              MS. GRIFFIN:  Well, I'm not going to

24  waste time during this deposition debating it with you.

James Murray                                                04/29/2005

143

1    I disagree and I'll reserve my rights.

2    BY MS. GRIFFIN:

3         Q.   Did you see the text of Exhibit 93 before

4    it went out?

5              MR. MCENANEY:   Objection.  You can

6    answer yes or no.

7         A.   I don't believe so.

8         Q.   You saw it after it went out; correct?

9         A.   Yes.

10        Q.   Did the town voice any objection to

11   Mr. McEnaney having sent Exhibit 93 out?

12             MR. MCENANEY:   Objection.  Don't answer

13   that question.

14        Q.   Would you take a look at the spreadsheet

15   that was an enclosure with Exhibit 93.

16             (Pause.)

17        Q.   And do you see the section of the

18   spreadsheet about three-quarters of the way down the page

19   that says construction manager 115 hourly rate, hours per

20   week 50, estimated number of weeks to complete 43 and

21   estimated cost $247,250?

22        A.   Yes.

23        Q.   Did the town actually incur fees to Dore

24   and Whittier at that rate for Mr. Conway's time during

James Murray                                                    04/29/2005

                                                                        144

1    the completion of the work?

2              A.    I don't know.

3              Q.    Did the town enter into a new contract

4    with Dore and Whittier after Fontaine was hired as the

5    completion contractor?

6              A.    I believe there was an amendment to Dore

7    and Whittier's contract not a new contract.

8              Q.    Was it in the form of a letter or did it

9    look more like the printed contracts that we saw earlier?

10             A.    I believe it was more of a letter form.

11             Q.    Let me show you a document that was marked

12   previous to this as Exhibit 66.  Is that the letter that

13   you're referring to as an amendment?

14                   MR. McENANEY:  Can we go off the record

15   for one second?

16                   MS. GRIFFIN:  All right.

17                   (Discussion off the record.)

18                   MS. GRIFFIN:  While we were off the

19   record counsel has indicated there is an actual amendment

20   which the town will produce; correct?

21                   MR. McENANEY:  That's fine.

22             Q.    I'll withdraw that last question.

23                   (Documents marked for identification

24                    as Exhibit Nos. 94 and 95.)

145

1              (Pause.)

2    BY MS. GRIFFIN:

3         Q.   I've handed you Exhibits 94 and 95 which

4    are two different copies of a letter dated November 21,

5    2003.  Have you seen either of them before?

6         A.   I believe I've seen them both.

7         Q.   Whose handwriting -- other than the

8    signature on the letter whose handwriting appears on

9    Exhibit 94?

10        A.   I don't know that.

11        Q.   But you have seen Exhibit 95 as well which

12   has a two-page enclosure; is that right?

13        A.   Yes.

14        Q.   Okay.  And how soon after November 21st

15   did you receive either Exhibit 94 or 95?

16        A.   Exact date I don't know but I would say

17   within a couple weeks.

18              (Documents marked for identification

19              as Exhibit Nos. 96, 97 and 98.)

20              (Pause.)

21   BY MS. GRIFFIN:

22        Q.   Can you identify Exhibit 96 for us please?

23        A.   It's the completion contract to Fontaine

24   Brothers.

James Murray                                                04/29/2005

146

1          Q.    And that's signed by both the town and

2    Fontaine; correct?

3          A.    Correct.

4          Q.    And can you identify Exhibit 97 please?

5          A.    It's the performance bond from Fontaine

6    Brothers.

7          Q.    And Exhibit 98 can you identify that?

8          A.    It's a notice to proceed to Fontaine

9    Brothers.

10              MS. GRIFFIN:  Let's mark this as the

11   next exhibit.

12              (Document marked for identification

13              as Exhibit No. 99.)

14              (Pause.)

15   BY MS. GRIFFIN:

16         Q.    Can you identify Exhibit 99 please?

17         A.    It's meeting minutes from a school

18   building committee meeting.

