UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,
                              Plaintiff,

vs.                                                    Civil Action No. 03-40266-CBS

TOWN OF NORTH BROOKFIELD,
                              Defendant.

MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff and defendant-in-counterclaim American Manufacturers Mutual Insurance

Company ("AMMIC") hereby opposes the Motion for Partial Summary Judgment [docket #38]

("Town's Motion") filed by the defendant, Town of North Brookfield (the "Town" or "North

Brookfield").  In further support of its Opposition, AMMIC has filed a Response to Defendant's

Local Rule 56.1 Statement of Material Facts Not in Dispute and Statement of Additional Facts in

Opposition to Defendant's Motion for Partial Summary Judgment ("AMMIC's Facts") and

affidavits referenced therein.[1]

The Town's Motion seeks summary judgment in its favor on (1) "the liability of …

AMMIC under the performance bond … as set forth in Count I of the Counterclaim," and (2)

AMMIC's assertion of a *pro tanto* discharge from liability under its performance bond (the

"Bond") as a result of the Town's prejudicial payments to Sciaba in May 2003 (the "May

Payments").[2]  Summary judgment on liability must be denied because the Town has not shown

---

[1]    Reference is also made to the Local Rule 56.1 Statement of Material Facts Not in Dispute ("Town's Facts")[docket # 40] and its Memorandum of Law in Support of Defendant's Motion for Partial Summary Judgment [docket #41] ("Town's Memo").  Capitalized terms not defined herein have the definitions ascribed to them in the Town's Memo.

[2]    It is undisputed that the Town made payments to Sciaba on May 21, 2003 in the amount of $287,556.28 for its March, 2003 payment requisition and on May 27, 2003 in the amount of $443,733.76 for its April, 2003 payment requisition.  Town's Facts ¶ 9.

undisputed facts entitling it to judgment and AMMIC has valid affirmative defenses that it is entitled to prove at trial. Likewise, summary judgment on AMMIC's *pro tanto* discharge defense must be denied because the law and undisputed facts support this defense and/or some facts on which the Town relies are genuinely in dispute.

## ARGUMENT

**I.  SUMMARY JUDGMENT ON LIABILITY UNDER COUNT I MUST BE DENIED BECAUSE DISPUTED FACTS EXIST THAT REQUIRE ADJUDICATION.**

The Town as movant, and burden-bearing party on Count I of its Counterclaim, must initially show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See Tobin v. Liberty Mut. Ins. Co.*, 428 F.3d 54, 59 (1st Cir. 2005). The Town has not made such a showing and therefore its Motion fails out of the gate.

The first part of the Town's Motion seeks summary judgment on "the liability of … AMMIC under the performance bond … as set forth in Count I of the Counterclaim." Count I alleges AMMIC's breach of contract (*i.e.,* the Bond) and consists of 52 numbered paragraphs, only a handful of which are the subject of the Town's Facts and many of which were denied by AMMIC in its Answer. Among the allegations AMMIC denied is the crucial allegation, in paragraph 51, that "AMMIC has breached its obligations under the [Bond] to the Town to provide for the cost of correcting defective work and completion of the Contract work and compensating the Town for its additional legal, design, professional and delay costs and liquidated damages."

If AMMIC paid the Town all that it owed under the Bond, there was no failure to pay, no breach, and therefore no "liability" under a breach of contract theory. First, the Town's Motion does not show an undisputed act of failing to pay. Second, because the Town's Motion does not establish the amount *owed* by AMMIC as an undisputed fact, the question of whether AMMIC

*failed to pay* remains. That is, if AMMIC discharged its obligation when it indisputably paid $3,322,996, then there was no failure to pay and no liability for breach. AMMIC's Facts ¶ 21.

Even if, *arguendo*, the Town made the proper showing of undisputed facts, AMMIC's affirmative defenses bar summary judgment as a matter of law. *See Paraskevaides v. Four Seasons Washington*, 148 F. Supp. 2d 20, 24 (D.D.C. 2001) ("[a party] can … defend against the opposition's summary judgment motion … by putting on an affirmative defense"). In particular, and without waiving any affirmative defenses, AMMIC asserted Payment as its Third Affirmative Defense. A breach of contract cannot be found if the contractual obligation has been fulfilled by performance. *See Comm'r of Banks v. Chase Sec. Corp.,* 298 Mass 285, 298 (1938) (contractual obligation discharged when substitute performance approved by plaintiff); RESTATEMENT (SECOND) CONTRACTS § 235(1) (2005); RESTATEMENT (FIRST) CONTRACTS § 386 (2005). It is undisputed that AMMIC has paid the Town over $3,322,996. AMMIC's Facts ¶ 21. Again, if by making those payments AMMIC already paid at least the amount it owed, its payment defense is valid, there is no breach for non-payment, and the Town is not entitled to judgment as a matter of law before AMMIC has the chance to prove its defense at trial.

In summary, the Town's Motion as to liability must be denied because the Town has not shown undisputed facts entitling it to judgment and AMMIC has valid affirmative defenses to be proven at trial.

