**EXHIBIT  7**

Lee P. Dore                                         04/13/2005

1

1                  UNITED STATES DISTRICT COURT
         DISTRICT OF MASSACHUSETTS:  CENTRAL DIVISION
2

3

AMERICAN MANUFACTURERS      *
4  MUTUAL INSURANCE COMPANY  *
                            *
5           vs.              *  CASE NO. 03-40266 CBS
                            *
6  TOWN OF NORTH BROOKFIELD  *

7
                    D E P O S I T I O N
8
                            OF
9
                       LEE P. DORE
10
         Taken on behalf of the Plaintiff on Wednesday
11            April 13, 2005 at the offices of
          Dore and Whittier, So. Burlington, Vermont.
12

13  APPEARANCES:

14  DEBORAH S. GRIFFIN, ESQ., of the firm Holland &
    Knight, 10 St. James Avenue, 11th Floor, Boston,
15  MA 02116, appeared and represented the Plaintiff.

16  THOMAS W. MCENANEY, ESQ., of the firm Kopelman and
    Paige, P.C., 31 St. James Avenue, Boston, MA
17  02116, appeared and represented the Defendant.

18  MATTHEW M. O'LEARY, ESQ., of the firm Donovan
    Hatem LLP, World Trade Center East, Two Seaport
19  Lane, Boston, MA 02210, appeared and represented
    the Deponent.

20

21  COURT REPORTER:  Virginia L. Simmer, RPR

22

23

24

25

Lee P. Dore                                          04/13/2005

115

1    A.  I believe, yes.

2    Q.  Did you prepare Exhibit 40 in accordance with

3    the procedures you described previously with respect

4    to the preparation of meeting minutes?

5    A.  Yes, I did.

6    Q.  Would you take a look at the document that's

7    been marked Exhibit 41, please.  Can you identify

8    Exhibit 41?

9    A.  School building committee meeting minutes of

10   19 March 2003.

11   Q.  Did you prepare Exhibit 41?

12   A.  Yes, I did.

13   Q.  Did you prepare it on or about April 3, 2003?

14   A.  Yes, I did.

15   Q.  Did you prepare it in accordance with the

16   procedures you described previously regarding the

17   preparation of meeting minutes?

18   A.  Yes, I did.

19   Q.  Did Mr. Conway at that meeting of March 19,

20   2003 express his view about whether Sciaba was still

21   two months behind or was further behind or had made

22   up time?

23   A.  I don't recall specifically if he did at that

24   meeting.

25   Q.  Did you form such an opinion at that time?

Lee P. Dore                                              04/13/2005

118

1  Exhibit 41 beyond what's either written there or

2  that you've testified to?

3      A.  I don't believe so.

4      Q.  Was somebody tasked at the end of that meeting

5  to discuss that issue with North Brookfield's

6  attorney?

7              MR. MCENANEY:  Objection.

8      A.  No, I don't believe so, not to my knowledge.

9      Q.  Why don't you take a look at the document

10 that's been marked Exhibit 42, please.  Can you

11 identify Exhibit 42, please?

12     A.  These are school building committee meeting

13 minutes of 2 April 2003.

14     Q.  And you didn't attend that meeting, right?

15     A.  Correct.

16     Q.  Who prepared Exhibit 42?

17     A.  They were prepared based on notes from Chris

18 Conway.

19     Q.  Did you prepare the minutes or did Chris

20 Conway prepare them?

21     A.  I believe actually one of our administrative

22 assistants prepared them and I reviewed them.

23     Q.  Did you go over them with Chris Conway before

24 signing them?

25     A.  Yes.

Lee P. Dore                                                04/13/2005

119

1    Q.  Did you consider Exhibit 42 to have been

2    prepared in accordance with the usual procedures for

3    preparing meeting minutes?

4    A.  Yes, I would.

5    Q.  As of the April 2, 2003 meeting did Mr. Conway

6    have an opinion as to whether Sciaba had made up any

7    of the two months that it was behind schedule at the

8    earlier time?

9    A.  I don't recall any conversations with him.  I

10   don't see anything here specifically stating that.

11   Q.  Had you received any information about

12   progress on the job that led you to believe that

13   Sciaba had made up time since Mr. Conway expressed

14   the view that Sciaba was two months behind?

15   A.  That they had made up time?

16   Q.  Right.

17   A.  No.

18   Q.  Paragraph 3 -- strike that.  Paragraph 4 on

19   the second page of Exhibit 42 reflects a request by

20   the school building committee to investigate a

21   projected completion date based on manpower history

22   to date as well as payment requisitions and says the

23   committee's concerned that potential liquidated

24   damage costs will be very high and question if the

25   contractor's retainage alone could cover these

Lee P. Dore                                          04/13/2005

123

1    page that looks to me like it says formal LD request

2    Ed come to next meeting, building committee meeting

3    April 30th.  Can you help us understand that note at

4    all?

5        A.  Not sure what it means.

6        Q.  After the job meeting on April 2nd did anyone

7    ask you to ask Ed Sciaba to attend the next building

8    committee meeting?

9        A.  I don't recall.  I know there were a few

10   instances over the course of the project where the

11   building committee did ask to invite Ed Sciaba but I

12   don't remember specifically the timeframes of

13   those.  The Ed they're referring to here could also

14   be Ed O'Malley who was the principal.  He was

15   usually in attendance at job meetings.

16       Q.  Could you take a look at the document that's

17   been marked Exhibit 44, please.  Can you identify

18   Exhibit 44, please?

19       A.  It's a memo from myself to E.J. Sciaba's

20   project manager Scott Finneran.

21       Q.  Are the four bullet points at the bottom of

22   Exhibit 44 the list of critical path items that it

23   was indicated in Exhibit 42 that Dore and Whittier

24   would issue in paragraph 3 of Exhibit 42?

