UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 03-40266 CBS

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

    Plaintiff

v.

TOWN OF NORTH BROOKFIELD,

    Defendant

### DEFENDANT'S REPLY MEMORANDUM TO PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant and plaintiff-in-counterclaim Town of North Brookfield (the "Town") submits this memorandum in reply to Plaintiff's Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment (the "Opposition").

In its Opposition, AMMIC advances essentially two arguments against the award of summary judgment on the Town's counterclaim. First, AMMIC contends that there are, indeed, disputed facts regarding what types of costs it owes to the Town. Second, AMMIC asserts that it is entitled to a pro tanto discharge of certain funds because the Town made improper payments to the Contractor, E.J. Sciaba ("Sciaba") in May, 2003. Each of these arguments is entirely without merit and may be promptly disregarded.

I.    <u>The Town Seeks a Determination that AMMIC is Per Se Liable for Certain Types of Costs, Not a Ruling on the Amount of Damages</u>.

In its Motion for Partial Summary Judgment the Town seeks a ruling that AMMIC is responsible under the terms of the Performance Bond for the correction of defective work and

completion of the Contract work, including any additional legal, design professional and delay costs and liquidated damages incurred by the Town.  AMMIC contends that summary judgment is barred with respect to this issue because there is a disputed fact as to whether AMMIC has paid such costs, to the extent that they exist at all.  AMMIC's argument serves only to misdirect the Court's attention from the material inquiry.  The Town does not at this stage of the litigation seek an adjudication of what amount of money AMMIC owes to the Town.  Instead, the Town seeks only to establish that AMMIC is responsible under the Performance Bond for these certain <u>types</u> of costs.  To resolve this question, the Court need only refer to the terms of the Performance Bond, and may disregard any facts beyond those which establish that the parties did, indeed, enter into the Performance Bond arrangement.  <u>See</u> Memorandum of Law in Support of Defendant's Motion for Partial Summary Judgment at pp. 5-8.  AMMIC's assertion to the contrary is fallacious.

II.    <u>The Town Was Not Obligated to Withhold Payments From Sciaba</u>

    A.    <u>The M.G.L. c. 30, § 39K Retention Remedy is Permissive and Not Mandatory.</u>

The chief argument that AMMIC advances to support its position that it is entitled to a *pro tanto* discharge is that the Town had a "claim" against Sciaba as of May, 2003, and that, as a result, the Town was <u>required</u> to withhold certain sums from payments made to Sciaba that month and earlier.  AMMIC derives its conclusion that the Town had a claim from the premise that Sciaba had "breached" the terms of its contract with the Town by purportedly violating Sections 3.4.1 and 14.2.1of the General Conditions of the Contract.  AMMIC then cites four unrelated and inapplicable cases for the proposition that because these "claims" had accrued, the Town was required to withhold "the estimated value of the liquidated damages remedy" under G.L. c. 30, § 39K.  Opposition, p 8.  As explained below, the Town's claim for liquidated

damages had not accrued in May of 2003. Therefore, there was no breach authorizing the withholding of liquated damages.

In attempting to support its argument, AMMIC describes at length how, throughout the spring of 2003, the Town should have known of the forthcoming perils of Sciaba's performance[1]. Though the Town would dispute these facts, as it turns out they are immaterial and thus the fact that they are disputed does not preclude summary judgment in this matter. Indeed, the level of emphasis that AMMIC devotes to this argument is curious given its irrelevance. The fundamental defect of this argument, and that under which it wholly collapses, is that it fails to establish that the Town was <u>obligated</u> to withhold liquidated damages or any other sum from its progress payments to Sciaba.

