**EXHIBIT A**



1795 WILLISTON RD. STE. 5 •S. BURLINGTON, VT 05403
Phone (802) 863-1428 •Fax (802) 863-6955

1400 HANCOCK STREET, QUINCY, MA 02169
Phone: (617) 471-2897 • Fax: (617) 471-2516

29 WATER STREET, SUITE 304 •NEWBURYPORT, MA 01950
Phone: (978) 499-2999 • Fax· (978) 499-2944

# MEETING NOTES

| | |
|---|---|
| **DATE OF MEETING:** | 21 May 2003 |
| **PROJECT:** | North Brookfield Jr/Sr High School<br>D&W Project No. 00-404A |
| **SUBJECT:** | Status and Progress of Construction Meeting held in High School Library at 2:50p.m. |

**ATTENDING:**

| | |
|---|---|
| Ed O'Malley | Principal |
| Robert O'Neill | Superintendent of Schools |
| Don Gillette | Building Committee, Co-Chair |
| Edward Wilkins, Jr. | Building Committee |
| Greg Kline | Building Committee |
| Larry Hasenfus | Selectman |
| Michael P. Sheehan | E.J. Sciaba |
| Matt Daly | E.J. Sciaba |
| Mike Haynes | E.J. Sciaba |
| Bert Capone | Attorney for E.J. Sciaba |
| Ken Walton | Attorney for Dore and Whittier, Inc. |
| Thomas W. McEnaney | Kopelman and Paige |
| Deborah Griffin | Holland and Knight, Attorney for Surety |
| Richard Anastasio | Greyhawk/Kemper Surety |
| Stephen Beatty | Kemper Surety |
| Tom Barden | Dore and Whittier, Inc. |
| Chris Conway | Dore and Whittier, Inc. |
| Lee P. Dore | Dore and Whittier, Inc. |
| R. John Dore | Dore and Whittier, Inc. |
| Harald Aksdal | Dore and Whittier, Inc. |

1. Tom McEnaney opened the meeting with an introduction. All present introduced themselves. Basically, the meeting was held to address Owner concerns with the progress of the construction and to, generally and specifically, address items in the letter from the Owner to Kemper Surety dated 23 April 2003.

Status and Progress of Construction Meeting held in High School Library
Held on 21 May 2003

2.  Neither the Surety nor EJS attorney had received a copy of the letter. Copies were made and distributed and time was allowed for EJS representatives and Surety representatives to review the letter.

3.  It was noted that Ed Sciaba was unable to attend this meeting.

4.  Owner questions presented to EJS: What is EJS going to do to bring this project back on schedule? When will it be completed? Will staffing be changed and/or increased? Will monies owed to subcontractors and suppliers be paid?

    a.  Staffing change has taken place and a new project manager has been assigned to this project.
    b.  A new schedule and recovery is being worked on, however no firm date as to when the schedule will be complete. However, a firm schedule will be provided prior to the next requisition.
    c.  EJS noted the major problem with this job has been cash flow and related to that has been three other joint venture projects, which consumed EJS cash, and are now concluded.

5.  Owner question to the Surety: Is Kemper Surety stepping in to assist EJS?

    a.  EJS is putting together a review and report of the company's financial status for the Surety's review. The report is due to the Surety this Friday (23 May 2003). Surety will review report to determine what and if assistance is required.
    b.  Owner noted concern that letter from them to Kemper is a month old, why such a late reaction? No answer was given.

6.  Open discussion:

    a.  Reference was made to the last partnering session (October 2002), and basically EJS was given the opportunity to set their own schedule. The milestones that were given by EJS have not been met.
    b.  EJS referenced cash flow problem; not getting March requisition monies and not getting April requisition monies and structural steel delays as major causes of scheduling problems.
    c.  It was noted that required Release of Liens were not submitted and the pencil requisition for March was not provided to Dore and Whittier for review until 7 April 2003.
    d.  EJS questioned procedure of requiring liens. Owner stated it was a contract requirement.
    e.  It was noted that scheduling problems and paying of subcontractors and vendors has been an issue long before this March/April 2003 requisition.
    f.  EJS noted concern of some subcontractors for payment was unrelated to this project.

