**EXHIBIT E**

A    I don't know if it's a summation, it hits some of the
points, and --

Q    Well, do you agree with Mr. O'Neill's characterization
as to what occurred at the meeting?

A    Well, it's a little more like bullet points.  Here's an
issue, here's an issue, here's an issue.

Q    Is there anything in there that you specifically
disagree with?

A    Well, only that it's really kind of incomplete.

Q    Did you --

A    Let me see here, first.  I'd have to study this in
connection with other materials to see if I buy on to
each and every item here, but --

Q    Did you respond to Mr. O'Neill's letter?

A    I don't recall responding to it.  I'd have to look at
the file.

Q    Now, at that meeting that occurred on May 21st, did you
ask the town to withhold payments from Sciaba?  Any
future payments that would have been due under the
contract?

A    I don't specifically recall asking them to withhold,
but I believe I did ask them to advise us before any
payments were in fact going to be made.

Q    Did you ask the town to make any payments to -- any

payments that would have become due and owing to Sciaba

to the surety instead of Sciaba?

       MS. GRIFFEN: Objection.  Can I hear that

again?

       MR. MCENANEY: Could you read that one back,

please?

     (Stenographer reads back prior question)

A    I don't recall specifically asking them to do that at

that juncture, merely just asking -- asking that they

advise us before they make any payment, period.

Q    Did you ask the town to make checks jointly payable to

the surety and Sciaba on the project at that time?

A    I don't recall that.

Q    And, those are all options that you could have

selected, correct?

A    Not necessarily.

Q    And, why do you say that.

A    You hadn't -- you hadn't defaulted Sciaba at that point

in time, and a surety does run a number of risks, and

faces a number of problems when you start directing an

owner to do something in the middle of a contract that

has not been formally terminated by the owner.

Q    Have you ever directed an owner on a project to make

payments to the surety, as opposed to the general

about matters involved in that meeting.

Q    Does Mr. Anastasio concur with your recollection that
     you made a request to the town to notify you of
     payments prior to issuing such payments?

A    I don't know that I specifically asked Rick if he had
     that recollection or not.

Q    Why didn't you ask the town to withhold payments, or
     make payments to the surety instead of Sciaba, or make
     checks jointly payable to the Sciaba and the surety at
     that time?

A    Have you heard of interference of contract?  We're not
     a party to that contract.  Until such time as the town
     takes the formal, necessary steps under the contract,
     and under the bond, to declare Sciaba in default, we're
     not a party to that contract.  Now, Sciaba can let us
     in, but sureties run a great risk if they try to impose
     themselves into the contract before it has been, you
     know, basically placed in their lap with the necessary
     termination and default that the contract requires.

Q    Was Sciaba in default in May -- on May 21, 2003 of its
     contract?

A    Had it been terminated and defaulted, I don't know.
     That is a matter for the owner to determine.  The owner
     is the party with who Sciaba has the contract.  It is

make payments -- request that payments be made to you
-- to the surety as opposed to Sciaba, or why checks
weren't made payable -- why you didn't request that
checks be made payable jointly to Sciaba and the
surety, you indicated that you had some concerns about
interference with the contract.  Is that correct?

A    Contractual interference, yes, sir.

Q    And does contractual interference include notifying
you, the surety, about payments that would be made?

A    No.

Q    Any pending payments?

A    No.

Q    Why not?

          MS. GRIFFEN: Objection.  You can answer.

A    We're not interfering with the performance of the
contract.  We are merely asking for information, by
which we can, you know, then make some determination,
or make -- when are you going to pay Sciaba?  Okay,
you're going to pay Sciaba in two weeks, we can check
with Ed.  Okay, Ed, who's out there that needs to be
paid.  What's the status of their work.  Do you have
lien waivers and so forth from them?  At that point in
time we can say, you know, and request the owner to
issue joint checks.  Whatever.

89

Q    And, that wouldn't be interfering, requesting Sciaba to
     issue joint checks?

A    Interfering?  We were asking Sciaba to do something,
     we're not interfering with his contract at that point
     in time.  We're not directing somebody who Sciaba has a
     -- on Sciaba -- other side of Sciaba, like the owner to
     "Don't pay Sciaba."  You know, guess what you're going
     to have, you're going to have a lawsuit potentially
     from your principal.  And, you could have -- the owner
     could be equally, you know, complicite in that.  You
     know, it's not just a matter of protecting the surety
     from a lawsuit, it's protecting the owner from a
     lawsuit, because quite often, owners, you know, seem to
     think that the surety can come in and do anything it
     wants.  That is not quite true.

Q    Did you give any specific direction to the town
     concerning payments that had been approved, but were
     pending lien waivers?

A    I don't specifically recall drawing a distinction
     between future payments that had been approved but were
     requiring lien waivers or what, just any future
     payments.

Q    Do you recall whether there was a representation made
     at the meeting that there were two payments pending for

to interfere with that, correct, that process?

A    Not without running some risk.

Q    What would you have done specifically, had you been
      notified of any payments following May 21, 2003?

          MS. GRIFFEN: Objection.  The witness is not
      required to speculate, but if you -- maybe you can
      rephrase your question to ask about fact, you can
      answer.

Q    (By Mr. McEnaney) Sir, your expectation was that the
      town would not make payments without your consent, is
      that correct?

A    Without advising us.

Q    But, they didn't require your consent, correct?  Is
      that what you're saying?

A    Well, since it happened, I don't know what I was --
      what I would have specifically done.

Q    No, I'm asking you specifically what you said.

A    I wanted to be advised before they made any payment.
      And, then at that juncture, depending upon the status
      of many things, I could make some further determination
      of what I might want to do.

Q    And, what are your potential options that you could
      select in terms of what you might want to do?

A    Well, potential options are to, you know, request joint

## ERRATA SHEET
### Deposition of Stephen J. Beatty

I, Stephen J. Beatty, do hereby certify that I have read the foregoing transcript of my testimony taken on May 10, 2005, and further certify that, subject to the following list of corrections, said transcript is a true and accurate record of said testimony.

Signed under the pains and penalties of perjury.

Dated this 14th day of June, 2005.

Stephen J. Beatty

## LIST OF CHANGES

| Page/Line | Change | Reason |
|---|---|---|
| Throughout | "Griffin," not "Griffen" | Spelling |
| Throughout | "Manufacturers," not "Manufacturer's" | Punctuation |
| 14:16-17 | "run off," not "run-off" | Punctuation |
| 23:6 | client's professionals | Stenographic and punctuation |
| 30:2 | "my own personal," not "non-personal" | Stenographic |
| 48:10 | "They were," not "We're" | Stenographic |
| 48:24 | delete the comma after claims | Punctuation |
| 53:7 | "are wont," not "want" | Stenographic |
| 56:23 | Matters | Stenographic |
| 64:17 | "Dore," not "Dora" | Stenographic |
| 69:11 | "they'd," not "I'd" | Stenographic |
| 73:20 | I got the letter at the May 21 meeting with the Town. | Memory refreshed; see p. 74:10 |
| 77:20 | "ABA," not "A-V-A" | Stenographic |
| 78:9 | "ABA," not "A-V-A" | Stenographic |
| 78:14 | "ABA," not "A-V-A" | Stenographic |
| 78:16 | "analysts," not "panelists" | Stenographic |
| 84:3 | "A" not "Q" | Stenographic |
| 86:5 | delete "other" | Stenographic |
| 88:23 | delete "and" | Stenographic |
| 89:10 | "complicit," not "complicite" | Spelling |
| 91:5 | "right," not "write" | Spelling |
| 92:59 | "financing," not "finance" | Stenographic |
| 95:6 | "issued," not "issues" | Stenographic |
| 95:23 | "Bert," not "Burt" | Spelling |
| 99:16 | "Bert," not "Burt" | Spelling |
| 104:23 | "juncture," not "junction" | Stenographic |
| 107:6 | was not in breach | Stenographic or I misspoke |

