**EXHIBIT G**

# REBUTTAL REPORT

## In response to Expert Report of Lee P. Dore

### GREYHAWK North America, LLC

### Richard P. Anastasio

### October 28, 2005

I have studied the expert report of Lee P. Dore, dated August 4, 2005, rendered in the case of American Manufacturers Mutual Insurance Co vs. the Town of North Brookfield ("Town"). I present the following rebuttal which supplements my own Expert Report and Analysis dated August 5, 2005 in the same case.

## OPINION

Mr. Dore's opinions do not take into account a number of facts concerning the history of the project of which I know he is aware. He selectively recites events that tend to support his opinion without acknowledging facts that would undermine it. Specifically, he failed to acknowledge several causes of delay for which the Town (or Dore & Whittier as the Town's Agent) was responsible, or for which the Town has the risk under the Contract. Some of his conclusions are not supported by the information available. He also improperly uses hindsight to criticize Sciaba's approach to staffing and removal of unsuitable material. Omission of these Town-responsible causes, incorrect reasoning, unsupported conclusions, and the inappropriate use of hindsight, present a distorted and inaccurate picture of what happened on the project and attribute to Sciaba greater responsibility for the delays than Sciaba deserves. He misinterprets and/or misuses the time extension given for the unsuitable soil. He unfairly criticizes the important parts of Sciaba's schedules. He makes an invalid analogy to another project. In summary, Mr. Dore's conclusion that the exposure of the building to the weather was all Sciaba's fault, is wrong

## Town's Late Issuance of Notice to Proceed and Building Permit

The Town of North Brookfield did not issue a Notice to Proceed to Sciaba until April 24, 2002.[1] Dore & Whittier, the project architect (and Mr. Dore's employer) took responsibility for applying for a building permit for the project. Its application was not submitted to the Town Building Department until April 29, 2002 at the earliest.[2] The Town did not sign Sciaba's contract and deliver it to Sciaba until the job meeting on

[1] Deposition Exhibit 177
[2] Building Permit Application & Package NB42031-42049. John Dore's signature in the application is dated April 29, 2002. NB42034

2

May 30, 2002. [3] The Town Building Department did not issue the building permit until at least June 3, 2002,[4] but even after it was issued, it was not delivered to the job site until after the end of the workday on Friday, June 14, 2002. [5]

In my experience, it is rare that a contractor would start work before receiving a Notice to Proceed and although some contractors are willing to mobilize before receiving a signed contract, it is very unusual for contractors to begin actual construction activity before they have a building permit in hand. It is simply too risky to begin work without it, at least from a pragmatic standpoint and probably also from a legal standpoint. Thus, in my opinion, Sciaba was justified in not beginning the real work of dewatering and excavation for the building until the building permit was in hand, in mid June, 2002. It also means that Sciaba was justified in not loading up the site with manpower until the building permit was in hand.

On pages 2 and 3 of his report, Mr. Dore refers to Sciaba's initial schedule submitted to the Town and much of his analysis is based upon that schedule. The initial schedule had a "run date" of May 17, 2002.[6] The run date is the date the schedule was printed. The more important date is the "data date", which indicates the effective date when the planning and logic for the schedule were done. In the case of the May 17, 2002 run date schedule, the data date was April 1, 2002. This date was before the effective date of Sciaba's contract, before the Notice to Proceed, before the Town signed and delivered the signed contract to Sciaba, before the building permit was issued, and, most importantly, long before anyone could have known that the building permit would not be delivered to the site until June 14, 2002.

---

[3] Minutes of Job Meeting May 30, 2002 6th bullet MDW14167-70; minutes of school building committee meeting May 29, 2002, MDW12524-26 § 5
[4] Building Permit Application & Package, NB42031
[5] Conway's Daily Report, June 14, 2002, special note NBDW 60447
[6] MDW10756-62

The importance of these dates is that the initial schedule assumed, optimistically, that a Notice to Proceed would be issued immediately, on April 1, 2002. See Activity 00. The initial schedule contemplated that excavation for the footings for Building Area C would start about 8 weeks later (May 31, 2002 on the initial schedule, Activity 340). The site was extremely wet. Therefore, the site needed dewatering before substantial excavation, backfill and compaction could take place. In actuality, these activities did not and could not begin until mid June, after the building permit was issued. [7]  Sciaba lost approximately 4 weeks due to the Town's delay in issuing the building permit, compared with the initial schedule.

