UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ) | |
| AMERICAN MANUFACTURERS MUTUAL ) | |
| INSURANCE COMPANY, ) | |
|        Plaintiff, ) | |
| vs. ) | **CIVIL ACTION** |
| ) | **NO. 03-40266 - TSH** |
| TOWN OF NORTH BROOKFIELD, ) | |
|        Defendant. ) | |
| ) | |

**MEMORANDUM AND ORDER**
**August 10, 2006**

**HILLMAN, M.J.**

**INTRODUCTION**

This matter was assigned to Chief Magistrate Judge Swartwood by Order dated August 5, 2004 pursuant to 28 U.S.C. §636(c) and Fed. R. Civ. P. 73 upon consent of all parties to the jurisdiction of a United States Magistrate Judge. The matter was reassigned to me on February 16, 2006 (see Docket No. 108). Pending are the following motions, which are addressed in this Memorandum and Order:

    1.    Plaintiff's Motion for Summary Judgment on Count III of Defendant's Counterclaim – Tort (Docket No. 34);

    2.    Plaintiff's Motion for Summary Judgment on Count II of Defendant's Counterclaim – Chapter 93A (Docket No. 35);

    3.    Plaintiff's Motion for Partial Summary Judgment as to Claims for Direct Payment (Docket No. 36);

    4.    Plaintiff's Motion for Partial Summary Judgment on Liquidated Damages as the Exclusive Remedy for Delay (Docket No. 37);

1

5.    Defendant's Motion for Partial Summary Judgment (Docket No. 38);

6.    Plaintiff's Motion to Strike the Town's Reply Facts and Accompanying Affidavits (Docket No. 109);

7.    Plaintiff's Alternative Motion for Leave to Respond to Defendant's Reply Facts If Plaintiff's Motion to Strike is Denied (Docket No. 112).

As described more fully herein, Docket No. 34 is GRANTED; Docket No. 35 is GRANTED IN PART and DENIED IN PART; Docket No. 36 is GRANTED; Docket No. 37 is DENIED; Docket No. 38 is DENIED; Docket No. 109 is DENIED, and Docket No. 112 is GRANTED.

## NATURE OF THE CASE

This is an action for declaratory judgment brought by American Manufacturers Mutual Insurance Company ("AMMIC") against the Town of North Brookfield (the "Town" or "North Brookfield") seeking a declaration of its rights and responsibilities under a performance bond issued by AMMIC on the North Brookfield Junior/Senior High School construction project ("Project"). The Town has asserted a counterclaim seeking damages from AMMIC based upon breach of contract (Count I), violations of Mass. Gen. L. c.93A and c.176D (Count II), and tort liability (Count III).

## FACTUAL BACKGROUND[1]

---

[1] Despite the voluminous (and frequently duplicative) evidentiary submissions, many of the facts in this case are not disputed. The following narrative draws from the LR 56.1 Statements of Material Facts, responses thereto, and associated evidentiary submissions filed in connection with each of the seven pending motions.

**a.      The contract for the North Brookfield Junior/Senior High School**

In the Spring of 2002, the Town entered into a construct contract with E.J. Sciaba

Contracting Company ("Sciaba" or the "Contractor") for construction of a new Junior/Senior

High School in North Brookfield, Massachusetts.  This contract, dated April 19, 2002, was a

standard American Institute of Architects Standard Form of Agreement, AIA Document A101-

1997[2]  ("Construction Contract").  Under the terms of the Construction Contract, Sciaba was

obligated to achieve "substantial completion" of the new building by July 17, 2003.  Completion

of the final phase, Phase 4 (involving parking lot construction and related work), was to be

substantially completed by November 17, 2003.  Through a Change Order for the contract, the

project's substantial completion date was subsequently extended to December 15, 2003.[3]

As is required under construction contracts for the Commonwealth, see Mass. G.L. c.

149, § 29, Sciaba was obligated to obtain payment and performance bonds ensuring that

subcontractors would be paid and construction appropriately completed.  Sciaba obtained

bonding from AMMIC, and payment and performance bonds were executed and delivered to the

Town effective that day.  The performance bond at issue in this case, AMMIC Bond No.

3SE057856 (referred to hereinafter as the "Performance Bond") was also an AIA form

document, Document A312-1984.

_____

Disputed details are discussed where necessary for substantive analysis.

[2]  The American Institute Of Architects (AIA) form documents "have virtually become scripture in the construction injury."  Travelers Cas. & Surety Co. v. Long Bay Management Co., 58 Mass. App. Ct. 786, 790 n. 13, 792 N.E.2d 1013, 1017 (2003) (citation omitted).

[3]  AMMIC claims that Change Order #3 extended the substantial completion date for not only the parking lot, but also the building, to December 15, 2003.  If so, that would affect the calculation of liquidated damages; however, since neither party has sought summary judgment on the amount of liquidated damages, the Court needs not reach that issue.

The Town retained Dore & Whittier, Inc. ("Dore" or "Architect") as the Architect for the project. Dore also provided construction management services for the project. Relevant to this case, on May 22 2002 (well before the events relevant to this lawsuit) Dore's compensation agreement was amended to indicate "it is the Owner's intent to have any additional construction management costs paid out of liquidated damages which could be potentially assessed to the General Contractor" if construction lasted beyond December 31, 2003 through no fault of Owner. (Docket #53, ¶6; #54 at Exhibit C, NBDW34665 ¶2).

**b.  Problems begin to develop with the Project**

Problems on the Project began to arise in the early spring of 2003. Multiple subcontractors had made claims against AMMIC's Payment Bond in early 2003, suggesting that Sciaba had not used the Town's progress payments to pay those subcontractors. With concerns about apparent delays mounting in the Town's School Building Committee, on April 2, 2003 the Town asked Dore to investigate Sciaba's projected completion date. Minutes from the Committee's meeting of that date express concern about potential liquidated damages, and whether the project retainage would suffice to cover those damages.

Dore's first step was to contact Sciaba and ask for assurances that Sciaba could rectify numerous performance shortcomings on the project. Dore continued its investigation in anticipating of reporting to the Committee at its April 16, 2003 meeting. Prior to that meeting, Dore was projecting a completion date for the construction project of January 2005, some 13 months after the scheduled completion date. At the April 16, 2003 School Building Committee meeting, the Committee and Dore both expressed doubt that construction could be completed

anywhere near the contractual time frame of December 2003. The Town's estimate was that substantial completion would be at least fourteen months after the contract completion date. The Committee's minutes reflect that "additional costs will be incurred to pay the architect and construction manager beyond the scheduled substantial completion dates. These funds will be made up by liquidated damages of $1,000 per day." However, the contractual retainage as of April 16, 2003 – approximately $235,000 – would not be sufficient to cover the estimated liquidated damages, which with a fourteen-month delay would be approximately $426,000.

A week later, on April 23, 2003, the Town formally expressed its concerns to AMMIC that Sciaba was behind schedule and would be unlikely to complete project in a timely manner. The Town requested a meeting with AMMIC to discuss the project.

AMMIC, however, was not unaware of Sciaba's troubles. AMMIC had necessarily been aware of the potential claims under its Payment Bond in the first months of 2003. On March 13, 2003, AMMIC's senior surety counsel, Mr. Stephen Beatty, faxed Sciaba to request a meeting with Sciaba's principal, Edward Sciaba, Jr., and others to review various Sciaba projects (including the North Brookfield project) bonded by AMMIC. Beatty and Anastasio traveled to North Brookfield and other project sites to conduct these investigative meetings. Beatty and counsel also sought a full financial accounting of each AMMIC-bonded Sciaba contract, including the North Brookfield project.

**c.    The May 21, 2003 meeting**

On North Brookfield's request, Mr. Beatty (of AMMIC[4]), AMMIC's project consultant Mr. Richard Anastasio, P.E., and Deborah Griffin, Esq. (outside counsel for AMMIC) attended an

---

[4]  The Town's minutes of this meeting identify Mr. Beatty as being associated with Kemper Surety, not AMMIC. The import of this discrepancy is unclear.

on-site project meeting on May 21, 2003 to discuss Sciaba's performance issues on the project. Also attending the meeting were Ed O'Malley, the school principal; Robert O'Neill, the Superintendent of Schools; Don Gillette, the Building Committee co-chair; Edward Wilkins, Jr., and Greg Kline, members of the School Building Committee; Tom Barden, Chris Conway, Lee Dore, John Dore, and Harald Aksdal of Dore & Whittier; Larry Hasenfus, town selectman; Michael Sheehan, Matt Daly, Mike Haynes of Sciaba Construction; Bert Capone, as counsel for Sciaba; Ken Walton, Esq. as counsel for Dore & Whittier; and Thomas McEnaney, Esq. as counsel for the Town.

The happenings at this meeting are sharply disputed. According to AMMIC, the Town or its agents informed AMMIC of various subcontractor complaints about lack of payment and Sciaba's failure to provide updated monthly construction schedules. The Town complained that the project was substantially behind schedule and satisfactory progress was not being made on the project. Particularly relevant to this dispute, Mr. Beatty avers that the Town informed AMMIC that Sciaba "would have to submit an updated construction schedule" before it would be paid, to which Sciaba allegedly responded that it would be 3 weeks before an updated schedule could be submitted. Beatty further avers he asked the Town to advise him before any payments were in fact going to be made to Sciaba.