19         Q.    Dated December 17, 2003?

20         A.    Correct.

21         Q.    Did you attend that meeting?

22         A.    Yes, I did.

23         Q.    Do you remember the meeting?

24         A.    Yes.

# EXHIBIT  12

KOPELMAN AND PAIGE, P. C.

ATTORNEYS AT LAW

31 ST. JAMES AVENUE

BOSTON, MASSACHUSETTS 02116-4102

(617) 556-0007

FAX (617) 654-1735

———

PITTSFIELD OFFICE
(413) 443-6100

———

NORTHAMPTON OFFICE
(413) 585-8632

———

WORCESTER OFFICE
(508) 752-0203

LEONARD KOPELMAN
DONALD G. PAIGE
ELIZABETH A. LANE
JOYCE FRANK
JOHN W. GIORGIO
BARBARA J. SAINT ANDRE
JOEL B. BARD
JOSEPH L. TEHAN, JR.
THERESA M. DOWDY
DEBORAH A. ELIASON
RICHARD BOWEN
DAVID J. DONESKI
JUDITH C. CUTLER
KATHLEEN E. CONNOLLY
DAVID C. JENKINS
MARK R. REICH

EDWARD M. REILLY
DIRECTOR WESTERN OFFICE

WILLIAM HEWIG III
JEANNE S. McKNIGHT
KATHLEEN M. O'DONNELL
SANDRA M. CHARTON

PATRICIA A. CANTOR
THOMAS P. LANE, JR.
BRIAN W. RILEY
MARY L. GIORGIO
DARREN R. KLEIN
THOMAS W. McENANEY
JONATHAN M. SILVERSTEIN
KATHARINE GOREE DOYLE
GEORGE X. PUCCI
LAUREN F. GOLDBERG
JASON R. TALERMAN
JEFFREY A. HONIG
MICHELE E. RANDAZZO
GREGG J. CORBO
RICHARD T. HOLLAND
LISA C. ADAMS
ELIZABETH R. CORBO
MARCELINO LA BELLA
VICKI S. MARSH
JOHN J. GOLDROSEN
SHIRIN EVERETT
BRIAN E. GLENNON, II
JONATHAN D. EICHMAN
LAURA H. PAWLE
TODD A. FRAMPTON
JACKIE COWIN

July 2, 2003

CERTIFIED MAIL - RETURN RECEIPT REQUESTED
AND FIRST-CLASS MAIL

NO. 7099 3220 0009 7561 7414

Deborah Griffin, Esq.
Holland & Knight, LLP
10 St. James Avenue
Boston, MA 02116

NO. 7099 3220 0009 7561 7407

Bert J. Capone, Esq.
Cetrulo & Capone
2 Seaport Lane
Boston, MA 02210

Re:    Notice of Default Under General Contract
       Project:                       North Brookfield Junior/Senior High School Project
       Performance Bond No.            3SE057856
       Principal:                      E.J. Sciaba Contracting Company, Inc.
       Owner:                          Town of North Brookfield, Massachusetts
       Contract Date:                  April 19, 2002
       Bond Amount:                    $13,222,000.00

Dear Counsel:

         As you know, this firm serves as Town Counsel for the Town of North Brookfield,
Massachusetts. Please be advised that pursuant to paragraph 3.1 of the Performance Bond, the
Town of North Brookfield is considering declaring a contractor default on the above-referenced
project and hereby requests a meeting with E.J. Sciaba Contracting Company, Inc. ("Sciaba") and
American Maufacturers Mutual Insurance Company ("AMMIC"), as surety on the above-

KOPELMAN AND PAIGE, P.C.