## II. SUMMARY JUDGMENT AS TO AMMIC'S *PRO TANTO* DISCHARGE DEFENSE MUST BE DENIED BECAUSE APPLICABLE LAW AND FACTS PERMIT SUCH A DEFENSE AND FACTS UPON WHICH THE TOWN RELIES ARE DISPUTED.

AMMIC bears the burden of persuasion for its *pro tanto* defense. As such, the Town as moving party (and the non burden-bearing party as to AMMIC's *pro tanto* defense) must initially either submit affirmative evidence to negate an element of AMMIC's defense or demonstrate that AMMIC has no reasonable expectation of proving the same. *Fireman's Fund Ins. Co. v.*

*Harley Realty Co.*, 24 F. Supp. 2d 117, 118 (D. Mass. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 324 n5 (1986) ("[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . .")); *see also Meyers v. M/V Eugino C*, 842 F.2d 815, 816-17 (5th Cir. 1988) (discussing burden-shift once movant avers to absence of evidence supporting affirmative defense); *Riberglass, Inc. v. Techni-Glass Indus., Inc.*, 804 F.2d 1577, 1580 (11th Cir. 1986) (same); *Hope v. G&S Foods, Inc.*, 2004 U.S. Dist. LEXIS 11255, at *4-5, 10 (N.D. Tex. 2004) (applying *Celotex* standard to summary judgment on affirmative defenses); *Dynasty Apparel Indus. v. Rentz*, 206 F.R.D. 603, 603-04 (S.D. Ohio 2002) (same); *Von Milbacher v. Teachers Ins. & Annuity Assoc.*, 1988 U.S. Dist. LEXIS 15027, *3-4 (N.D.N.J. 1988) (same). The Town has done neither and so its Motion must fail.  In any event, AMMIC can rebut any showing by the Town with facts and law that entitle it to a *pro tanto* discharge in this case.

AMMIC is entitled to a *pro tanto* discharge by virtue of North Brookfield's breach of its statutory, contractual, equitable and common law obligations.  Specifically, the payments made by North Brookfield violated Mass. G.L. c. 30 § 39K, Mass. G.L. c. 30 § 39F and its duty to mitigate damages for the benefit of the surety.  Moreover, under the terms of the Bond, the amount of AMMIC's liability is determined after charging the Bond obligee, North Brookfield, with the "Balance of the [original] Contract Price," crediting only "valid and proper payments." Thus, the measure of AMMIC's liability is largely dependent upon whether the Town's payments at issue in this litigation were "valid and proper."  On the facts before the Court, either it is undisputed that the payments were not valid and proper, or this is a factual matter in genuine dispute.  In either case, summary judgment must be denied.

**A.  Part or all of the May Payments Violated Mass. G.L. c. 30 § 39K.**

North Brookfield breached its statutory obligation to mitigate its damages under Mass. G.L. c. 30 § 39K.  This statutory provision requires that:

> [w]ithin fifteen days … after receipt from the contractor … of a periodic estimate requesting payment … the awarding authority will make a periodic payment … *but less (1) a retention based on its estimate of the fair value of its claims against the contractor.*

Mass. G.L. c. 30 § 39K (emphasis added).  The Contract expressly incorporates this provision. Supplementary General Conditions § 9.0 states: "The provisions of Article  9 [dealing with payments] are modified by the requirements set forth in M.G.L. Chapter 30, Sections 39F and 39K."  Project Manual, Supplementary General Conditions §9.0, Town's Facts Exh. M at 14.

> 1.  <u>In May, 2003, North Brookfield Had A Claim Against Sciaba For Liquidated Damages That Should Have Been Withheld Under Chapter 30 § 39K.</u>

The record shows that North Brookfield had claims against Sciaba and enough information to estimate their fair value at the time North Brookfield made the May 2003 payments, but did not make any withholding thereof.  North Brookfield identified numerous breaches by Sciaba in its April 23, 2003 letter to AMMIC.  Town's Facts Exh. E.  At that point the Town knew, despite numerous attempts to gain adequate assurances, that Sciaba was clearly unable to complete the Project on time, had failed to pay subcontractors, failed to submit updated construction schedules, and improperly staffed the Project on numerous occasions.  *See* Town's Facts, Exh. E; AMMIC's Facts ¶ 41.  All of these facts put Sciaba in breach of the Contract.[3]

---

[3]    The General Conditions of the Contract, Section 3.4.1, required Sciaba to "*provide and pay for labor, materials, equipment, tools, construction equipment . . . and services necessary for proper execution and completion of the Work . . . .*"  In addition, General Conditions Section 14.2.1 describes North Brookfield's right to terminate for cause upon Sciaba's breach by "persistently or repeatedly refus[ing] to *supply enough properly skilled workers or proper materials*; . . . [and] fail[ing] to make *payment to Subcontractors for materials or labor* in accordance with the respective agreements between the Contractor and Subcontractors."  AMMIC's Facts ¶ 38.