25       A.  And the items you're referring are items 1, 2,

125

1    and do is identify items that Sciaba needs quickly

2    because all the items usually come in fairly close

3    together and there are some items that are hot, what

4    we call hot items that need to get completed first

5    in order to sequence the job correctly or there may

6    be a certain sequence of work coming up during the

7    construction progress that requires us to approve a

8    submittal.  And so these four were items that were

9    very important to the sequencing of work at that

10   point and we had not received shops or approved

11   shops for these items.

12       Q.  How did you know they were hot items?

13       A.  Mostly because they were required for the

14   sequence of work that was coming up.  So we would

15   review it at a job meeting with Sciaba and it would

16   be a discussion that we would have.

17       Q.  I'll hand you now what's been marked as

18   Exhibit 45.  Can you identify Exhibit 45, please?

19       A.  School building committee meeting minutes from

20   16 April 2003.

21       Q.  Did you prepare Exhibit 45?

22       A.  Yes, I did.

23       Q.  Did you prepare these minutes on April 21,

24   2003?

25       A.  Yes, I did.

Lee P. Dore                                                    04/13/2005

126

1    Q.  Did you prepare Exhibit 45 in accordance with

2    the procedures you described earlier regarding the

3    preparation of meeting minutes?

4    A.  Yes, I did.

5    Q.  In paragraph 2 the minutes say at the end of

6    the sentence, Progress has been slow over the past

7    two weeks, correct?

8    A.  Yes, it does.

9    Q.  And was that an accurate statement?

10   A.  I believe so.  I don't recall exactly what was

11   going on at the site at that time.

12   Q.  What analysis did Dore and Whittier do, if

13   any, to come to the conclusion that progress had

14   been slow over the two weeks preceding April 16th?

15   A.  That would have been based on Chris Conway's

16   observations of activity on the site over the past

17   two weeks in question.

18   Q.  Was it also based on his judgment about what

19   the progress should have been?

20   A.  I don't know if that entered into that

21   context.  I know that he observed the site over that

22   time duration and it didn't appear to him that there

23   was a lot of activity going on.

24   Q.  You don't know if he based his opinion on more

25   than just a general impression?

Lee P. Dore                                      04/13/2005

127

1    A.   I don't know.

2    Q.   Paragraph 5 of Exhibit 45 refers to a

3    projected completion graph based on requisitions,

4    right?

5    A.   Yes.

6    Q.   I'm going to hand you the document that's been

7    marked Exhibit 46 and ask if that's the graph that

8    was referenced in paragraph 5 of Exhibit 45?

9    A.   I believe so, yes.

10    Q.   Who prepared Exhibit 46?

11    A.   I did.

12    Q.   Would you describe what you've depicted in

13    Exhibit 46 please and where you got the information?

14    A.   Sure.  The top line on the graph there

15    represents what we have projected the cash flow to

16    be for the job for E.J. Sciaba.  The bottom line

17    illustrates what the actual billings were on a

18    monthly basis.  Up to that point kind of midway

19    through there it's hard to read.  It says something

20    like April 2003 with the two hash marks on each end

21    is a projection based on an averaged requisition

22    that they had been forwarding to date which I

23    believe is at the very bottom of the page, actual

24    average billing per month of 392,000.

25    Q.   And what conclusion did you draw after

Lee P. Dore                                    04/13/2005

                                                          128
1   compiling the projected drawdown part of the graph

2   and the actual part of the graph?

3       A.   Based on this modeling it appeared that the

4   construction was going to be about 14 months beyond

5   substantial completion if they followed a consistent

6   path of the average billing rate.

7       Q.   When we were looking at Exhibit 42 paragraph 4

8   we were talking about the building committee's

9   request that D and W investigate a projected

10  completion date based on manpower history as well as

11  payment requisitions, right?

12      A.   Yes.

13      Q.   Was Exhibit 46 intended to be your

14  investigation of a projected completion date based

15  on payment requisitions?

16      A.   Yes.

17      Q.   Did you do any other analysis based on

18  manpower history to come up with a projected

19  completion date?

20      A.   No, it was based on -- this is -- the analysis

21  that I did was based on requisitions as far as I can

22  remember.  I don't recall exactly if Chris Conway

23  had prepared any manpower scheduling based on his

24  daily reports or not.  I think we had a conversation

25  about it but I don't know if it was actually

Lee P. Dore                                              04/13/2005

129

1    completed.

2       Q.   All right.  Going back to Exhibit 45, we were

3    looking at paragraph 5, the third sentence of which

4    says the projection indicates a completion date of

5    January 2005, more than one year late.  That's --

6    that was -- that corresponded to the 14 months that

7    you referenced in one of your earlier answers?

8       A.   Yes.

9       Q.   And then the next sentence says, Substantial

10   completion with all approved extensions of contract

11   is December 15, 2003, right?

12      A.   Yes.

13      Q.   And that was the date from changeorder 3?

14      A.   Yes, the date of the second substantial

15   completion date for all of the building.

16      Q.   The last full sentence on page 1 of Exhibit 45

17   says, DW and the committee are very concerned that

18   this schedule will not be completed anywhere near

19   the contract timeframe.  Can you recall anything

20   more of the discussion beyond what's reported there?

21      A.   I think it was just a general discussion from

22   the committee that they were concerned based on some

23   of this information and recent lack of progress on

24   the project that it didn't appear that they were

25   going to be hitting the schedule.

130

1    Q.  Who voiced the concerns referenced in that

2    sentence?

3    A.  I don't know specifically.

4    Q.  Did anyone at the meeting voice the view that

5    it was still possible for the contract to be

6    completed on time?

7    A.  I don't recall any specific conversations

8    about that, no.