AMMIC asserts that Section 39K required the Town to withhold the amount of any claims against Sciaba. Section 39K provides as follows:

> Within fifteen days (30 days in the case of the commonwealth, including local housing authorities) after receipt from the contractor, at the place designated by the awarding authority if such a place is so designated, of a periodic estimate requesting payment of the amount due for the preceding month, the awarding authority will make a periodic payment to the contractor for the work performed during the preceding month and for the materials not incorporated in the work but delivered and suitably stored at the site (or at some location agreed upon in writing) to which the contractor has title or to which a subcontractor has title and has authorized the contractor to transfer title to the awarding authority, upon certification by the contractor that he is the lawful owner and that the materials are free from all encumbrances, but less (1) a retention based on its estimate of the fair value of its claims against the contractor and less (2) a retention for direct payments to subcontractors based on demands for same in accordance with the provisions of section thirty-nine F, and less (3) a retention not exceeding five per cent of the approved amount of the periodic payment.

---

[1] Ironically, this position implies that AMMIC was not aware of Sciaba's dereliction and impending default during this time. Such a position is alarming given AMMIC's prior insistence that it was adequately informed about the project in accordance with G.L. c. 176D, § 3(9). <u>See</u> AMMIC's Motion for Summary Judgment on Count II of Defendant's Counterclaim and Memorandum of Law in Support thereof.

3

AMMIC's interpretation of this provision would make compulsory a municipality's retention of an amount of money over which, by the express terms of the statute, it has considerable discretion in determining. Such a construction is illogical and plainly inconsistent with the purpose of the statute. Section 39K provides for retention from progress payments as a remedial measure, for the benefit of awarding authorities, and may not be interpreted in a manner which would limit an awarding authority's rights or yield a detrimental result for an awarding authority. See First Nat. Ins. Co. of America v Commonwealth, 391 Mass. 321, 325 infra at pp. 13-15

   B.   AMMIC Has Failed to Offer any Legal for Support its Position

AMMIC offers no case law support for its position that the Town was required to retain funds from Sciaba. Instead, AMMIC refers to a few cases which a cursory review reveals to be entirely useless to the Court's analysis in this matter. Each merits only brief treatment. The first is City of Boston v. New England Sales Mfg. Corp., 386 Mass. 820 (1982). AMMIC cites City of Boston and Construction Contracting & Management, Inc. v. McConnell, 112, NM 372, 378 (1991) [sic] to support the notion that an owner is entitled to a contractual remedy of liquidated damages when a contractor abandons the project prior to the specified completion date. This assertion does not defeat the Town's position in this matter.

An awarding authority is not required to assess liquidated damages merely because it is entitled to do so. Moreover, the facts involved in City of Boston and McConnell render them inapplicable to this case. In each of those cases, the breach was the defendant's outright abandonment of the project. Sciaba did not abandon this Project. AMMIC's reference is also misleading. The salient issue in City of Boston was whether liquidated damages could be assessed after the passing of the completion date, when the contractor had abandoned the project prior to that date. The determination on this point is not dispositive here and could not in any

4

event provide support for the proposition that an owner is required to assess liquidated damages against a contractor for the occurrence of an event – prior to any default or completion date - that may somehow be deemed a breach of some condition of a contract.

Similarly, AMMIC cites International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 29 Mass. App. Ct. 215 (1990) for the proposition that "a breach of contract claim accrues upon the breach and not upon the infliction of damages." The Town agrees with the principle recited, but that principle does nothing to advance AMMIC's case. Indeed, it highlights why AMMIC's argument must fail. As of the time of the May payments, the time for substantial completion specified in the Contract had not yet occurred. The earliest applicable substantial completion date was August 15, 2003. See Affidavit of Lee Dore in Support of Defendant's Reply to Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Material Facts Not in Dispute and Statement of Additional Facts in Opposition to Defendant's Motion for Partial Summary Judgment (Dore Local Rule 56.1 Affidavit),¶¶ 20, 23. Thus, in May there was no breach triggering the Town's right to assess liquidated damages and the Town did not have a "claim" against Sciaba entitling it to withhold an estimated or anticipated amount of liquidated damages. Even assuming that Sciaba's conduct as of May, 2003 somehow constituted a breach of some terms of the Contract, AMMIC offers no legal precedent for its proposition that the Town was required to withhold funds from Sciaba upon such purported breach.