Prepared on 7/21/2004

Status and Progress of Construction Meeting held in High School Library
Held on 21 May 2003

7.     EJS's attorney asked: what are the issues? Owner noted the letter of 23 April defined
       Owner's concerns. It was decided to review the letter of 23 April 2003, item by item (10
       items) and to identify if item is basically a scheduling issue or a funding issue.

       **Item (1) Draw Down Schedule:** Draw Down Schedule and Construction Schedule are
       being worked on. Both will be submitted with the next Application for Payment. This
       item is a scheduling item and will require time to update. EJS noted that the Substantial
       Completion date can be met. Meeting requirements will be difficult, but November is
       accurate. EJS further noted that cash flow is the major problem, however hopefully a
       solution is at hand.

       **Item (2) Staffing:** EJS does not feel there is or has been a staffing problem. Owner
       noted that by using the average of requisition amounts paid that all indications are that
       staffing for this project is low. EJS noted staffing will increase dramatically once the
       structural steel phase is completed. Also, EJS noted a majority of materials are on site
       and ready to be installed. It was noted this is a funding issue as the cash flow problem
       has directly affected staffing.

       **Item (3):** EJS is reviewing the proposal request log and PR's issued and related CCD's.
       EJS noted they do not agree with the procedure of how PR's and CCD's were handled
       even if it is part of the contract. Owner noted "...as per contract we have the right..."
       EJS noted: "...will be responding in detail in a couple of weeks..." Kemper Surety
       requested info. in relation to Proposal Request, CCD and timeline.

       **Item (4):  Concern for flow of information from EJS to the subcontractors:** EJS has
       reviewed and forwarded all information from the Architect to the subcontractors. Some
       replies have been received and EJS is waiting for all subcontractor replies before
       reviewing with the Architect.

       **Item (5)  Concern for subcontractor payment of funds:** Greenwood Roofing was
       discussed and how they are expected back on site once they have been paid. EJS is
       waiting for their return. This is a funding issue.

       **Item (6):** Scheduling item was addressed previously. See Item (1) above.

       **Item (7):** Note EJS will have new project manager at job meetings and this will be his
       only project. EJS noted this item is a past issue and is now resolved. This is a staffing
       issue.

       **Item (8):** Concern for the past condition of the Application for Payments appears to have
       been corrected with the new project manager and evidenced by the April requisition
       application submitted.

       **Item (9):** EJS noted that the issue with payment of benefits for employees on site has
       been cleared up.

Status and Progress of Construction Meeting held in High School Library
Held on 21 May 2003

**Item (10) Project Schedule and Completion:** Concern expressed for latest schedule submitted by EJS and inadequately of schedule in sequencing of work, milestones not met and scheduling window installation before walls are up; painting walls before they are installed etc. EJS noted to refer back to Item (1).

8.    Kemper Surety requested copies of direct payment claims and claims of subcontractors and vendors who say they have not been paid. Owner will provide.

9.    Discussion on project time frame and recovery; EJS noted the following:

    a.    Structural steel erection set project back.
    b.    Hard winter and wet spring set project back.
    c.    EJS realizes they have a lot of work to do.
    d.    Structural steel issue is behind them now.
    e.    Roofer getting back on site is critical.
    f.    As noted previously, a lot of material is on site ready to be installed.

10.    EJS repeated that their major problem right now is cash flow. Kemper Surety noted that they will review with EJS the status and condition of this project, and they realize their assistance will be required. What is required will be determined by Surety with EJS. Surety will keep Owner informed of the situation.

11.    Owner expressed the following concerns:

    a.    Anticipate late completion of this project.
    b.    Continued inaccurate schedule with unrealistic milestones and less than honest information.
    c.    November completion does not seem realistic.
    d.    Continued promises with no on site construction results.