| | | |
|---|---|---|
| 108:18 | Insert "you" after "do" | Stenographic |
| 110:3 | financial condition. We . . . | Punctuation |
| 111:20 | "not," not "no" | Stenographic |
| 112:4 | "issue," not "issued" | Stenographic |
| 113:5 | Insert "say" before "impending" | Stenographic |
| 114:5 | Insert "a fire alarm" not "to fire" | Stenographic |
| 116:19-20 | "sum and substance" not "some in substance" | Stenographic |
| 116:23 | Delete "our" | Stenographic |
| 117:18 | "conclusion," not "conclusive" | Stenographic |
| 118:10-11 | "appointed an arbitrator," not "appointment an arbitrary" | Stenographic |
| 128:3 | "doctrine of," not "document" | Stenographic |
| 128:4 | "doctrine," not "document" | Stenographic |
| 128:7 | "run off," not "run-off" | Punctuation |
| 130:8 | Insert "about" after "inquire" | Stenographic |
| 134:17 | Insert periods after "recall" and "jobs" | Punctuation |
| 134:18 | Insert a period after "one" | Punctuation |
| 135:15 | "Float," not "flow" | Stenographic |
| 141:10 | Insert "do" after "should" | Stenographic |
| 150:16 | "ratifying," not "erratify the posture" | Stenographic |
| 153:15 | "go," not "do" | Stenographic |
| 158:19 | "retained," not "regained" | Stenographic |
| 161:9 | "some time," not "sometime" | Stenographic |
| 167:10 | "seek," not "see" | Stenographic |
| 167:23 | "at," not "for" | Stenographic |
| 168:20 | "Fireman's Fund," not "firemen's fund" | Stenographic |
| 172:10-11 | "Agostini/Bacon," not "Agastini slash Bacon" | Spelling |
| 173:13-14 | "Joe Iantuono," not "Joy Enfano" | Spelling |
| 178:9 | "Mandate," not "a mandate" | Stenographic |
| 178:16 | "contractor," not "contract" | Stenographic |
| 181:12 | "an e-mail," not "a fax" | I misspoke |
| 181:20 | Insert "out" after "set" | Stenographic |
| 181:24 | "scriveners," not scripture | Stenographic |
| 182:22 | "14th," not "16th" | See pg. 183:15 |
| 185:5 | "as," not "a" | Stenographic |
| 185:11 | "them," not "him" | Stenographic |
| 188:1 and 7 | Remove quotation marks | This was a paraphrase, not a quote – Punctuation |
| 192:13 | Insert "you may" before "have" | Stenographic |
| 194:1 | "milieu," not "millue" | Spelling |
| 199:4 | "you're asking," not "we ask of" | Stenographic |
| 201:6-8 | This does not sound right and makes no sense, but I do not recall what I said | Stenographic |

| 206:6 | Change to "I don't know." | Clarification. See also pg. 225:18 |
|---|---|---|
| 210:11 | Insert a period after "engaged" | Punctuation |
| 211:9 | "construction," not "inspection" | Stenographic |
| 215:8 | "additional," not "traditional" | Stenographic |
| 217:14 | "Treasury," not "treasurer" | Stenographic |
| 217:15 | "Treasury," not "treasuring" | Stenographic |
| 217:16-17 | Capitalize "treasury" | Spelling |
| 218:4 | Change the period to a comma | Punctuation |
| 219:20 | "design and," not "assignment of" | Stenographic |
| 225:6 | "foreclose," not "propose" | Stenographic |

# 2936019_v1
431261.00002

**EXHIBIT F**

# REBUTTAL REPORT

## In response to Expert Report of Chris Conway

### GREYHAWK North America, LLC

### Richard P. Anastasio

### October 28, 2005

*Rebuttal Report in Response to Chris M. Conway Expert Report, August 3, 2005*

I have studied the expert report of Chris M. Conway, dated August 3, 2005, issued in the case of American Manufacturers Mutual Insurance Company vs. the Town of North Brookfield. I present the following rebuttal which supplements my own Expert Report and Analysis dated August 5, 2005 in the same case.

## OPINION

Mr. Conway's opinions do not take into account a number of facts concerning the history of the project of which I know he is aware. He selectively recites events that tend to support his opinion without acknowledging facts that would undermine it. Specifically, he failed to acknowledge several causes of delays for which the Town (or Dore & Whittier as the Town's agent) was responsible, or for which the Town has the risk under the Contract. Some of his conclusions are not supported by the information available. He also improperly uses hindsight to criticize Sciaba's approach to staffing and removal of unsuitable material. Omission of these Town-responsible causes, incorrect reasoning, unsupported conclusions and the inappropriate use of hindsight present a distorted and inaccurate picture of what happened on the project and attribute to Sciaba greater responsibility for the delays than Sciaba deserves.

In summary, the Town bore responsibility for delays in the issuance of a notice to proceed, issuance and delivery to Sciaba of a building permit, issuance of a Construction Change Directive relating to the removal of unsuitable soil and then instituted an overly cumbersome and time-consuming methodology for measuring unsuitable soil removed from the site. When these Town-responsible causes are given appropriate recognition, Mr. Conway's opinions are clearly seen as untenable.

*Rebuttal Report in Response to Chris M. Conway Expert Report, August 3, 2005*

### Town's Late Issuance of Notice to Proceed and Building Permit

The Town of North Brookfield did not issue a notice to proceed to Sciaba until April 24, 2002.[1] Dore & Whittier, the project architect (and Mr. Conway's employer) took responsibility for applying for a building permit for the project. Its application was not submitted to the Town Building Department until April 29, 2002 at the earliest.[2] The Town did not sign Sciaba's contract and deliver it to Sciaba until the job meeting on May 30, 2002.[3] The Town Building Department did not issue the building permit until at least June 3, 2002,[4] but even after it was issued, it was not delivered to the job site until after the end of the work day on Friday, June 14, 2002.[5]

In my experience, it is rare that a contractor would start work before receiving a Notice to Proceed and although some contractors are willing to mobilize before receiving a signed contract, it is very unusual for contractors to begin actual construction activity before they have a building permit in hand. It is simply too risky to begin work without it, at least from a pragmatic standpoint and probably also from a legal standpoint. Thus, in my opinion, Sciaba was justified in not beginning the real work of dewatering and excavation for the building until the building permit was in hand, in mid June, 2002. It also means that Sciaba was justified in not loading up the site with manpower until the building permit was in hand.