However, Mr. Dore disregards these causes of delay in his report. Both in his expert report and contemporaneously on the job, Mr. Dore and others from Dore & Whittier were critical of Sciaba for not having more people on site. However, conveniently, they disregard the lack of a building permit as a legitimate reason for Sciaba not achieving the progress that the initial schedule contemplated, assuming an April 1 Notice to Proceed and no delay in issuance of the building permit.

### Town's Late Issuance of a Construction Change Directive for Unsuitable Soil

Mr. Dore's report acknowledges that unanticipated, unsuitable soil was encountered in several building areas.[8]  In order for Sciaba to perform any work with respect to removal of the unsuitable soil, it needed, and was entitled under the Contract to, a directive from the architect and owner directing that the soil be removed and confirming the terms of payment.[9]  The Town and Dore & Whittier signed such a directive, called a Construction Change Directive, CCD, on July 31, 2002.[10]

---

[7] Actual activities are recorded on subsequent schedules, including the schedule with a run date of September 26, 2002 to which Mr. Dore referred (Dore Report Exhibit B) as the schedule of September 10, 2002 (Data date). MDW10739-47

[8] Mr. Dore implies the unsuitable soil was first discovered on July 12, 2002 (report page 3). However, Dore & Whittier's daily report of July 12, 2002 (Exhibit C to Mr. Dore's report) indicates it "showed up in the 5 observations dug Wednesday", which was July 10, 2002. Discovery on July 10 is confirmed by the soil field report of Yankee Engineering and Testing ("Yankee"), dated July 10, 2002. ;NBDW29172

[9] Project Manual, Change Order Procedure 1.05, MDW11616-11617; Project Manual, Supplementary General Conditions, I.1.5; Project Manual, Excavation 3.04.D, MDW11737, Deposition Exhibit 78.

[10] CCD #4R, GH06034-35

In my opinion, there is no reason that Dore & Whittier and the Town could not have issued CCD #4R immediately after discovery of the unsuitable soil on July 12. The conditions were observed by Mr. Conway and by Yankee Engineering & Testing, an engineering company engaged by Dore & Whittier to monitor and test soils during preparation of the building site among other things. CCD #4R did not contain any details regarding the extent of the problem, and left the measurement of unsuitable soil for later. CCD#4R did not propose to pay Sciaba on a fixed lump sum basis but on a unit price basis, at a price ($25 a cubic yard) that was dictated by the Town in its bid document. The price was not even one that Sciaba had to (or was permitted to) quote.

**Impact of Late and Cumbersome Methods of Quantifying Extra Unsuitable Soil**
As stated in a letter of July 29, 2002, from Mr. Parker of Yankee Engineering, (attached to CCD #4R), it was not possible, before the excavation of the unanticipated, unsuitable soil, to estimate with any accuracy, the quantities of soil to be removed that Sciaba could be compensated for. Ordinarily, in a situation like this, the contractor is permitted to use heavy equipment to excavate the material in a continuous operation and stockpile the material. Measurement of quantities for purposes of compensation can be done later, based on the stockpiled material. The risk of Sciaba excavating more than necessary was small because the contract had dictated a flat, all-encompassing rate of $25 per cubic yard. That rate was not even enough to cover the cost of removal and disposal, let alone the replacement of removed material with suitable material and compaction of the new material. It was not a rate with any profit for the contractor. In this case, however, Sciaba was not permitted to proceed in this fashion. Rather, Sciaba was required to proceed slowly and meticulously, so that daily monitoring or measurements could be made, in an effort to produce a calculation that, in my opinion, was to be more precise than is usually made in similar circumstances.