The Town sharply disputes Beatty's averments. Multiple affiants averred that (a) the Town was never requested to notify AMMIC prior to making payments; (b) AMMIC did not request the Town to withhold payments from Sciaba; and (c) AMMIC did not foresee a default by Sciaba. Selectman Hasenfus averred that he asked "representatives of AMMIC and Sciaba" whether the Town should continue making payments to Sciaba, to which he was informed by

6

representatives of "AMMIC and/or Sciaba" that payments should go to Sciaba.

On the other hand, Mr. Beatty indicated that AMMIC did not know the Town had already written two checks payable to Sciaba, and that had AMMIC known of those checks, he would have instructed the Town not to issue them without his consent. Instead, he believed that it would be "approximately three weeks before any checks would be released, at the earliest."

Regardless of what was said (or not said) at the meeting, the Town proceeded to make a payment of $2387,556.28 to Sciaba on May 21, 2003 for Sciaba's March 2003 requisition, and a payment of $447,733.76 to Sciaba on May 27, 2003 for Sciaba's April 2003 requisition. The Town made no further payments to Sciaba after May 27, 2003.


**d.    The declaration of default**

By letter dated May 30, 2003, Sciaba advised North Brookfield that it was unable to complete the project and admitted a voluntary default. This letter was delivered by AMMIC's counsel to the Town on June 5, 2003. The accompanying cover letter directed that all future project payments be made to AMMIC.

Aware of problems with the project (in the form of multiple claims on its payment bond from unpaid subcontractors) AMMIC had already retained Mr. Anastasio (a registered engineer with 38 years of industry experience) and his firm Greyhawk North America LLC to provide engineering, construction, and claim expertise with respect to AMMIC's investigation of Sciaba and its performance on the project. AMMIC had also retained a forensic accountant as well as Attorney Griffin in connection with Sciaba. By the time of Sciaba's declaration of voluntary default, Anastasio was fully involved with the project and was meeting regularly with the Town

7

and Dore & Whittier during June.  Anastasio had begun to seek project documentation and information from Dore & Whittier and the Town.

**e.      Events in July, 2003**

By letter dated July 2, 2003, Attorney Thomas W. McEnaney for the Town formally advised AMMIC's counsel that the Town sought  a meeting and was considering declaring a contractor default on the project.  This request formed a condition precedent to AMMIC's obligations under the Performance Bond.  In response, AMMIC waived its rights to insist on the Town's compliance with the conditions precedent to declaration of a contractor default (namely, a 20-day waiting period) and the consequent termination of Sciaba's right to perform under the Construction Contract.  Notwithstanding this waiver and Sciaba's prior declaration of default, the Town did not formally terminate Sciaba's right to perform until July 23, 2003.[5]  It was this act, together with calling on AMMIC to respond under its Performance Bond, that triggered AMMIC's obligations under the Performance Bond.

**f.      Actions following Sciaba's termination from the project**

Mr. Anastasio met with the School Building Committee on August 6, 2003 to explain the process of obtaining a completion contractor, and to discuss what steps would be required going forward to manage the project.  Mr. Anastasio also developed a Request for Expression of Interest that was distributed to a dozen potential completion contractor on or about August 13, 2003.

---

[5]  The record is unclear as to the Town's reasons for delay in taking these steps after receipt of Sciaba's declaration of default.

One week later, on August 20, 2003, Mr. Anastasio distributed the final Request for Proposal ("RFP") to nine potential completion contractors.  The Town and its Architect, which had various inputs into the RFP, also approved the list of contractors which received the RFP.

That day (August 20, 2003), Attorney Griffin submitted a draft tender agreement to the Town's counsel on AMMIC's behalf.  In this letter, AMMIC raised, as a partial defense to its obligations under the Performance Bond,  the Town's May 21 and 27 payments to Sciaba, as well as and a claim that it was entitled to schedule extensions that should have been granted to Sciaba (thereby reducing the Town's claim for liquidated damages).  A draft completion contract, to be signed by the completion contractor and the Town, had also been circulated between the Town and AMMIC in the previous weeks.

In response to the RFP, interested contractors submitted bids on the project on September 8, 2003.  These bids were substantially higher than AMMIC expected.  AMMIC evidently sought to refine the bids, although its communications with the Town to that end do not present a model of clarity or openness.  See, e.g., Docket #44 at Exhibit P (e-mail exchange from September 10, 2003 with AMMIC's counsel indicating the "surety is studying the bids and considering the next steps.  We will advise you when a decision has been made."); Exhibit Q (letter from Town to AMMIC dated September 16, 2003 inquiring as to status of bids).  Anastasio conducted follow-up interviews and analysis with the bidders, and on October 8, 2003 solicited the submission of best and final bids by October 17, 2003.  Despite Anastasio's efforts, however, the three best and final bids were still higher than AMMIC's estimated cost to complete the project.

Fontaine Brothers, Inc. submitted the low bid for the project.  After being awarded the job, but prior to signing the tendered completion contract, Fontaine objected to the original

completion dates as set forth in the RFP. Fontaine refused to execute any completion contract

until the dates were changed. Fontaine also took issue with the latent defect provision, as

communicated to AMMIC and North Brookfield.

**g.     The parties' discussions about AMMIC's asserted defenses.**

In her August 20, 2003 e-mail to the Town, Attorney Griffin discussed AMMIC's

assertion of a potential *pro tanto* defense under the Performance Bond. AMMIC took issue with

the Town's release of payments to Sciaba at the end of May at a time when the Town already

knew that "Sciaba's performance was seriously deficient and that making such payments would

leave insufficient funds in the hands of the town to complete the work if Sciaba was terminated."

The Town took umbrage to that asserted defense and pointed to AMMIC's failure to protect its

interests (i.e., via a joint check arrangement) despite its awareness of Sciaba's troubles.

Various communications were exchanged, ultimately leading to a meeting between

counsel for AMMIC and the Town on October 15, 2003, where AMMIC's various defenses were

discussed. At this meeting, Beatty and Attorney Griffin of AMMIC requested additional detail

and supporting documentation for the Town's damage claims. Attorney McEnaney for the Town

followed up with Attorney Griffin on November 3, 2003, providing additional information

supporting the Town's claims for roof repairs. He also disputed AMMIC's claims regarding the

substantial completion date for the project (namely, AMMIC's argument that Change Order #3

extended substantial completion of the building, as opposed to the Phase 4 parking lot

construction, to December 2003), and he disputed the claim that Sciaba was entitled to a schedule

extension based on weather delays. The Town, however, did not provide complete supporting

documentation of its agreement with Dore & Whittier, or invoices for Dore & Whittier's design and construction management services, until December 2003.

### h.     Selection of the completion contractor and execution of the contract

AMMIC informed the Town that it had selected Fontaine Brothers as a completion contractor approximately two and one-half weeks after bids were received, on November 4, 2003. With respect to Fontaine Brothers' performance as completion contractor, Attorney McEnaney advised Attorney Griffin of the Town's concerns with respect to the completion date for the construction contract, noting they were "substantially different from those agreed to by the Town and [AMMIC's consultant] at a Building Committee meeting [in August 2003]. This extended time period will also increase the additional costs for A/E services and [construction management] services." AMMIC responded by acknowledging that "it will have responsibility for the additional liquidated damages for delay after the dates contained in" the draft Request for Proposals from August.

AMMIC provided a draft completion contract (identifying Fontaine Bros.) to the Town on Friday, November 7, 2003. That draft contract contained a revised substantial completion date of August 15, 2004, rather than the April 30, 2004 substantial completion date discussed in August. In the accompanying e-mail, Griffin requested comments from the Town "ASAP." On Tuesday afternoon, November 11, Griffin alerted McEnaney that Fontaine would sign the tendered completion contract that day. Fontaine did so, and the signed contract was tendered to the Town the next day. In the accompanying letter, AMMIC agreed that it would "have responsibility for the additional liquidated damages after the dates that were given in the RFP. It also intends to accept responsibility for the reasonable cost of addressing latent defects that were Sciaba's

responsibility."

The Town's response was less than enthusiastic.  By letter dated November 11, 2003 (but which bears a facsimile header of "11/12/2003 16:16") Attorney McEnaney demanded that AMMIC "pay for whatever acceleration costs are necessary to complete the project in a time frame acceptable to the Town," and requested "an irrevocable letter of credit upon which the Town may draw in an amount equal to 125% of the total completion costs[.]" AMMIC declined this request, asserting that liquidated damages were sufficient to make the Town whole.  While the Town asserted that it would not sign the tendered completion contract, the contract was ultimately executed by the Town on December 15, 2003.  Meanwhile, AMMIC brought this suit for declaratory judgment on November 24, 2003.

**i.     Damages**

The Town claims a total of $4,854,379.66 as bond claim damages, of which AMMIC tendered $2,528,828.37 unconditionally.  The remaining balance of $2,325,551.29 is comprised of the following amounts:

   a.     $659,157.80 paid to the Town on December 3, 2003 under a reservation of rights;

   b.     $125,000 paid to the Town on December 15, 2003 under a reservation of rights;

   c.     $150,439.75 as a funding deficiency (Fontaine's completion price less remaining balance on Sciaba contract, less AMMIC's total payments as of date)

   d.     $674,607.24 in additional architect (and construction management) fees

   e.     $35,000 in legal fees through 2/24/2004;

   f.     $655,000 in liquidated damages; and

   g.     $6,336.50 in repairs for roof of old school.