<u>CERTIFIED MAIL - RETURN RECEIPT REQUESTED</u>
<u>AND FIRST CLASS MAIL</u>
Deborah Griffin, Esq.
Bert J. Capone, Esq.
July 2, 2003
Page 2


referenced project.  This intention to declare a contractor default is based upon Sciaba's voluntary default, as set forth in its May 30, 2003 letter, a copy of which is attached hereto.  The Town requests a meeting with Sciaba and AMMIC as soon as possible.

The Town hereby reserves all statutory and contractual rights to remedy Sciaba's breach, including, but not limited to, the termination of Sciaba's contract in accordance with the applicable provisions of the general contract.  The Town further reserves all its rights under the contract documents.

If you have any questions, please do not hesitate to contact me.  The Town looks forward to your prompt reply.

Very truly yours,

Thomas W. McEnaney

TWM/rlf
Enc.
cc:    Board of Selectmen
       School Building Committee
       Mr. Lee P. Dore, Assoc. AIA, CSI
195659/NBRO/0017

**EXHIBIT  13**

Ex 147

# HOLLAND & KNIGHT LLP

Law Offices

10 St. James Avenue
Boston, Massachusetts 02116

617-523-2700
FAX 617-523-6850
http://www.hklaw.com

Annapolis        Orlando
Atlanta          Orlando
Bethesda         Portland
Boston           Providence
Bradenton        San Antonio
Chicago          San Francisco
Fort Lauderdale  Seattle
Jacksonville     St. Petersburg
Lakeland         Tallahassee
Los Angeles      Tampa
Miami            Washington, D.C.
New York         West Palm Beach
Northern Virginia

International Offices:    São Paulo
Caracas*                 Tel Aviv*
Helsinki                 Tokyo
Mexico City
Rio de Janeiro           *Representative Offices

June 5, 2003

DEBORAH S. GRIFFIN
617-305-2044

Internet Address:
deborah.griffin@hklaw.com

***VIA FIRST CLASS CERTIFIED MAIL***
***RETURN RECEIPT REQUESTED***

Thomas W. McEnaney, Esq.
Kopelman & Paige, P.C.
31 St. James Avenue, 7th Floor
Boston, MA  02116

|   |   |   |
|---|---|---|
| Re: | *Notice of Default Under General Contract* | |
| | *Project:* | *North Brookfield Junior/Senior High School Project* |
| | *Performance Bond No.:* | *3SE057856* |
| | *Principal:* | *E.J. Sciaba Contracting Company, Inc.* |
| | *Owner:* | *Town of North Brookfield, Massachusetts* |
| | *Contract Date:* | *April 19, 2002* |
| | *Bond Amount:* | *$13,222,000.00* |

Dear Mr. McEnaney:

On behalf of American Manufacturers Mutual Insurance Company ("AMMIC"), I am responding to your letter of July 2, 2003.  Please be advised that AMMIC waives the requirement of a meeting and of the passage of twenty (20) days after receipt of the initial letter under paragraphs 3.1 and 3.2 of the above-referenced Performance Bond, which are conditions precedent to the

Thomas W. McEnaney, Esq.
July 3, 2003
Page 2

owner declaring a Contractor Default and formally terminating the Contractor's
right to complete the contract.  Please let me know if you receive a similar
waiver from the contractor.

Very truly yours,

HOLLAND & KNIGHT LLP

Deborah S. Griffin

DSG/bsw: BOS1 #1354377 v1
431261.00002
cc:    Bert J. Capone, Esq.
       Stephen J. Beatty, Esq. (w/encl.)
       Richard P. Anastasio, P.E. (w/encl.)

**EXHIBIT  14**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 03-40266 CBS

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

     Plaintiff

v.

TOWN OF NORTH BROOKFIELD,

     Defendant

TOWN OF NORTH BROOKFIELD'S
ANSWERS TO PLAINTIFF'S FIRST SET
OF INTERROGATORIES TO DEFENDANT

I.     GENERAL OBJECTIONS

A.     Defendant objects to each and every interrogatory set forth in Plaintiff's First Set
of Interrogatories (the "Interrogatories") to the extent that any such interrogatory requests
information which is protected by the attorney/client privilege.