North Brookfield's primary concern was that "the project will not be completed until January, 2005." Town's Facts Exh. E. The very purpose of the May 21, 2003 meeting was "to discuss the Town's concern's with Sciaba's progress," demonstrating North Brookfield's awareness of its claims. *Id.* Indeed, Town agents at that meeting indicated that Sciaba would not be paid unless it provided updated monthly construction schedules. AMMIC's Facts ¶20.

North Brookfield was acutely aware that Sciaba would not complete the project on time, and that it had a claim for liquidated damages. The Town's School Building Committee ("SBC") discussed this point at several meetings before sending the April 23 letter to AMMIC. At a March 19, 2003 meeting, the architect's project manager, Lee Dore, told the SBC about another project where the contractor was late. The minutes state that "on that project the Town's attorney agreed to withhold liquidated damages from requisitions and placing [sic] them in an escrow account. This way the Town is still holding on to funds for liquidated damages that under typical situations would already be paid to the Contractor and difficult to recover. DW will keep the committee informed of this project." AMMIC's Facts ¶ 22.

The subject of Sciaba's lateness came up again at the SBC's next meeting of April 2, 2003. The SBC asked that the architect issue a memo listing outstanding items on the critical path. The architect did so the next day. AMMIC's Facts ¶ 41. The SBC also asked that the architect investigate a projected completion date based on manpower history and payment requisitions. The minutes stated that "the committee is concerned that potential liquidated damage costs will be very high and question if the contractor's retainage alone could cover these costs." School Superintendent O'Neill, who attended that meeting, explained that "the building committee was looking for documentation with regard to their concerns about the schedule. And it was felt that another way to do that would be to formalize a budget and a manpower summary

report."  In the notes he made of that meeting, Mr. O'Neill wrote "penalties will exceed

retainage."  SBC Co-Chair Murray had also done some mental calculations of the liquidated

damages and concluded that "they were going to be very high."  AMMIC's Facts ¶ 23.

Before the SBC's next meeting on April 16, 2003, Lee Dore prepared a projected

completion date of *January 2005* – based upon Sciaba's rate of drawing down Contract funds.

This was more than a year beyond December 15, 2003 – the completion date under the Contract

according to North Brookfield.  The minutes of the April 16 meeting reflect that the architect

"and the Committee are very concerned that this schedule will not be completed anywhere near

the contract timeframe.  … The Committee noted that additional costs will be incurred to pay the

architect and construction manager beyond the scheduled substantial completion dates.  These

funds will be made up by liquidated damages of $1,000 per day …. Liquidated damages are

estimated at over $400,000 based on the projected completion date."  AMMIC's Facts ¶ 24.

Thus, by April 16, North Brookfield believed that substantial completion was going to be 14

months late[4] and that the amount of retainage it was holding back at the time (approximately

$235,000) was insufficient to cover the projected liquidated damages.  AMMIC's Facts ¶ 26.

Between the April 16 meeting and May 21, 2003, the date the first of the May Payments

was delivered to Sciaba, an additional 35 days passed.  Very little progress was made during that

time.  The April 16 analysis showed that, as of the end of March, 2003, there was $9,518,000 of

work left to do and only 8½ months left from April through December 15.  Thus, Sciaba would

---

[4]    SBC Co-Chair Murray so testified as a Rule 30(b)(6) witness for the Town:

> Q.  So after hearing Dore and Whittier's presentation at the April 16 meeting, did you believe that substantial completion was going to be 14 months late?
> A.  Yes.
> Q.  Did anybody who attended that meeting disagree with that conclusion or voice disagreement with that conclusion?
> A.  No.

AMMIC's Facts ¶25.

have to work at the rate of $1,119,765 a month in order not to lose more ground.  AMMIC's

Facts ¶ 27.  However, Sciaba's requisition for the month of April was only approved for payment

of $443,733.  AMMIC's Facts ¶ 28.  Not surprisingly, North Brookfield believed that Sciaba had

fallen another month behind by the end of May, 2003.  AMMIC's Facts ¶ 29.  Another month of

delay would result in another $30,000 of liquidated damages being added to the $425,000

estimated in April, for a total of $455,000.  *Id.*

On May 21, when Requisition 12 was paid to Sciaba, North Brookfield was only holding

$248,013 in retainage, and on May 27, when Requisition 13B was paid, it held only $271,366.

AMMIC's Facts ¶ 30.  This retainage was $184,634 less than the fair value of North

Brookfield's estimated claim for liquidated damages.  AMMIC's Facts ¶ 31.  North Brookfield

made no additional retention from either May Payment on account of this shortfall.  AMMIC's

Facts ¶ 32.