9    Q.  Did you think as of April 16, 2003 that it was

10   possible for the contract to be completed on time?

11   A.  I don't think I formed an opinion on that.  If

12   I had been listening to the contractor then I would

13   agree with that statement that they would be able to

14   complete because they had consistently told us they

15   were still going to be able to complete within the

16   contract period.

17   Q.  But you didn't believe it?

18   A.  I guess my opinion at that point would be

19   skeptical.

20   Q.  The next sentence in Exhibit 45, the one that

21   starts at the bottom of the first page and carries

22   over to page 2 says, The committee noted that

23   additional costs will be incurred to pay the

24   architect and construction manager beyond the

25   scheduled completion dates.  These funds will need

Lee P. Dore                                                    04/13/2005

131

1    to be made up by liquidated damages of a thousand

2    dollars per day for each and every day the project

3    is beyond substantial completion.  Liquidated

4    damages are estimated at over 400,000 based on the

5    projected completion date.  Who said that at the

6    meeting?

7       A.  I don't recall specifically.  I think someone

8    was probably playing on their calculator at the

9    meeting and brought up that comment.

10      Q.  It was someone on the school building

11   committee rather than someone from Dore and Whittier

12   who made that statement?

13      A.  I don't specifically recall who said the

14   statement.

15      Q.  Did anyone disagree with it?  Did anyone voice

16   disagreement with it at the meeting I should say?

17      A.  Not that I recall.

18      Q.  Do you recall how much was held in retainage

19   as of April 16, 2003?

20      A.  Not off the top of my head, no.

21      Q.  If we look at the last requisition prior to

22   that time that will tell us?

23      A.  Yes.

24      Q.  We'll get there.  Was there any discussion at

25   the April 16 school building committee meeting about

Lee P. Dore                                        04/13/2005

132

1    the possibility of withholding liquidated damages

2    from any future payments over and above retainage?

3       A.  No, not that I remember.

4       Q.  In paragraph 6 there's a discussion of issues

5    relating to various subcontractors who hadn't been

6    paid, is that -- was that your report?

7       A.  Yes, just on -- as it says there, various

8    subcontractors were having varying levels of

9    frustration with lack of payment, some had even

10   filed for direct payment claims.

11      Q.  Did any of the subcontractors referenced in

12   paragraph 6 speak to you?

13      A.  I believe I had heard from Greenwood Roofing

14   and possibly Millis Plumbing.

15      Q.  Did the others speak to Chris Conway?

16      A.  I believe so.

17      Q.  In paragraph 8 of Exhibit 45 it says the

18   committee discussed available options to them

19   regarding lack of performance by the contractor.

20   What discussion do you recall on that topic at the

21   April 16 school building committee meeting?

22      A.  I don't recall any specific options.  I think

23   it was just noted here that it was just general

24   discussions.  I don't recall any specifics of what

25   options they were throwing out there.

133

1    Q.  Which committee members spoke up on that

2    topic?

3    A.  I don't recall.

4    Q.  The next sentence of paragraph 8 says a motion

5    was made to have town counsel review the job status

6    and provide recommendations on how to proceed and

7    the motion was approved unanimously.  Did anyone

8    from Dore and Whittier talk to the town's attorney

9    to review job status and provide recommendations on

10   how to proceed?

11           MR. MCENANEY:  Objection.

12   A.  I don't recall.  We may have.

13   Q.  Did you ever learn if somebody from the school

14   building committee contacted town counsel about

15   that?

16           MR. MCENANEY:  Objection.

17   A.  I think I had heard they had been in touch

18   with town counsel.

19   Q.  Did you hear the results of that discussion?

20           MR. MCENANEY:  Objection.  I'm going to

21               instruct Lee not to answer that question.

22               It's inquiring into attorney-client

23               privilege.

24           MS. GRIFFIN:  Are you taking the

25               position that Mr. Dore was part of the

Lee P. Dore                                    04/13/2005

181

1    Q.  Mr. Dore, do you recall approximately when

2    that amendment was signed?

3    A.  I really can't recall the date.

4    Q.  Okay.  Can you identify Exhibit 68?

5    A.  This is application for payment No. 11 from

6    E.J. Sciaba to the Town of North Brookfield.

7    Q.  And the signatures on the right-hand side of

8    the first page of Exhibit 68 are first Scott

9    Finneran on behalf of Sciaba, right?

10   A.  Yes.

11   Q.  And then a notary for his signature?

12   A.  Yes.

13   Q.  And there's no signature on the -- oh, yeah,

14   and the signature at the bottom is Mr. Russell's

15   signature as the architect on the project?

16   A.  Yes.

17   Q.  And whose handwriting is on the left-hand side

18   of the page where some numbers were changed?

19   A.  Harald Aksdal's initials.

20   Q.  Would you describe just generally and briefly

21   what the steps were in the submission review,

22   approval and signature of requisitions on the North

23   Brookfield project?

24   A.  Yes.  Pencil requisition would be submitted at

25   the job site from Sciaba to Chris Conway and either

Lee P. Dore                                          04/13/2005

182

1    myself or Harald depending who was down there

2    reviewed with them at the site and it would be

3    marked up on stuff that we disagreed with and then

4    Sciaba would send to Vermont, this office, a formal

5    copy which we would then when we would get it,

6    either myself or Harald would review it with Chris

7    Conway and compare it to the pencil requisition to

8    make sure that the changes were made, and if they

9    weren't made then we would make them.  And then we

10   would pass it to Al Russell or in some instances

11   Richard Ziemba would then sign which they would then

12   question us as to and review the pencil requisition

13   and the final requisition before certifying it.

14     Q.  The pencil requisition was literally in

15   pencil?

16     A.  No, it's a term just as a draft copy and it

17   would be basically this not formalized, notarized or

18   signed.