AMMIC also asserts that the Town improperly paid Sciaba for General Conditions in May, 2003. To the extent that it would impose a requirement on the Town to retain portions of payments under Section 39K, this argument suffers from the same critical flaw as AMMIC's liquidated damages argument. In fact, not only was the Town not required to retain such sums, it may indeed have incurred liability for a statutory violation if it had elected to do so. Bonfatti &

Co., Inc. v. Town of Rockport, 12 Mass. App. Ct. 797, 799 (1981) (town, as awarding authority for public building project, was liable for amounts withheld from contractor, with interest, where the work was approved by the Town's engineer, and by provisions of M.G.L. c. 30, § 39K such approval conclusively established the contractor's entitlement to such sums).  Given the potential for such consequences, the Town's decision not to retain sums from Sciaba's progress payments for General Conditions was entirely reasonable and consistent with the requirements and purposes of Section 39K.  This conclusion is further supported by the acknowledged discretion of an awarding authority in making progress payments.  First National Ins. Co., 341 Mass. at 325.

Finally, AMMIC contends that the Town violated G.L. c. 30, § 39F by making payments directly to subcontractors Millis Plumbing Co., Inc. and Greenwood Industries, Inc.  The Town has responded to this contention in its Memorandum of Reasons in Opposition to Plaintiff's Motion for Partial Summary Judgment as to Claims for Direct Payment (Document No. 77).  AMMIC's interpretation of the requirements of Section 39F is erroneous.

    C.    <u>Relief for AMMIC Would be Contrary to Public Policy</u>

AMMIC contends that, though Sciaba had not abandoned the Project or been declared in default by the Town in May of 2003, Sciaba was in breach of its Contract with the Town at that time, and that the Town was thus required to withhold an amount for liquidated damages from its May payments to Sciaba.  This position is irreconcilably inconsistent with important principles of public policy.  AMMIC's theory would impose inconsistent, incoherent, and ill-defined obligations upon awarding authorities in a manner not contemplated in Section 39K.  It would require awarding authorities to expend limited public resources in overzealously monitoring contractor performance to ascertain any hint of a present or prospective breach.  Such a result is

contrary to "the apparent purpose of §39K… to provide a contractor with reasonably current payment for work done in accordance with the contract." Acme Plastering Co. v. Boston Housing Authority, 21 Mass. App. Ct. 669, 676 (1986). Furthermore, it would encourage awarding authorities to more liberally retain funds from contractors, in order to avoid any future claims of impropriety by inattentive sureties. Public projects would be constantly stalled and protracted, as unpaid and disgruntled contractors and subcontractors would decline to proceed, and litigation would no doubt arise with increasing frequency. These results would run afoul of the spirit and purposes underlying Section 39K, in addition to being obviously undesirable for purely practical reasons.

III.  AMMIC is not Entitled to a *Pro Tanto* Defense Based on the Town's Payments under the Contract Because Those Payments Were Not Improper.

AMMIC urges the Court to find that it is entitled to a *pro tanto* defense under the Performance Bond on the grounds that the Town's payments to Sciaba under the Contract were improper. It asserts impropriety on three grounds: failure to withhold liquidated damages in violation of M.G.L. c. 30 s. 39K, overpayment for the general conditions portion of Sciaba's payment applications, and payment to Sciaba instead of subcontractors who had submitted direct payment demands pursuant to M.G.L.c. 30, s.39F. As set forth above, the payments in question were not improper, but plainly consistent with the Town's rights and discretion as an awarding authority for a Massachusetts public building construction project. Accordingly, AMMIC's arguments must be rejected.

AMMIC suggests that because the Contract afforded the project architect the option to withhold a certificate for payment submitted by Sciaba or to nullify a certificate previously issued "to such extent as may be necessary in the Architect's opinion to protect the Owner from loss for which the Contractor is responsible" the absence of such action by the architect, or

7

direction from the Town to the architect to take such action, constitutes a violation of the Contract, and thereby renders the Town's payments improper within the meaning of the Performance Bond. It does so in the face of Contract language clearly making the withholding or nullifying of a certificate for payment discretionary with the architect, and by relying on decisions from other states construing different contract language under different circumstances. Thus, this Court should not entertain the suggestion.