12.    Owner requested that EJS provide and document a real schedule.

13.    EJS noted that the new project manager, Matt Daly, will be full time on this project and that North Brookfield is his only project.

14.    Owner asked what involvement the Surety would have in this project. Surety noted that that is yet to be determined and will be after review with EJS.

15.    Owner asked what plans Surety had if EJS fell apart and/or can't right the ship? Kemper Surety does not plan or foresee that as a possibility at this time. Up to now the Surety has seen this as a "quiet job". Surety did note however that this project "…should have come to my attention and didn't."

Status and Progress of Construction Meeting held in High School Library
Held on 21 May 2003

16.   Owner requested information on the reporting and monitoring procedures, specifically in
      reference to this job and EJS. Kemper Surety noted the following:

      a.    Sureties are financial in nature and hire consultants to review actual construction
            projects.
      b.    Sureties do not monitor construction schedules.
      c.    Sureties normally wait for their clients and/or Owners to notify them of concerns
            before they react.
      d.    This project is now "beeping on Kemper's radar".

17.   It was noted that this project is frustrating to the Owner and Design Team especially as it
      related to EJS meeting schedules and deadlines. Surety noted they will provide
      assistance as needed to EJS, and will expect EJS to follow through.

18.   It was verified that there are two substantial completion dates:

      a.    15 August 2003 for the new building.
      b.    15 December 2003 for the entire project including demolition of the existing
            building and related site work.
      c.    It was further noted that liquidated damages are set at $1000.00 per day. For the
            building completion and additional $1,000.00 per day for the site completion.

19.   Kemper Surety requested a copy of the contract, special conditions and change orders.
      Owner will provide through the Architect.

20.   EJS request response to their request for winter delay. D&W will verify.

The above is my summation of our meeting. If you have any additions and/or corrections, please
contact me for incorporation into these minutes. After 10 days, we will accept these minutes as
an accurate summary of our discussion and enter them into the permanent record of the project.

Sincerely,

**DORE AND WHITTIER, INC.**
Project Managers • Architects

Harald Aksdal, AIA
Project Architect

HA:elc

cc:   Mr. Ed O'Malley, Principal, North Brookfield Public Schools
      Mr. Robert O'Neill, Superintendent of Schools
      Mr. Chris Conway, Construction Manager
      RJD/JFT/LPD/GOJ/File

Prepared on 7/21/2004                                              page 5 of 5

**EXHIBIT B**

A    Yes.  He introduced himself that way along with I guess
     Mike Sheehan at the time.

Q    Was there any representation by Sciaba or anyone on
     Sciaba's behalf that they would be able to complete the
     North Brookfield project at the May twenty-first, 2003
     meeting?

A    No.

Q    Was there discussion concerning cash flow issues that
     Sciaba was having at that meeting?

A    On that particular project, yes.  Obviously Mr. Capone
     and Mr. Sheehan had indicated they were looking for the
     pending payments, and of course I heard the town's
     position that it was making a condition.

Q    Wasn't the condition that was placed on the pending
     payment requisitions the failure of Sciaba to produce
     lien waivers that were required?

A    That was one of them, that the schedule was also -- I
     don't know that I heard a distinction in importance
     between the two.

Q    Did the -- was the representation made, that you recall,
     that the schedule would come with the next payment
     requisition that Sciaba was submitting to the town?

A    With it?  I don't know that I recall that being a
     condition, that it would come with it.  Certainly it was

1      withheld had in fact been released.

2           That was -- that was the main topic of

3      that discussion.

4  Q   (By Mr. McEnaney)  Okay.  And subsequently have you had

5      further conversations with Mr. Beatty about that?

6  A   About the payments and about --

7  Q   Just about the May twenty-first meeting.

8  A   Yes.

9  Q   And when were those discussions?

10 A   Over the course of the last two years I would say we've

11     had that discussion on and off a number of times.

12 Q   Was it the same substance that you just testified to or

13     did you discuss other matters?