On Page 3 of his report, Mr. Conway refers to Sciaba's initial schedule submitted to the Town and much of his analysis is based upon that schedule. The initial schedule has a "run date" of May 17, 2002.[6] The run date is the date the schedule was printed. The more important date is the "data date", which indicates the effective date when

---

[1] Deposition Exhibit 177
[2] Building Permit Application and package NB42031-42049. John Dore's signature in the application is dated April 29, 2002. NB42034
[3] Minutes of Job Meeting May 30, 2002 6th bullet MDW14167-70; minutes of school building committee meeting May 29, 2002, MDW12524-26 § 5
[4] Building Permit Application and package, NB42031
[5] Conway's Daily Report June 14, 2002, special note NBDW 60447
[6] MDW10756-62

the planning and logic for the schedule were done. In the case of the May 17, 2002 run date schedule, the data date was April 1, 2002. This date was before the effective date of Sciaba's Contract, before the Notice to Proceed, before the Town signed and delivered the signed contract to Sciaba, before the building permit was issued, and, most importantly, long before anyone could have known that the building permit would not be delivered to the site until Friday, June 14, 2002. The importance of these dates is that the initial schedule assumed, optimistically, that a notice to proceed would be issued immediately, on April 1, 2002. [See Activity 00] The initial schedule contemplated that excavation for the footings for building Area C would start about 8 weeks later (May 31, 2002 on the initial schedule, Activity 340). The site was extremely wet. Therefore, the site needed dewatering before substantial excavation, backfill and compaction could take place. In actuality, these activities did not, and could not, begin until mid June, after the building permit was issued.[7] Sciaba lost approximately 4 weeks due to the Town's delay in issuing the building permit, compared with the initial schedule.

However, Mr. Conway disregards these causes of delay in his report. Both in his expert report and contemporaneously on the job, Mr. Conway and others from Dore & Whittier, were critical of Sciaba for getting off to a "slow start" and for not having more people on site. However, conveniently, they disregard the lack of a building permit as a legitimate reason for Sciaba not achieving the progress that the initial schedule contemplated, assuming an April 1, 2002, Notice to Proceed and no delay in issuance of the building permit.

---

[7] Actual activities are recorded on subsequent schedules, including the schedules with a run date of September 26, 2002 to which Mr. Conway referred (Page 4) as the schedule of September 10, 2002 (data date). MDW10739-47

*Rebuttal Report in Response to Chris M. Conway Expert Report, August 3, 2005*

## Town's Late Issuance of a Construction Change Directive for Unsuitable Soil

Mr. Conway's report acknowledges that unanticipated, unsuitable soil was encountered in Building Areas B and A.[8]  In order for Sciaba to perform any work with respect to removal of the unsuitable soil, it needed, and was entitled under the contract to, a directive from the architect and owner directing that the soil be removed and confirming the terms of payment.[9]  The Town and Dore & Whittier signed a directive, called a Construction Change Directive, CCD, on July 31, 2002. [10]

Mr. Conway states on page 3 of his report:

> *EJS was requested to provide profiles and quantities of the unsuitable materials. During the period of July 12, 2002 through July 30, 2002, EJS concentrated on excavating, and forming footings and walls for Area C. EJS paid little attention to the unsuitable materials problem until July 31, 2002. On that day, EJS dug eleven observation pits to determine a general grid pattern of the unsuitable material.  D&W issued CCD#4R to EJS on July 31, 2002.*

This passage implies that the 11 test pits were a prerequisite to issuance of the CCD and that Sciaba was responsible for the fact that the CCD was not issued for almost 3 weeks after discovery of the unsuitable soil.  There are numerous errors and fallacies in such an implication, which I will discuss.

1. When a contractor encounters unanticipated subsurface conditions, it is usually the owner, or an engineer working for the owner, who investigates the conditions.  The Contract in this case provided for the owner to investigate[11].  I am not aware of any provisions of the Contract that require the contractor to prepare soil profiles; nor is this customary.

---

[8] Mr. Conway implies the unsuitable soil was first discovered in Area A on July 12, 2002 (report page 3) However, his daily report of July 12, 2002 (exhibit G to his report) indicates it "showed up in the 5 observations dug Wednesday", which was July 10, 2002.  Discovery on July 10 is confirmed by the soil field report of Yankee Engineering & Testing ("Yankee"), dated July 10, 2002.  MDW29172

[9] Project Manual, Change Order Procedures §1.05, MDW11616-11617; Project Manual, Supplementary General Conditions, §I.1.5; Project Manual, Excavation §3.05.D, MDW11737, deposition exhibit 78

[10] CCD #4R, GH06034-35

[11] Project Manual, Supplemental General Conditions, §I.1.5, Deposition exhibit 78, MDW11518

2.  Sciaba promptly gave the Town written notice of the unsuitable soil and that they were significantly different from the report that had been included in the bid documents. [12] Mr. Conway then requested Whitney Parker, of Yankee Engineering & Testing ("Yankee"), to visit the site and investigate.[13] Mr. Parker visited the site on July 17, 2002. [14] There was no indication in the daily reports prepared by Mr. Conway, or by Yankee, that Mr. Conway or Yankee made specific requests of Sciaba to dig test pits or observation pits, or to take other action to enable Yankee to investigate as requested, or that Sciaba refused any requests that might have been made.

3.  Mr. Parker apparently told Mr. Conway on July 17 that Yankee would issue a field report. [15]

4.  Sciaba dug some test pits a week before Mr. Conway now acknowledges.[16]

5.  On the basis of the earlier test pits, Yankee Engineering wrote to Dore & Whittier, advising that it was premature to estimate the quantity of soil to be removed. This letter was referenced in CCD #4R and CCD #4R was issued without reference to the test pits that were dug on July 31. Thus, in my opinion, any test pits dug on July 31, were not needed for CCD#4R to be issued.

6.  The CCD could have been issued earlier, without <u>any</u> test pits having been dug. The process of actually excavating the soil should have been expected to furnish enough new information on which to base payment to Sciaba for the extra work. In my opinion, there is no reason that Dore & Whittier and the Town could not have issued CCD #4R immediately after discovery of the unsuitable soil on July 12.

7.  Under Sciaba's contract, North Brookfield was required to compensate Sciaba for the cost of addressing any unanticipated subsurface conditions. Owner liability for such extra compensation and quantification of such liability is a common and costly cause of disputes in construction projects. Prudent contractors will insist on clear written directions to proceed before starting such work, to minimize or avoid dispute. Sciaba followed this prudent practice by waiting for CCD #4R to be issued before starting to excavate the unsuitable material.

---

[12] July 12, 2002, Letter from Scott Finneran to Dore & Whittier, GH06039
[13] July 15, 2002, Fax from Chris Conway to Whitney Parker of Yankee, NBDW28480
[14] Conway Daily Report of July 17, 2002, MDW14243
[15] Conway Daily Report of July 17, 2002, MDW14243
[16] July 29, 2002 Letter from Yankee Engineering to Lee Dore, GH06035, attached to CCD #4R

6

*Rebuttal Report in Response to Chris M. Conway Expert Report, August 3, 2005*

8.  The areas in which Sciaba worked between July 12 and July 30, 2002 were also logical and reasonable, given the conditions in the field and the planned sequence of construction, starting in Area C and moving to Areas B and A. The process of preparing Area C, first to erect the concrete foundations and footings, and then the structural steel, logically preceded such work in Areas B and A. Area C therefore, had high priority. The need to focus attention on Area C was amplified by the fact that a large boulder was unexpectedly encountered right on the line of one of Area C foundation walls and had to be removed to enable Sciaba to prepare the area for construction of the foundation. The Town and the architect issued a CCD for removal of the boulder to Sciaba on July 16, but did not propose to allow any time extension for this obstacle.[17]

### Impact of Late and Cumbersome Method of Quantifying Extra Unsuitable Soil

As stated in Mr. Parker's letter of July 29, 2002, it was not possible, before the excavation of the unanticipated, unsuitable soil, to estimate with any accuracy the quantities of soil to be removed that Sciaba could be compensated for. Ordinarily, in a situation like this, the contractor is permitted to use heavy equipment to excavate the material in a continuous operation and stockpile the material. Measurement of quantities for purposes of compensation can be done later, based on the stockpiled material. The risk of Sciaba excavating more than necessary was small because the contract had dictated a flat, all-encompassing rate of $25 per cubic yard. That rate was not even enough to cover the cost of removal and disposal, let alone the replacement of removed material with suitable material and compaction of the new material. It was not a rate with any profit for the contractor. In this case, however, Sciaba was not permitted to proceed in this fashion. Rather, Sciaba was required to proceed slowly and meticulously, so that daily measurements could be made, in an effort to produce a calculation that, in my opinion, was to be more precise than is usually made in similar circumstances.