This methodology was left undefined until almost two months after CCD #4R was issued.[11] Uncertainty about the method of quantification made it impossible for Sciaba to approach the excavation and removal of unsuitable soil efficiently. When a methodology was finally spelled out, it required daily measurements by a surveyor as the bottom elevation of each point of excavation was reached. This meant that work had to stop at any given point, when the bottom of the unsuitable soil was reached so that a measurement could be taken. Therefore, it could not be back-filled right away. Ultimately, the Town gave Sciaba, and Sciaba accepted an extension time for the impact of the unanticipated, unsuitable soil that moved the substantial completion date to December 15, 2003.[12]

## Change Order #3

Mr. Dore states repeatedly in his report (Page 3 and 3 times in Exhibit B) that Change Order #3, which gave the time extension for the unsuitable soil, extended the substantial completion date of the building to December 15, 2003. I agree with this statement. However, Mr. Dore mischaracterizes the effect in length of the extension by using 28 days as the length of the extension. The original contract had two completion dates, July 17, 2003, for substantial completion of "the new building", and November 17, 2003 for substantial completion of "the balance of the work."[13] When Change Order #3 was issued, it extended both substantial completion dates to December 15, 2003. This represented a 28-day extension for "the balance of the work," but a 151-day extension for "the new building" as it is 151 days from July 17 to December 15, 2003. Mr. Dore's use of 28 days as the length of the extension is incorrect, misleading and inconsistent with his other statements that the extended substantial completion date for the new building was December 15, 2003.

---

[11] September 19, 2002, Letter from Scott Finneran to Lee Dore, with enclosures, NBDW29727-29736; September 24, 2002, Letter from Whitney Parker to Lee Dore, with enclosures, NBDW28984-86; minutes of Site Meeting, September 25, 2002, NB36629-30; sketch dated September 25, 2002, NBDW27381; September 25, 2002, Letter from Whitney Parker to Lee Dore with enclosures, NBDW28978-80;
[12] Exhibit D to Mr. Dore's report.
[13] Contract § 3.3, Deposition Exhibit 22.

The extension of 151 days for the building, in my opinion, reasonably reflected not only the delay caused by the unexpected, unsuitable soil, but also the other delays discussed above that the Town was responsible for. If 151 days is treated as the length of the extension for the new building, that is a reasonable extension and no further allowance needs to be made for the other owner-caused delays early in the job. If 28 days is treated as the length of the extension for the new building, then it improperly disregards the owner-caused delays. Those delays must be taken into consideration in any analysis of when the building should have been weather tight. Mr. Dore does not do so.

**Impact of the Extension**

If the true length of the extension of the substantial completion date for the new building –151 days is used, I come to very different conclusions than Mr. Dore does about when Sciaba should have had the building weather tight. As Mr. Dore correctly points out, Sciaba's baseline schedule, with a data date of April 1, 2002, called for the new building to be weather tight (capable of being tented for work during the winter) by December 6, 2002. Adding 151 days to that date, moves the scheduled date for the entire building to be weather tight out to May 6, 2003. With that adjustment, no one could realistically conclude that, after taking into consideration the extension in Change Order #3, it was feasible or planned to have the building weather tight before the inclement weather of the winter of 2002-03 set in.

The first schedule that reflects an impact of the unsuitable soil indicated a run date of September 13, 2002, with a data date of September 10, 2002. That schedule shows steel erection in Area C due to start October 29, 2002. In actuality, that activity started about a week earlier than that date, showing that the scheduled date was realistic and achievable. That schedule also shows completion of the roofing and/or exterior stud systems (both necessary for weather-tightness), on December 26, 2002 for Area C; January 17, 2003 for Area B and February 10, 2003 for Area A. The dates and the durations for the precedent activities were realistic as of the time of the schedule, given

7

what was known as of the September 10, 2002 data date, assuming normal weather conditions. However, these dates do not contemplate that any of the building areas would be weather tight before November 1, 2002, which is when the abnormal weather began to affect the project (as shown in my August 5, 2005 report).