(Docket #56 at ¶56, #57 at Ex. 42).

**LEGAL ANALYSIS**

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). For the purposes of summary judgment, "'genuine' means that 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party', and a 'material fact' is one which 'might affect the outcome of the suit under the governing law' " Seaboard Sur. Co. v. Town of Greenfield, ex rel. Greenfield, 370 F. 3d 215, 218-19 (1st Cir. 2004) (citations omitted).  Where this Court's jurisdiction is predicated on the diversity of the parties, see 28 U.S.C. § 1332(a)(1), the Court applies the substantive law of the forum state.  Erie R. Co. v. Tompkins, 304 U.S. 64, 78 1938), Lexington Ins. Co. v. General Acc. Ins. Co. of America, 338 F.3d 42, 46 (1st Cir. 2004).

I.      **Plaintiff's Motion to Strike the Town's Reply Facts and Accompanying Affidavits**

By Motion titled Plaintiff's Motion to Strike Town's Reply Facts and Accompanying Affidavits ("Motion to Strike Reply") (Docket #110) and accompanying Memorandum of Law (Docket #111), AMMIC moves to strike Docket # 94, Defendant's Reply to Response by American Manufacturers Mutual Insurance Company to Local Rule 56.1 Statement of Material Facts Not in Dispute and Statement of Additional Facts in Opposition to Defendant's Motion for Partial Summary Judgment, ("Town's Reply Statement").  The Town's Reply Statement is submitted in furtherance of the Town's Motion for Partial Summary Judgment (Docket #38) and in response to AMMIC's Response re: Statement of Facts Not in Dispute and Statement of Additional Facts in Opposition to Defendant's Motion for Partial Summary Judgment (Docket

13

#62).  In the alternative, AMMIC has submitted Plaintiff's Alternative Motion for Leave to Respond to Defendant's Reply Facts if Plaintiff's Motion to Strike is Denied (Docket #112), also with an accompanying Memorandum of Law (Docket #113).

Local Rule 56.1 obligates movants to provide a "concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried" together with citations to record evidence.  Oppositions to motions for summary judgment similarly are obligated to submit a "concise statement of the material facts or record as to which it is contended that there exists a genuine issue to be tried."  L.R. 56.1.  Reply briefing, in connection with motion practice, is governed by Local Rule 7.1(B)(3) which provides that "[a]ll other papers not file as indicated in sections (B)(1) and (2), whether in the form of a reply brief or otherwise, may be submitted only with leave of court."  The parties in this case filed an Assented to Motion to Extend Deadline for Filing Opposition to Dispositive Motions and Reply Briefs (Docket #60) on January 19, 2006, allowed by electronic Order on February 22, 2006.  In terms of reply papers, this Motion contemplated only reply briefs, not the submission of additional facts and evidence.

Valid local rules are "an important vehicle by which courts operate.  Such rules carry the force of law, and they are binding upon the litigants and upon the court itself."  Air Line Pilots Association v Precision Valley Aviation, Inc., 26 F.3d 220, 224 (1st Cir. 2004) (internal citation, footnote omitted).  District courts enjoy "broad latitude in administering local rules" and are "entitled to demand adherence to specific mandates contained in the rules."  Id.  See also Atlas Truck Leasing, Inc. v. First NH Banks, Inc., 808 F.2d 902, 903 (1st Cir. 1987) (holding that application of local rule is reversible error only if its disposition "results in clear injustice.").  But see Fed. R. Civ. P. 1 (the Federal Rules of Civil Procedure "shall be construed and

administered to secure the just, speedy, and inexpensive determination of every action.").

Local Rule 56.1 permits a movant's material facts to be deemed admitted if not opposed, but the converse is not true: the Rule does not require *responsive* facts be deemed admitted unless refuted. Moreover, while AMMIC moved to strike the Town's Reply Statement, its prayer for relief did not seek the striking of the various reply affidavits. The Court declines to read that implicit request into its motion. Finally, given the large volume of evidentiary submissions and the numerous motions to which they relate, it would be unreasonably difficult to limit consideration of evidentiary affidavits to a single motion. That said, AMMIC's Motion to Strike Reply (Docket #110) is DENIED. While the motion is denied, the Court credits the representations contained in the Town's Reply Statement only insofar as they are fairly derived from the underlying evidence.

AMMIC's <u>Alternative Motion for Leave to Respond to Defendant's Reply Facts if Plaintiff's Motion to Strike is Denied</u> (Docket #112) is GRANTED. The Court has considered the pleading denominated <u>Plaintiff's Response to Defendant's Reply Facts</u> (Docket #112, Exhibit A). While that pleading is little more than a surreply brief, the Court has considered it and the other pleadings in evaluating all of the parties' respective motions.

## II.     Plaintiff's Motion for Partial Summary Judgment as to Claims for Direct Payment

AMMIC moves for partial summary judgment with respect to $33,443.55 of payments which AMMIC alleges violated Mass. G.L. c. 30, § 39F and prejudiced AMMIC (Docket #36). In particular, AMMIC claims that two subcontractors, Millis Plumbing Co., Inc. and Greenwood Industries, Inc. (the "Claimants"), made claims for direct payment under Mass. G.L. c. 30, § 39F,

and the Town – rather than complying with its statutory obligations – included the Claimants'

payment obligations in requisitions payable to Sciaba (who then converted the funds to its own

use rather than paying its subcontractors, leaving AMMIC with an obligation under its Payment

Bond). The Town disagrees and asks for entry of summary judgment on its behalf. The Town

argues that (i) the Claimants' claim for direct payment encompassed <u>only those amounts certified</u>

<u>by the Architect as of the date of their respective demands for direct payment</u>, and (2) the Town's

payment to <u>Sciaba</u> for requisitions encompassing the subcontractor work is (or should be viewed

as) a condition precedent before a subcontractor may make a demand for direct payment. There

are no material disputed facts, and so this issue is ripe for summary judgment.

1.    **Factual background**

The Town's construction contract with Sciaba incorporated the provisions of Mass. G.L.

c. 30, § 39F with respect to subcontractor claims for direct payment. The purpose of Section 39F

is to ensure prompt payment to subcontractors on public works projects. Relevant to this dispute,

it provides as follows:

> (a)    Forthwith after the general contractor receives payment on account of a periodic estimate, the general contractor shall pay to each subcontractor[6] the amount paid for the labor performed and the materials furnished by that subcontractor, less any amount specified in any court proceedings barring such payment and also less any amount claimed due from the subcontractor by the general contractor.
>
> \* \* \* \* \*
>
> (c)    Each payment made by the awarding authority to the general contractor pursuant to subparagraphs (a) and (b) of this paragraph for the labor performed and the materials furnished by a subcontractor shall be made to the

---

[6] It is uncontested that the Claimants were "subcontractors" within the definition of Mass. G.L. c. 30, § 39F(3).

general contractor for the account of that subcontractor; and <u>the awarding authority shall take reasonable steps to compel the general contractor to make each such payment to each such subcontractor</u>. If the awarding authority has received a demand for direct payment from a subcontractor for any amount which has already been included in a payment to the general contractor or which is to be included in a payment to the general contractor for payment to the subcontractor as provided in subparagraphs (a) and (b), the awarding authority shall act upon the demand as provided in this section.

(d)     [If, within 70 days after substantial completion, the subcontractor has not been paid by the general contractor] the subcontractor may demand direct payment of that balance from the awarding authority. The demand shall be by a sworn statement delivered to or sent by certified mail to the awarding authority, [with a copy to the general contractor, who has 10 days in which to respond.]

(e)     Within fifteen days after receipt of the demand by the awarding authority, but in no event prior to the seventieth day after substantial completion of the subcontract work, the awarding authority shall make direct payment to the subcontractor of the balance due under the subcontract including any amount due for extra labor and materials furnished to the general contractor, <u>less any amount</u> (i) <u>retained by the awarding authority as the estimated cost of completing the incomplete or unsatisfactory items of work</u>, (ii) specified in any court proceedings barring such payment, or (iii) disputed by the general contractor in the sworn reply[.] The awarding authority <u>shall make further direct payments to the subcontractor forthwith after the removal of the basis for deductions from direct payments made as provided in parts (i) and (ii) of this subparagraph.</u>

* * * * *

(i)     If the subcontractor does not receive payment as provided in subparagraph (a) [concerning periodic payments] or if the general contractor does not submit a periodic estimate for the value of the labor or materials performed or furnished by the subcontractor and the subcontractor does not receive payment for same when due less the deductions provided for in subparagraph (a), the subcontractor may demand direct payment by following the procedure in subparagraph (d) and the general contractor may file a sworn reply as provided in that same subparagraph. . . . <u>Thereafter the awarding authority shall proceed as provided in subparagraph (e), (f), (g) and (h).</u>

Mass. G.L. c. 30, § 39F(1) (emphasis added).

By letter dated April 9, 2003, Millis Plumbing made a claim for direct payment in the

17

amount of $31,505.85 covering requisitions through March 20, 2003.  Likewise, by letter dated

April 21, 2003, the roofing subcontractor on the project, Greenwood Industries, Inc. made a claim

for direct payment in the amount of $137,350.00, covering requisitions through March 31, 2003.