B.     Defendant further objects to each and every interrogatory that requests
information and materials prepared in anticipation of litigation or for trial by or for Defendant
and its representatives, attorneys, and agents, or requests the Defendant to disclose mental
impressions, conclusions, opinions, or legal theories of any attorney or other representative of
Defendant concerning this litigation.  Such information and materials are privileged as work
product, and Defendant is not required to produce said information except as provided under
Rule 26(b)(3) of the Federal Rules of Civil Procedure.

C.     Defendant objects to each and every interrogatory that requests information that is
not relevant to the subject matter involved in the pending action and does not come within Rule
26(b) of the Federal Rules of Civil Procedure.

INTERROGATORY NO. 11:

Identify and describe in detail all actions taken by the Town, if any, on or after August 20, 2003, to obtain funding, other than from AMMIC, for the completion of the Project and for professional fees and expenses associated therewith, in the event AMMIC was or is not liable for the full amount incurred by the Town. Include in your answer any and all actions the Town considered taking for that purpose but did not take; the Town's reasons for not taking actions considered; and identify all communications concerning such actions taken or considered but not taken.

ANSWER NO. 11:

OBJECTION OF COUNSEL: Interrogatory Number 11 is overly broad, vague, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence and seeks information protected by the attorney-client privilege and work-product doctrine. Notwithstanding this objection and without waiving the same, the Town states that it made a claim on the performance bond furnished by Sciaba and issued by AMMIC. The performance bond provides that the surety is obligated for the responsibilities of the contractor for the correction of defective work and completion of the construction contract; additional legal, design professional, project management and delay costs resulting from the contractor's default and resulting from the actions or failure to act of the surety under paragraph 4 of the performance bond; and liquidated damages, or if no liquidated damages are specified in the construction contract, actual damages caused by the delayed performance or nonperformance of the contractor. The Town did not contemplate any other funding options as it did not expect that AMMIC would take actions to avoid its clear liability under the performance bond given Sciaba's voluntary default on the project.

INTERROGATORY NO. 12:

State the basis for the Town's assertion that, as a result of Sciaba's default, it is entitled to $674,607.24 in additional design and project management fees from AMMIC.

ANSWER NO. 12:

The performance bond, in paragraph 6.2, provides for the recovery of additional design and project management fees incurred as a result of the contractor's delayed performance or nonperformance.

INTERROGATORY NO. 13:

State the basis for the Town's claim that AMMIC is responsible for charges amounting to $16,719.40 from Keyspan Energy.

ANSWER NO. 13:

Sciaba incurred these costs with Keyspan Energy. Under paragraph 3.4.1 of the general conditions of the contract, Sciaba is responsible for providing labor, materials, water, heat, utilities, transportation and other facilities and services necessary to complete the project unless otherwise provided in the contract. The contract does not otherwise provide that a party other than Sciaba is responsible for heat and utilities used during the course of construction. Therefore, Sciaba, and now AMMIC, as performance bond surety, is responsible for these charges.

INTERROGATORY NO. 14:

State the basis for the Town's assertion in Count II of the Counterclaim that AMMIC misrepresented "pertinent facts or provisions" relating to any bond coverage, including in your answer, without limitation, an identification and detailed description of specific facts, actions, omissions, communications, documents and persons that concern or comprise any such

11

misrepresentation.

ANSWER NO. 14:

Please refer to Answers to Interrogatories Nos. 11 and 12. Despite the clear language of the performance bond, AMMIC has refused to provide for the cost of correcting the defective work and completing the contract work and has not compensated the Town for its additional legal, design professional, project management, and delay costs, and liquidated damages.

INTERROGATORY NO. 15:

State the basis for the Town's assertion in Count II of the Counterclaim that AMMIC "failed to acknowledge and act reasonably promptly" with respect to any Performance Bond claims or communications; including in your answer, without limitation, an identification and detailed description of specific facts, actions, omissions, communications, documents and persons that concern or comprise any such failure.