An owner is entitled to a contractual remedy of liquidated damages when a contractor

breaches prior to the agreed-upon completion date.  *See City of Boston v. New England Sales*

*Mfg. Corp.*, 386 Mass. 820, 823-24 (1982) (liquidated-damage remedy is generally available

upon contractor abandonment); *Constr. Contracting & Mgmt., Inc. v. McConnell*, 112, NM 372,

378 (1991) (liquidated-damage remedy is viable when contractor abandons the project prior to

completion date).  Moreover, it is settled in the Commonwealth that a breach of contract claim

accrues upon the breach and not upon the infliction of damages.  *See Int'l Mobiles Corp. v.*

*Corroon & Black/Fairfield & Ellis, Inc.*, 29 Mass. App. Ct. 215, 222 (1990) (citing *Boston Tow*

*Boat Co. v. Medford Nat'l Bank*, 232 Mass. 38, 40-42 (1919)).  As described above, North

Brookfield was well aware of Sciaba's multiple breaches by April 2003.[5]  As in *McConnell*, the

---

[5]    *See supra* note 3 and accompanying text.

8

Town's claim for breach of contract accrued at the time of the breach – and liquidated damages were calculated definitively later as the Project became late. Thus, the May Payments were invalid and improper because North Brookfield had a claim against Sciaba but failed to withhold the estimated value of the liquidated-damage remedy required by G.L. c. 30 §39K.

    2.   <u>In May, 2003, North Brookfield Had A Claim Against Sciaba For Recoupment of Excess General Conditions That Should Have Been Withheld Under Chapter 30 § 39K.</u>

At the job meeting with Sciaba on May 28, 2003, the day after North Brookfield released payment on Requisition 13B to Sciaba, the architect raised with Sciaba for the first time the issue of the rate at which Sciaba was being paid for General Conditions. AMMIC's Facts ¶¶ 33-34. Sciaba had billed for General Conditions at the rate of about $35,000 a month, and cumulatively almost 72% of the total amount available for that Division ($609,353). The April 16 analysis also shows that Sciaba's overall work was only 35.6% complete. AMMIC's Facts ¶ 35. At the time of the May Payments, North Brookfield was only holding about $200,000 left in that Division to cover the remaining time. If Sciaba continued to bill at that rate, it would exhaust the funds before the end of 2003. Given North Brookfield's belief that the work would not be complete until January 2005, it requested a reduction in the rate of billing based upon an updated projected completion date in a forthcoming schedule. Sciaba's Project Manager, Matt Daly, was receptive to a reduction in the billing rate and would divide the balance by the months left according to the new completion date. AMMIC's Facts ¶ 36. There is no reason this issue could not have been raised before the May Payments instead of a day later.

Before releasing the May Payments to Sciaba, North Brookfield held $250,797 for General Conditions. AMMIC's Facts ¶ 37. That was only enough to fund the General Conditions for less than 8 months at $35,000 a month. Given North Brookfield's belief that Sciaba would finish 20 months late, it could and should have realized that it was holding

insufficient funds for the General Conditions for the remainder of the project. Indeed, at $35,000 a month over 20 months, $700,000 would have been needed – $449,203 more than it had.

Viewed another way, Sciaba carried $609,353 for General Conditions for the whole project, and the April 16 analysis showed that the overall work was only 35.6% complete. Therefore, only $216,930 of the General Conditions line item had actually been earned. Before the May Payments, however, North Brookfield paid General Conditions assuming that $358,556 had been earned – $141,626 more than actual. North Brookfield had at least a recoupment claim for monies paid in excess of what was actually earned on General Conditions.

In summary, before making the May Payments, North Brookfield understood its claim for liquidated damages of at least $184,634 and a recoupment claim for between $141,626 and $449,203 on General Conditions. North Brookfield was obligated to estimate and withhold these amounts under G.L. c. 30, § 39K. North Brookfield breached its statutory obligation when it failed to do so. Accordingly, the May Payments cannot be considered "valid and proper."

**B. The Town Improperly Paid Sciaba In Violation Of The Direct Payment Statute.**

North Brookfield also violated G.L. c. 30 §39F, the Massachusetts statute regarding claims for direct payment to subcontractors on public construction projects, to AMMIC's prejudice. AMMIC incorporates herein by reference the Memorandum [docket #49] and Statement of Undisputed Facts [docket #50] submitted in support of its Motion for Partial Summary Judgment As To Claims for Direct Payment [docket #36], which establish this violation. In summary, the Town paid to Millis Plumbing Co., Inc., only $3,361.81 of its $31,505.85 claim for direct payment. In addition, the Town paid to Greenwood Industries, Inc., only $31,350.00 of its $137,350.00 claim for direct payment. In both instances, the Town paid the difference to the general contractor, Sciaba, in violation of the statute. These violations prejudiced AMMIC to the extent of $33,443.55, in that the cost of completing the project

following the contractor's default was higher by $33,443.55 than it should have been.  Once

again, these payments cannot be considered "valid and proper" under the Bond.

### C.  The Town's Improper Payments Provide AMMIC With A *Pro Tanto* Defense.

The Supreme Judicial Court has recognized that improper payments to a surety's

principal provide the surety with a *pro tanto* discharge of its performance bond obligations.