19     Q.  But it would still be typed, right?

20     A.  Yes.

21     Q.  And was the -- the handwritten changes on the

22   first page of Exhibit 68, do you know were those

23   changes made because changes that were supposed to

24   have been made from the pencil requisition to the

25   formal submission had not been made or were there

Lee P. Dore                                              04/13/2005

183

1  other reasons for those changes?

2     A.  I'm not specifically sure why these were made

3  for this specific application.  In some instances as

4  you described and in other instances it's because of

5  the lag time between when we review the pencil copy

6  versus the formal.  Some submittals were supposed to

7  be included, updated project schedules, project

8  photographs and if those didn't come with the final

9  requisition and they were billing for them, then we

10 would also have to mark these down.

11    Q.  The through date for the period covered by

12 requisition 11 was February 28, 2003, right?

13    A.  Correct.

14    Q.  And typically when in relation to that through

15 date did you have the meeting to go over the pencil

16 requisition?

17    A.  Usually it would be by the 25th of the month.

18    Q.  So February 25th for the requisition that was

19 about to cover -- that was going to cover the period

20 about to end?

21    A.  Right.

22    Q.  In conducting your review of the requisition

23 after it was submitted formally and signed by Sciaba

24 did you make use of any additional information about

25 events that happened between the time you reviewed

Lee P. Dore                                             04/13/2005

184

1   the pencil requisition and the time the formal

2   requisition came in?

3     A.  Yes, if at the pencil requisition we would

4   question material deliveries, for instance, if they

5   weren't there yet and Sciaba would inform us that

6   they would be coming prior to the submission of the

7   formal, we would check to verify that, indeed, they

8   did come or if they were stored off-site did we have

9   the paperwork, insurance certificates, et cetera

10  that they had actually come in.

11    Q.  And you would check with Chris Conway about

12  that?

13    A.  Yes.

14              MS. GRIFFIN:  Mark this next bundle as

15        69.

16  BY MR. GRIFFIN

17    Q.  Can you identify Exhibit 69, please?

18    A.  This is a memo from Harald Aksdal to Robert

19  O'Neill regarding application for payment No. 11.

20    Q.  Are the pages behind it additional materials

21  that Sciaba submitted in support of requisition 11?

22    A.  I don't recall specifically if they were in

23  support of application No. 11.

24    Q.  At the bottom of some of the pages there's a

25  fax header March 7, '03 Sciaba, can you tell whether

185

1   that records a fax transmission to either you or

2   Chris Conway?

3       A.   It could be to one of us.

4       Q.   Could you see if you can identify Exhibit 70,

5   please?

6       A.   Yes, I can.  It's application for payment No.

7   12.

8       Q.   And it's got the same signatures on the

9   right-hand side that we referred to before, Scott

10  Finneran and Mr. Russell?

11      A.   Yes, it does.

12      Q.   At the bottom right-hand corner it says,

13  Recommend providing separate checks to Millis and

14  Greenwood, see attached memo.  Is the memo that's

15  referred to there the one that is the third page on

16  Exhibit 70?

17      A.   Bates No. 25494, yes.

18      Q.   Did you have a role in formulating that

19  recommendation and particularly the dollar amounts

20  stated for payments to Millis Plumbing and Greenwood

21  Industries on page 25494?

22      A.   I don't recall specifically.  I do recall

23  conversations regarding direct payment requests.

24      Q.   Who did you have the conversations with?

25      A.   Harald and Chris Conway.

Lee P. Dore                                    04/13/2005

188

1    Dore and Whittier had the check and was ready to
2    deliver it?
3        A.   I don't recall that being stated specifically.
4        Q.   Do you know whether the check was delivered
5    after the meeting broke up?
6        A.   I believe it was.
7        Q.   And nobody from Kemper Surety was there when
8    the check was delivered, were they?
9        A.   I wasn't there either when that happened so I
10   couldn't tell you who was there.
11       Q.   Take a look at Exhibit 72.  Can you identify
12   Exhibit 72, please?
13       A.   This is application for payment 13B.
14       Q.   And it was signed by someone on behalf of
15   Sciaba, right?
16       A.   Yes.
17       Q.   And Mr. Russell signed on behalf of the
18   architect, correct?
19       A.   Yes.
20       Q.   Let me show you what's been marked as Exhibit
21   73.  Can you identify Exhibit 73 as another copy of
22   the face page of application 13B?
23       A.   Yes.
24       Q.   And on this copy there's a note at the top of
25   the page, EJS REC. payment check for this month on

EXHIBIT 8

# APPLICATION AND CERTIFICATE FOR PAYMENT    AIA DOCUMENT G702

PAGE ONE OF    PAGES

| | |
|---|---|
| TO OWNER: TOWN OF N. BROOKFIELD<br>10 New School Drive<br>North Brookfield, MA 01535 | PROJECT: NORTH BROOKFIELD JR./SR. HI |

| | |
|---|---|
| FROM CONTRACTOR: E. J. SCIABA CONTRACTING CO. IN<br>18 Wolcott Street<br>Readville, MA 02137 | VIA ARCHITECT: DORE AND WHITTIER, INC.<br>1795 Williston Road<br>S. Burlington, VT 05403 |

APPLICATION NO: 00012
PERIOD TO: 3/28/2003
PROJECT NOS.: 238
CONTRACT DATE:

Distribution to:
☐ OWNER
☒ ARCHITECT
☐ CONTRACTOR
☐

RECEIVED APR 2 5 2003

NBDW25492

CONTRACT FOR:

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the contract.
Continuation Sheet, AIA Document G703, is attached.