.	In <u>Standard Acc. Ins. Co.</u> v. <u>Bear</u>, 134 Fla. 523, 184 So. 97, 100 (1938) the language at issue provided that the contractor should submit with its payment application "if required, receipts and other vouchers showing his payments for materials and labor." Standard Accident was surety on the performance bond furnished by the general contractor for a <u>private</u> construction contract and had been found liable in the court below to indemnify the owner/bond obligee for the claim of a subcontractor who was not paid by the general contractor for certain materials and who had obtained a judgment against the owner. The parties agreed that the architect was aware of the subcontractor's claim, but had nevertheless approved final payment to the general contractor without requiring submission of receipts or vouchers to show that the claim had been paid. Following the architect's issuance of a payment certificate, the subcontractor served notice of a lien on the owner but the owner paid the general contractor the full amount of the payment certificate.

In ruling that the owner's payment gave the surety a *pro tanto* discharge, the court relied on the Florida lien statute and the fact that the owner's payment was a final payment and not a progress payment during the course of construction. It observed that the words "if required" did not give the owner "an option which he could arbitrarily refuse to exercise, especially after a notice of lien had been served upon him." 184 So. at 103. It noted that the intent of the contract

provision in question was to give the owner a security against liens and was "not to authorize him to pay [the subcontractor] after notice of a lien, which would be in the teeth of the statute." Id. Following this line, the court went on to say that the moment the lien notice was served on the owner, his relation to the contract balance and the general contractor changed because "the statute operated to release [the owner] from any contract obligation to pay [the contractor] and to impose an obligation on him to pay the materialman instead." Id. It declared that a court of equity would not permit a party who had it in his hands to pay his debt to benefit from his own failure to do so.

Significantly, the court also explained that since it was the final payment that was at issue the case was distinguishable from those where "the work was still progressing and the contractor needed the money to carry on." Id. Crystallizing the point, it stated that the contract term in question "should not, therefore, be construed as justifying payment in full to the contractor in the face of such a lien notice served." Id. In the present matter, it is not final payment, but progress payments that are at issue. In addition, there is no statute that would transform the Town's rights respecting payment as was found by the court in Standard Accident.

In Aetna Cas. & Sur. Co. v. Russell, 24 S.W. 2d 385 (Tex. 1930) the general contract gave the owner the right to require receipts from those furnishing materials to the contractor showing that the contractor had paid the material suppliers. It also provided that 25% of the value of materials incorporated into the construction was to be retained by the owner until "final approval and acceptance . . . of all other material and work embraced in the contract." Aetna Cas. & Sur. Co., 24 S.W. 2d at 386. When the contractor became unable to complete the job, the owner paid him the "full amount of the contract price, less the amount necessary to complete the contract." Id. Following the owner's final payment to the contractor, he discovered that the

contractor had failed to pay bills of laborers and materialmen.  The owner paid the bills and sought recovery from the contractor's surety.  Relying chiefly on the fact that the owner had made final payment to the contractor without retaining any funds on account of materials incorporated into the work, the court ruled that the surety was not liable. It stated a principle that "a surety has the right to have the retainage percentage provided for in the contract applied to the exoneration of losses sustained by breach of the conditions of the bond." Id. at 388.

     Here, again, the Town payments objected to by AMMIC were not final payments, but progress payments.  The payments were made pursuant to the applicable statute, M.G.L. c. 30, §39K, and the Town did not release to Sciaba any of the five percent retainage that had accumulated with each of Sicaba's payment applications.  As the progress payments were appropriate for the purpose of enabling the work of the Contract to continue, they cannot be labeled arbitrary or in derogation of AMMIC's interest.  See discussion of First Nat. Ins. Co. of America, infra pp. 13-15.  Indeed, AMMIC's Mr. Beatty has testified that AMMIC would not have directed the Town to refrain from making the payments on Sciaba's applications 12 and 13B because the Town had not declared Sciaba in default and such action could therefore constitute interference with contractual relations.  See Affidavit of Thomas W. McEnaney in Support of Defendant's Reply to Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Material Facts Not in Dispute and Statement of Additional Facts in Opposition to Defendant's Motion for Partial Summary Judgment ("McEnaney Reply Affidavit"), Exhibit E.  Thus, the Town cannot be said to have prejudiced AMMIC's position and AMMIC's claim to a *pro tanto* discharge is without merit.