14 A   Pretty much that --

15 Q   Okay.

16 A   -- particular subject.

17 Q   Did you discuss any other issues besides the release of

18     payments in May or was that primarily the discussion?

19 A   That was the primary.  That was the primary subject.

20 Q   At that meeting in May, 2003, did the surety at any time

21     ask the town to withhold payments from Sciaba?

22 A   Not that I recall, no.

23 Q   Did the surety at any time ask the town to make payments

24     to the surety as opposed to Sciaba?

1   A   The surety did not make that request, no.

2   Q   Did it ask the town to make checks jointly payable to

3       Sciaba and the surety?

4   A   It did not, and -- no.

5   Q   Okay.  Are those all options that were available to the

6       surety at that time?

7               MS. GRIFFIN:  Objection.

8               THE WITNESS:  At that time, absent a

9       default and absent a -- absent a default or a

10      specific demand by the obligee, I don't know

11      that that wouldn't have been viewed as

12      interference, you know, by the surety at that

13      particular time or prejudicial to Sciaba.

14  Q   (By Mr. McEnaney)  And when you say interference or

15      prejudicial to Sciaba, what do you mean by that?

16  A   Well, the condition imposed upon the release of the

17      payment was specifically related to performance, or

18      his -- you know, a condition that was required under your

19      contract, produce the lien waivers and, you know, produce

20      an updated schedule.

21          So being a contractual matter, the surety is not

22      obligated at that point to make that request.  In fact,

23      can be -- it just is not something that they would do.

24  Q   So you're saying they're not obligated to do it, but

1    could they do it --

2              MS. GRIFFIN:  Objection.

3    Q    (By Mr. McEnaney)  -- is the question.

4              MS. GRIFFIN:  Objection.

5              THE WITNESS:  Could they do it?  If

6         there was a specific request made by -- there

7         would have to be, you know, certain conditions

8         and circumstances made where it is a

9         three-party contract and so as not to impune

10        the rights of one of the three parties, I

11        think it would almost have to be by mutual

12        agreement.

13   Q    (By Mr. McEnaney)  Did the surety ever have any

14        discussions with Sciaba related to having payments made

15        to a custodial account or to the surety or jointly to

16        Sciaba and the surety in May of 2003?

17   A    Not at that time, no.

18   Q    Subsequently were there any discussions in that regard?

19   A    What do you mean subsequently?

20   Q    After the May twenty-first, 2003 meeting.

21   A    Well, I guess within actually a request -- you know what?

22        Can you repeat the exact question again?

23             MR. MCENANEY:  Can you read that back,

24        please?

                    (Court reporter read back question).

                    THE WITNESS:  Not for custodial

          payments, no.

Q    (By Mr. McEnaney)  For joint payments?

A    Not joint payments, no.

Q    For any issues concerning upcoming or pending payments to

     Sciaba?

A    Pending payments?  No.

Q    So what were the discussions about, then?

A    Well, there was a request for financing and concurrent

     with a -- a voluntary notice of default.

Q    Okay.  And we can -- we'll talk about that.

A    It was about a week later.

Q    Okay.

A    It was about -- actually, it was thereafter.  I'm not

     quite sure of the timing.

Q    Now, you testified that you have worked on a number of

     projects involving surety in your capacity at Gray Hawk.

     In your experience have any sureties ever required

     payments be made to them instead of the contractor or to

     have checks made jointly to the surety and the contractor

     prior to a default?

                    MS. GRIFFIN:  Objection.

Q    (By Mr. McEnaney)  A formal declaration of default?

ERRATA SHEET
Deposition of Richard P. Anastasio

I, Richard P. Anastasio, do hereby certify that I have read the foregoing transcript of my testimony taken on May 19, 2005, and further certify that, subject to the following list of corrections, said transcript is a true and accurate record of said testimony.

Signed under the pains and penalties of perjury.

Dated this 14th day of July, 2005.