---

[17] CCD #1, GH06028

This methodology was left undefined until almost two months after CCD #4R was issued.[18] Uncertainty about the method of quantification made it impossible for Sciaba to approach the excavation and removal of unsuitable soil efficiently. When a methodology was finally spelled out, it required daily measurements by a surveyor as the bottom elevation of each point of excavation was reached. This meant that work had to stop at any given point when the bottom of the unsuitable soil was reached so that a measurement could be taken. Therefore, it could not be back filled right away. Ultimately, the Town gave Sciaba, and Sciaba accepted, an extension of time for the impact of the unanticipated, unsuitable soil that moved the substantial completion date to December 15, 2003.

## Sciaba's Schedules

Mr. Conway includes a paragraph about construction schedules on page 3 of his report, apparently to support his conclusion that *"During the months of September, October and November of 2002, it became apparent that EJS was struggling to manipulate their construction schedule to achieve a weather tight building for late December 2002 or early January 2003."* Again, Mr. Conway presents his facts only selectively, some of them are inaccurate, and he draws an untenable conclusion.

First, although he lists six dates on which Sciaba delivered written schedules, he omits at least 2 other schedules that should be considered.[19]

Second, as best I can tell, several of the schedules Mr. Conway is referring to in that paragraph were not full schedules, showing all activities. The June 13th and August 22nd schedules were so-called "2-week look-ahead schedules", showing only the next

---

[18] September 19, 2002, letter From Scott Finneran to Lee Dore, with enclosures, NBDW29727-29736; September 24, 2002, letter from Whitney Parker to Lee Dore, with enclosures, NBDW28984-86; minutes of Site Meeting, September 24, 2002, NB36629-30; sketch dated September 25, 2002, NBDW27381; September 25, 2002, letter from Whitney Parker to Lee Dore with enclosures, NBDW28978-80;
[19] These 2 schedules are referenced in Exhibit B to Mr. Dore's report and have data dates of July 15 and December 31, 2002.

2 weeks' anticipated activities (and there were more 2 week schedules than the ones Mr. Conway lists).

Third, Mr. Conway refers in the middle of page 3 of his report to Exhibit H, page 3, items 1-8. He cites those items as instances where Dore & Whittier pointed out activities on a Sciaba schedule that "were showing start dates that did not coincide with completed dates of related, or adjacent work activities." Only items 6 and 7 of this Exhibit actually try to make this kind of point and even they are not valid points. As for item 6, electrical rough-in can be and often is done before the roof is tight. As for item 7, the July 15th data date schedule shows the roof decking in Area A to be completed by November 26, 2002 (Activity SUPOA 307). HVAC rough-in was to start December 13, 2002 (Activity SUPOA 800). Most mechanical subcontractors would be willing to start their rough-in after installation of the roof decking and would not insist on waiting until the entire roofing system was installed. The other points in Exhibit H merely show skepticism about how quickly activities could be accomplished.

Fourth, the schedules that were prepared after the impact of the unsuitable soil began to appear do not show either manipulation with regard to weather tightness, or an attempt to achieve a weather tight building for late December 2002, or early January 2003. The first schedule that reflects an impact of the unsuitable soil indicated a run date of September 13, 2002 with a data date of September 10, 2002. That schedule shows steel erection in Area C due to start October 29, 2002. In actuality, that activity started about a week earlier than that date, showing that the scheduled date was realistic and achievable. That schedule also shows completion of the roofing and/or exterior stud systems (both necessary for weather tightness) on December 26, 2002 for Area C; January 17, 2003, for Area B; and February 10, 2003 for Area A. The dates and the durations for the precedent activities, were realistic as of the time of the schedule, given what was known as of the September 10, 2002 data

*Rebuttal Report in Response to Chris M. Conway Expert Report, August 3, 2005*

date, assuming normal weather conditions.  However, the dates do not support Mr. Conway's conclusion "that Sciaba was struggling to manipulate" these dates.  The schedules simply do not contemplate that Areas B and A would be weather tight by early January 2003, as Mr. Conway states.  In fact, they do not contemplate that <u>any</u> of the building areas would be weather tight before November 1, 2002, which is when the abnormal weather began to affect the project (as shown in my August 5, 2005 report).

Fifth, Mr. Conway's criticisms about the schedules are directed primarily at the paper Sciaba submitted, rather than at the work that was to be done in the field and the conditions in the field.  What Sciaba put on paper really had no effect on actual progress.  The schedules merely indicated the planned activities, dates, durations and activity progress to date.  The emphasis on the paper schedules suggests that the reality of the actual project circumstances was being overlooked.

## Manpower

In several places in his report, Mr. Conway has attributed slow progress to insufficient manpower, and uses those attributions to support his opinion that insufficient manpower contributed to the building not being weather tight before bad weather set in.  In my opinion, although there were periods of time when Sciaba's progress was slower than it should have been, there were legitimate reasons that were not entirely Sciaba's responsibility.  Some of the slow progress was due to factors for which the Town was responsible, or for which the Town bore the risk under the Contract.  Some of those factors I have already discussed in other sections herein.

## April to Mid-June

The low levels of manpower, during the period from April through June 14, 2002 were justified by the lack of a building permit.  Before a building permit is in hand, a

contractor can only push dirt around. Sciaba did that, as well as other tasks for mobilization. As discussed above, once the building permit was in hand on June 17, Sciaba immediately started dewatering, followed by excavation, compaction, foundation and footings work. The average crew size more than doubled for the month of July.

### Mid-June to Early September

Mr. Conway comments at the top of page 4 of his report, that: *"Generally in the construction industry, a contractor will employ additional equipment and manpower to focus only on a particular issue that has a compounding effect on the critical path schedule."* This statement may be true as a general matter, but only after the likelihood of a compounding effect of a particular issue is apparent. It does not apply here to the July-early September time period. At the time the unanticipated unsuitable soil was discovered in July, no one had any idea what quantities would be uncovered, how widespread it would be, or how deep the unsuitable material was located. Mr. Parker said in his July 29th letter, *"the test pits did not reveal a consistent layer and it is possible that little, if any, 'extra excavation', will be required."* [20] Sciaba had no reason to anticipate the extent of the unsuitable soil, nor the impact it would have on the schedule, until after the extent and depth of it became known. This did not occur until September. Mr. Conway's criticism seems logical only when viewed in hindsight, but not contemporaneously. In these circumstances, it was reasonable for Sciaba not to have added a separate crew in July, August, or early September, 2002, specifically dedicated to removal of the unsuitable soil.