Mr. Dore's analysis not only improperly uses 28 days as the length of the extension; he assumes that the abnormally bad weather did not begin until the beginning of January 2003. In the last two paragraphs on page 3 of his report, he adds 28 days to the obsolete December 6, 2002 weather tight date, moving the activity to January 3, 2003 and making that date the new date that the building should have been weather tight. In concluding that Sciaba could have had the building weather tight by that date ignores the facts (as shown in my August 5, 2005 report) that the abnormally bad weather began the 1st week of November, a fact that he does not dispute. Nowhere in his report does Mr. Dore show how he rules out the impact of the abnormal, inclement weather of November and December 2002 as contributing to the project being behind schedule on January 3, 2003.

**Sciaba's Schedule**

Mr. Dore states in page 4 of his report:

> With each subsequent scheduled update…EJS was manipulating scheduled completion milestone dates in a manner that would not extend the substantial completion date for which they were under contract.
>
> EJS's schedule noted the ultimate completion for the entire building always remained constant as 15 December 2003. Dore and Whittier's opinion regarding the schedule conflicts were [sic] noted to EJS through a letter from Dore and Whittier to the Owner (Exhibit G) and copied to EJS on 12 August 2002 after a review of the schedule that was submitted to the Owner at the 31 July 2002 Building Committee meeting. Exhibit G (page 3) is Dore and Whittier's review of the submitted schedule. This review noted several instances where activities overlapped and were not possible to be completed in the sequence illustrated in the schedule. As an example, the July, 2002 schedule indicated that electrical work would be starting prior to the roof being installed.

8

I disagree with Mr. Dore's opinion, in the excerpt. He presents facts only selectively, some of them are inaccurate and he draws an untenable conclusion.

First, for purposes of determining if abnormal weather delayed the project, or whether Sciaba should have had the building weather tight before the abnormal weather set in, the portions of Sciaba's schedules that are relevant are those reflecting the activities leading up to the building being weather tight. The portions of the schedules after that time have no bearing on the analysis. The dates that Sciaba carried for substantial or final completion, or the durations in sequencing of later activities, do not enter into the analysis of what happened in 2002, or the first quarter of 2003.

Second, Sciaba's schedules were updated to show changes in the projected finish dates. In the lower left corner of each page, the schedules show a "finish date" just above the data date and run date. For the schedules summarized in Mr. Dore's Exhibit B, the finish dates were:

| Data Date | Finish Date |
|-----------|-------------|
| 4/1/02 | 6/17/03 |
| 7/15/02 | 11/27/03 |
| 9/10/02 | 11/14/03 |
| 12/31/02 | 12/8/03 |

Thus, Mr. Dore's statement that Sciaba's "schedules noted the ultimate completion for the entire building always remains constant as 15 December 2003" is not accurate.

Third, three of the four schedules referenced in Mr. Dore's report, page 4 in Exhibit B, were prepared before the abnormal weather began (November 1, 2002). Only the schedule with a data date of December 31, 2002, was prepared after that date, and, even then, the extent of the abnormality of the weather and the full impact of the abnormal weather had not yet become apparent. Therefore, it is understandable and reasonable that those schedules did not reflect a weather impact. As the winter drew to a close, and the abnormality of the weather, and the impact of the abnormal weather did

become apparent, Sciaba prepared a new schedule with a data date of March 31, 2003. That schedule showed an updated finish date of January 29, 2004, and added specifically lines entitled "Inclimate [sic] Weather".

Fourth, I disagree with the point Mr. Dore is making regarding Exhibit G, page 3, items 1 thru 8. He cites those items as instances where activities on a Sciaba schedule "overlapped and were not possible to be completed in the sequence illustrated in the schedule."