Sciaba did not reply to either Millis' or Greenwood's demand.  It is undisputed that no deductions

were made on account of unsatisfactory work on the part of the Claimants; nor were there court

orders barring payment to the Claimants.

After the Town's receipt of both Claimants' demand letters, the Town's Architect

reviewed and certified the following Sciaba payment applications:  On April 29, 2003 the Town's

Architect certified Sciaba's Payment Application No. 12, covering work through March 28, 2003.

That Application contained certifications of work performed (a) by Millis for work through

March 31, 2003 of $82,246.55 (before retainage of $4,112.33); and (b) by Greenwood for work

through March 31, 2003 of $159,579.50 (before retainage of $7,978.98).

Payment on Application No. 12 was made on May 21, 2003.  Of the amounts paid,

$31,350.00 was paid by the Town to Greenwood and $3,361.81 was paid by the Town to Millis.

Interestingly, in certifying this progress payment, the Architect specifically recommended that the

Town provide separate checks to the Claimants.  (See Docket #51,  Ex. E at NBDW25492 and

NBDW25494 (Memo from Harald Aksdal to Robert O'Neill, Superintendent of Schools, dated

May 6, 2003)).

On May 9, 2003, the Town's Architect certified Sciaba's Payment Application No. 13B,

covering work for the period to May 1, 2003.  This application contained certifications of work

performed by Millis through April 30, 2003 of $111,731.40 (before retainage of $5,586.57). On

May 27, 2003, the Town made payment on Sciaba's Payment Application No. 13B, none of

which was directed to the Claimants.  However, Sciaba paid Greenwood $100,700.49 on May 28, 2003.

     2.    **<u>Analysis</u>**

Section 39F, which permits subcontractors to obtain direct payment from an awarding governmental authority, is not unusually complicated.  If unpaid by the general contractor, within the time frame provided by Section 39F(1)(i), a subcontractor may demand direct payment from the awarding authority for progress payments, after providing a sworn "detailed breakdown of the balance due under the subcontract and also a statement of the status of completion of the subcontract work."  Section 39F(1)(d).  The onus is on the general contractor to respond and explain why the amounts are not in fact owing to the subcontractor, and the general contractor's response also must be made under oath.  After the awarding authority's receipt of the demand and response, the awarding authority "<u>shall</u> make direct payment to the subcontractor of the balance due under the subcontract" less amounts (i) estimated for incomplete or unsatisfactory work,(ii) barred by court proceedings, or (iii) disputed by the general contractor.  Mass. G.L. c. 30, § 39F(1)(e) (emphasis added).  If the subcontractor's work is incomplete, the awarding authority "shall make further direct payments to the subcontractor forthwith after removal of the basis for deductions".  <u>Id.</u>

The Town does not explain why it failed to make the further direct payments to the Claimants rather than Sciaba.  Instead, the Town's principal argument is that Section 39F "presupposes that a subcontractor making a direct payment demand has a right to payment in the amount demanded," Opposition p. 3, and that "if the awarding authority has not paid the general contractor for the subcontractor's work in question or does not approve work performed by the

subcontractor that is outside the scope of the contract, the subcontractor does not have the right to be paid for the work." Id. The Town then argues that the Claimants' demands covered only those amounts *approved by the Architect* as of the date of the demand, rather than the amounts set forth in the Claimants' demand letter. Id. at 7.

This line of reasoning fails for multiple reasons. First, the cases cited by the Town do not support the Town's proposition. Adalian Brothers, Inc. v. City of Boston, 323 Mass. 692, 83 N.E.2d 871 (1949), involved efforts by the plaintiff to recover payments for rugs acquired (at least in part illegally) by the Boston City Mayor without the necessary appropriations – not demands for direct payments from subcontractors on public construction projects under the comprehensive statutory scheme of Mass. G.L. c. 30, § 39F. The Town's reliance on Cardi Corp. v. Sutton Corp. 95-6027-D (Sup.Ct. October 3, 1996) is likewise to no avail. First, that case involved a "substantial completion" claim rather than a § 39F(1)(i) progress payment claim. Second, Sutton claimed "substantial completion" because of the general contractor's own breach. Id. at p. 5-6. Third, the substance of Sutton's payment demands "related to extra costs an change orders" executed by Sutton, rather than work performed under the underlying subcontract. Id. at p. 6. Fourth, as AMMIC points out, Justice Lauriat's analysis is *dicta* and lacks citation to controlling legal authority.

In any event, the Town's argument fails because it presents no evidence that the Claimants' work (a) exceeded the scope of the contract; or (b) was not ultimately approved by the Architect. See Mass. G.L. c. 30, § 39F(1)(e) (requiring the awarding authority to make payments to the subcontractor after completion of incomplete items, which completion presumably would be established by certification by the architect). While the statute permits the awarding authority

to retain such amounts "as the estimated cost of completing the incomplete or unsatisfactory items of work," those retained amounts are <u>not</u> paid to a general contractor in subsequent requisitions. Instead, they "<u>shall</u>" be paid "to the <u>subcontractor</u> <u>forthwith</u> after the removal of the basis for [those] deductions[.]" Mass. G.L. c. 30, § 39F(1)(e) (emphasis added). To the extent the Town contends that the Claimants sought direct payment for amounts that had not been earned (an argument not supported by evidence submitted in opposition to AMMIC's motion) those amounts should have been withheld and then paid directly to the Claimants after successful completion of the work.

The Town's remaining arguments are equally unavailing. Contrary to the Town's contention, there is no conflict with Mass. G.L. c. 30, § 39K, because that section provides an express carve out for amounts retained pursuant to § 39F. Finally, the argument that AMMIC is not entitled to an offset because of its "obligation to keep itself informed of any defaults on the part of its principal" misses the point. Opposition p. 9. The Town's acts were "arbitrary and capricious" by operation of its violation of the statute. The Town's obligations vis-a-vis the Claimants were mandatory. <u>Pioneer Steel Erectors, Inc. v. Commonwealth</u>, 344 Mass. 195, 198, 181 N.E.2d 670, 672 (1962). Finally, the Claimants' omission of a statement of the status of completion of the subcontract work was immaterial. The Town did not object to the omission; nor have they advanced meritorious arguments why the omission was material. In any event, the relevant information (lack of payment, together with the requisitions incorporated into the demand letters) was in fact averred to by the Claimants.

For the foregoing reasons, AMMIC's <u>Motion for Partial Summary Judgment as to Claims for Direct Payment</u> (Docket #35) is GRANTED.

III.    **Defendant's Motion for Partial Summary Judgment and the Plaintiff's Motion for Partial Summary Judgment on Liquidated Damages as the Exclusive Remedy for Delay**

The Town moves for partial summary judgment (Docket No. 38) as to two issues: (a) "the liability of [AMMIC] under the performance bond it issued to the Town for the Junior/Senior High School construction project for additional costs incurred by the Town as the result of the default of AMMIC's principal, the general contractor, as set forth in Count I of the Counterclaim" (seeking entry of judgment against AMMIC in the Town's favor "in an amount equal to all of its damages including attorneys' fees and costs[.]"); and (b) AMMIC's claim "that it is entitled to a *pro tanto* discharge from liability under its performance bond as a result of payments that the Town made to the general contractor in May 2003." [7]

AMMIC moves for partial summary judgment on the issue of whether the Town's damages are limited to the liquidated damages provided for in the construction contract. If so, claims AMMIC, the Town cannot recover (1) architect and construction management fees and expenses arising from work required after Sciaba's time for performance expired – an amount claimed to be $517,679.03 and (2) the cost of repairing a roof on the old junior-senior high school

---

[7] In support of this Motion, the Town submits its Local Rule 56.1 Statement of Material Facts Not in Dispute (Docket #40) ("Town's Rule 56.1 Statement"); the Affidavit of Thomas C. McEnaney filed December 16, 2005 (Docket #43), with evidentiary exhibits thereto; and a Memorandum of Law in Support of Defendant's Motion for Partial Summary Judgment (Docket #41). In opposition, AMMIC submits a Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment (Docket #61); a Response to the Town's Rule 56.1 Statement (Docket #62); an Affidavit of Deborah S. Griffin in Support of Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment (Docket #63), with evidentiary exhibits thereto; an Affidavit of Richard P. Anastasio dated January 18, 2006 also in support of the Plaintiff's Opposition (Docket #64); and an Affidavit of Stephen J. Beatty dated January 11, 2006 also in support of the Plaintiff's Opposition (Docket #63). In reply to AMMIC's submissions, the Town submitted a blizzard of evidentiary materials, comprised of Docket entries no. 82, 83, 86, 87, and 89-98. AMMIC addressed the propriety of those reply materials in a motion to strike (Docket 109) which is denied supra, and a motion to file surreply statement of facts, (Docket #112) which is allowed.

building – an amount claimed to be $6,336.50.  (Docket #37 at p. 1).[8]

<u>Analysis</u>

These motions address two related and relatively straightforward matters: first, the nature

of AMMIC's obligations under its Performance Bond to compensate the Town, and second,

whether AMMIC has established enough facts, when viewed in the appropriate light, to support a

potential *pro tanto* defense offsetting AMMIC's liability to the Town.