ANSWER NO. 15:

On or about April 23, 2003, the Town notified AMMIC that Sciaba was behind schedule and that it did not appear to the Town that Sciaba was able to complete the project in a timely manner. At a meeting on May 21, 2003, AMMIC's representatives indicated that it appeared that Sciaba was having a cash flow problem but that AMMIC did not foresee that Sciaba would default. On or about June 5, 2003, counsel for AMMIC forwarded to counsel for the Town a copy of a letter dated May 30, 2003 from Sciaba indicating that Sciaba was declaring a voluntary default, for convenience, on the project.

On or about July 2, 2003, the Town notified AMMIC that it was considering declaring a contractor default and requested a meeting with Sciaba and AMMIC in accordance with the requirements of paragraph 3.1 of the performance bond. On or about July 5, 2003, AMMIC

12

responded to the Town's letter indicating that it waived the requirements in paragraphs 3.1 and 3.2 of the performance bond of a meeting and the passage of 20 days prior to the Town's termination of the contractor's right to complete the contract. On or about July 23, 2003, the Town provided formal notice to AMMIC that it had declared a contractor default on the part of Sciaba and formally terminated Sciaba's right to complete the contract.

Following the declaration of contractor default, the Town and AMMIC negotiated a completion agreement that was acceptable to both parties, whereby a completion contractor would complete the building by April 30, 2004 and the phase IV work by August 1, 2004. AMMIC subsequently altered the terms of the agreement unilaterally and without consulting the Town. AMMIC set several deadlines for its selection of a final completion contractor, all of which it failed to meet. AMMIC did not open bids for the selection of a completion contractor until on or about October 8, 2003.

Despite several requests from the Town to tender a completion contractor, AMMIC did not do so until November 12, 2003, six (6) months after Sciaba notified AMMIC of its voluntary default on the project. However, AMMIC failed to provide the Town with sufficient funds to enter into the completion contract until December 3 and 15, 2003, despite the fact that the Town notified AMMIC that it could not legally enter into the completion contract until it had sufficient funds on hand to satisfy the contract price. The Town executed a completion contract with Fontaine on December 15, 2003.

The Town has produced to AMMIC documentation of the additional costs incurred by the Town as a result of Sciaba's breach. Despite AMMIC's clear obligation under the terms of the performance bond to compensate the Town for the costs of the completion contract, as well as the additional costs incurred by the Town as a result of Sciaba's breach, AMMIC has still

failed to and refused to fully compensate the Town in accordance with its obligations under the bond.

INTERROGATORY NO. 16:

State the basis for the Town's assertion in Count II of the Counterclaim that AMMIC "failed to adopt and implement reasonable standards for the prompt investigation of claims under the performance bond" and "refuse[ed] to pay claims with conducting a reasonable investigation"; including in your answer, without limitation, an identification and detailed description of specific facts, actions, omissions, communications, documents and persons that concern or comprise any such failure or refusal.

ANSWER NO. 16:

Please refer to Answers to Interrogatories Nos. 14 and 15. The Town further states that discovery is ongoing and hereby reserves the right to seasonably supplement its response to this Interrogatory.

INTERROGATORY NO. 17:

State the basis for the Town's assertion in Count II of the Counterclaim that AMMIC "failed to affirm or deny coverage within a reasonable time after proof of loss statements have been completed" and that AMMIC "fail[ed] to provide promptly a reasonable explanation of the basis in the performance bond"; including in your answer, without limitation, an identification and detailed description of specific facts, actions, omissions, communications, documents and persons that concern or comprise any such failure or refusal.

ANSWER NO. 17:

Please refer to Answers to Interrogatories Nos. 14 through 16. The Town further states that discovery is ongoing and hereby reserves the right to seasonably supplement its response to