*Veneto v. McCloskey* & Co., 333 Mass. 95, 104-05 (1955).  This principle provides AMMIC

with a defense ranging from $326,260 to $633,837 paid in violation of G.L. c. 30 §39K and

$33,443.55 paid in violation of Mass. G.L. c. 30 § 39F.  *See supra*, II B., p. 9.[6]

The Bond provisions also reflect this principle.  Specifically, Bond Section 3 provides:

> If there is no Owner Default, the Surety's obligation under this Bond shall
> arise after: …
>
> 3.3 The Owner has agreed to pay the *Balance of the Contract Price* to the
> Surety in accordance with the terms of the Construction Contract or to a
> contractor selected to perform the Construction Contract in accordance with
> the terms of the contract with the Owner.

Town's Facts Exh. C (emphasis added).  In the event the surety elects to tender a completion

contract, as AMMIC did here, the surety's liability is measured as "the amount of damages as

described in Paragraph 6 *in excess of the Balance of the Contract Price* … ."  *Id.* § 4.3 (emphasis

added).  The phrase "Balance of the Contract Price" is defined in Section 12.1 of the Bond as:

> The total amount payable by the Owner to the Contractor under the Construction
> Contract after all proper adjustments have been made … reduced by *all valid and
> proper payments* [previously] made to or on behalf of the Contractor … .

---

[6]    In addition, AMMIC contends, and North Brookfield disputes, that North Brookfield made additional
overpayments prior to May.  In light of the other evidence of overpayments, it is unnecessary for the Court address
these disputes on summary judgment.  However, AMMIC reserves the right to present evidence at trial on these
overpayments, consistent with any rulings of law that may come out of the Town's Motion.

*Id.* § 12.1 (emphasis added). As such, the "Balance of the Contract Price" determination under the Bond, after reduction of "all valid and proper payments," will drive the analysis of whether AMMIC has any remaining liability under the Bond and the extent of any such liability.

Whether any payment is "valid and proper" is determined in light of the language of the Bond itself, applicable statutory provisions, the Bonded Contract and applicable equitable principles. In addition to the May Payments made in violation of G.L. c. 30 § 39K and G.L. c. 30 § 39F, the Town and its architect also failed to nullify and withhold the May Payments in accordance with the Contract that was incorporated into the Bond.

More particularly, the General Conditions of the Contract called for North Brookfield to make periodic progress payments based on the architect's certification of the contractor's applications for payment. AMMIC's Facts ¶ 38; Town's Facts Exh. M. Section 4.2.5 of the General Conditions provides that "the Architect will review and certify the amounts due the Contractor and will issue Certificates for Payment in such amounts." AMMIC's Facts ¶ 38. A critical part of the architect's review is found in Section 9.5 of the General Conditions:

> 9.5.1 The Architect may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Architect's opinion the representations to the Owner required by Subparagraph 9.4.2 cannot be made. … The architect may also withhold a Certificate for Payment or, because of subsequently discovered evidence, *may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Owner from loss for which the Contractor is responsible, including loss resulting from acts and omissions [such as]:*

> .1     defective Work not remedied;

> .2     third party claims filed or reasonable evidence indicating probable filing of such claims unless security acceptable to the Owner is provided by the Contractor;

> .3     failure of the Contractor to make payments properly to Subcontractors or for labor, materials or equipment;

> .4     reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;

> .5     damage to the Owner or another contractor;

.6 reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; or

.7 persistent failure to carry out the Work in accordance with the Contract Documents . . . .

*Id.* (emphasis added). Thus an important aspect of the architect's review of a payment application was to assess whether any of the enumerated conditions existed, so that an appropriate adjustment could be made and additional funds withheld.

 The record reflects that the Town and its architect clearly understood that such conditions existed on the Project in or about April, 2003. Town's Facts, Exh. E. As such, both the Town and the architect were required at the end of May to nullify previous Certificates for Payment to protect the Town and avoid prejudice to AMMIC. *See* AMMIC's Facts ¶ 38, § 9.5.1. Even though Subparagraph 9.5 uses the word "may" with respect to the architect's withholding or nullification, such language does not mean it was optional for the architect to consider the propriety of withholding or nullifying a Certificate for Payment once it became apparent that a loss was possible. Nor was it optional for North Brookfield to request that the architect withhold or nullify a Certificate in order to protect it. Attempts to characterize similar language as giving rise to mere option have been rejected by the courts. In one case, the Supreme Court of Florida rejected the argument that the phrase "if required" rendered optional a contractual provision requiring proof of payment of subcontractors and vendors as a condition precedent to payment. *Standard Acc. Ins. Co. v. Bear,* 134 Fla. 523, 531, 536 (1938). The contract at issue in that case, in addition to the "if required" language, also "provided that the architect might withhold from the contractor, or, on account of subsequently discovered evidence, nullify, the whole or any part of any certificate for payment to such extent as might be necessary to protect the owner from

loss …." *Id.* at 529.  It was undisputed that the architect did not nullify a previously issued

certificate and that the owner did not request him to do so.  *Id.* at 531.  The court stated:

> The general rule is that a surety . . . is subrogated as of the time the contract was
> made to the benefit of all securities and means of payment then or thereafter under
> the creditor's control; [citations omitted]; and it follows that *he is entitled to have*
> *the building fund in the hands of the owner properly applied as contemplated by*
> *the contract and bond and in accordance with law.*

*Id.* at 534 (emphasis added).  The court held that the surety was discharged to the extent of the

payments made without such proof, noting that:

> The words 'if required' in the paragraph of the contract relating to the right of
> [the owner/obligee] to demand releases before making final payment, *did not, in*
> *our opinion, give him an option which he could arbitrarily refuse to exercise … .*
> *As against the surety, certainly it was not the intention of this clause to confer …*
> *the right to give up or surrender a security the surrender of which would injure*
> *the surety.*

*Id.* at 536 (emphasis added).

In another case, the court rejected the argument that requiring payroll receipts as a

condition of payment was optional.  *See Ætna Cas. & Sur. Co. v. Russell,* 24 S.W.2d 385 (Tex.

1930).  Although the owner "reserved the right" to require receipts, the owner owed a duty to the

surety to exercise that right to protect the contract funds, as security in the owner's hands, for the

benefit of the surety.  *Id.* at 387.

Thus, the Court should rule as a matter of law that a payment is not "valid and proper"

when it is made without regard for (1) the obligation to withhold or nullify previous Certificates

for Payment; and (2) the statutory withholdings under G.L. c. 30 §§ 39K or 39F.  AMMIC is

therefore entitled to a *pro tanto* discharge to the extent of these payments because they

improperly reduced the Balance of the Contract Price – which in turn prejudiced AMMIC by

creating a larger difference between the Balance of the Contract Price and the cost to complete.

### D.  The May Payments Discharged AMMIC Under The Law Of Suretyship.

In addition to North Brookfield's statutory and contractual duty to withhold part or all of the May Payments, *see supra*, well-established equitable principals of surety law also required North Brookfield to withhold those Contract funds comprising the May Payments which were security for Sciaba's performance:

> [A] creditor who has … property from the [surety's] principal as a pledge or security for his debt, is to hold the property fairly and impartially for the benefit of the surety … and if he parts with it without the knowledge or against the will of the surety, he shall lose his claim against the surety to the amount of the property so surrendered. …
>
> [W]hen the creditor has the means of satisfaction actually or potentially in his hands, and does not choose to retain it, the surety is discharged. …
>
> Fair dealing requires that he should consult the safety of the surety when he the means in his hands.

*Baker v. Briggs,* 25 Mass. (8 Pick.) 122, 129-132 (1829); *accord Museum of Fine Arts v. Am. Bonding Co.,* 211 Mass. 124 (1912); *Guild v. Butler,* 127 Mass. 386, 389 (1879); *Am. Bank v. Baker,* 45 Mass. (4 Metc.) 164, 175-76 (1842).

This principle has been applied in numerous contexts.  In *Baker,* the obligee relinquished the principal's horse and gig, held as security for a note guaranteed by the defendant surety, before the principal's debt had been satisfied.  The release of the security discharged the surety. *Baker,* 25 Mass. at 129-132.  In *Guild,* the obligee released the maker of notes that had been pledged as security for a note guaranteed by a surety.  The release was held to discharge the surety.  *Guild,* 127 Mass. at 389.  In another case, a surety was held discharged because the obligee failed to avail itself of the opportunity to make itself whole by setting off life insurance proceeds in its hands against the principal's debt, to the detriment of the surety.  *See White's Adm'r v. Life Ass'n of America,* 63 Ala. 419, 1879 WL 1034, 35 Am. Rep. 45 (1879).  The Alabama court explained: "the creditor is bound to exercise reasonable diligence in the

preservation of [security held by the creditor]; and if, by his negligence, they are lost, or if he should disable himself form surrendering them to the surety … the surety is discharged, to the extent to which the securities … would have extinguished his liability." *White's Adm'r,* 1879 WL 1034, at *5; *accord McDowell v. President, Dir. & Co. of the Bank of Wilmington & Brandywine,* 1 Del. 369 (1834) (surety discharged due to failure of obligee to apply set-off of funds in its control to reduce or satisfy principal's debt). The Supreme Judicial Court of Massachusetts ("SJC") has indicated that these principles apply in the context of a performance bond for a construction contract. *See Museum of Fine Arts v. Am. Bonding Co.,* 211 Mass. 124, 128 (1912); *see also Veneto v. McCloskey & Co.*, 333 Mass. 95, 104 (1955).

If this issue of prejudicial overpayment arises in the context of the obligee's claim against the surety, the result of a breach of the equitable duty is a *pro tanto* discharge of the surety. *Veneto*, 333 Mass. at 104. If a surety incurs expense in fulfilling bond obligations, and the obligee released funds to the contractor in violation of the terms of the contract, or in breach of its duty to the surety to protect the contract funds, the surety is entitled to affirmative recovery of the funds so released. *Commercial Cas. Ins. Co. v. Durham County*, 190 N.C. 58, 61-62 (1925).