1. ORIGINAL CONTRACT SUM .................................. $13,222,000.00
2. Net change by Change Orders ............. $132,829.28  ~~$136,179.07~~
3. CONTRACT SUM TO DATE (Line 1 ± 2) ...... $13,354,829.28  ~~$13,558,179.07~~
4. TOTAL COMPLETED & STORED TO DATE ..... $4,960,248.78  ~~$4,966,598.57~~
   (Column G on G703)
5. RETAINAGE:
   a. 5.000 % of Completed Work ................. $0.00
      (Columns D + E on G703)
   b. 5.000 % of Stored Material ................ $0.00
      (Columns F on G703)
   Total Retainage (Line 5a + 5b or ............ $248,013.43  ~~$248,329.94~~
   Total in Columns I on G703)
6. TOTAL EARNED LESS RETAINAGE ............ $4,712,235.34  ~~$4,718,268.63~~
   (Line 4 less Line 5 Total)
7. LESS PREVIOUS CERTIFICATES FOR PAYMENT ... $4,424,679.06
   (Line 6 from prior Certificate)
8. CURRENT PAYMENT DUE ..................... $287,556.28  ~~$293,589.57~~
9. BALANCE TO FINISH, INCLUDING RETAINAGE ... $8,639,910.44
   (Line 3 less Line 6)

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $150,973.38 | $20,000.00 |
| Total approved this Month | $5,205.69 $3349.79 | $0.00 |
| TOTALS | $156,179.07 $23,349.79 | $20,000.00 |
| NET CHANGES by Change Order | $132,829.28 ~~$136,179.07~~ | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this application for payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR: E. J. SCIABA CONTRACTING

By: _____    Date: 4/1/2003

State of: _____
County of: Suffolk
Subscribed and sworn to before
me this _____ day of _____

Notary Public: David P. Russo
My commission expires: 1-15-04

DAVID P. RUSSO
Notary Public
My Commission Expires January 15, 2004

Dore 70
EXHIBIT
4/8/06  KS
CASE #

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED ............... $287,556.28  ~~$293,589.57~~

(Attach explanation if amount certified differs from the amount applied for. Initial all figures on this Application and on the Continuation Sheet that are changed to conform to the amount certified.)

ARCHITECT: Dore & Whittier, Inc.

By: _____    Date: 4/8/03

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

AIA DOCUMENT G702 • APPLICATION AND CERTIFICATE FOR PAYMENT • 1992 EDITION • AIA® • ©1992 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.
"This document has been reproduced electronically with the permission of The American Institute of Architects under License #97003 to Primavera Systems, Inc. Reproduction of this document without project-specific information is not permitted. Contact The American Institute of Architects to verify the current version of this document and license status."

G702-1992

RECOMMEND PROVIDING SEPERATE CHECKS TO Millis & Greenwood. SEE attached MEMO

# CONTINUATION SHEET

## AIA DOCUMENT G703

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column 1 on Contracts where variable retainage for line items may apply.

APPLICATION NO.: 00012
APPLICATION DATE:
PERIOD TO: 3/28/2003
ARCHITECT'S PROJECT NO.: 238

| A | B | C | D | E | F | G | % | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | | BALANCE TO FINISH (C - G) | RETAINAGE (IF VARIABLE) RATE |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | (G÷C) | | |
| 00005 | Mobilization & Internal Office Setup | $123,722.00 | $123,722.00 | $0.00 | $0.00 | $123,722.00 | 100.000 | $0.00 | $6,186.10 |
| 00010 | General Contractor Bond | $247,444.00 | $247,444.00 | $0.00 | $0.00 | $247,444.00 | 100.000 | $0.00 | $12,372.20 |
| 00015 | Subcontractor Bonds | $118,000.00 | $118,000.00 | $0.00 | $0.00 | $118,000.00 | 100.000 | $0.00 | $5,900.00 |
| 00020 | GLPD Insurance | $26,000.00 | $26,000.00 | $0.00 | $0.00 | $26,000.00 | 100.000 | $0.00 | $1,300.00 |
| 00025 | Builders Risk | $32,000.00 | $32,000.00 | $0.00 | $0.00 | $32,000.00 | 100.000 | $0.00 | $1,600.00 |
| 00030 | Baseline CPM Schedule | $10,000.00 | $10,000.00 | $0.00 | $0.00 | $10,000.00 | 100.000 | $0.00 | $500.00 |
| 00035 | Schedule of Values | $5,000.00 | $5,000.00 | $0.00 | $0.00 | $5,000.00 | 100.000 | $0.00 | $250.00 |
| 00040 | Construction Sign | $3,500.00 | $3,500.00 | $0.00 | $0.00 | $3,500.00 | 100.000 | $0.00 | $175.00 |
| 00045 | Construction Fence | $24,000.00 | $24,000.00 | $0.00 | $0.00 | $24,000.00 | 100.000 | $0.00 | $1,200.00 |
| 00050 | SUBTOTAL | $589,666.00 | $589,666.00 | $0.00 | $0.00 | $589,666.00 | 100.000 | $0.00 | $29,483.30 |
| | | | | | | | | | |
| 00100 | GENERAL CONDITIONS | | | | | | | | |
| 00105 | Project Staffing | $452,853.00 | $273,388.21 | $25,158.00 | $0.00 | $298,546.21 | 65.926 | $154,306.79 | $14,927.31 |
| 00110 | Field Offices | $25,000.00 | $15,290.00 | $1,390.00 | $0.00 | $16,680.00 | 66.720 | $8,320.00 | $834.00 |
| 00115 | Temporary Telephones | $10,000.00 | $5,550.00 | $555.00 | $0.00 | $6,105.00 | 61.050 | $3,895.00 | $305.25 |
| 00120 | Temporary Toilets | $5,000.00 | $3,080.00 | $280.00 | $0.00 | $3,360.00 | 67.200 | $1,640.00 | $168.00 |
| 00125 | Electrical Consumption | $16,000.00 | $8,880.00 | $280.00 | $0.00 | $9,160.00 | 57.250 | $6,840.00 | $458.00 |
| 00130 | Storage Trailors | $3,500.00 | $1,950.00 | $888.00 | $0.00 | $2,838.00 | 81.086 | $662.00 | $141.90 |
| 00135 | Tarps, Blankets & Temp. Enclosure | $5,000.00 | $4,000.00 | $0.00 | $0.00 | $4,000.00 | 80.000 | $1,000.00 | $200.00 |
| 00140 | Interim Cleaning | $8,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $8,000.00 | $0.00 |
| 00145 | Project Photos | $3,000.00 | $1,660.00 | $166.00 | $0.00 | $1,826.00 | 60.867 | $1,174.00 | $91.30 |
| 00150 | CPM Schedule Updates | $16,000.00 | $5,000.00 | $0.00 | $0.00 | $9,000.00 | 56.250 | $7,000.00 | $450.00 |
| 00155 | Registered Survey | $15,000.00 | $14,000.00 | $0.00 | $0.00 | $14,000.00 | 93.333 | $1,000.00 | $700.00 |
| 00160 | Layout Stakes & Supplies | $10,000.00 | $8,500.00 | $0.00 | $0.00 | $8,500.00 | 85.000 | $1,500.00 | $425.00 |
| 00165 | G.C. As-Builts & Closeout Documents | $5,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $5,000.00 | $0.00 |
| 00170 | Temporary Water | $4,000.00 | $3,108.00 | $222.00 | $0.00 | $3,330.00 | 83.250 | $670.00 | $166.50 |
| 00175 | Dumpsters | $18,000.00 | $7,800.00 | $1,500.00 | $0.00 | $9,300.00 | 51.667 | $8,700.00 | $465.00 |
| 00180 | Final Cleaning | $10,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $10,000.00 | $0.00 |
| 00185 | Building Permit | $3,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $3,000.00 | $0.00 |
| 00299 | SUBTOTAL | $609,353.00 | $352,206.21 | $34,439.00 | $0.00 | $386,645.21 | 63.452 | $222,707.79 | $19,332.26 |
| | | | | | | | | | |
| 02060.00 | BUILDING DEMOLITION | | | | | | | | |
| 02060.05 | Demo Existing School | $67,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $67,500.00 | $0.00 |
| 02060.98 | SUBTOTAL | $67,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $67,500.00 | $0.00 |