IV.  Suretyship Principles Provide no Basis for a Discharge of AMMIC by Virtue of the Town's May, 2003 Payments to Sciaba.

AMMIC argues that principles of equity embodied in suretyship law obligated the Town to withhold from Sciaba the payments made in May of 2003. This contention cannot be sustained. The decisions AMMIC cites in support of its position are inapposite to the facts before this Court and have been eclipsed by the modern law of surety applicable to government obligees as enunciated by both the courts of Massachusetts and the federal judiciary. Federal court consideration of the rights of sureties as against bond obligees generally arises under projects subject to the Miller Act, 40 U.S.C. §270a et seq., and the Supreme Judicial Court has observed that it is "guided by numerous Federal decisions which have applied the Federal performance and payment bond statute, the Miller Act." First Nat. Ins. Co. of America v. Commonwealth, 391 Mass. at 324.

In one of those decisions, issued only weeks ago, the Court of Federal Claims repeated the oft cited principle that "[o]rdinarily, a surety must give notice to the government before the government is obliged to hold the remaining contract funds". Nova Casualty Co. v. United States, No. 04-1665C, slip op. at 17 (Fed.Cl. January 12, 2006) (a copy of which is attached to this Memorandum). It is such notice "that the contractor is in default and that the surety is invoking its rights to the remaining contract proceeds [that] converts the government to a stakeholder with duties to the surety." Id., quoting American Ins. Co. v. United States, 62 Fed. Cl. 151, 155 (2004). The decision in National Surety Corp. v. United States, 118 F. 3d 1542 (Fed. Cir. 1997), relied on by AMMIC, is an "exception to the notice rule," Nova Casualty, slip op. at 18, but the reasons for applying an exception in that case are not present here. Therefore, AMMIC's claim to a *pro tanto* discharge cannot succeed.

11

AMMIC acknowledges that even under National Surety "when the obligee has discretion with regard to payments, the surety must notify the obligee of the principal's default (or object to payments) in order to precipitate its equitable subrogation rights to any retainage and therefore an equitable duty on the part of the obligee to withhold the same." (Plaintiff's Opposition at p. 17).  It incorrectly asserts, however, that the Town was required to withhold the payments to Sciaba in the same way that the government in National Surety was required to withhold a percentage of the progress payments made to the contractor.

The contract in National Surety provided that there was to be a 10% retainage on each progress payment until a so-called project arrow diagram had been submitted by the contractor and approved by the contracting officer.  The contractor did not submit the diagram, but the government did not retain the stated 10% on progress payments.  The contractor "abandoned the project before its completion, and the government then terminated the contract for default." National Surety, 118 F. 3d at 1544.  The Federal Circuit found that the contract made withholding of retainage a requirement until approval of the arrow diagram and ruled that the failure to so withhold despite the absence of an approved arrow diagram was a change in the contract's terms. It stated that contract terms affording security for bonded contract performance "can not be ignored, waived, or modified without consideration of the surety's interests," and determined that the surety was entitled to recover the retainage because its payment to the contractor was an "improper release."  National Surety, 118 F. 3d at 1547.

In contrast, there has been no improper release here. As set forth above, the Town was not required to withhold the May payments to Sciaba.  It had the discretion to act on the payment applications within the range of options established in the Contract.  As to retainage, the only subject of the National Surety decision, the Town withheld from the May payments retainage of

5%, the amount prescribed by the Contract. Thus, there is no fault of the kind the court found significant in National Surety.