Richard P. Anastasio

LIST OF CHANGES

| Page/Line | Change | Reason |
|---|---|---|
| Throughout | Change "Gray Hawk" to "Greyhawk" | Spelling |
| Throughout | Change "Dorr" to "Dore" | Spelling |
| 5:11 | Change "Wood Hull" to "Woodhull" | Spelling |
| 8:2 | Delete "situations" | Stenographic |
| 9:10 | Change "were" to "or" | Stenographic |
| 10:10 | Change "Doreen" to "Dore &" | Stenographic |
| 13:2 | Change "Grummond" to "Grumman" | Stenographic |
| 13:3 | Change "McDonald" to "McDonnell" | Stenographic |
| 19:1 | Change "Lunderman" to "Lumbermens" | Stenographic |
| 19:23 | Change "Chemical" to "Chemico" | Stenographic |
| 21:8, 9 | Change "Professionals," to "Professional" | Stenographic and punctuation |
| 24:6 | Add "recall any." | Stenographic |
| 24:10 | Change "agreed" to "agree" | Stenographic |
| 24:19 | Insert "only" after "could" | Stenographic |
| 25:13 | Should say: "way it evolved.  It was not one task.  They were all kind of going" | Stenographic and punctuation |
| 25:17 | Change "or" to "and" | Stenographic |
| 26:15 | Change "where" to "the way" | Stenographic |
| 27:3-4 | Change "Iantuano" to "Iantuono" | Spelling |
| 27:5-6 | Change "Remeau" to "Rameau" | Spelling |
| 28:3 | Add new sentence after "Tunnel" When the Obligee rescinded its declaration of default, Greyhawk and the Surety completed the work with the Surety's Bond Principal . | Clarification |
| 29:11 | Change "five, six" to "-5, -6" | Spelling |
| 31:11 | Change "got" to "that got me" | Stenographic |
| 31:22 | Change "incidence" to "incident" | Stenographic |
| 32:15 | Insert "reason" after "the" | Stenographic |
| 33:4 | Change "he's" to "he was" | Stenographic |

| 147:13 | Change "this deal" to "the steel" | Stenographic |
|---|---|---|
| 155:24 | Change "the" to "there" | Stenographic |
| 157:16 | Change "Remeau" to "Rameau" | Spelling |
| 166:4 | Change "rec's" to "req's" | Stenographic |
| 174:16-17 | Should say: "paper that asked them to advise me of the completion dates on which they based their most competitive price to complete." | Memory refreshed. |
| 180:3 | Change "Dalbare" to "D'Albert" | Spelling |
| 185:22; 186:1 | Should say: "I did not discuss the specific dates in the agreement but I discussed the request that the bidders advise me of the completion dates on which they based their most competitive price to complete." | Memory refreshed |
| 186:19-187:3 | I now recall that I did not specify a different set of dates for the best and final round. Instead, I asked that the bidders advise me of the completion dates on which they based their most competitive price to complete. | Memory refreshed. |
| 197:19, 22 | Change "Maher" to "Meagher" | Spelling |
| 198:5 | Change "Maher" to "Meagher" | Spelling |
| 204:6 | Change "this deal" to "the steel" | Stenographic |
| 205:15 | Change "allucidate" to "elucidate" | Spelling |
| 212:14 | Change "must" to "would" | Stenographic |
| 219:19 | Should say: "That's not something you would see if the work was done properly." | Stenographic |
| 235:5 | Delete "in terms" | Stenographic |
| 238:3 | Change "strong" to "smart" | Stenographic |
| 238:12 | Change "appoint" to "opine" | Stenographic |
| 240:21, 22 | Change "subbidder" to "sub-bidder" | Punctuation |

# 3047421_v1
431261.00002

**EXHIBIT C**



**North Brookfield Public Schools**
**Office of the Superintendent**
10 New School Drive, North Brookfield, MA 01535
Telephone (508) 867-9821 Fax (508) 867-8148
e-mail ~ roneill@nbschools.org



May 30, 2003

Mr. Stephen Beatty
American Manufacturers Mutual Insurance Company
One Kemper Drive
Long Grove IL 60049
Bond No. 3SE057856

Dear Mr. Beatty:

As a follow-up to our meeting of 21 May 2003, please accept this summation of the events.