Mr. Conway's Exhibit L purports to show the average work force on the job from May through September 17, 2002. I have been unable to replicate Mr. Conway's data in Exhibit L based upon the numbers of Sciaba personnel Mr. Conway recorded in

---

[20] July 29, 2002 letter from Whitney Parker to Lee Dore, GH06035

*Rebuttal Report in Response to Chris M. Conway Expert Report, August 3, 2005*

his daily reports.  In Exhibit A of this report, I have listed the numbers of personnel on site, as recorded by Mr. Conway in his daily reports beginning May 14, as Mr. Conway does, counting Sciaba's project manager and superintendent, as Mr. Conway does, I achieve slightly different results.  In the table below I show this analysis through the period ending June 30.  Additionally, Mr. Conway routinely does not include in his personnel count the independent truckers that Sciaba utilized that were hauling in or out gravel, unsuitable material, and fill material.  Inclusion of trucking personnel would add to the average manpower calculation.

| Months | Conway's Exhibit L | My Exhibit A | Comments |
|--------|--------------------|--------------|----------|
| May | 3.67 | 3.82 | Starting 5/13 including PM & Supt.  14 work days |
| June 1-14 | 5.35 | 4.6 | 10 work days, does not include independent truckers who hauled in fill commencing June 12. |
| June 17-30 | 5.35 | 5.6 | 10 work days,  does not include independent truckers who hauled in fill almost every day |

As there was significant fill, gravel and stone hauled in during the period commencing mid June, Mr. Conway's Exhibit L table provides an inaccurate picture of the effective workforce performing the work.  Mr. Conway makes no distinction in his analysis of the manpower during the month of June.  However, in my analysis I have analyzed the manpower in two separate periods: June 1 thru June 14, or the period prior to the arrival of the building permit and the second period, June 17 thru June 30, the period after the permit was delivered and the dewatering and excavation could begin and note a slight increase in the average manpower thereafter.  This period also coincides with the initial deliveries of structural fill which was hauled in by independent truckers who are not represented in the Exhibit L manpower calculations.

*Rebuttal Report in Response to Chris M. Conway Expert Report, August 3, 2005*

### Mid-September to Mid-November

Mr. Conway has included in his report an Exhibit I, supposedly showing the number of average "crew hours" spent between August 19 and November 5, 2002, by Sciaba on placement and compaction of suitable structural fill used to replace the unsuitable soil. This data apparently only relates to the activities of placing fill in locations where the unsuitable soil had been removed and does not attempt to record, calculate, or total the time spent on removal of the unsuitable material. It only shows a portion of the whole picture. Mr. Conway's daily reports record activities indicating excavation of unsuitable material on numerous dates that are not listed in Exhibit I. Reference is made to Exhibit J (his daily report for September 12, 2002) as an example.

He states that the average "crew" working on placement of fill consisted of 2 men, but does not identify them or their job categories. He has not explained how he counts crew members. He also has a column giving the number of hours the crew spent on placement of fill material. He does not give the source of the information about the hours. He did not record such data in his daily reports, or in any other contemporaneous records that have been made available to me. I, therefore, question the reliability and accuracy of this data because its source is undocumented.

I have prepared Exhibit B, which is attached hereto, in which I have utilized the equipment, manpower and the description of the activities performed between the dates August 19 through November 5, 2002, as indicated in the Conway daily reports, to determine the number of personnel involved in the unsuitable soil operation, not including the independent truckers, who would add considerably to this manpower analysis. I also utilized the Sciaba daily reports, as well as the certified payrolls to verify information where Mr. Conway was not on site, or where he did not prepare a report.

13

*Rebuttal Report in Response to Chris M. Conway Expert Report, August 3, 2005*

Exhibit B extracts the information provided by Mr. Conway regarding Sciaba's actions concerning the unsuitable material on a daily basis. It also indicates the total available manpower, including subcontractor personnel on those dates. I have also made note in the comments column of the presence of the testing agency, engaged by the Town, to monitor the work on the unsuitable material, but I did not include them in the manpower count. I utilized this data to determine the minimum crew which Sciaba would have engaged, relating to the unsuitable material, on each of those dates according to Mr. Conway's description of the activities recorded on those dates.

Exhibit I, in which Mr. Conway arbitrarily determined an average of a 2 man crew per day for a total of 148 "crew hours", is inconsistent with the information I have extracted from the daily reports and other documents that cite the activities performed, the craft personnel and the equipment available on the site for activities related to the unsuitable material.

In Exhibit I, Mr. Conway's calculation regarding 148 crew hours indicate a total of 18.5 crew days, by incorrectly assuming that for each of the days on which he indicated that work on the unsuitable material was performed the two man crew worked an 8 hour day. He assumed a two man crew, which translates to only 37 man days and, therefore, accounts for less than 10% of the actual effort that Sciaba expended, as illustrated in Exhibit B of this report.

Additionally, Exhibit I shows that during the period 8/19/02 through 11/5/02 Mr. Conway indicates that there were only 30 days on which work on the unsuitable material was performed and then only on placement and compaction activities; a further inconsistency. By contrast, my Exhibit B indicates that activities relating to the unsuitable material took place over 60 days; 53 regular weekday workdays plus 7 Saturday and Holiday workdays. Therefore, Exhibit I paints an inaccurate picture of

14

the number of men and the effort expended on the unsuitable material including the excavation, removal, grading and replacement fill activities and the other related activities.

I also question the accuracy and reliability of Mr. Conway's data, based upon the quantity of unsuitable soil for which Sciaba was paid under Change Order #3. Change Order #3 compensated Sciaba for 5,312.17 cubic yards of unanticipated, unsuitable soil (Exhibits 23, 82). This means that Sciaba needed to truck out 5,312 cubic yards of unsuitable soil and to truck in at least the same quantity of structural fill, for a total of 10,624 cubic yards of material going in or out of the site. (This was in addition to the fill that was anticipated and for which Sciaba was not paid extra.)

The average truck used to haul this kind of material holds between 10 cubic yards and 25 cubic yards, ( I have used an average of 17.5 cubic yards) which means that Sciaba used approximately 607 truckloads to move the 10,624 cubic yards of material on and off the site. It does not appear that these trucks were making round trips loaded. Therefore, there must have been 607 truckloads going both in and out. The removal and replacement of the unsuitable soil took place over 60 workdays between August 19 and November 5, 2002, but there are approximately 51 days on which structural fill hauling was recorded[21], which means that truckloads related to the replacement fill were coming in and out at the average rate of 10-12 trucks per day. It is my understanding that Sciaba was restricted from using the school access road during the period in which the road was used by school busses. Accounting for the restrictions put in place following the opening of the existing school, which occurred during the week of August 26, the useful trucking period was limited to roughly 5 ½ hours a day, or approximately 2 trucks per hour. On certain days, Mr. Conway indicates that incoming structural fill loads alone, reached twelve trucks per day. In

---

[21] Conway Daily Reports for the period 8/19/02 through 11/5/02, supplemented by Yankee Engineering reports on dates where Conway was not on site or did not make a report, indicate material deliveries of structural fill on 51 dates during this period. These dates are noted in Exhibit B, "Comments."

addition, there were approximately 880 truckloads of gravel and stone furnished by two suppliers, plus the additional structural fill that would ordinarily have been required, during the period August 19 and November 5, 2002. For the average 5.5 hour day, this could translate into 10 trucks every two hours coming and going for the combined activities.

In addition to the trucking personnel not accounted for in this operation, Mr. Conway makes no reference, or allowance for the logistics involved in the operation of handling this volume of material on the site.

The calculation he makes at the bottom of Exhibit I is also questionable. He translates the 148 crew-hours to 18.5 days of placement and compaction work by dividing 148 crew-hours by 8 hours a day. This calculation implies that it was feasible for the crew to have worked full days at this activity. Full days of work on placing fill were generally not feasible, because of the widespread and uneven distribution of the unsuitable material and the meticulous method that was used to measure that material. There were not vast holes waiting to be filled at any one point in time. Sciaba was never in a position to attack the placement of fill in a continuous, efficient operation. The placement of fill had to occur piecemeal, because that is how the unsuitable soil was removed and measured. This limitation was dictated by the Town's insistence on daily monitoring or measurement.