Only items 6 and 7 in Exhibit G actually try to make this kind of point and even they are not valid points. As for item 6, electrical rough-in can be, and often is, done before the roof is tight. In addition, the schedule referred to, called for the electrical rough-in work to begin in Area A on December 13, 2002 and had an expected duration of 30 days (Activity SUPOA600). Work on the roofing system in Area A was scheduled to take place between December 4 and December 26, 2002 (Activity SUPOA320)

As for Item 7 in Exhibit G, the July 15 data date schedule shows the roof decking in Area A to be completed by November 26, 2002 (Activity SUPOA307). HVAC rough-in was to start December 13, 2002 (Activity SUPOA800). Most mechanical and electrical subcontractors would be willing to start their rough-ins after installation of the roof decking and would not insist on waiting until the entire roofing system was installed. The plan, therefore, was for part of the roofing system to be on before HVAC and electrical rough-in was scheduled to start, which would allow a dry area for those activities to start. The entire roofing system in Area A was due to be completed before the electrical and HVAC would catch up. This was a reasonable plan for sequencing the work.

The other points in Exhibit G merely show skepticism about how quickly activities could be accomplished, not questionable sequencing.

## Manpower

In several places in his report, Mr. Dore has attributed delay in the project to insufficient manpower, and uses those attributions to support his opinion that the building was exposed to the weather during the winter of 2002-03 because of Sciaba's ineffectiveness. In my opinion, although there were periods of time when Sciaba's manpower levels were lower than originally planned and other times when progress was slower than it should have been, there were legitimate reasons for this that were not entirely Sciaba's responsibility. Some of the slow progress was due to factors for which the Town was responsible, or for which the Town bore the risk under the Contract. I have already discussed some of those factors in my rebuttal report to Mr. Conway.

## Ralph C. Mahar Regional School

The last section of Mr. Dore's report discusses an unrelated project he worked on 2002-2003. He seems to suggest that because another contractor on another project got another building weather tight before the same abnormal weather, Sciaba should have been able to do the same thing. I disagree that the situations are comparable and therefore, disagree with Mr. Dore's conclusions.

On the basis of the information about the Mahar Regional School, available to me, it appears that the existence and the approximate quantity of contaminated soil to be removed was well known before the contract was awarded. Dore & Whittier had commissioned a very thorough and professional geotechnical investigation of the contamination that resulted in a 200-page report.[14] This report was made available to bidders before they had to bid.[15] The bid documents instructed the bidders to assume that the quantity of contaminated soil to be removed would be 14,400 tons, equivalent to 10,206 cubic yards.[16] The bid documents also included a plan showing the bidders

---

[14] Immediate Response Action Status report, dated September 27, 2001, MRS44712-933
[15] Mahar Regional School, Project Manual MRS43365-709. See page MRS43676, #02082-4
[16] Mahar Regional School, Project Manual page MRS43688, #02082-16. This appears to be the total tonnage for 2 building areas at Mahar not just the "Phase II" Area that Mr. Dore uses for comparison to North Brookfield. The Phase II area appears to account for about 80% of the total. See Fontaine Applications for payment on Mahar Regional School, line items 03-126 & 03-164. I have not been able to verify from the Mahar documents, Mr. Dore's

the location of the contaminated soil in relation to the building area.[17]  Approximately, two-thirds of the area depicted was outside the footprint of the new buildings.

This was very different from the unsuitable soil that Sciaba had to remove and replace. The extent of the unsuitable soil at North Brookfield was unanticipated and its location was unknown.  Once the quantity and location of the unsuitable soil were discovered, it turned out to be spread over most of North Brookfield building Areas B & A, at irregular and varying depths.[18]

Under the Fontaine contract on the Mahar Regional School project, the bidders were instructed to carry a lump sum price for handling the anticipated 14,400 tons of contaminated soil.  If more or less tonnage than 14,400 tons actually needed to be removed, the lump sum price would be adjusted at the rate of $73.50 per ton ($102.90 per cubic yard), in the case of excess material, or $68 per ton ($95.20 per cubic yard) in the case of less material.  These quantities did not need to be measured in place before removal, or even by a surveyor measuring elevation, after the bottom of the unsuitable material had been reached (as Sciaba's unsuitable material was).  Instead, the Mahar Regional School contract provided that any adjustment to Fontaine's price would be based upon truckloads of materials removed.[19]  The method of measurement at Mahar Regional School did not require Fontaine to slow down its excavation to take measurements in order to be assured of payment.  The trucking records to be used for payment were those that would ordinarily be created in the usual course of business.