**a.      The Pro tanto defense**

AMMIC claims it is entitled to a *pro tanto* discharge of its obligations under the

Performance Bond based on the Town's payments to Sciaba after the May 21, 2003 meeting.

AMMIC suggests two grounds for this claim:  first, that the Town (which it claims surely knew as

early as April 2003 that significant liquidated damages would be accruing) was authorized under

Mass. G.L. c. 30, § 39K (first paragraph) to withhold those liquidated damages from the progress

payments to Sciaba and prejudiced AMMIC in failing to do so; and second, the Town made

payments to Sciaba on May 21 and 27 in contravention of both its representations at the May 21

meeting and AMMIC's express instructions not to do so.  <u>See</u> Plaintiff's Memorandum in

Opposition to Defendant's Motion for Partial Summary Judgment (Docket #61) at p. 5-6, 15.  The

Town responds that AMMIC did not instruct it to withhold payments from Sciaba prior to June 5,

---

[8]   In support of this Motion, AMMIC submits its <u>Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment on Liquidated Damages as the Exclusive Remedy for Delay</u> (Docket #52); its <u>Statement of Undisputed Facts</u> with respect to the same (Docket #53); the <u>Affidavit of Deborah S. Griffin</u> dated December 16, 2005 with exhibits thereto with respect to the same (Docket #54).  In opposition, th e Town submits its <u>Response to Plaintiff's Statement of Undisputed Facts</u> with respect to the motion (Docket #79) and its <u>Memorandum of Reasons in Opposition</u> to the motion (Docket #81).  In reply to the Town's submissions, AMMIC filed a <u>Reply to the Defendant's Opposition to the Plaintiff's Motion for Partial Summary Judgment</u> (Docket #104).  While not linked to its opposition to AMMIC's Motion, the Court has reviewed and considered all materials filed in connection with the Town's Motion for Partial Summary Judgment (Docket #38) and, to the extent relevant, the other motions filed in this action.

2003, and thus any payments prior to that date were proper.  See Memorandum of Law in Support of Defendant's Motion for Partial Summary Judgment (Docket #41) at p. 8, 10.

Because the Town is seeking judgment as to AMMIC's *pro tanto* defense, the issue is whether AMMIC's evidence, when viewed in the light most favorable to it, creates a genuine issue as to whether the Town's conduct created the defense.  AMMIC presents affidavits that the Town stated Sciaba would not be paid before updated construction schedules were submitted, and evidence suggesting that Sciaba conceded it would take three weeks to submit such schedules.  See Affidavit of Stephen J. Beatty dated January 11, 2006 (Docket #65) at ¶¶2-5; see also Affidavit of Richard P. Anastasio dated January 18, 2006 (Docket No. 64) at ¶¶11, 12.  AMMIC also presented evidence that the Town did not disclose that it had written (but not delivered) two checks to Sciaba.  Id.  Finally, AMMIC has presented evidence that its agent "asked the Town's representatives at the meeting to advise [AMMIC] before any payments [to Sciaba] were in fact going to be made."  Id.  The Town strongly controverts these representations, see Docket Nos. 83, 84, 86, 87, and 89-92.  However, when viewed in the light most favorable to AMMIC, if the averments in the Beatty and Anastasio affidavits set forth facts suffice to state a *pro tanto* defense the Town's motion for summary judgment must be denied.

Under Massachusetts law "compensated sureties . . . ought not to be relieved from their obligations on merely technical grounds, not affecting substantially the character of the undertaking which they assumed."  Bayer & Mingolla Constr. Co, Inc. v. Deschenes, 348 Mass. 594, 596 n. 4, 205 N.E.2d 208, 211 (1965) (quoting Maryland Cas. Co. v. Dunlap, 68 F.2d 289, 291 (1st Cir. 1933)).  The rule of *pro tanto* discharge states that "*if the obligee departed from or altered the contractual provisions relating to payments and/or the security of retained funds*, a

surety is discharged to the extent it can show injury, loss or prejudice.  Thus, for the rule to

operate to [the surety's] benefit, the [obligee] must have departed from the terms of the bonded

contract."  Fireman's Fund Ins. Co. v. United States, 909 F.2d 495, 497 (Fed. Cir. 1990) (citation

omitted, emphasis in original).  In the modern world of suretyship, when a contractual alteration

is less than a substituted contract or fundamentally different risk, "the surety's obligation 'is

reduced to the extent of loss due to the modification.'"  Preferred National Ins. Co. v. United

States, 54 Fed. Cl. 600 (Ct. Cl. 2002).  See also Restatement (Third) of Suretyship & Guaranty §

37(3)(f) and cmt. d, §42 (1996).  Payment of substantial sums before they are due is a material

alteration that will discharge a surety to the extent of the prejudice.  Continental Ins. Co. v. City

of Virginia Beach, 908 F. Supp. 341, 348 (E.D. Va. 1995).  The reasoning is that unauthorized

advances reduce the principal's incentive to complete the contract, thereby increasing the surety's

risk and the cost of the surety's substitute performance.  Argonaut Ins. Co. v. Town of

Cloverdale, 699 F.2d 417, 419 (7th Cir. 1983).

Even if the prepayment or overpayment resulted from mere negligence, such negligence

can exonerate the surety's duty to the extent of the prejudice caused by the payment.

Transamerica Ins. Co. v. City of Kennewick, 785 F.2d 660, 662 (9th Cir. 1986).  The surety bears

the burden of demonstrating both (1) that the modification materially increased its risk, and (2)

some of the liability for which it is answerable resulted from the modification.  Town of Hingham

v. B.J. Pentabone, Inc., 354 Mass. 537, 541-42, 238 N.E.2d 534, 536 (1968).

Drawing on the language in Fireman's Fund, the Town argues that AMMIC was obligated

to keep itself abreast of its obligor's situation and notify the obligee of any potential default, see

Memorandum of Law in Support of Defendant's Motion for Partial Summary Judgment (Docket

No. 41) at pp. 9-11, and a *pro tanto* defense can arise only after such notice. The Town claims

that notice first came with the June 5, 2003 notice of default sent by AMMIC's counsel.

AMMIC's first response is that the Town and its Architects knew that substantial losses

existed as of April 2003, and thus were empowered to withhold liquidated damages from its

progress payments to Sciaba under Mass. G.L. c. 30, § 39K. When the Town failed to do so,

argues AMMIC, the Town "breached its statutory obligation to mitigate its damages"

Memorandum in Opposition (Docket #61) at p. 5, because project retainage was far less than a

reasonable estimate of liquidated damages, id. at 9-10. The Court is reluctant to impose such an

affirmative obligation on the Town prior to notice by the surety or declaration of default. See

Fireman's Fund, 909 F.2d at 498-99 ("the government as obligee owes no equitable duty to a

surety . . . unless the surety notifies the government that the principal has defaulted under the

bond", but also noting that the surety did not ask that payments to the contractor be withheld prior

to the government's release of the funds in question). To rule otherwise would impose an

onerous burden on the Town, which would face a Hobson's choice when faced with a struggling

general contractor: either pay the contractor and keep the project rolling, with the attendant risk of

liability to the surety, or withhold the payments and virtually guarantee the contractor's failure,

with the potential liability attendant thereto.

Still, that does not end the inquiry. AMMIC has presented admissible evidence that it

requested that payments to Sciaba be withheld on May 21, 2003. Likewise, the affidavit

testimony surrounding the request for updated construction schedules as a prerequisite for

payment, and the failure of the Town to disclose that it had already drafted checks payable to

Sciaba, create genuine issues of material fact as to what representations (if any) were made by the

Town.  Finally, it is an issue as to whether AMMIC's reliance on the representations (whatever those were) was reasonable.[9]  Accordingly, because the representations made on May 21, 2003 create a genuine issue of material fact as to both (a) whether the Town should have made the May 21 and 27 payments to Sciaba and (b) whether AMMIC was reasonable in relying on those statements, the Town's motion for summary judgment insofar as AMMIC's *pro tanto* defense (Docket #38) is DENIED.

### b. Liquidated damages as exclusive remedy for delay

AMMIC moves for summary judgment on damages, arguing that the Town's damages for delay are limited to the liquidated damages of $1,000 per day provided in Article 3.3 of the Construction Contract.  If allowed, AMMIC would not be liable for the additional design, construction management, and architect fees claimed by the Town.  Resolution of this claim lies at the intersection of the liquidated damages clause of the Construction Contract and the damages clause of the Performance Bond.

The Construction Contract provided that the Owner would be compensated for that construction delay damages through a liquidated damages clause:

> [i]n the event the Contractor fails to achieve substantial completion of the work by the substantial completion dates indicated for the building and site phasing work, the Contractor shall pay to the Owner as liquidated damages the sum of one thousand dollars ($1,000.00) per day for each and every day thereafter that it fails to deliver such Work. . . . Separate liquidated damages shall apply to each substantial completion date for the building and for the remainder of the site construction.  Such liquidated damages shall be paid not as a penalty, but to partially cover losses and expenses to the Owner, including intangible costs and losses that are or may be impractible [*sic*] to ascertain.

---

[9]  In passing, the Court notes that Beatty's failure to identify the individual who allegedly stated that Sciaba "would have to submit an updated construction schedule in order to get paid," Affidavit of Stephen J. Beatty (Docket No. 65) at ¶2, goes to weight, not admissibility.  Beatty clearly indicated that it was a Town representative who made the alleged statement.