North Brookfield points to decisions under federal law that have required the surety to give notice to the obligee of the principal's default in order for an equitable duty to run from the obligee to the surety not to make further payments to the principal. *See* Town's Memo at 8-9, *citing, e.g.*, *Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 498 (Fed. Cir. 1990). A subsequent case from the Federal Circuit, however, suggests that the notice requirement articulated in *Fireman's Fund* is not absolute and would not apply on different facts. *National Sur. Corp. v. United States*, 118 F.3d 1542, 1547 (Fed. Cir. 1997). The *National Surety* court clarified that in *Fireman's Fund* the surety was required to notify the obligee of the principal's

default because of the obligee's *discretion* to authorize payments in full without holding back retainage from periodic payments. *See id.* Therefore, when the obligee has *discretion* with regard to payments, the surety must notify the obligee of the principal's default (or object to payments) in order to precipitate its equitable subrogation rights to any retainage and therefore an equitable duty on the part of the obligee to withhold the same. *See id.* Unlike in *Fireman's Fund*, the obligee in *National Surety* was *required* by contract to withhold a percentage of each periodic payment, and therefore the court found that an equitable duty arose in the surety's subrogation rights to the retainage and likewise the obligee's duty to withhold the same. *See id.*[7]

AMMIC submits that the SJC should and would hold that, just as the obligee in *National Surety* was required to retain funds from each periodic payment, that North Brookfield was also required to retain the estimated fair value of its claims from any progress payments under c. 30, § 39K, and was similarly required to withhold from Sciaba funds claimed by a claim for direct payment under c. 30 § 39F, as shown above. Indeed, the SJC in *First Nat'l Ins. Co. v. Commonwealth*, 391 Mass. 321 (1984), left undisturbed the trial court's reasoning that "*so long as* the progress of the contractor on the job is satisfactory to the Commonwealth and it has *good reason to believe that the Contract will be completed*," then there is no equitable duty to withhold progress payments "[e]ven where the Commonwealth knows, or should know, that a contractor has serious financial difficulties … ." *Id.* (emphasis added). In this case, however, the equitable duty alluded to by the SJC in *First National* arises because the condition that prevented its arising in that case is *not* substantiated by the facts here: that is, North Brookfield was *clearly aware* that the contractor had serious difficulties, that progress on the job was *not*

---

[7]    The Court stated: "When the contractor abandoned performance before completion, . . . and the government had knowledge of the default, as here, and so informed the surety, as here, *Fireman's Fund* does not impose a further requirement that the surety notify the government that "the principal has defaulted." The holding in *Fireman's Fund* did not change the rules of subrogation, but simply dealt with the rights and obligations of the parties *on the conditions of that case*." *National Sur. Corp.*, 118 F.3d at 1547 (emphasis added).

satisfactory, that subcontractors were *not* being paid, and that the job would be more than a year late. Indeed, this is what North Brookfield complained about in its April 23 letter and May 21 meeting with AMMIC. *See* Town's Facts, Exh. E. Moreover, AMMIC was led to refrain from giving notice by North Brookfield's statement that it would not release payments until a new schedule was submitted. AMMIC's Facts ¶ 20. It is likely, under *First National*, *National Surety*, and the *Baker v. Briggs* line of cases, that the SJC would hold that the facts in this case triggered an equitable duty requiring North Brookfield to withhold the May Payments. Accordingly, North Brookfield had an obligation under the principles of suretyship to withhold from Sciaba the two May Payments totaling $696,578.23. North Brookfield's failure to do so prejudiced AMMIC as these contract funds, to which Sciaba was subrogated, were no longer available to complete the Project. A *pro tanto* discharge is thereby appropriate.

### E.  North Brookfield Failed To Mitigate Damages By Making The May Payments.

North Brookfield's claim against AMMIC is a contract claim stemming from Sciaba's breach. The general rule with respect to mitigation of damages is that a party may not recover damages that were avoidable by the use of reasonable precautions on its part. *See Burnham v. Mark IV Homes, Inc.*, 387 Mass. 575, 586 (1982). Here, North Brookfield could have taken numerous precautions that were reasonable and tailor-made to protect its interests. Simply, North Brookfield could have mitigated by exercising its rights to withhold monies under the equitable principals of surety law, Mass. G.L. c. 30 §§ 39K or F, or under the Contract General Conditions Section 9.5.1, as explained above. Failure to mitigate damages should preclude the Town from recovering to the extent of the May Payments and entitle AMMIC to a refund.

### F. There Are Disputed Facts Upon Which North Brookfield Bases Its Argument That It Was Required To Make The May Payments To Sciaba.