_(Handwritten annotations appear across rows 00145 and 00150: "$1,000", "$4,000.00", "HA", "6600", "17.500", "10,000", "300")_

AIA DOCUMENT G703• APPLICATION AND CERTIFICATE FOR PAYMENT   • 1992 EDITION • AIA• • ©1992 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292   • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.
"This document has been reproduced electronically with the permission of The American Institute of Architects under License 97003 to Primavera Systems, Inc. Reproduction of this document without project-specific information is not permitted. Contact The American Institute of Architects to verify the current version of this document and license status."

NBDW25498

# CONTINUATION SHEET

AIA DOCUMENT G703

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO.:  00012
APPLICATION DATE:
PERIOD TO:  3/28/2003
ARCHITECT'S PROJECT NO.:  238

| A | B | C | D | E | F | G | % | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | | BALANCE TO FINISH (C - G) | RETAINAGE (IF VARIABLE) RATE |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | (G÷C) | | |
| 05300.98 | SUBTOTAL | $101,100.00 | $87,400.00 | $4,250.00 | $0.00 | $91,650.00 | 90.653 | $9,450.00 | $4,582.50 |
| 05410.00 | STUD SHEAR CONNECTORS | | | | | | | | |
| 05410.05 | Stud Shear Connectors | $18,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $18,000.00 | $0.00 |
| 05410.98 | SUBTOTAL | $18,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $18,000.00 | $0.00 |
| 05500.00 | FSB - MISCELLANEOUS METALS | | | | | | | | |
| 05500.05 | Miscellaneous Metals | $239,000.00 | $17,385.00 | $11,544.00 | $0.00 | $28,929.00 | 12.104 | $210,071.00 | $1,446.45 |
| 05500.98 | SUBTOTAL | $239,000.00 | $17,385.00 | $11,544.00 | $0.00 | $28,929.00 | 12.104 | $210,071.00 | $1,446.45 |
| 06100.00 | ROUGH CARPENTRY | | | | | | | | |
| 06100.05 | Roof Blocking Material | $18,000.00 | $5,940.00 | $0.00 | $0.00 | $5,940.00 | 33.000 | $12,060.00 | $297.00 |
| 06100.10 | Roof Blocking Labor | $6,000.00 | $1,000.00 | $0.00 | $0.00 | $1,000.00 | 16.667 | $5,000.00 | $50.00 |
| 06100.98 | SUBTOTAL | $24,000.00 | $6,940.00 | $0.00 | $0.00 | $6,940.00 | 28.917 | $17,060.00 | $347.00 |
| 06200.00 | FINISH CARPENTRY AND ARCHITECTURA | | | | | | | | |
| 06200.05 | Furnish Woodwork | $33,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $33,000.00 | $0.00 |
| 06200.10 | Install Woodwork | $8,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $8,000.00 | $0.00 |
| 06200.15 | Install Doors & Hardware | $18,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $18,000.00 | $0.00 |
| 06200.98 | SUBTOTAL | $59,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $59,000.00 | $0.00 |
| 07100.00 | FSB - WATERPROOFING/DAMPROOFING | | | | | | | | |
| 07100.05 | WATERPROOFING/DAMPROOFING | $60,000.00 | $39,000.00 | $0.00 | $0.00 | $39,000.00 | 65.000 | $21,000.00 | $1,950.00 |
| 07100.98 | SUBTOTAL | $60,000.00 | $39,000.00 | $0.00 | $0.00 | $39,000.00 | 65.000 | $21,000.00 | $1,950.00 |
| 07200.00 | BUILDING INSULATION | | | | | | | | |
| 07200.05 | BUILDING INSULATION | $10,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $10,000.00 | $0.00 |
| 07200.98 | SUBTOTAL | $10,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $10,000.00 | $0.00 |
| 07400.00 | METAL SIDING AND SOFFITS | | | | | | | | |
| 07400.05 | METAL SIDING AND SOFFITS | $64,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $64,500.00 | $0.00 |
| 07400.98 | SUBTOTAL | $64,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $64,500.00 | $0.00 |
| 07500.00 | FSB - ROOFING, FLASHING AND SHEET M | | | | | | | | |