Critical to this Court's analysis is the distinctive nature of the payments being challenged by AMMIC. They are not, as was the case in National Surety, periodic payments made without consultation with the surety. Rather, they are payments made after the specific subject of the Town continuing to make payment to Sciaba had been raised with AMMIC and AMMIC declined to request or direct that the payments not be made. At the meeting of Town, AMMIC and Sciaba representatives on May 21, 2003, representatives of the Town asked AMMIC's and Sciaba's representatives if the Town should continue to make payment to Sciaba or make payment directly to AMMIC. See Defendant's Reply to Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Material Facts Not in Dispute, at Defendant's Statement of Additional Facts in Reply to Plaintiff's Response, ¶¶ 23-24. The response was that payment should be made to Sciaba to enable it to cover its own payment requirements for the Project. Id. at ¶ 25. Thus, AMMIC has no cause to complain that the May payments were improper and cannot by virtue of its subrogation rights charge the Town for the amount of those payments.

AMMIC's suggestion that the Supreme Judicial Court would hold that the Town was required to withhold payments from Sciaba in the same way that the National Surety court found the United States bound is completely undercut by the decision in First National, the facts of which are similar to those here. In that case, the surety on a construction project at the University of Massachusetts sent a mailgram on September 30 to the contracting authority, the Bureau of Building Construction, stating that the contractor was in default for failure to pay subcontractors and suppliers and requesting that the Commonwealth make no further payments to the contractor without the surety's consent. The mailgram was received on October 2 and on October 3 the

13

surety sent a confirmatory letter.  Also on October 3, the Commonwealth issued a progress payment check to the contractor, in the amount approved by the project architect and the Bureau's construction engineer, for a payment application that had been submitted on September 9.  At a meeting between representatives of the surety and the Bureau on October 16, the surety stated it intended to take over performance of the contract and asked for information on the contract balance.  The Bureau's attendees provided a dollar figure, but did not mention the recently issued check, and the surety did not inquire about any recent payments to the contractor.  Ultimately, the Bureau terminated the contract and the surety undertook to complete the work.  The surety paid claims of subcontractors and suppliers and brought suit against the Commonwealth to recover the amount of the October 3 progress payment, alleging that the payment violated its subrogation rights to the contract funds.

     The court first distinguished a surety's rights respecting progress payments from those respecting contract funds retained by the government after completion of the work.  It cited with approval the following language from Argonaut Ins. Co. v. United States, 434 F. 2d 1362, 1367-1368 (Ct. Cl. 1970):

> During performance, the Government's role is substantially different from that of a mere stakeholder of a final contract payment.  The [Government] has an important interest in the timely and efficient completion of the contract work.  In furtherance of this interest, the Government contracts for a broad range of rights which are designed to promote continuation of the contract work.  These provisions give the Government considerable discretion and flexibility in administering the contract.  Public policy supports this flexibility in light of the various unforeseen circumstances which may hinder performance.  During the performance of the contract the Government has a duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other problems encountered in the administration of the contract.

    Noting that the Argonaut Ins. court held that the government's refusal to terminate its contract  and its decision to issue a progress payment without first securing the surety's consent

and contrary to the surety's request were within the government's range of discretion, the Supreme Judicial Court then repeated the trial judge's statement of the law:

> Even where the Commonwealth knows, or should know, that a contractor has serious financial difficulties, the Commonwealth does not become obligated either to withhold progress payments or to declare the contractor in default at the surety's request . . . so long as the progress of the contractor on the job is satisfactory to the Commonwealth and it has good reason to believe that the Contract will be completed. 391 Mass. at 326.

In declaring its decision, the court addressed the surety's contention that the Commonwealth was obligated to withdraw the October 3 payment by stopping payment on the check. It ruled that equitable considerations did not require adoption of a rule compelling the government to stop payment on a rightfully issued progress payment check "at least in the circumstances of this case, where prior to payment of the check the Surety neither inquired whether a payment had recently been made nor brought to the Bureau's attention the possibility of stopping payment on the check." Id. at 327.