1. The meeting was held to address the concerns documented in the letter from the owner to Kemper Surety dated 23 April 2003.
2. E J Sciaba was not in attendance.
3. A new project manager, Matt Daly, has been assigned on a full time basis.
4. A new project schedule will be completed and provided no later than the next application for payment request.
5. E J Sciaba will provide Kemper with a report on the company's financial status by Friday 23 May 2003.
6. Lien requirement procedures are a contract requirement.
7. The delayed processing of payment for March 2003 was due to lacking lien information and a late submission (7 April 2003) by E J Sciaba.
8. E J Sciaba project superindent (Mike Haynes) indicated that November 2003 is a reasonable, accurate substantial completion date for the building.
9. Kemper Surety (Stephen Beatty) would like information on the PR's and CCD's.
10. The return of Greenwood industries is a funding issue.
11. Front end specification documents have been transmitted to your office as requested.

If you have any corrections, please contact me for incorporation into these minutes.

Sincerely,

Robert O'Neill, Superintendent of Schools

c.c.     Tom McEnaney
         Jim Murray
         Lee Dore
         Bert Capone
         Mike Sheehan

**EXHIBIT D**

12:51:43    1    from the May 21st meeting?

12:51:46    2        A.  Pretty much so.

12:51:47    3        Q.  Now, who said something about Sciaba's

12:51:52    4    financial issues being behind them?

12:51:54    5        A.  I believe -- I'm trying to think.  I'm not

12:52:07    6    sure if it was Mr. Sheehan or Mr. Daly, but I

12:52:11    7    believe the Sciaba representatives provided that

12:52:17    8    information.  As I recall, it may have been

12:52:24    9    Mr. Sheehan specifically.

12:52:26   10        Q.  And did he -- Are those the words he used,

12:52:32   11    or is that what you took from his remarks?

12:52:34   12        A.  That's probably my interpretation of his

   52:38   13    remarks.

12:52:38   14        Q.  You said that Sciaba gave assurance that

12:52:43   15    they would still meet reasonable deadlines.  Who

12:52:46   16    said that?

12:52:46   17        A.  Again, I would -- I can't recall

12:52:52   18    specifically, but I would guess it was Mr. Sheehan

12:52:57   19    or Mr. Daly.

12:52:59   20        Q.  Did you believe the assurance that Sciaba

12:53:07   21    would still meet reasonable deadlines?

12:53:10   22        A.  I had no reason not to believe it given the

12:53:15   23    fact that Sciaba and the surety were both present

12:53:20   24    and were expressing optimism that things would get

LegaLink Boston

Robert J. O'Neill                                    05/23/2005

94

| 1?:53:25 | 1 | better. |
| 12:53:26 | 2 | And I guess we were consistently |
| 12:53:27 | 3 | optimistic through the process and hoped that an |
| 12:53:32 | 4 | infusion of funds and manpower would allow the |
| 12:53:36 | 5 | project to be successful. |
| 12:53:38 | 6 | Q. Did anybody say what Sciaba thought |
| 12:53:41 | 7 | reasonable deadlines were that they would meet? |
| 12:53:43 | 8 | A. I don't recall specifically. October, |
| 12:53:54 | 9 | November rings a bell. Along those lines. |
| 12:53:57 | 10 | Something that was still doable. |
| 12:54:06 | 11 | Q. And October or November of 2003? |
| 12:54:09 | 12 | A. I believe so. |
| 54:10 | 13 | Q. And October or November 2003 they would |
| 12:54:16 | 14 | complete the new building; is that what you |
| 12:54:19 | 15 | understood them to say? |
| 12:54:19 | 16 | A. I believe so. |
| 12:54:20 | 17 | Q. And that would be within the substantial |
| 12:54:24 | 18 | completion date; is that right? |
| 12:54:26 | 19 | A. I'm not exactly sure. |
| 12:54:31 | 20 | Q. Now, you said that you heard or |
| 12:54:37 | 21 | understood -- Strike that. |
| 12:54:38 | 22 | You said you understood the surety to |
| 12:54:40 | 23 | say it could provide the necessary support for |
| 12:54:44 | 24 | Sciaba to complete, but you didn't hear them say |