Mr. Conway concludes his discussion of Exhibit I, on pages 3 and 4 of his report by saying that *"Had additional equipment and manpower been deployed to handle the unsuitable issue, in my opinion, the time duration to complete the activity (55 workdays) could have been reduced by as much as 60 to 65%"*. The reduction of 55 work days by 60-65 per cent would mean 19-22 work days. This apparently is the number of work days Mr. Conway thinks should have been consumed "to handle the unsuitable issue," and presumably correlates to the 18.5 days calculated in Exhibit I.

16

That assertion would translate to roughly 4 trucks per hour per 8 hour day or 6 per hour per the actual 5.5 hour day, just for the removal of the unsuitable material and the replacement material. When combined with the other materials and fill which Sciaba was providing, or an additional 3 trucks per hour, the congestion on the site would create a logistical nightmare.

Furthermore, my analysis as shown in Exhibit B indicates there were approximately 3189 man-hours expended on the unsuitable material work over a 60 work day period, including the Saturdays and holidays that Sciaba worked, which Mr. Conway failed to recognize. Using Mr. Conway's 18.5 day conclusion would also translate to Sciaba utilizing a minimum crew of approximately 21 craft personnel for that period, plus the appropriate additional pieces of equipment plus accounting for the truck traffic, performing work simultaneously with the other contract work. Additionally, this conclusion probably would require that Yankee provide a daily full time site technician and that the verifying survey team also be deployed on full time daily basis, which would add at least 3 more personnel to the daily population.

Therefore, I believe Mr. Conway's conclusions to be idealistic hindsight and impractical.

While I believe Mr. Conway's conclusion is wrong for the reasons I have given, it was at the Town's insistence that the work relating to the unanticipated, unsuitable soil had to be approached piecemeal and monitored so closely.

Mr. Conway's "data" is unreliable and incomplete, and he has only looked at the hours necessary to place and compact the replacement material, disregarding the hours necessary to dig out and dispose of the unsuitable material. Additionally, Mr. Conway makes no mention that subsequent to a resolution between Sciaba and the Town regarding the method of measurement, which was reached in late September

2002, Sciaba proceeded to work seven consecutive Saturdays, plus the Columbus Day Holiday, performing work related to the unsuitable material. In addition, there are numerous references in the Conway daily reports to days on which a portion of the crew worked overtime or where the Testing Agent, Yankee, also worked Saturdays and overtime to monitor the compaction activities. This direct information and the information contained in Exhibit B, most of which was extracted from the daily reports, undermines the data reflected in Exhibit I. Clearly, Sciaba was spending more than two hours per day on work related to the unsuitable material and with a larger crew than has been represented in Exhibit I. Mr. Conway grossly understates the effort expended by Sciaba and the conclusion that this work could have been handled in 18.5 days, given the method of measurement, is ludicrous.

## Mid November to December 2002

The effects from the onset of severe winter conditions and the impact it had on the project for the period November 1, 2002 through March 31, 2003 are more fully detailed in my August 5, 2005 report and analysis.

**Materials Considered**

In addition to the documents and information referenced in my August 5th Report and Analysis, in forming the opinions expressed here, I have considered the documents specifically referenced in Mr. Conway's report, to the extent I could identify them.  I also considered the documents specifically referenced in the body and footnotes of my Rebuttal Report above, and those referenced in my Rebuttal Report to the Expert Report of Lee Dore.  I also utilized information obtained via an oral report and interview with former Sciaba site project manager, Scott Finneran and information provided by W. J. Graves and Aggregate Industries in support of their claims for unpaid invoices for material furnished to the project.

Richard P.  Anastasio

19

**Project: North Brookfield JR/SR High School**          **EXHIBIT A**

**American Manufacturers Mutual Insurance Co. vs. Town of North Brookfield, Board of Education**

**ANALYSIS OF MANPOWER MAY 2002 THROUGH JUNE 2002**

| Date | Day | Work Day Count | Report # | EJS +S/C Total Man days | Comments |
|---|---|---|---|---|---|
| 4/29/02 | M | | No Number | | No Manpower indication |
| 5/10/02 | F | | No Number | 3 | Set-up trailers |
| 5/13/02 | M | 1 | No Number | 1.5 | Spread gravel |
| 5/14/02 | T | 2 | No Number | 2 | Grading |
| 5/15/02 | W | 3 | No Number | 4 | Gravel and Electrical |
| 5/16/02 | Th | 4 | No Number | 2 | Stockpile top soils |
| 5/17/02 | F | 5 | No Number | 2 | Stockpile loam, NB building inspector picks up docs for building permit. |
| 5/20/02 | M | 6 | No Number | 3 | Site grading |
| 5/21/02 | T | 7 | No Number | 6 | Site clearing |
| 5/22/02 | W | 8 | No Number | 2 | Grading |
| 5/23/02 | Th | 9 | 10 | 6 | Grade pond area |
| 5/24/02 | F | 10 | 11 | 6 | Layout and grading |
| 5/27/02 | M | | NO REPORT | | HOLIDAY |
| 5/28/02 | T | 11 | 12 | 5 | Layout and grading |
| 5/29/02 | W | 12 | 13 | 4 | Ground Breaking Ceremony, Site Grading |
| 5/30/02 | Th | 13 | 14 | 5 | Stockpile, top soil |
| 5/31/02 | F | 14 | NO REPORT | 5 | Conway @ different job, M Haynes DR indicates 4 Man days +SF |
| May 13-31 | | AVG | 3.82 | 53.5 | |

Page 1 of 2

**Project: North Brookfield JR/SR High School**          **EXHIBIT A**

**American Manufacturers Mutual Insurance Co. vs. Town of North Brookfield, Board of Education**

**ANALYSIS OF MANPOWER MAY 2002 THROUGH JUNE 2002**

| Date | Day | Work Day Count | Report # | EJS +S/C Total Man days | Comments |
|------|-----|------|------|------|------|
| 6/3/02 | M | 1 | 16 | 4 | Stockpile, top soil |
| 6/4/02 | T | 2 | 17 | 5 | Grading pond |
| 6/5/02 | W | 3 | 18 | 5 | Site grading |
| 6/6/02 | Th | 4 | 19 | 5 | Grading pond, credit deduct building permit |
| 6/7/02 | F | 5 | 20 | 2.5 | Indicated unsuitable soil dispute |
| 6/10/02 | M | 6 | 21 | 4 | Site grading |
| 6/11/02 | T | 7 | 22 | 4.5 | Unsuitable soil, dispute, site grading |
| 6/12/02 | W | 8 | 23 | 4 | Site grading, hauling fill |
| 6/13/02 | Th | 9 | 24 | 5 | Unsuitable soil removal, hauling fill |
| 6/14/02 | F | 10 | 25 | 7 | Building Permit delivered 3:30 p.m., hauling fill, site grading |
| June 1-14 | | AVG | 4.6 | 46 | This period prior to EJS receipt of Bldg Permit |
| 6/17/02 | M | 1 | 26 | 3 | Site grading. Conway not at site. |
| 6/18/02 | T | 2 | 27 | 6 | Hauling fill, site grading |
| 6/19/02 | W | 3 | 28 | 6 | Stockpile, top soil, grading |
| 6/20/02 | Th | 4 | 29 | 6 | Dewatering equipment, site grading. |
| 6/21/02 | F | 5 | 30 | 6 | Site grading, dewatering. |
| 6/24/02 | M | 6 | 31 | 5 | Hauling fill, site grading, dewatering. |
| 6/25/02 | T | 7 | 32 | 6 | Dewatering equipment, site grading. |
| 6/26/02 | W | 8 | 33 | 6 | Unsuitable soil, hauling fill, excavating. |
| 6/27/02 | Th | 9 | 34 | 6 | Unsuitable soil, hauling fill, excavating. |
| 6/28/02 | F | 10 | 35 | 6 | Heavy rain, hauling fill, grading. |
| June 17-30 | | AVG | 5.6 | 56 | This period subsequent to EJS receipt of Bldg Permit |