---

statement that Phase II included excavation and removal of 13,000 cubic yards of contaminated soil.  Dore report page 4.  There is correspondence dated November 8, 2002 to Dore & Whittier, stating that only 12,000 tons of contaminated soil were estimated to be in that phase and that only 10,231.92 tons were actually removed.  MRSDW 57858-59.  This translates to only 7,308 cubic yards, just over half the quantity Mr. Dore said was removed.  Mr. Dore also understated the volume of unanticipated unsuitable soil Sciaba had to remove at North Brookfield.  Sciaba was paid to remove 5,312.17 cubic yards, according to Deposition Exhibits 23 & 82, not 4,000 cubic yards as Mr. Dore stated, report page 4.  Thus, Fontaine only removed 1.38 times the amount Sciaba removed not 3.25 times as Mr. Dore's figures would suggest.

[17] Mahar Regional School, Drawings ATC-1-10, MRS43112-121.

[18] See 9/24/02 and 9/25/02 letters & sketches by Yankee Engineering, NBDW28984-86 & BDW28978-81.

[19] Mahar Regional School project, Manual page MRS43689, #02082-17.

The lump sum pricing and advance awareness of the contaminated soil at Mahar Regional School meant that there was no need to take precise measurements of soil being removed and that Fontaine could attack the contaminated soil in an efficient, smooth manner. That work was built into Fontaine's schedule and did not cause either a delay in progress, or a change in the planned sequence of construction.

All of the Phase II Work with the contaminated soil was accomplished during the pay period from July 15 to August 15, 2002.[20] Completion of this work during a single month enabled Fontaine to move smoothly and efficiently through the placing of footings and slabs between early September and Mid-November 2002.[21] This contrasts with Sciaba's footing and foundation wall work, which had to be performed in Areas B & A only after the unsuitable soil was removed, measured, and replaced. Sciaba's was, of necessity, a choppy operation that was impossible to plan.

I noted other differences between the Mahar Regional School, Phase II work and the North Brookfield project that make the situations incomparable:

> The Mahar Regional School Phase II section is all on one level. There is no basement level or substantial "below grade" level. Therefore, the footings and foundations did not require the excavation of the building perimeter foundations, or the intermediate piers to be as deep as those required at the North Brookfield project. Essentially, the Mahar Regional School is constructed on a concrete slab on grade. The deepest excavation which Fontaine had to perform for this Phase was limited to the areas affected by the already contemplated contaminated soil.[22]

---

[20] Fontaine's Application of Payment No. 6 MRS46869-907, page 4.
[21] Fontaine's Application of Payment Nos. 8 & 9, MRS46762-801, page 8 & MRS46721-760, page 8.
[22] Contract Drawing S-1.14, Partial Foundation, Plan Area D and indicated Sections and Contract Drawings S-2.1 Section and S.2.2 Section.

13

The cross section of the sub-grade provided for the work at the Mahar Regional School, which was used to identify the contaminated soil and its relation to the groundwater, indicates that the groundwater level for the Phase II area was approximately 10 feet below grade and lower. [23] Additionally, the geotechnical report and the specifications contemplated a fully engineered solution for dewatering the affected areas and this was all planned for and implemented, prior to the contractor dealing with the excavation and remediation activities. [24] The level of ground water was much deeper than the required excavation for the foundations and footings for the Phase II work. Therefore, the existing groundwater should not have affected the excavation for the footings and foundations.

The significance of this physical difference in the underground conditions between the two projects is that there would be no existing condition at Mahar which would require the entire project site to be dewatered to a lower level. The North Brookfield project, on the other hand, required a massive operation to dewater and to maintain the lower water level. The lower water level was needed to permit subsequent activities relating to the underground utilities, foundations and footings to take place.

The borings and the actual physical surface conditions at the North Brookfield site also failed to reveal the depth of the unsuitable soil, which required that the dewatering extend deeper than anyone thought necessary. The deeper dewatering required additional effort and time.