(Docket #44 at Exhibit B, p. 2).  The Performance Bond contained a provision setting forth the surety's obligations to the owner:

> After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraphs 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract.  To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, <u>the Surety is obligated without duplication for</u>:
>
> 6.1    The responsibilities of the Contractor for correction of defective work and completion fo the Construction Contract;
>
> 6.2    <u>Additional legal, design professional and delay costs</u> resulting from the Contractor's Default, <u>and resulting from the actions or failure to act of the Surety under Paragraph 4</u>; <u>and</u>
>
> 6.3    <u>Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor</u>.

Performance Bond p. 2 (emphasis added).  Despite the parties' valiant efforts, the obligations of the Performance Bond are unambiguous and easily summarized: Under the Performance Bond, AMMIC is liable for the <u>entire</u> amount of liquidated damages <u>and</u> "additional legal, design professional and delay costs . . . resulting from the actions or failure to act of the Surety under Paragraph 4," <u>so long as</u> those legal, design professional, and delay costs are not duplicative of the liquidated damages.  In other words, the liquidated damages owing under the Construction Contract set a floor – but not a ceiling – for AMMIC's liability to the Town under the Performance Bond.

Applying these precepts to the case, the Town's claim for the roof repair is a claim for actual damages which must be subsumed into the category of liquidated damages.  In the

alternative, to the extent it is a "delay cost," it is duplicative of the liquidated damages

contemplated by Paragraph 6.3. Likewise, AMMIC has established – and the Town does not

credibly dispute – that Dore's architect and construction management costs were to be paid out of

the liquidated damages pool. See Plaintiff's Statement of Undisputed Facts in Support of

Plaintiff's Motion for Partial Summary Judgment on Liquidated Damages (Docket #53),

Defendant's Response thereto (Docket #79) at ¶6, Affidavit of Deborah S. Griffin in Support of

Plaintiff's Motion dated December 16, 2005 (Docket #54) at NBDW34665. As such, the Town's

recovery of both liquidated damages and architect and construction management fees would be

duplicative. However, to the extent the Town's legal and design professional costs exceed the

amount of (a) liquidated damages less (b) costs of repair to the roof, AMMIC is liable for those

amounts in addition to liquidated damages. Accordingly, AMMIC's motion for partial summary

judgment (Docket No. 37) is DENIED in part.


**IV.    Plaintiff's Motion for Summary Judgment on Count III of Defendant's**
**Counterclaim – Tort**

AMMIC moves for summary judgment seeking dismissal of Count III of the Town's

counterclaim sounding in tort (Docket No. 34). Count III of the Town's Complaint alleges that

"AMMIC was obligated to honor its obligations under the performance bond and deal fairly with

the Town in the resolution of the Town's claims[,]" and "AMMIC negligently and/or knowingly

and willfully breached its duty to the Town." (Docket No. 5 at ¶¶60-61).

AMMIC claims that the breach of a duty of good faith and fair dealing is simply an

implied contractual obligation unenforceable in tort; and that the economic loss doctrine

precludes recovery under a tort cause of action because the Town's damages did not arise from

personal injury or property damage.  The Town asserts that AMMIC was obligated to perform its

contractual duties to the Town with a reasonable degree of care, and that the "economic loss"

doctrine does not preclude damages arising from the tort of negligent misrepresentation.  Finally,

the Town asserts that Count III also contains facts sufficient to establish a cause of action for

breach of contract.  There are no material disputed facts, and so this issue is ripe for summary

judgment.

### Analysis

**a.      Tort liability for breach of contract**

As the Supreme Judicial Court wrote in Abrams v. Factory Mut. Liab. Ins. Co., 298 Mass.

141, 10 N.E.2d 82 (1937):

> When a party binds himself by contract to do a work or to perform a service, he
> agrees by implication to do a workmanlike job and to use reasonable and appropriate
> care and skill in doing it. . . . Although the duty arises out of the contract and is
> measured by its terms, negligence in the manner of performing that duty as
> distinguished from mere failure to perform it, causing damage, is a tort.

Id. at 143-144, 10 N.E.2d at 83-84.  The obligation to honor one's contractual obligations does

not stand as an independent tort.  Instead, it is subsumed within the covenant of good faith and

fair dealing implicit in all contracts.  Ayash v. Dana-Farber Cancer Institute, 443 Mass. 367, 385,

822 N.E.2d 667, 683-684 (2005).  That implied covenant dealing "exists so that the objectives of

the contract may be realized.  . . . The concept of good faith and fair dealing . . . is shaped by the

nature of the contractual relationship from which the implied covenant derives. The scope of the

covenant is only as broad as the contract that governs the particular relationship" and may not be

"invoked to create rights and duties not otherwise provided for in the existing contractual

relationship.  Id.

       However, the Town is correct in arguing that if it "can show that it sustained damages due

to the tort of negligent misrepresentation on AMMIC's part, then an exception to the rule permits

recovery for economic losses."  Opposition, docket #67, at p. 5, citing Nota Construction Corp. v.

Keyes Associates, Inc., 45 Mass. App. Ct. 15, 19-20, 694 N.E.2d 401, 405 (1998).  A negligent

misrepresentation claim require the plaintiff to prove that "the defendant (1) in the course of his

business, (2) supplies false information for the guidance of others (3) in their business

transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable

reliance upon the information, and (6) with failure to exercise reasonable care or competence in

obtaining or communicating the information."  Id.  The Town does not describe the supposed

false information, how that information in fact guided the town, or how the Town's reliance on

that information was justified or reasonable.  As such, the Town has failed to meet its burden

under Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

**b.**      **The economic loss doctrine.**

       It has been a longstanding rule in the Commonwealth that "purely economic losses are

unrecoverable in tort and strict liability actions in the absence of personal injury or property

damage" Aldrich v. ADD, Inc., 437 Mass. 213, 222, 770 N.E.2d 447, 454 (2002) (quoting FMR

Corp. v. Boston Edison Co., 415 Mass. 393, 395, 613 N.E.2d 902 (1993)). The policy reasons

underlying this doctrine include a concern that otherwise the cost of even simple torts could spiral

out of control, and a realization that persons or entities suffering financial as opposed to physical

losses may have an easier time arranging for alternative compensation and (at least in the case of

businesses) are more likely to have access to insurance. See Barber Lines v. M/V Donau Maru, 764 F.2d 50, 54 (1st Cir.1985). Here, the Town's damages are foursquare within the economic loss rule. As a result, the Plaintiff's Motion for Summary Judgment (Docket #34) is GRANTED.

**IV.     AMMIC's Motion for Summary Judgment with respect to Count II of the Counterclaim (Chapter 93A)**

AMMIC moves for summary judgment on Count II of the Town's counterclaim alleging that AMMIC violated Mass. Gen. L. c. 93A (Docket #35). The motion is GRANTED in part and DENIED in part. The Town alleges that AMMIC violated Mass. Gen. L. c. 93A and c. 176D, §3(9)(a)-(h) and (n) by:

> misrepresenting pertinent facts or provisions relating to coverages at issue, failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under the performance bond; failing to adopt and implement reasonable standards for the prompt investigation of claims arising under the performance bond; refusing to pay claims without conducting a reasonable investigation based upon all available information; failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; compelling the Town to institute litigation to recover amounts due under the performance bond by offering substantially less than the amounts that will ultimately be recovered; failing to provide promptly a reasonable explanation of the basis in the performance bond, in relation to the facts or applicable law, for denial of a claim or for the offer of a compromise settlement.

Answer to Amended Complaint and Counterclaim, Docket #5, at ¶55.

Broadly stated, Chapter 93A was designed to foster more civilized behavior in the business world. See Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir.1998). To achieve this end, the statute prohibits those engaged in trade or commerce from utilizing "unfair or deceptive acts or practices" in the course of business transactions. Mass. Gen. Laws ch. 93A, §

2.[10]  Similarly, Chapter 176D prohibits unfair or deceptive acts or practices in the business of

insurance.  Mass. G. L. c. 176D, § 3.  While Chapter 176D creates no private right of action, it is

well settled that unfair claims settlement practices in violation of Chapter 176D, § 3(9) are

actionable under G.L. c. 93A, §9 (1).  Schwartz v. Travelers Indemnity Co., 50 Mass. App. Ct.

672, 675, 740 N.E.2d 1039 (2001).

        In order to establish a claim for violation of Chapter 176D (and therefore Chapter 93A),

the plaintiff must establish that an unfair or deceptive act or practice has been committed, and that

the commission of the act or practice has caused him or her an injury within the meaning of

Chapter 93A, §9(1).  Lord v. Commercial Union Insurance Co., 60 Mass. App. Ct. 309, 321-22,

801 N.E.2d 303 (2004).  For purposes of summary judgment, AMMIC does not challenge the

Town's claim for damages, and so the issue for adjudication is whether the Town can adduce

facts sufficient to support an inference that AMMIC engaged in an unfair or deceptive act or

practice.

        "An absence of good faith and the presence of extortionate tactics generally characterize

the basis for a c. 93A-176D action based on unfair settlement practice."  Guity v. Commerce Ins.