North Brookfield argues that, "[s]ince AMMIC never requested that the Town take any specific action concerning payments to Sciaba, the Town was bound to make payments to Sciaba in accordance with the requirements of the Contract and G.L. c.30, §39K." Town's Memo at 11. However, some of the facts on which North Brookfield bases its argument are disputed. The Contract required the submission of an updated construction schedule with each application for payment, or requisition. AMMIC's Facts ¶ 20. At the May 21 meeting, representatives of the Town stated that, in addition to lien waivers, Sciaba would have to submit an updated construction schedule in order to get paid.[8] Sciaba's representatives at the meeting stated that it would be three weeks before they would be able to submit an updated schedule. *Id.* Thus, on the basis of testimony and documentary evidence presented in AMMIC's Facts, the finder of fact can infer that if Sciaba presented lien waivers earlier than it did, the lack of an updated construction schedule would (or should) have posed an obstacle to payment.

In addition, AMMIC has disputed that it never requested that the Town take action with respect to payments to Sciaba. To the contrary, at the May 21 meeting, Stephen Beatty of AMMIC asked the Town's representatives to advise him before any would be made.

---

[8]    North Brookfield asserts, incorrectly, that AMMIC "must identify the person who made these statements and establish his authority to speak for the Town on the matter," citing *Simpson v. Marlborough*, 236 Mass. 210 (1920). Town's Memo at 13. That case, however, involved the power to bind the city in contract, not the scope of an agent's authority to speak at a meeting to discuss an already existing contract. Moreover, in Section 4.2.1 of the Contract's General Conditions, the Town conferred upon the architect the authority to act as the Town's representative and agent. AMMIC's Facts ¶38. It is also clear that other Town representatives (including the Superintendent, Selectman, Principal and Building Committee Co-Chair) attended the May 21, 2003 meeting as Town agents with either the express or apparent authority to speak on the Town's behalf. *See* Town's Memo at Exhibit F (listing attendees). Any unauthorized statement at the May 21 meeting was ratified by the Town's other agents' failure to contest the same immediately. *See Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 18-19 (1997). In any event, AMMIC fulfilled its obligation to "take notice of the scope of authority of those professing to act as [the Town's] agents" under *Simpson* because the highest ranking members of the Town and the Building Committee were in attendance, conveying (at the very least) their apparent authority to speak or ratify statements on behalf of the Town – statements upon which AMMIC could rely and that could be imputed to the Town.

AMMIC's Facts ¶ 39.  This was a specific request that specific action be taken by the Town with respect to payments to Sciaba.  This evidence also negates the implication by the Town that AMMIC failed to make the effort to inform itself about the state of affairs.  *See* Town's Memo at 10.  For this reason, the Town's citation to *John W. Egan Co., Inc. v. Major Constr. Mgmt. Corp.*, 46 Mass. App. Ct. 643 (1999), and *Watertown Fire Ins. Co. v. Simmons,* 131 Mass. 85 (1881), is inapposite.  AMMIC made a reasonable request of the Town for information that would have enabled AMMIC to protect its interests.  Nothing in any of the cases North Brookfield cites rewards an obligee that ignores a reasonable request for information and releases funds to the principal at a time when the obligee has superior information about the principal's deficient performance.[9]  AMMIC has effectively disputed facts upon which the Town's Motion rests and therefore the Motion must be denied.

### CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion for Partial Summary Judgment.

> Respectfully submitted,
> **AMERICAN MANUFACTURERS
> MUTUAL INSURANCE COMPANY**
>
> By its attorneys,
> **HOLLAND & KNIGHT LLP**

---

[9]    Neither *Egan* nor *Watertown* involved a bond obligee that ignored a surety's request for information or the release of security.  In *Egan¸* the issue was whether the payment bond surety was responsible for interest on damages arising from a payment bond claim even though it was neither notified nor sued until almost one year after default entered against its principal.  *See Egan,* 46 Mass. App. Ct. at 645.  In *Watertown,* the issue was whether the obligee's failure to give earlier notice of the principal's non-payment (not required by the bond) was a defense to the surety.  *See Watertown*, 131 Mass. at 86.  These cases are inapposite because they address a surety's duty to inform itself of the actions of its principal, *not the more narrow duty* owed by an obligee to "do no act which affects the rights[] to which the surety is subrogated … ."  *See Welch v. Walsh*, 177 Mass. 555, 558 (1901).  Indeed, the SJC has further recognized that "[i]f a creditor does any act which injuriously affects the situation and rights of the surety, *such as … relinquishing security which he holds for the debt*, he discharges the surety either in whole or *pro tanto*."  *See Watertown*, 131 Mass. at 86 (emphasis added).  Here, AMMIC asserts that Mr. Beatty specifically requested that the Town advise him of any payments – a specific request for a specific action that would have protected the Contract funds to which the surety was subrogated.

/s/ Deborah S. Griffin
Deborah S. Griffin, BBO #211460
Jeff D. Bernarducci, BBO #657454
10 St. James Avenue
Boston, MA  02116
Tel:    (617) 523-2700
Fax:    (617) 523-6850

Dated: January 25, 2006

# 3466879_v3
431261.00002