AIA DOCUMENT G703 · APPLICATION AND CERTIFICATE FOR PAYMENT · 1992 EDITION · AIA® · ©1992 · THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 · WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.
"This document has been reproduced electronically with the permission of The American Institute of Architects under License #9703 to Primavera Systems, Inc. Reproduction of this document without project-specific information is not permitted. Contact The American Institute of Architects to verify the current version of this document and license status."

G703-1992

NBDW25504

# CONTINUATION SHEET

## AIA DOCUMENT G703

PAGE 8 OF 17 PAGES

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO.: 00012
APPLICATION DATE:
PERIOD TO: 3/28/2003
ARCHITECT'S PROJECT NO.: 238

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G÷C) | BALANCE TO FINISH (C - G) | RETAINAGE (IF VARIABLE) RATE |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| 07500.05 | ROOFING, FLASHING AND SHEET METAL | $923,721.00 | $48,000.00 | $111,579.50 | $0.00 | $159,579.50 | 17.276 | $764,141.50 | $7,978.98 |
| 07500.98 | SUBTOTAL | $923,721.00 | $48,000.00 | $111,579.50 | $0.00 | $159,579.50 | 17.276 | $764,141.50 | $7,978.98 |
| 07900.00 | FSB - JOINT SEALANTS | | | | | | | | |
| 07900.05 | JOINT SEALANTS | $39,200.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $39,200.00 | $0.00 |
| 07900.98 | SUBTOTAL | $39,200.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $39,200.00 | $0.00 |
| 08100.00 | METAL DOORS AND FRAMES | | | | | | | | |
| 08100.05 | METAL DOORS AND FRAMES | $25,000.00 | $17,500.00 | $0.00 | $0.00 | $17,500.00 | 70.000 | $7,500.00 | $875.00 |
| 08100.98 | SUBTOTAL | $25,000.00 | $17,500.00 | $0.00 | $0.00 | $17,500.00 | 70.000 | $7,500.00 | $875.00 |
| 08200.00 | WOOD DOORS | | | | | | | | |
| 08200.05 | WOOD DOORS | $19,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $19,000.00 | $0.00 |
| 08200.98 | SUBTOTAL | $19,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $19,000.00 | $0.00 |
| 08300.00 | SPECIAL DOORS | | | | | | | | |
| 08300.05 | SPECIAL DOORS | $2,900.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $2,900.00 | $0.00 |
| 08300.98 | SUBTOTAL | $2,900.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $2,900.00 | $0.00 |
| 08331.00 | COILING DOORS | | | | | | | | |
| 08331.05 | COILING DOORS | $3,800.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $3,800.00 | $0.00 |
| 08331.98 | SUBTOTAL | $3,800.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $3,800.00 | $0.00 |
| 08400.00 | FSB - ALUMINUM ENTRANCES,DOORS, AN | | | | | | | | |
| 08400.05 | ALUMINUM ENTRANCES,DOORS, AND WI | $298,200.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $298,200.00 | $0.00 |
| 08400.98 | SUBTOTAL | $298,200.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $298,200.00 | $0.00 |
| 08710.00 | FINISH HARDWARE | | | | | | | | |
| 08710.05 | FINISH HARDWARE | $39,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $39,000.00 | $0.00 |
| 08710.98 | SUBTOTAL | $39,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $39,000.00 | $0.00 |
| 08800.00 | FSB - GLASS AND GLAZING | | | | | | | | |
| 08800.05 | GLASS AND GLAZING | $19,496.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $19,496.00 | $0.00 |
| 08800.98 | SUBTOTAL | $19,496.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $19,496.00 | $0.00 |

*(handwritten: SUBTOTOL #'s ARE O.K.)*

NBDW25505

AIA DOCUMENT G703 • APPLICATION AND CERTIFICATE FOR PAYMENT • 1992 EDITION • AIA® • ©1992 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.
"This document has been reproduced electronically with the permission of The American Institute of Architects under License 97003 to Primavera Systems, Inc. Reproduction of this document without project-specific information is not permitted. Contact The American Institute of Architects to verify the current version of this document and license status."

G703-1992

# CONTINUATION SHEET
## AIA DOCUMENT G703

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO.:  00012
APPLICATION DATE:
PERIOD TO:  3/28/2003
ARCHITECT'S PROJECT NO.:  238