In this action, adoption of the government obligation proposed by AMMIC is even more inimical to the principles endorsed in the First National case. Here, there was no request by AMMIC for the Town to make no further payments to Sciaba or to otherwise limit progress payments that would be made in the ordinary course of the project. See Defendant's Reply to Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Material Facts Not in Dispute, at Defendant's Statement of Additional Facts in Reply to Plaintiff's Response, ¶¶ 18-19; McEnaney Reply Affidavit, Exhibit E pp. 61-62. Moreover, this was the case despite the fact that the Town directly inquired of AMMIC's representatives as to whether the Town should continue to make payments to Sciaba. See Defendant's Reply to Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Material Facts Not in Dispute, at Defendant's Statement of Additional Facts in Reply to Plaintiff's Response, ¶¶ 23-25. Where the Town gave AMMIC the opportunity to give direction

15

regarding progress payments and AMMIC neglected to do so it cannot be said that the Town did not consider the surety's interest or acted outside of its discretion. See 391 Mass. at 325. Indeed, the Town acted consistently with the position of AMMIC and Sciaba that payment should be made to Sciaba to enable it to meet its financial obligations on the Project. Therefore, AMMIC can not meet its "unusually heavy burden of proof in showing that the determination made [regarding payment] was arbitrary and capricious." Balboa Ins. Co. v. United States, 775 F.2d 1158, 1164 (Fed. Cir. 1985).

AMMIC's assertion that the Town had an equitable duty to AMMIC that it breached because it was aware of Sciaba's difficulties is unavailing. AMMIC was aware of these same difficulties for it had received the Town's demand letter of April 23 and its representatives had attended the meeting of May 21, 2003. The Town was not possessed of superior knowledge, as AMMIC contends. This argument is belied by AMMIC's representation that it undertook action to investigate Sciaba's performance in February of 2003 (Plaintiff's Statement of Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment on Count II of Defendant's Counterclaim, ¶ 5) and the statement in the affidavit of Richard Anastasio in Support of Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment that he visited the Project site in March of 2003 and on May 13, 2003. Accordingly, AMMIC's claim that it was led to refrain from giving any notice to the Town solely as a result of alleged statements that the Town would not release payments until Sciaba had submitted a new schedule is insupportable.

V.      The Town Did Not Fail to Mitigate its Damages.

For the same reasons that AMMIC cannot sustain its argument that the Town's payments to Sciaba in May of 2003 contravened AMMIC's rights as a surety, the assertion that the Town violated a duty to mitigate damages is without merit. It cannot be the case that a surety who

declines to issue a directive regarding the obligee's payments to the contractor, or to offer any specific recommendation regarding such payments, has standing or justification to claim that the obligee failed to mitigate its damages when it did make payments in the ordinary course under the bonded contract. Accordingly, AMMIC's argument must be rejected.

VI.  <u>Facts Upon Which AMMIC Relies for its Pro Tanto Discharge Argument are Not in Dispute.</u>

The Town submits that the material facts bearing on AMMIC's claim of entitlement to a *pro tanto* discharge are clear, and that the applicable law warrants a conclusion that the Town acted within its rights as an awarding authority under a Massachusetts public building construction contract. The suggestion that AMMIC relied, without further inquiry, on alleged statements by Town representatives at the May 21, 2003 meeting that no further payments would be made without Sciaba's submission of an updated schedule is unavailing. Even assuming that such a statement was made, Mr. Beatty's subsequent deposition testimony makes it immaterial. He stated that AMMIC would not have directed the Town to refrain from paying Sciaba because the Town had not declared Sciaba in default and such direction could constitute interference with Sciaba's contractual relations. McEnaney Affidavit, Exhibit E. For the same reason, Mr. Beatty's contention that he asked the Town's representatives at the May 21 meeting to advise him before any payments were to be made to Sciaba (Affidavit of Stephen J. Beatty in Support of Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment, ¶ 5) does not preclude the granting of the Town's motion for partial summary judgment on the issue of *pro tanto* discharge.

TOWN OF NORTH BROOKFIELD

By its attorneys,

/s/Thomas W. McEnaney
David J. Doneski (BBO# 546991)

                                       Thomas W. McEnaney (BBO# 629130)
                                       Peter L. Mello (BBO# 659680)
                                       Kopelman and Paige, P.C.
                                        Town Counsel
                                       31 St. James Avenue
                                       Boston, MA 02116
                                       (617) 556-0007

Date:  February 2, 2006