LegaLink Boston

Robert J. O'Neill                                    05/23/2005

95

| | | |
|---|---|---|
| 12:54:47 | 1 | that they had made a decision to do that, did you? |
| 12:54:50 | 2 | A.  No, I don't believe so. |
| 12:54:52 | 3 | Q.  Did you hear anyone at the meeting say that |
| 12:54:58 | 4 | Sciaba was going to be unable to complete? |
| 12:55:04 | 5 | A.  I don't believe so. |
| 12:55:06 | 6 | Q.  Do you recall anything of the discussion |
| 12:55:17 | 7 | about what needed to happen before the town would |
| 12:55:21 | 8 | release payments to Sciaba? |
| 12:55:23 | 9 | A.  The lien waivers had to be provided before |
| 12:55:33 | 10 | payment could be made. |
| 12:55:40 | 11 | Q.  Wasn't it also stated that a new realistic |
| 12:55:44 | 12 | schedule needed to be submitted before payment would |
| 55:47 | 13 | be made? |
| 12:55:47 | 14 | A.  I don't believe so.  The schedule was always |
| 12:55:52 | 15 | part of the discussion, but I don't recall, at least |
| 12:55:58 | 16 | as I recollect, that it was ever a requirement that |
| 12:56:01 | 17 | the lien waivers were the sole requirement -- |
| 12:56:03 | 18 | contractual requirement in order to provide payment. |
| 12:56:09 | 19 | Q.  Do you recall any other discussion about |
| 12:56:19 | 20 | payment to Sciaba? |
| 12:56:30 | 21 | A.  Not really. |
| 12:56:31 | 22 | Q.  Do you recall the surety's representative |
| 12:56:33 | 23 | asking to be advised if the town was planning to |
| 12:56:36 | 24 | make any payments to Sciaba? |

LegaLink Boston

Robert J. O'Neill                                    05/23/2005

96

| | | |
|---|---|---|
| 12:56:40 | 1 | A. I don't recall specifically. |
| 12:56:50 | 2 | Q. Do you recall Sciaba discussing what steps |
| 12:57:04 | 3 | it needed to take before it could prepare and submit |
| 12:57:07 | 4 | a new schedule? |
| 12:57:12 | 5 | A. I recall some discussion, yes. |
| 12:57:13 | 6 | Q. What do you recall about that? |
| 12:57:15 | 7 | A. As I recall, there were assurances that they |
| 12:57:20 | 8 | would provide a schedule, an updated schedule. |
| 12:57:33 | 9 | Q. Do you recall their enumerating steps they |
| 12:57:39 | 10 | needed to take before they would be in a position to |
| 12:57:41 | 11 | do that? |
| 12:57:42 | 12 | A. Not specifically. I do recall the emphasis |
| 57:52 | 13 | on Matt Daly being there full-time and having the |
| 12:57:59 | 14 | ability to provide appropriate schedule information. |
| 12:58:08 | 15 | Q. Now, before we went back on the record after |
| 12:58:11 | 16 | the lunch break you reviewed Exhibit 51, did you |
| 12:58:15 | 17 | not? |
| 12:58:16 | 18 | A. This one here? |
| 12:58:19 | 19 | Q. Right. |
| 12:58:22 | 20 | Is that yes? |
| 12:58:23 | 21 | A. Yes. |
| 12:58:23 | 22 | Q. Have you seen Exhibit 51 before today? |
| 12:58:33 | 23 | A. I believe, yes. |
| 12:58:35 | 24 | Q. When did you first see a copy of Exhibit 51? |

LegaLink Boston