Page 2 of 2

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Project: North Brookfield JR/SR High School** | | | | | | | **EXHIBIT B** | |
| **American Manufacturers Mutual Insurance Co. vs. Town of North Brookfield, Board of Education** | | | | | | | | |
| **ANALYSIS OF MANPOWER DURING WORK INVOLVING UNANTICIPATED, UNSUITABLE SOIL ACTIVITIES** | | | | | | | | |
| **NOTE:** Work associated with unsuitables, includes excavation, removal of unsuitable material; handling replacement structural fill, backfilling and compaction. NID indicates that the listed dates are not included in denominator of the calculation of the average. | | | | | | | | |
| Date | Day | Report # | EJS +S/C Total Man days | Minimum EJS Man-days, Unsuitable Material | Manhours Unsuitable soils | Day Count Unsuitables | Avg Man-days, Unsuitable Material | Comments |
| 8/19/02 | M | 71 | 21.5 | 5 | 40 | 1 | | 1st mention of unsuitable soil removal in Conway Daily Reports. |
| 8/20/02 | T | 72 | 26 | 6 | 48 | 2 | | Hauling fill, backfill and compaction. |
| 8/21/02 | W | 73 | 26 | 6 | 48 | 3 | | Hauling fill, backfill and compaction. |
| 8/22/02 | Th | 74 | 26 | 6 | 48 | 4 | | Hauling fill, backfill and compaction. |
| 8/23/02 | F | 75 | 23 | 5 | 40 | 5 | | Hauling fill, backfill and compaction. |
| 8/26/02 | M | 76 | 26 | 6 | 48 | 6 | | Hauling fill, backfill and compaction. |
| 8/27/02 | T | 77 | 25.5 | 5 | 40 | 7 | | Hauling fill, backfill and compaction. |
| 8/28/02 | W | 78 | 27 | 6 | 48 | 8 | | Hauling fill, backfill and compaction. |
| 8/29/02 | Th | 79 | 27 | 6 | 33 | 9 | | Hauling fill, backfill and compaction. Rain. |
| 8/30/02 | F | 80 | 22 | 0 | 0 | | | Wet site, no, backfill and compaction. |
| **August** | | | | **51** | | | **5.67** | AVG, NID 8/30/02 |
| 9/2/02 | M | 81 | NO REPORT | | 0 | | | HOLIDAY |
| 9/3/02 | T | 82 | 29 | 6 | 48 | 10 | | Hauling fill, backfill and compaction. |
| 9/4/02 | W | 83 | 30 | 0 | 0 | | | No unsuitable work at bldg footprint, Moving Stockpile |
| 9/5/02 | Th | 84 | 31 | 6 | 48 | 11 | | Hauling fill, backfill and compaction. |
| 9/6/02 | F | 85 | 30 | 6 | 24 | 12 | | Hauling fill, backfill and compaction. |
| 9/9/02 | M | 86 | 28 | 6 | 48 | 13 | | Hauling fill, Yankee on site entire day to monior unsuitable materials. |
| 9/10/02 | T | 87 | 30 | 6 | 48 | 14 | | Haulling fill, Yankee on site entire day to monitor unsuitable materials. |
| 9/11/02 | W | 88 | 30 | 6 | 48 | 15 | | Yankee on site entire day to monitor unsuitable materials. Confirm unsuitables deeper than borings |
| 9/12/02 | Th | 89 | 30 | 6 | 48 | 16 | | Yankee on site entire day to monitor unsuitable materials. |

Project: North Brookfield JR/SR High School                                      EXHIBIT B

American Manufacturers Mutual Insurance Co. vs. Town of North Brookfield, Board of Education

ANALYSIS OF MANPOWER DURING WORK INVOLVING UNANTICIPATED, UNSUITABLE SOIL ACTIVITIES

NOTE:  Work associated with unsuitables, includes excavation, removal of unsuitable material; handling replacement structural fill, backfilling and compaction.  NID indicates that the listed dates are not included in denominator of the calculation of the average.

| Date | Day | Report # | EJS +S/C Total Man days | Minimum EJS Man-days, Unsuitable Material | Manhours Unsuitable soils | Day Count Unsuitables | Avg Man-days, Unsuitable Material | Comments |
|---|---|---|---|---|---|---|---|---|
| 9/13/02 | F | 90 | 30 | 6 | 43 | 17 | | Hauling fill, Yankee on site entire day to monitor unsuitable materials +2.5 hours OT |
| 9/16/02 | M | 91 | 31 | 7 | 35 | 18 | | Rain, Haulling fill, Yankee on site to monitor Compaction |
| 9/17/02 | T | 92 | 32 | 7 | 56 | 19 | | Hauling fill, Yankee on site to monitor unsuitable materials. |
| S/18/02 | W | 93 | 34 | 7 | 56 | 20 | | Yankee on site entire day to monitor unsuitable materials. |
| 9/19/02 | Th | 94 | 32 | 7 | 56 | 21 | | Hauling fill,Yankee on site entire day to monitor unsuitable materials. Meeting w/NB re Unsuitable quantities |
| September 1-19 | | | | 76 | | | 6.33 | AVG:  NID 9/2 Holiday; 9/4/02 Rain |
| 9/20/02 | F | 95 | 33 | 7 | 56 | 22 | | Hauling fill, Yankee on site entire day to monitor unsuitable materials + OT. |
| 9/21/02 | Sa | NO REPORT | 7.6 | 7.6 | 61 | | | Yankee on Site; Conway verifies all day work operators and laborers @ 10: NB39431-35 Cert Payroll record |
| 9/23/02 | M | 96 | 33 | 8 | 64 | 23 | | Hauling fill, Yankee on site entire day to monitor unsuitable materials. |
| 9/24/02 | T | 97 | 33 | 8 | 64 | 24 | | Hauling fill, Yankee on site entire day to monitor unsuitable materials + OT; Larger Excavator brought in |
| 9/25/02 | W | 98 | 33 | 8 | 64 | 25 | | Hauling fill, Another meeting held to resolve payment-measurement of Unsuitables, grid method established |
| 9/26/02 | Th | 99 | 32 | 8 | 64 | 26 | | Hauling fill, Done after fact by Conway; Ref; NB39486-490 Cert PR |
| 9/27/02 | F | 100 | 8 | 0 | 0 | | | Rain |

Project: North Brookfield JR/SR High School     **EXHIBIT B**

American Manufacturers Mutual Insurance Co. vs. Town of North Brookfield, Board of Education

ANALYSIS OF MANPOWER DURING WORK INVOLVING UNANTICIPATED, UNSUITABLE SOIL ACTIVITIES

NOTE: Work associated with unsuitables, includes excavation, removal of unsuitable material; handling replacement structural fill, backfilling and compaction. NID indicates that the listed dates are not included in denominator of the calculation of the average.