There may be other differences that render a comparison between the two projects unfair and I reserve the right to supplement this rebuttal if other differences come to my attention.

---

[23] Contract Drawing ATC-1 Remedial Excavation and UST Location Plan, Cross-Section Detail A-A'
[24] Immediate Response Action Status report, dated September 27, 2001, MRS44712-933

For the reasons stated above, I believe the comparison made by Mr. Dore between the Mahar Regional School and the North Brookfield projects to be misleading and invalid.

**Materials Considered**

In addition to the documents and information referenced in my August 5 Report and Analysis, in forming the opinions expressed here, I have considered the documents specifically referenced in Mr. Dore's report, to the extent I could identify them. I also considered the documents specifically referenced in the body of my Rebuttal Report above, and those referenced in my Rebuttal Report to the Expert Report of Chris Conway. I also considered documents produced by Dore and Whittier and the Town of Orange, regarding the Ralph C. Mahar Regional School and I visited that school.

Richard P. Anastasio

15

**EXHIBIT H**

1

1    Volume:  I                        Pages:  154

2

3              UNITED STATES BANKRUPTCY COURT

4                DISTRICT OF MASSACHUSETTS

5                    EASTERN DIVISION

6    - - - - - - - - - - - - - - - - - x

7    IN RE:

8    EDWARD J. SCIABA, JR.          Chapter 7

9            Debtor              Case No. 03-20569

10       -CJK

11   - - - - - - - - - - - - - - - - - x

12   AMERICAN MANUFACTURERS MUTUAL

13   INSURANCE COMPANY,

14            Plaintiff

15       v                       Adversary Proceeding

16   EDWARD J. SCIABA, JR.          No. 04-1106

17            Defendant

18   - - - - - - - - - - - - - - - - - x

19            DEPOSITION OF MATTHEW J. DALY

20        Friday, August 13, 2004, 10:01 a.m.

21             HOLLAND & KNIGHT LLP

22              10 St. James Avenue

23          Boston, Massachusetts  02116

24      Reporter:  Carol A. Pagliaro, CSR/RPR/RMR

41

1  individuals that were there and who you were with, I

2  would appreciate it.

3      A.  It was Mike Sheehan who was a general

4  superintendent, there was Mike Haynes who was the

5  superintendent --

6      Q.  Were these Sciaba people?

7      A.  Yes. -- and myself, and then there was a

8  slew of people from the owner's reps, and, you know,

9  the architect, which I don't really recall who it

10 was at the time, I don't remember the name, and then

11 that's really it.  Then I know there was a couple of

12 representatives from Kemper Surety there, and then

13 there was another consultant, construction

14 consultant, I remember that was there.  That's it.

15     Q.  What happened at that meeting?

16     A.  You know, the status of the job was

17 discussed, you know, where we stood and what we

18 thought we could do to accelerate the schedule.  We

19 talked about payment from the owner to us and

20 payment to, you know, vendors, and stuff like that.

21     Q.  What was the outcome of the meeting?

22     A.  The outcome was more or less that, you know,

23 the owner was going to pay us, and, you know, we

24 were going to proceed to accelerate the schedule,

42

1   and I know Kemper had basically stated that they

2   were going to stand behind us on it, and they would

3   continue to monitor the situation closely, and get

4   weekly updates and daily updates, I forget what it

5   was, and that was really it. We were ready to start

6   rocking and rolling and going in there.

7       Q. Did you make any kind of presentation at the

8   meeting?

9       A. Did I? No. I was not familiar with the

10  project, you know.

11      Q. Did you speak at all at the meeting?

12      A. I think I spoke about a couple of things. I

13  don't really recall, but I think the owner had asked

14  us different questions. I honestly don't recall, to

15  be honest with you. I know I piped up about a

16  couple of things here and there.

17      Q. You don't recall in any way what they were

18  about?

19      A. I'm trying to think. I know it had

20  something to do with the specs, specifications of

21  the project. I don't really recall, to be honest

22  with you. I'm not sure.

23      Q. What about submitting project schedules?

24      A. There might have been talk about it. I'm