Co., 36 Mass. App. Ct. 339, 344, 631 N.E.2d 75, 78 (1994).  "A plausible, reasoned legal position

---

        [10]    Chapter 93A prohibits unfair or deceptive acts or practices, in part, by creating private rights of action.
Id. at §§ 9, 11.  Section 11 entitles those persons engaged in "trade or commerce" to bring an action for unfair or
deceptive practices, whereas Section 9 grants similar rights to aggrieved consumers.  By their terms, these two
sections are mutually exclusive.  See Employers Ins. of Wausau v. George, 41 Mass .App. Ct. 719, 673 N.E.2d 572,
579 (1996); DiVenuti v. Reardon, 37 Mass .App .Ct. 73, 637 N.E.2d 234, 239 (1994).  Although the Town nowhere
identifies the section under which its claim arises, it is brought under §9.  See Peabody N.E., Inc. v. Town of
Marshfield, 426 Mass. 436, 439-440, 689 N.E.2d 774 (1998) (where entity is motivated by legislative mandate,
rather than business or personal reasons, it is not engaged in "trade or commerce"); Park Drive Towing, Inc. v. Town
of Revere, 442 Mass. 80, 85, 809 N.E. 2d 1045, 1050-51 (2004).  The Town was obligated by statute to obtain a
performance bond, see Mass. G.L. c. 149, § 29, and so was not involved in trade or commerce for purposes of
Section 11.  The distinction is relevant, of course, because Mass. G.L. c. 93A, § 11 does not grant an independent
right to recover for violations of Mass. G.L. c. 176D § 3(9).  Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747,
754, 610 N.E.2d 912 (1993) (violations of § 3(9) may be evidence of violations of G.L. c. 93A, § 2).

that may ultimately turn out to be mistaken-or simply . . . unsuccessful - is outside the scope of the punitive aspects of the combined application of c. 93A and c. 176D." Id. at 343, 631 N.E.2d at 77.

Following is an analysis of AMMIC's liability under each of sections §3(9)(a)-(h) and (n):

      a.      **Violations of G.L. c. 176D, §3(9)(a)**: *Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue.*

Section 3(9)(a) prohibits misrepresentations of pertinent facts or insurance policy provisions relating to coverage at issue.  AMMIC contends that the Town cannot present any false statement of material fact made by AMMIC and the dispute is, *simpliciter*, merely a disagreement about the scope of bond coverage.  The Town does not directly refute AMMIC's argument, but contends generally that motions for summary judgment for violations of Chapter 176D are disfavored because reasonableness seldom can be determined as a matter of law.

Although whether a particular set of acts, in their factual setting, is unfair or deceptive may be a question of fact, "the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law." Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 46, 54 (1st Cir. 1998) (citation, internal quotations omitted).  Liability under Mass. G.L. c. 176D § 3(9)(a) requires more than mere negligent misrepresentation.  Instead, "although it is possible to recover in insurance cases for a deceptive act that is the result of a defendant's negligence, courts have required plaintiffs to show that the defendant deliberately misrepresented the extent of insurance coverage, or otherwise acted in bad faith or with an improper motive, in order to establish a violation of Chapter 176D, §3(9)(a)" Aquino v. Pacesetter Adjustment Co., 416 F. Supp.2d 181, 192-93 (D. Mass. 2005) (internal citations, quotations omitted).

34

When challenged to state the basis[11] of its claim that AMMIC misrepresented pertinent facts or provisions, the Town responded only that "[d]espite the clear language of the performance bond, AMMIC has refused to provide for the cost of correcting the defective work and completing the contract work and has not compensated the Town for its additional legal, design professional, project management, and delay costs, and liquidated damages."  Docket #57 (Affidavit of Deborah Griffin) at Ex. 14 (Town's Answers to Interrogatories).

Neither this answer nor its opposition to AMMIC's motion direct the Court to any statements or representations that were materially false.  Nor has the Town identified any facts which would <u>reasonably</u> support an inference that AMMIC's representations in this dispute were deliberately false, put forth in bad faith, or advanced because of improper motivations.  AMMIC's litigation position has undoubtedly been aggressive, and its claims may ultimately be rejected by the finder of fact, this alone does not warrant a finding of liability under Chapter 176D, § 3(9)(a).  <u>Aquino</u>, *supra*, <u>U.S. es rel. Metric Elec. v. Enviroserve, Inc.</u>, 301 F. Supp.2d 56, 70-71 (D. Mass. 2003).  Summary judgment is GRANTED as to the Town's claims under Mass. G. L. c. 176D, §3(9)(a).

---

[11]  Under the Local Rules, to"state the basis" means to:

(a)     identify each and every document (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(b)     identify each and every communication which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(c)     state separately the acts or omissions to act on the part of any person (identifying the acts or omissions to act by stating their nature, time, and place and identifying the persons involved) which form any part of the party's information regarding the alleged facts or legal conclusions referred to in the interrogatory; and

(d)     state separately any other fact which forms the basis of the party's information regarding the alleged facts or conclusions referred to in the interrogatory.

LR 26.5(C)(8).

b.  **Violations of G.L. c. 176D, §3(9)(b)**: *Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.*

Section 3(9)(b) prohibits an insurer from "failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies".  The Town, through its interrogatory answers, took umbrage that AMMIC tendered a completion contractor approximately six months after Sciaba notified AMMIC of its voluntary default on the contract, contends that AMMIC "repeatedly ignored" evidence of subcontractor claims against the Sciaba payment bond dating back to November 19, 2002, and "failed to address increasingly alarming evidence of Sciaba's [impending] demise", and argues that "even when AMMIC finally did address the situation, its response was inadequate and resulted in substantial project delays." (Docket #72 at pp. 10-11).

Section 3(9)(b) obligates an insurer to acknowledge and respond promptly to communications with respect to claims.  It necessarily follows that a claim must arise before obligations under this section may be triggered.  Enterprise Capital, Inc. v. San-Gra Corp., 284 F. Supp. 2d 166, 179 n. 21 (D. Mass. 2003) (provisions in performance bond were conditions precedent to surety's performance obligations).  Contrary to the Town's argument, the unambiguous language of the Performance Bond states that AMMIC's legal obligations were triggered only after the Town "has declared a Contractor default and formally terminated the Contractor's right to complete the contract."  This occurred on July 23, 2003 when the Town terminated Sciaba's right to perform the contract and called upon AMMIC to respond under the Performance Bond.

The Town identifies no post-July communications that AMMIC ignored or failed to act

36

upon.  Instead, the record illustrates vigorous and timely communications between counsel.

Moreover, the record evinces a continuing dialog between AMMIC, its agent, and the Town,

dating to well before the July 23 default.  Prior to that date, AMMIC's project consultant met with

the Town and the Architect multiple times.  AMMIC had already begun to obtain subcontractors'

agreements to continue work under a replacement contractor.  As the Town has not established its

burden, summary judgment is GRANTED as to the Town's claims under Mass. G. L. c. 176D, §

3(9)(b).


c.      **Violations of G.L. c. 176D, §3(9)(c)**: *Failing to adopt and implement reasonable*
*standards for the prompt investigation of claims arising under insurance policies.*

Section 3(9)(c) prohibits an insurer from "failing to adopt and implement reasonable

standards for the prompt investigation of claims arising under insurance policies[.]"  The Town

contends that AMMIC failed to adopt or implement reasonable standards – or any standards – for

handling this or other claims or for the training of its claims handlers, Docket #72 at p. 11 - 12.

AMMIC responds by citing to Spencer Press, Inc. v. Utica Mutual Ins. Co., 1994 WL 879732, 1

Mass. L. Rptr. 469 (Mass. Super. 1994) as a parallel case where the surety's claims handling was

found not to give rise to liability on similar facts.

Inquiries as to promptness "must focus on whether the response of the surety was

reasonable, given the circumstances surrounding the underlying default of the Contractor and

considering the status and complexity of the project remaining for completion."  Seaboard Sur.

Co. v. Town of Greenfield, 266 F. Supp. 2d 189, 194 (D. Mass. 2003), aff'd on other grounds 370

F.3d 215 (1st Cir. 2004).  Sureties are permitted time to investigate the "circumstances

surrounding a default termination of a contractor" as well as a "due diligence review of the work

37

completed and to analyze the tasks remaining for completion."  Id. (citations omitted).

While these principles may favor AMMIC after trial on the merits, AMMIC's reliance on Spencer Press and Seaboard Surety Co. ultimately fail to carry the day at the summary judgment stage.  The Spencer Press holding relied on credibility determinations made by the Superior Court, which are inappropriate at the summary judgment phase.  As for Seaboard Surety, that case ultimately turned on the adequacy of the obligee's default notice under Paragraph 5 of the performance bond.  See Seaboard Surety, 370 F.3d at 219.

In this case, a finder of fact could reasonably find that AMMIC promptly investigated claims arising under the Performance Bond.  AMMIC's distribution of the Request for Proposals to potential completion contractors (who presumably had been approved by the Town and its Architect) came on August 20, 2003, less than a month after the Town's termination of Sciaba's right to perform.  Presumably with the Town's knowledge and assent, bids were to be received 19 days after that, and a completion contractor was selected less than seven weeks later.