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G÷C) | BALANCE TO FINISH (C - G) | RETAINAGE (IF VARIABLE) RATE |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| 15400.160 | KITCHEN | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 15400.161 | UNDERGOUND WASTE | $4,500.00 | $4,500.00 | $0.00 | $0.00 | $4,500.00 | 100.000 | $0.00 | $225.00 |
| 15400.162 | LABOR-UNDERGROUND WASTE | $4,500.00 | $1,575.00 | $0.00 | $0.00 | $1,575.00 | 35.000 | $2,925.00 | $78.75 |
| 15400.163 | ABOVEGROUND WASTE AND VENT. | $4,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $4,500.00 | $0.00 |
| 15400.164 | LABOR- ABOVEGROUND WASTE AND VEN | $5,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $5,000.00 | $0.00 |
| 15400.165 | WATER PIPING | $4,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $4,500.00 | $0.00 |
| 15400.166 | LABOR- WATER PIPING | $5,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $5,000.00 | $0.00 |
| 15400.167 | GAS PIPING | $2,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $2,500.00 | $0.00 |
| 15400.168 | LABOR- GAS PIPING | $2,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $2,500.00 | $0.00 |
| 15400.169 | FIXTURES | $4,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $4,500.00 | $0.00 |
| 15400.170 | LABOR- FIXTURES | $4,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $4,500.00 | $0.00 |
| 15400.171 | INSULATION | $3,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $3,500.00 | $0.00 |
| 15400.172 | DRAINS AND CARRIERS | $5,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $5,000.00 | $0.00 |
| 15400.173 | LABOR- DRAINS AND CARRIERS | $3,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $3,000.00 | $0.00 |
| 15400.174 | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 15400.180 | MISCELLANEOUS | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 15400.181 | COORDINATION DRAWINGS | $7,900.00 | $6,715.00 | $0.00 | $0.00 | $6,715.00 | 85.000 | $1,185.00 | $335.75 |
| 15400.182 | PERMITS/MOBILIZATION | $5,000.00 | $5,000.00 | $0.00 | $0.00 | $5,000.00 | 100.000 | $0.00 | $250.00 |
| 15400.183 | ASBUILTS/O & M | $2,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $2,500.00 | $0.00 |
| 15400.900 | SUBTOTAL | $631,000.00 | $62,078.10 | -20,168.45 | $0.00 | $82,246.55 | -13.034 | $548,753.45 | $4,112.33 |
| | | | | | *#s SUBTOTAL ARE O.K. | | | | |
| 15500.000 | FSB - HVAC | | | | | | | | |
| 15500.184 | HVAC | $1,579,000.00 | $47,620.00 | $0.00 | $0.00 | $47,620.00 | 3.016 | $1,531,380.00 | $2,381.00 |
| 15500.199 | SUBTOTAL | $1,579,000.00 | $47,620.00 | $0.00 | $0.00 | $47,620.00 | 3.016 | $1,531,380.00 | $2,381.00 |
| 16000.00 | FSB - ELECTRICAL | | | | | | | | |
| 16000.05 | ELECTRICAL | $920,640.00 | $246,675.00 | $10,875.00 | $0.00 | $257,550.00 | 27.975 | $663,090.00 | $12,877.50 |
| 16000.98 | SUBTOTAL | $920,640.00 | $246,675.00 | $10,875.00 | $0.00 | $257,550.00 | 27.975 | $663,090.00 | $12,877.50 |
| 16740.00 | FSB - COMMUNICATION CABLING AND TE | | | | | | | | |
| 16740.05 | COMMUNICATION CABLING AND TECHNO | $164,900.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $164,900.00 | $0.00 |
| 16740.98 | SUBTOTAL | $164,900.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $164,900.00 | $0.00 |
| 18000.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 18000.01 | CHANGE ORDERS | | | | | | | | |

AIA DOCUMENT G703· APPLICATION AND CERTIFICATE FOR PAYMENT  · 1992 EDITION · AIA® · ©1992 · THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK
AVENUE, N.W., WASHINGTON, D.C. 20006-5292  · WARNING:  Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.
"This document has been reproduced electronically with the permission of The American Institute of Architects under License #7003 to Primavera Systems, Inc. Reproduction of this document without project-specific information is not permitted. Contact The American Institute of Architects to verify the current version of this document and license status."

G703-1992

NBDW25513

# CONTINUATION SHEET
## AIA DOCUMENT G703

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO.: 00012
APPLICATION DATE:
PERIOD TO: 3/28/2003
ARCHITECT'S PROJECT NO.: 238

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) . | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G÷C) | BALANCE TO FINISH (C - G) |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | RETAINAGE (IF VARIABLE) RATE |
| 18000.02 | CO#001 (Credit-permit, computer) | ($20,000.00) | ($20,000.00) | $0.00 | $0.00 | ($20,000.00) | 100.000 | $0.00 | ($1,000.00) |
| 18000.03 | CO#003 (Unsuitable soil) | $132,804.25 | $132,804.25 | $0.00 | $0.00 | $132,804.25 | 100.000 | $0.00 | $6,640.21 |
| 18000.04 | CO#002 (COP#1-#4) | $18,169.13 | $8,214.35 | $0.00 | $0.00 | $8,214.35 | 45.210 | $9,954.78 | $410.72 |
| 18000.05 | CCD#6 | $5,205.69 | $0.00 | $5,205.69 | $0.00 | $5,205.69 | 100.000 | $0.00 | $260.29 |
| 18000.06 | CCD#5 | $0.00 ~~$13,358,179.07~~ _$349.77_ | $4,657,556.91 | $0.00 ~~$309,041.64~~ _$349.77_ | $0.00 | $0.00 ~~$4,966,598.57~~ _$349.77_ | 37.18% | $0.00 ~~$8,391,580.50~~ | $0.00 ~~$248,329.94~~ _$17.49_ |

Handwritten annotations:
$13,354,829.28
$302,691.87
$1,960,248.78
$8,394,580.50
$248,013.4

NBDW25514


AIA DOCUMENT G703• APPLICATION AND CERTIFICATE FOR PAYMENT   • 1992 EDITION • AIA® ©1992 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK
AVENUE, N.W., WASHINGTON, D.C. 20006-5292   • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.
"This document has been reproduced electronically with the permission of The American Institute of Architects under License #7003 to Primavera Systems, Inc. Reproduction of this document without project-specific information is not permitted. Contact The American Institute of Architects to verify the current version of this document and license status."

G703-1992