| Date | Day | Report # | EJS +S/C Total Man days | Minimum EJS Man-days, Unsuitable Material | Manhours Unsuitable soils | Day Count Unsuitables | Avg Man-days, Unsuitable Material | Comments |
|---|---|---|---|---|---|---|---|---|
| 9/28/02 | Sa | NO REPORT | 9 | 0 | 0 | | | Conway report of 9/30 confirms Sa work, EJS personnel determined by Cert payroll NB39486-490. Concrete work only |
| 9/30/02 | M | 101 | 32 | 8 | 64 | 28 | | Hauled fill, compaction |
| September 20-30 | | | | 54.6 | | | 7.80 | AVG (1) NID 9/21 or 9/28 Saturday or 9/27/02 Rain |
| 10/1/02 | T | 102 | 32 | 8 | 64 | 29 | | Hauling fill, Yankee on site entire day to monitor unsuitable materials, concrete. |
| 10/2/02 | W | 103 | 32 | 7 | 56 | 30 | | Hauled fill, compaction |
| 10/3/02 | Th | 104 | 32 | 7 | 56 | 31 | | Hauled fill, 6 trucks constant |
| 10/4/02 | F | 105 | 32 | 7 | 56 | 32 | | Hauled fill, B Unsuitable finished, 8 hours |
| 10/5/02 | Sa | NO REPORT | 10 | 10 | 80 | | | Hauled fill, 12 loads of fill, Certified payroll records, NB39338 |
| 10/7/02 | M | 106 | 32 | 10 | 80 | 33 | | Hauled fill, B Unsuitable finished, 8 hours |
| 10/8/02 | T | 107 | 32 | 7 | 56 | 34 | | Hauled fill, compaction, excavation |
| 10/9/02 | W | 108 | 34 | 9 | 72 | 35 | | Hauled fill, compaction, excavation |
| 10/10/05 | Th | 109 | 31 | 9 | 72 | 36 | | Hauled fill, compaction, excavation |
| 10/11/02 | F | 110 | 31 | 7 | 56 | 37 | | Hauled fill, compaction, excavation, Yankee on site 8 hours |
| 10/12/02 | Sa | NO REPORT | 8 | 8 | 64 | | | Hauled fill, 8 hours for tech. NB39326-330 Cert Payroll records BF & Compact |
| 10/14/02 | M | 111 | 10 | 8 | 64 | | | Hauled fill, Holiday |
| 10/15/02 | T | 112 | 30 | 7 | 56 | 38 | | Hauled fill, 8 hours for tech |
| 10/16/02 | W | 113 | 10 | 9 | 36 | 39 | | Hauled fill, 12 loads, Rain Both Numbered 113 |
| 10/17/02 | Th | 113 | 30 | 7 | 56 | 40 | | Hauled fill, Both Numbered 113 |
| 10/18/02 | F | 114 | 28 | 7 | 56 | 41 | | Hauled fill, 8 hours for Yankee |

Project: North Brookfield JR/SR High School                                    EXHIBIT B

American Manufacturers Mutual Insurance Co. vs. Town of North Brookfield, Board of Education

ANALYSIS OF MANPOWER DURING WORK INVOLVING UNANTICIPATED, UNSUITABLE SOIL ACTIVITIES

NOTE:  Work associated with unsuitables, includes excavation, removal of unsuitable material; handling replacement structural fill, backfilling and compaction.  NID indicates that the listed dates are not included in denominator of the calculation of the average.

| Date | Day | Report # | EJS +S/C Total Man days | Minimum EJS Man-days, Unsuitable Material | Manhours Unsuitable soils | Day Count Unsuitables | Avg Man-days, Unsuitable Material | Comments |
|---|---|---|---|---|---|---|---|---|
| 10/19/02 | Sa | NO REPORT | 8.5 | 8.5 | 60 | | | Compacted fill Conway Report 115, crew size determined from payroll, Yankee on site to monitor compaction NB39236-40 Cert Payroll |
| 10/21/05 | M | 115 | 41 | 7 | 56 | 42 | | Hauled fill, Mandate on site |
| 10/22/02 | T | 116 | 41 | 7 | 56 | 43 | | Hauled fill, compaction, excavation |
| 10/23/02 | W | 117 | 16.5 | 6 | 24 | 44 | | Hauled fill, compaction, excavation |
| 10/24/02 | Th | 118 | 39 | 8 | 64 | 45 | | Hauling fill, Yankee on site entire day to monitor unsuitable materials, concrete. |
| 10/25/02 | F | 119 | 39 | 8 | 64 | 46 | | Hauling fill, Yankee on site entire day to monitor unsuitable materials, concrete. |
| 10/26/02 | Sa | NO REPORT | 2.5 | 2.5 | 20 | | | NB39376-79 Certified Payrolls |
| 10/28/02 | M | 120 | 39 | 8 | 64 | 47 | | Compaction, excavation, no fill |
| 10/29/05 | T | 121 | 43 | 8 | 72 | 48 | | Haulling fill, Yankee on site entire day+OT to monitor unsuitable materials, concrete. |
| 10/30/02 | W | 122 | 39 | 7 | 56 | 49 | | Hauled fill- Qty 3 sparse by Conway, end of exc Unsuitable |
| 10/31/02 | Th | 123 | 41 | 9 | 72 | 50 | | Hauled fill, compaction |
| October | | | | 206 | | 9.36 | | AVG- NID: 10/5/02, 10/12/02, 10/19/02 or 10/26/02, Sat. work, or 10/14/02 Holiday |

**Project: North Brookfield JR/SR High School**                                                                    **EXHIBIT B**

**American Manufacturers Mutual Insurance Co. vs. Town of North Brookfield, Board of Education**

**ANALYSIS OF MANPOWER DURING WORK INVOLVING UNANTICIPATED, UNSUITABLE SOIL ACTIVITIES**

**NOTE:**  Work associated with unsuitables, includes excavation, removal of unsuitable material; handling replacement structural fill, backfilling and compaction.  NID indicates that the listed dates are not included in denominator of the calculation of the average.

| Date | Day | Report # | EJS +S/C Total Man days | Minimum EJS Man-days, Unsuitable Material | Manhours Unsuitable soils | Day Count Unsuitables | Avg Man-days, Unsuitable Material | Comments |
|---|---|---|---|---|---|---|---|---|
| 11/1/02 | F | 124 | 41 | 9 | 72 | 51 | | Yankee on site entire day to monitor unsuitable materials, concrete. |
| 11/2/02 | Sa | NO REPORT | 8 | 2 | 16 | | | Hauling fill, Yankee on site to monitor unsuitable materials, concrete. NB39176-180,Cert Payroll |
| 11/4/02 | M | 125 | 39 | 8 | 64 | 52 | | Hauling fill, Yankee on site entire day to monitor unsuitable materials, concrete. |
| 11/5/02 | T | 126 | 37 | 7 | 56 | 53 | | Hauling fill, Yankee on site entire day to monitor unsuitable materials, concrete. |
| November | | | | 26 | | | 8.67 | **AVG  NID 11/2/02 Sat. 11/5/02 was last date Conroy advised work on Unsuitables** |
| Totals 8/19-11/5/02– Man-days/Man-hours relating to work on Unsuitables | | | | 413.60 | 3189 | 53 | 7.80 | AVG: Overall Work on Unsuitables EXHIBIT B |
| Approximate Manhours EXHIBIT I | | | 296 | 37 | | 30 | 2.00 | Conway totals per Exhibit I |