While this may constitute prompt investigation and handling of the Performance Bond claim, RLI Insurance Co. v. Wood Recycling, Inc., 03-CV-10196-RWZ, 2006 WL 839514 at *8 (D. Mass. March 30, 2006), the reasonable inferences do not compel this result.  For example, it is unclear whether the Town affirmatively agreed to the September 8 bid receipt date, or was presented that as a *fait accompli*.  Similarly, the evidence is insufficient to conclude that the seven-week delay between opening of bids on September 8, 2003, the solicitation and receipt of "best and final" bids on October 17, 2003, and the tendering of the signed completion contract to the Town  on November 11, 2003 is "prompt" as a matter of law.  Cf. Travelers Ins. Co. v. Waltham Indus. Laboratories Corp., 722 F. Supp. 814, 831-33 (D. Mass. 1988), aff'd in relevant

38

part 883 F.2d 1092, 1100 (1st Cir. 1989) (finding thirteen week delay reasonable as a matter of law where insurer was actively investigating case; in contrast, AMMIC had decided to complete the contract but was seemingly trying to reduce its exposure through solicitation of "best and final bids").  Accordingly, AMMIC's motion is DENIED as to claims arising under G.L. c. 176D, § 3(9)(c).

        d.      **Violations of G.L. c. 176D, §3(9)(d)**: *Refusing to pay claims without conducting a reasonable investigation based upon all available information.*

Section 3(9)(c) prohibits an insurer from "refusing to pay claims without conducting a reasonable investigation based upon all available information[.]"  The Town contends that AMMIC failed to adopt or implement any standards for handling this (or any other) claim or for training its claims handlers.  AMMIC's motion fails because it has not met its initial burden of establishing entitlement to summary judgment.  In particular, much of this dispute centers around two principal issues: (a) whether legal, architect, and construction management fees are duplicative of liquidated damages, and (b) whether Sciaba was entitled to an extension of the completion date due to weather or other delays (which would in turn decrease the amount of liquidated damages).  However, AMMIC offers no evidence that it has paid the undisputed portion of liquidated damages.  Because its *pro tanto* defense, if successful, may not wholly discharge it from liability under the Performance Bond, AMMIC's motion is DENIED as to claims arising under G.L. c. 176D, § 3(9)(d).

        e.      **Violations of G.L. c. 176D, §3(9)(e)**:  *Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed.*

Section 3(9)(e) prohibits an insurer from "failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed[.]"  AMMIC argues first that the Bond did not require a "proof of loss statement;" second, that it reasonably sought information substantiating the Town's damage claims; and third, that its position on liability was stated less than four months after the Town's claim.  The Town does not directly respond to this contention.  Instead, it asserts that AMMIC "neglected to effect any meaningful or substantive response to serious manifestations of Sciaba's impending default . . . [and that its] eventual response to the troubled Project proved inconsistent, unduly protracted, and resulted in a completion contract that imposed unfair and oppressive terms on the town."  Opposition, Docket #72, at pp. 9-10.  The Town's interrogatory answers shed minimal additional illumination on its position as to this claim.  See Docket #57 at Ex. 14.

The undisputed facts, however, demonstrate that AMMIC quickly and thoroughly set forth its position as to the Town's claims.  AMMIC's *pro tanto* defense first reared its head in an August 20, 2003 letter to the Town's counsel, less than one month after the Town's termination of Sciaba's rights.  That defense, and AMMIC's request for additional detail and supporting documentation, were discussed on October 15, 2003.  Communications were exchanged in the first week of November, and AMMIC acknowledged that it would "have responsibility for the additional liquidated damages after the dates that were given in the [Request For Proposals, and it] also intends to accept responsibility for the reasonable cost of addressing latent defects that were in Sciaba's responsibility" on November 12, 2003.[12]  AMMIC also communicated additional

---

[12]  AMMIC offers no evidence that it paid those liquidated damages for which it conceded liability in this letter.  Liability for its failure to do so would appear actionable under G.L. c. 176D, §3(9)(d), which claims are still pending in this action.

40

information about its defenses with the Town on November 14 and 21.

Although fact-intensive, no reasonable finder of fact could conclude that AMMIC acted unreasonably in affirming or denying claims. Accordingly, AMMIC's motion is GRANTED as to claims arising under §3(9)(e).

      f.      **Violations of G.L. c. 176D, §3(9)(f)**: *Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.*

Section 3(9)(f) prohibits an insurer from "failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear[.]" A question of fact exists as to AMMIC's *pro tanto* defense. If that defense is accepted by a finder of fact, then the amounts owing under the liquidated damages clause will have been offset by the Town's improper payment. As a result, it cannot be established that AMMIC's liability for those liquidated damages has become reasonably clear. Accordingly, summary judgment is GRANTED as to claims arising under §3(9)(f).

      g.      **Violations of G.L. c. 176D, §3(9)(g)**: *Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds.*

Section 3(9)(g) prohibits an insurer from "[c]ompelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds[.]" That provision "express [es] a legislative purpose to penalize the practice of 'low balling,' i.e., offering much less than a case is worth in a situation where liability is either clear or highly likely." Guity v. Commerce Ins. Co.,

36 Mass.App.Ct. 339, 343, 631 N.E.2d 75 (1994).[13]  In its Memorandum in support of the Motion, AMMIC contends that where liability is not reasonably clear, §3(9)(g) does not apply. Memorandum at p. 18.  The Town responds that assessment of a claim under §3(9)(g) requires an assessment of the amount ultimately recovered in the action.  Memorandum at p. 14.

Assessment of liability requires analysis of the amounts claimed, paid, and disputed in this case.  AMMIC tendered $2,528,828.37 unconditionally on December 3, 2003. An additional $659,157.80 was tendered under a reservation of rights, with AMMIC claiming that the Town's May 21 and 27 payments are subject to its *pro tanto* defense.  Because there is a genuine issue of material fact as to whether AMMIC is liable for such amounts, AMMIC cannot be found liable under §3(9)(g) for its failure to tender that money unconditionally.  Guity, 36 Mass. App. Ct. at 343, 631 N.E.2d at 77.

The other principal dispute as to damages arises with the interaction of the liquidated damages clause and the Town's claim for additional architect, construction management, and legal fees.  The Town claims $674,607.24 in such fees in addition to $655,000.00 in liquidated damages.   AMMIC challenges the amount of liquidated damages but it is unclear whether AMMIC has paid all (or any) of the undisputed amounts of liquidated damages, summary judgment is inappropriate.   AMMIC's motion is DENIED as to claims arising under Section 3(9)(g).

h.      **Violations of G.L. c. 176D, §3(9)(h)**: *Attempting to settle a claim for less than the*

---

[13]  While the Supreme Judicial Court has held that the language of G.L. c. 176D, §3(9)(g) "creates no rights in persons other than the insured," Jacobs v. Town Clerk of Arlington, 402 Mass. 824, 829 (1988), R.W. Granger & Sons, Inc. v. J&S Insulation, Inc., 435 Mass. 66, 77 (2001) suggests that sureties may be liable for claims arising under §3(9)(g) (allowing claims raised by subcontractor on payment bond).

> *amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application.*

Section 3(9)(h) prohibits an insurer from "[a]ttempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application." There is no evidence of any written or printed advertising material associated with the surety relationship between the Town and AMMIC. Nor does the Town argue against entry of summary judgment under this section. Accordingly, AMMIC's motion is GRANTED as to claims arising under G.L. c. 176D, § 3(9)(h).

      i.    **Violations of G.L. c. 176D, §3(9)(n)**: *Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.*

Section 3(9)(n) prohibits an insurer from "failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." The record is replete with episodes where AMMIC advised the Town of the nature and factual basis for its defenses. Although AMMIC's position may very well be rejected by the ultimate finder of fact, no reasonable finder of fact could conclude that AMMIC failed to provide a reasonable explanation of the basis for denial of the Town's claim or for the offer of a compromise settlement. Accordingly, AMMIC's motion is GRANTED as to claims arising under G.L. c. 176D, § 3(9)(n).

## <u>CONCLUSION</u>

For the foregoing reasons, the following actions are taken:

- The Plaintiff's <u>Motion to Strike the Town's Reply Facts and Accompanying Affidavits</u> (Docket No. 109) is DENIED.

- The Plaintiff's <u>Alternative Motion for Leave to Respond to Defendant's Reply Facts If Plaintiff's Motion to Strike is Denied</u> (Docket No. 112) is GRANTED.

- The Plaintiff's <u>Motion for Summary Judgment on Count III of Defendant's Counterclaim – Tort</u> (Docket No. 34) is GRANTED.

- The Plaintiff's <u>Motion for Summary Judgment on Count II of Defendant's Counterclaim – Chapter 93A</u> (Docket No. 35) is GRANTED IN PART and DENIED IN PART. Claims under Mass. G.L. c. 176D, §§3(9)(a), (b), (e), (f), (h) and (n) are dismissed. Claims under G.L. c. 176D, §§3(9)(c), (d), and (g), and G.L. c. 93A, §2 survive.

- The Plaintiff's <u>Motion for Partial Summary Judgment as to Claims for Direct Payment</u> (Docket No. 36) is GRANTED.

- The Plaintiff's <u>Motion for Partial Summary Judgment on Liquidated Damages as the Exclusive Remedy for Delay</u> (Docket No. 37) is DENIED.

- The <u>Defendant's Motion for Partial Summary Judgment</u> (Docket No. 38) is DENIED.

IT IS SO ORDERED.

/s/ Timothy S. Hillman
Hon. Timothy S. Hillman, USMJ